# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA N. YOUNG, on behalf of herself, and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 05 C 7314 |
| v. | ) ) | Magistrate Judge Morton Denlow |
| VERIZON'S BELL ATLANTIC CASH BALANCE PLAN, formerly known as Bell Atlantic Cash Balance Plan, formerly known as Bell Atlantic Management Pension Plan, and VERIZON COMMUNICATIONS, INC., as successor in interest to Bell Atlantic Corporation, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This is an ERISA class action suit in which Plaintiff Cynthia N. Young ("Plaintiff") alleges that Defendants Verizon's Bell Atlantic Cash Balance Plan and Verizon Communications, Inc. (collectively "Defendants") calculated her pension benefits, and those of other similarly situated employees, using an improper formula. Plaintiff seeks judicial review of the final decision of Defendant Verizon's Bell Atlantic Cash Balance Plan Administrator denying her claim for additional benefits. The Court conducted a bench trial on the papers and heard oral argument on August 5, 2008. The Court has carefully considered the administrative record, declarations, and the briefs and arguments of counsel. The following constitute the Court's findings of fact and conclusions of law pursuant to Rule

52(a) of the Federal Rules of Civil Procedure.

## I. BACKGROUND FACTS

**A.    General Background**

Plaintiff brings her claim on behalf of herself and a class of persons who were participants in the Bell Atlantic Management Pension Plan on December 31, 1995. Compl. ¶ 1.[1] The claim is brought under ERISA § 502(a)(1)(b), 29 U.S.C. § 1132(a)(1)(b), and § 502(a)(3), 29 U.S.C. § 1132(a)(3). Compl. ¶ 2.

Plaintiff was a management employee of Bell Atlantic. VZ 58, VZ 267.[2] For many years, Bell Atlantic operated a traditional pension plan, known as the Bell Atlantic Management Pension Plan (the "BAMPP"), as part of the compensation package for its employees. VZ 85-180. For those employees choosing early retirement, Bell Atlantic would create "cash out windows" that would allow employees to receive their pension all at once, in the form of a lump-sum, rather than an annuity. VZ 130-135. When she retired in November 1997 with 29 years of credited service, Plaintiff elected to receive her retirement benefits in the form of a lump-sum payment. VZ 50. Plaintiff accrued benefits under a series of defined benefit pension plans, including the BAMPP.

Effective December 31, 1995, Bell Atlantic amended the BAMPP to add a cash balance formula and to adopt a new name, the Bell Atlantic Cash Balance Plan (the "Plan"

---

[1]Citations to Plaintiff's First Amended Complaint are identified as follows: Compl. ¶ __ (paragraph number).

[2] Citations to the Administrative Record are identified as follows: VZ ___ (page number).

or "1996 Plan").  VZ 1035-36; VZ 1046-1106. The actual Plan document ("1996 Cash Balance Plan" or the "Cash Balance Plan"), referred to as the "official plan document" was not finalized until July 6, 1996, but was made retroactive to December 31, 1995. VZ 1046-1106. The Plan operated in accordance with this official plan document, the 1996 Cash Balance Plan, until it was amended in 1997 by the 1997 Cash Balance Plan. VZ 182-244. Thereafter, the Plan was amended on a yearly basis, and after Bell Atlantic merged with Verizon, it was renamed as the Verizon's Bell Atlantic Cash Balance Plan. VZ 11712-17; VZ 12586. The 1996 Cash Balance Plan was in effect at the time of Plaintiff's retirement, and is thus the version of the Plan at issue in this case.

**B.     Cash Balance Plan Operation**

The Cash Balance Plan provides pension benefits expressed as a specific dollar amount to be paid upon retirement in any number of forms, including a lump-sum or an annuity. VZ 1055. For participants who worked at Bell Atlantic prior to the conversion to the Cash Balance Plan and who accrued benefits under the BAMPP, the Cash Balance Plan devoted a separate section of the plan to the calculation of the opening balances of their Cash Balance Accounts, § 16.5 "Opening Balance." VZ 1100. That section provided several different formulas for calculating opening balances, depending on the particular circumstances of the participant. VZ 1100-01.

The two formulas at issue in this case are found in § 16.5.1(a)(1), which applies to former participants of the BAMPP who were eligible for service pensions on December 31, 1995, and § 16.5.1(a)(2), which applies to former participants of the BAMPP who were not

eligible for service pensions on December 31, 1995. VZ 1100.

**1.      The PBGC Interest Rate under §§ 16.5.1(a)(1) and (a)(2)**

Both §§ 16.5.1(a)(1) and 16.5.1(a)(2) require the pension benefits due to participants under the BAMPP as of December 31, 1995, to be converted into a lump-sum. VZ 1100. Generally, to determine the lump-sum, the plan uses a mortality table to determine the participant's life expectancy at the time of the conversion, and applies an interest rate to convert the sum of the expected values of participant's age - 65 (normal retirement age) annuity payments into a lump-sum cashout benefit. *Id.*

Section 16.5 of the Cash Balance Plan sets forth the formulas for converting the benefits to a lump-sum. Section 16.5 states as follows:

**16.5 Opening Balance**
The provisions of Section 4.3 of the Plan shall be supplemented by the following:

**16.5.1 Pension Conversions as of the Transition Date**
Where a present value must be determined under this Section 16.[5], the present value shall be determined as follows: (a) using the PBGC interest rates which were in effect for September of 1995 (using the immediate PBGC rate for a Participant who was then eligible for a Service Pension under the 1995 BAMPP Plan, and using the deferred PBGC rates for individuals who were not then eligible for a Service Pension), (b) using the UP-84 mortality table, and (c) taking account of age in years and completed months, *either* as of December 31, 1995 (for Participants not eligible on the Transition Date for a  Service Pension under the 1995 BAMPP Plan) or as of November 15, 1996 (for Participants who were eligible on the Transition Date for a Service Pension).

**16.5.1(a) 1995 Active Participants and 1995 Former Active Participants**
In the case of a 1995 Active Participant or 1995 Former

Active Participant, the opening balance of the Participant's Cash Balance Account on January 1, 1996 shall be the amount described in subsection (1) or (2) below, as applicable:

### 16.5.1 (a)(1) If Eligible for Service Pension

If, as of December 31, 1995, the Participant was eligible for a Normal Retirement Service Pension or an Early Retirement Service Pension under the 1995 BAMPP Plan, then the amount described in this paragraph (1) is the product of multiplying (A) the Participant's applicable Transition Factor described in Table 2 of this Section, *times* (B) the lump-sum cashout value of the immediate annuity benefit under the 1995 BAMPP Plan, determined as if the Participant had retired on December 31, 1995, ignoring any compensation paid after the date of the last paycheck for salary earned in December 1995. For a 1995 Former Active Participant, the date on which the individual ceased to be an Eligible Employee shall be substituted for December 31, 1995 in the last phrase of the previous sentence.

### 16.5.1(a)(2) Not Eligible for Service Pension

In the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is the product of multiplying (A) the Participant's applicable Transition Factor described in Table 1 of this Section, *times* (B) the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995, multiplied by the applicable transition factor described in Table 1 of this Section. For a 1995 Former Active Participant, the date on which the individual ceased to be an Eligible Employee shall be substituted for December 31, 1995 in the last phrase of the previous sentence.

VZ 1100.

Plaintiff alleges that Defendants used the wrong PBGC interest rate when calculating the opening balance of her account. Defendants used a rate of 120% of the applicable interest rate[3] specified by the Pension Benefit Guaranty Corporation ("PBGC") if the amount of the lump-sum, based on the 120% rate, exceeded $25,000; and the applicable PBGC rate if the lump-sum amount did not exceed $25,000, as provided for in § 4.19 of the BAMPP. VZ 11; VZ 133-34; VZ 1100. Because Plaintiff's lump-sum amount exceeded $25,000, Defendants used 120% of the PBGC applicable interest rate. VZ 11-12. The use of this interest rate reduced her opening cash balance to $240,127 compared to $292,383 if 100% of the applicable PBGC applicable interest rate had been used. VZ 10. Plaintiff argues that Defendants should have applied § 16.5.1 of the Cash Balance Plan, and accordingly, should have used 100% of the applicable PBGC rate, rather than applying § 4.19 of the BAMPP.

## 2.  The Transition Factor in § 16.5.1(a)(2)

Plaintiff also contends that Defendants incorrectly calculated her opening balance formula under § 16.5.1(a)(2) by multiplying her applicable transition factor by her lump-sum

---

[3] The term "applicable interest rate" is defined in § 4.19 (c)(2)(C) as follows:
the applicable PBGC interest rate in effect on the last day of the calendar month immediately preceding the first month of the calendar quarter in which the Severance from Service Date occurs. The applicable PBGC interest rate for cash-out of a Normal or Early Retirement Service Pension shall be the PBGC immediate rate for lump sums and for cash-out of a Deferred Vested Pension shall be the deferred and immediate PBGC rates for lump sums, as applicable.

VZ 135.

cashout value only once. To compute her opening balance, Defendants multiplied her lump-sum cashout value by her applicable transition factor. Plaintiff, however, argues that § 16.5.1(a)(2) requires Defendants to multiply her transition factor twice. Multiplying the transition factor twice for Plaintiff's opening account balance would increase that balance from $240,813 to $640,321. VZ 15648.

## II. PROCEDURAL HISTORY

On June 9, 2004, Plaintiff filed her initial administrative claim for benefits on the grounds that Defendants incorrectly determined her opening account balance because it used 120% of the PBGC rate, instead of 100%, in performing the calculation. VZ 2-3. The Verizon Claims Review Unit ("Review Unit") denied this claim on October 19, 2004. VZ 10-15. Plaintiff appealed the Claim Review Unit's decision on December 6, 2004, and the Verizon Claims Review Committee ("Committee") denied Plaintiff's appeal on February 16, 2005. VZ 50-57.

### A. Administrative Decision Regarding the PBGC Interest Rate

In its denial letter, the Review Unit explained that it used 120% of the PBGC rate, rather than 100% of the PBGC rate, because that is what is required under § 16.5.1(a)(2). Because § 16.5.1(a)(2) states that the opening cash balance account is determined by multiplying the "Transition Factor described in Table 1" by "the lump-sum cashout value of the Accrued Benefit payable at age 65 *under the 1995 BAMPP Plan . . .*", Defendants applied § 4.19(c)(2)(C) of the BAMPP to determine the lump-sum cashout value, in which "the lump-sum cashout value is determined, for present values exceeding $25,000, using 120%

of the PBGC deferred interest rates in effect for September of 1995 . . ." VZ 11 (emphasis added).

In her appeal letter, Plaintiff challenged Defendants' use of § 4.19(c)(2)(C) of the BAMPP because, according to Plaintiff, it "applies only to the 1994-95 cash-out window and is not applicable to all distributions from the BAMPP." VZ 46. Plaintiff contends that because § 16.5.1 provides a formula for determining the present value, and because § 16.5.1(a)(2)(B) uses the term "lump-sum cashout value" without specifically re-defining that term, the lump-sum cashout value is synonymous with the term "present value," and thus § 16.5.1 governs how to determine that value. Plaintiff states that "Section 16.5.1 specifically references the PBGC rates and makes no mention of the use of 120% of the PBGC rates." *Id.*

In reviewing Plaintiff's appeal of the Review Unit's decision, the Committee examined the relevant provisions of the current Verizon Plan, § 16 of Verizon's Bell Atlantic Cash Balance Plan as set forth in a document restated effective January 1, 1999 (the "1999 Bell Atlantic Plan"). The Committee also reviewed the provisions of § 16 of the 1996 Cash Balance Plan, which was in effect when Plaintiff retired. In addition, the Committee reviewed the resolutions authorized by the Human Resources Committee of Bell Atlantic's Board of Directors ("HRC") to amend the BAMPP. The Committee also consulted with David Beik of Verizon's finance department, and Rita Galgano of Verizon's pension department. VZ 55-56.

After reviewing the above documents and consulting with those individuals, the

Committee concurred with the Review Unit's decision that "the opening balance of [Plaintiff's] cash balance account was appropriately determined using 120% of the PBGC deferred rates for September of 1995." VZ 56. The Committee found that Plaintiff's "potential lump-sum benefit under Section 4.19 is the 'lump-sum cashout value' referred to in Section 16.5.1(a)(2) of the [1996 Cash Balance Plan], which pursuant to Section 4.19(c)(2)(C), is calculated using 120% of the PBGC deferred interest rates for September of 1995." VZ 55. The Committee found the statement in § 16.5.1 of the 1995 Bell Atlantic Plan regarding "present value" determinations does not override the specific reference to "lump-sum cashout value" in § 16.5.1(a)(2). VZ 57. The Committee further stated that the use of 120% of the PBGC deferred rates is consistent with the resolutions of the Human Resources Committee amending the BAMPP to provide for the cash balance conversion, assumptions applied for plan funding purposes, administrative interpretation of plan terms, and restated plan language intended to preserve rules relating to the cash balance conversion. *Id.*

To support its finding, the Committee references the October 23, 1995 resolutions of the HRC authorizing the amendments to the BAMPP, "in the manner presented to th[e] meeting." VZ 55-56. The Committee cited the proposed BAMPP amendments presented to the HRC, explaining how "a participant's opening account balance shall be equal to the product of the cashout value of the participant's accrued benefit on the Effective Date, [i.e., December 31, 1995] (determined under the existing rules of BAMPP as of 12/31/95) . . ." VZ 56. The Committee also cited the statements of Mr. Beik in Verizon's finance department,

9

explaining that for plan funding purposes, both before and after the conversion, "the opening cash balance account values [were] determined using 120% of the applicable PBGC rate for benefits valued in excess of $25,000." *Id.*

The Committee additionally cited Rita Galgano from Verizon's pension department, who advised the Committee that "Section 16.5.1(a)(2) of the [1996 Cash Balance Plan] reflects the amendments to the BAMPP made by the [HRC] in October of 1995 and supports the conclusion of the plan administrator that 120% of the September 1995 PBGC deferred interest rates should be used to determine opening cash balance accounts for participants with deferred vested pensions valued in excess of $25,000." *Id.*

Finally, the Committee looked to § 16.4.1(b)(2) of the 1999 Bell Atlantic Plan, where the cash balance transition provisions were restated. Those provisions now describe the calculation of the opening balance for a participant who is ineligible for a Service Pension as being the product of the transition factor times "the present value of the Participant's benefit." § 16.4.1(a)(1) of the 1999 Bell Atlantic Plan states that the "present value" is determined by using 120% of the applicable PBGC rate if the present value is $25,000 or more. VZ 56.

**B.    Plaintiff's Lawsuit Filed**

Plaintiff filed the complaint in this action on December 30, 2005, asserting only her PBGC rate claim. In July 2006, Plaintiff sought leave to amend the complaint to add a second claim, asserting that § 16.5.1(a)(2) should be read to require multiplying the lump-sum cashout value twice by the applicable transition factor. Compl. ¶¶ 52-59; Dkt. 36, 44. The

Court granted the motion and stayed all proceedings to permit Plaintiff to seek administrative review of her second claim. Dkt. 43. The Review Unit denied this claim on December 8, 2006, and after Plaintiff appealed the denial, the Committee rejected her appeal on April 5, 2007. VZ 13666, VZ 15645.

## C.     Administrative Decision Regarding the Transition Factor

In reviewing Plaintiff's claim that the language of § 16.5.1(a)(2) required the transition factor to be multiplied twice, the Review Unit considered the relevant plan provisions, and other plan documents and records, including earlier and later restatements of the plan, and plan summary documents sent to employees. The Review Unit also considered the resolutions adopting the pension plan amendments, and consulted with Bell Atlantic staff members familiar with the Plan. In its letter, the Review Unit set forth a timeline indicating the various points at which the Plan was amended, demonstrating the dates at which the reference to the second transition factor appeared. The Review Unit concluded that the second reference to the transition factor in § 16.5.1(a)(2) was a "mistake." VZ 13670. It set forth various reasons for this conclusion, including the following:

> If the intention had been to apply the transition factor twice, it would have been more natural to increase the transition factors in the Schedule.
> There are two other plan provisions that refer to the transition factors . . . and both of these provisions refer to multiplication by the transition factor only once.
> . . . .
> All notices and statements explaining the conversion and providing benefit amounts to employees (provided on dates both before and after the mistake was made) refer to application of the transition factor only once, for all affected participants.
> The 1997 Actuarial Report for the Bell Atlantic Plan refers to application

of the transition factor only once, for all affected participants.
The 1998 and 1999 restatements of the Bell Atlantic Plan provide for application of the transition factor only once, for all affected participants.

VZ 13682-83.

In addition, both Robert Moreen, the leader of the Mercer Team that worked on the cash balance conversion, and Barry Peters, the Bell Atlantic benefits attorney at the time of the conversion, "advised that it was never intended that the transition factor would be applied twice and that the plan provision in question was incorrect." VZ 13683. The Review Unit also based its decision on its finding that the HRC, in approving an amendment to convert the existing Bell Atlantic Pension Plan to a cash balance plan, only authorized the transition factor to be applied once, for all affected participants. *Id.* Because the double application of the transition factor would significantly increase the cost of the plan, the HRC would be required to specifically approve that change, which it did not do. Based on these findings, the Review Unit denied Plaintiff's claim. VZ 13684.

On appeal, Plaintiff argued the plan language is clear and cannot be validly interpreted to remove the second reference to the transition factor. VZ 15646. In reviewing Plaintiff's appeal of the Review Unit's decision, the Committee looked to other plan documents and other plan provisions that provide for only a single application of the factor. VZ 15645-50. The Committee found it necessary to interpret the Plan to resolve the inconsistency among the documents and that it is appropriate to review other contemporaneous plan records to that end. Because "all of the plan documents, communications, and other materials, other than the 1996 and 1997 plan restatements, reflect a single application of the transition factor," the

Committee agreed with the Unit's conclusion that the reference to the second transition factor was a mistake and cannot be applied to increase Plaintiff's benefits. VZ 15647-48. Of particular note to the Committee was the material sent to employees showing them how their opening balance would be determined. This material referred several times to the "transition multiplier" as being multiplied only once. *Id.* Nowhere in other materials sent to employees did it state that the transition factor would be multiplied twice.

In further support of their conclusion, the Committee noted there would be no reason for singling out the employees described in § 16.5.1(a)(2) for application of the transition factor twice, which would result in a substantially higher balance increase for such employees. *See* VZ 15648 (finding that applying the transition factor twice for Plaintiff's opening account balance would increase that balance from $240,812.83 to $640,321.34). The Committee also points out its belief that the cause of the error was a restructuring of the plan provisions to refer to the transition factor at the beginning of the paragraph instead of at the end, and that the draftsperson neglected to remove the reference to the transition factor after adding a reference at the beginning of that section. *Id.*

The Committee agreed with the Review Unit's conclusion that the double application of the transition factor was not authorized. The Committee considered Plaintiff's argument that "it is inconceivable that the Board and the [HRC] failed to review these Plans at the time they were promulgated. . . at the very least, the Board and/or the Committee permitted these Plans to be operative documents [and] Verizon is estopped from contending otherwise." VZ 15649. However, the Committee stated that the Board and the HRC entered resolutions only

approving amendments that provided for the application of the transition factor once, and did not approve any such amendments for a second application of the transition factor. *Id.* Accordingly, the Committee upheld the Review Unit's decision and denied Plaintiff's appeal. *Id.*

## D.    Phase One - Trial on the Papers Applying the Deferential Standard of Review

On January 16, 2007, the Court certified the case to proceed as a class action, based upon the parties' stipulation (with two sub-classes, one for each claim at issue). Dkt. 58-61. After Plaintiff's transition factor claim was denied by the Committee, Plaintiff was allowed to take discovery on "the drafting history and facts directly related to the transition factor provision." Dkt. 86. Thereafter, the parties proceed with this trial on the papers regarding the administrative denial of Plaintiff's claims, with the initial briefs limited to documents in the administrative record, applying the standards of administrative review. Dkt. 109. Following this process, the Court will also permit the parties to proceed at a later hearing with *de novo* review by the Court. The Court is proceeding in this manner to enable a reviewing court to decide the appropriate standard of review, to have a complete record, and to reach a final decision without the necessity for a later remand. No final judgment will be entered by this Court until the second phase hearing is completed.

### III. TRIAL ON THE PAPERS

This case comes before the Court by means of a trial on the papers in which the parties submitted briefs and the administrative record, which constitute the record in this case. *See Sullivan v. Bornemann,* 384 F.3d 372, 375 (7th Cir. 2004) (noting that a district court

decision, rendered after reviewing the stipulated facts of the parties, was more akin to a bench trial than summary judgment, and was thus governed by Federal Rule of Civil Procedure 52(a)); *Hess v. Hartford Life & Accident Ins. Co.,* 274 F.3d 456, 461 (7th Cir. 2001) (entering a judgment based upon a stipulation of facts that made up an administrative record was treated as a bench trial governed by Fed. R. Civ. P. 52(a)); *SparkNet Commc'ns, L.P. v. Bonneville Int'l Corp.,* 386 F. Supp. 2d 965 (N.D. Ill. 2005) (conducting a trial on the papers in a trademark infringement case); *Crespo v. Unum Life Ins. Co. of America,* 294 F. Supp. 2d 980, 991-92 (N.D. Ill. 2003) (recommending that parties involved in cases reviewing ERISA benefit claims should consider a trial on the papers rather than filing cross-motions for summary judgment); Morton Denlow, *Trial on the Papers: An Alternative to Cross-Motions for Summary Judgment,* Fed. Law., Aug. 1999, at 30 (analyzing the advantages and disadvantages of utilizing a trial on the papers as an alternative to cross-motions for summary judgment). The parties have agreed to proceed in this manner and to waive their right to present oral testimony.

## IV. STANDARD OF REVIEW

### A.    Deferential Standard of Review

When reviewing a denial of benefits under an ERISA plan, the Court must look to the plan language to determine the appropriate standard to be applied. *See Metro. Life Ins. Co. v. Glenn,* --- U.S. ---,---, 128 S. Ct. 2343, 2348 (2008); *Vallone v. CNA Fin. Corp.,* 375 F.3d 623, 631 (7th Cir. 2004). Principles of trust law require courts to review plan administrator's decisions to deny plan benefits under a *de novo* standard unless the plan provides to the

contrary. *Glenn,* 128 S. Ct. at 2348; *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). If the plan language grants the administrator discretion to interpret the plan terms or determine benefits eligibility, then the Court will review a denial of benefits under a deferential standard of review. *See Glenn,* 128 S. Ct. at 2348; *Vallone,* 375 F.3d at 631.

The 1996 Cash Balance Plan grants broad discretion to the Review Unit and the Committee to "make findings of fact; to interpret the Plan and resolve ambiguities therein; to make factual determinations; to determine whether a claimant is eligible for benefits; to decide the amount, form, and timing of benefits; and to resolve any other matter under the Plan which is raised by the claimant or identified by the respective committee." 1996 Cash Balance Plan, VZ 1088. Because this language broadly grants discretionary authority to the Review Unit and the Committee, the Court will begin its review under the deferential abuse-of-discretion standard.[4] *See Glenn,* 128 S. Ct. at 2348; *Williams v. Interpublic Severance Pay Plan,* 523 F.3d 819, 821 (7th Cir. 2008) (finding the Plan language authorizing the administrator to "interpret the Plan, make findings of fact, and . . . decide any and all matters arising hereunder, including the right to remedy possible ambiguities, inconsistencies or omissions" as granting discretionary authority to the administrator requiring deferential

---

[4]Although also often referred to as the "arbitrary and capricious" standard, courts appear to be moving away from using this phrase to describe this standard of review, and are rather referring to it as the deferential abuse-of-discretion standard of review. *See Glenn,* 128 S. Ct. 2343(describing the standard as a deferential standard of review, and one that requires the court to determine whether the plan administrator abused its discretion in denying benefits); *See Rush Prudential HMO v. Moran,* 536 U.S. 355, 384 n. 15, 386 (2002) (referring to the standard as requiring deferential review and reviewing for abuse of discretion); *See Gutta v. Standard Select Trust Ins. Plans,* 2008 WL 3271414 (7th Cir. 2008) (describing the standard as "the deferential abuse-of-discretion (or arbitrary and capricious) standard") (unpublished opinion).

judicial review).

The Court's role under the deferential standard of review is not to decide whether it would reach the same conclusion as the plan administrator, nor may the Court substitute its judgment for that of the plan administrator. *Carr v. Gates Health Care Plan,* 195 F.3d 292, 294 (7th Cir. 1999); *Smart v. State Farm Ins. Co.,* 868 F.2d 929, 936 (7th Cir. 1989). Rather, under this standard, a plan administrator's decision will be upheld so long as it is possible to offer a reasoned explanation, based on evidence, for that decision. *See Glenn,* 128 S. Ct. at 2349 (explaining this abuse of discretion standard in ERISA cases); *Speciale v. Blue Cross and Blue Shield Ass'n.,* --- F.3d ---, 2008 WL 3155058 (7th Cir. 2008). A court may also uphold an administrator's decision so long as "'the decision is based on a reasonable explanation of relevant plan documents, or . . . the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Speciale,* 2008 WL 3155058 (quoting *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan,* 429 F.3d 698, 700 (7th Cir. 2005).

## B.  Conflict of Interest

When determining whether an abuse of discretion exists, the Court may weigh certain factors in its analysis. For example, where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115. The Supreme Court recently discussed how courts should treat potential conflicts of interest in ERISA cases. In *Metropolitan Life Insurance Company v. Glenn,* the Court held that an

administrator who is also the plan sponsor suffers from an inherent conflict of interest. *Glenn*, 128 S. Ct. at 2348. The Court confirmed that this conflict is one of several different factors to be considered by a court when reviewing the propriety of a benefit denial, and that "the significance of the factor will depend upon the circumstances of the particular case." *Id.* at 2346, 2351. In addition to the impartiality of the administrator, the Court may also consider "the complexity of the issues, the process afforded the parties, the extent to which the decision makers utilized the assistance of experts where necessary, and . . . the soundness of the fiduciary's ratiocination." *Carr,* 195 F.3d at 195. When considering different factors, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Glenn,* 128 S. Ct. at 2351. Thus, a conflict of interest may prove more or less important depending upon the particular circumstances of each case. *See id.* (stating a conflict of interest "should prove more important where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important where the administrator has taken active steps to reduce potential bias and to promote accuracy. . .").

Because Verizon is both the plan sponsor and the plan's administrator, it possesses an inherent conflict of interest which must be considered as a factor in the Court's determination of whether the administrator abused its discretion in upholding the denial of Plaintiff's benefits. *Glenn,* 128 S. Ct. at 2348. The fact that Plaintiff represents a class with claims totaling billions of dollars in damages causes the Court to place greater importance on this conflict of interest in its analysis than it might otherwise do in the typical individual action.

18

## C. Interpreting ERISA Plan Language

Ambiguities in ERISA benefit plans fall into two categories: intrinsic and extrinsic ambiguities. The terms of a benefit plan can themselves create an intrinsic ambiguity, where "the agreement itself is unclear." *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 544-45 (7th Cir. 2000). An intrinsic ambiguity appears clearly on the face of the document "without having to know anything about how it interacts with the world." *Id.* at 543. An "[i]ntrinsic ambiguity exists when the contract's terms are internally unclear and the agreement is thus susceptible to more than one reasonable interpretation." *Chicago Area I.B. of T. Health & Welfare Trust Fund v. Kennicott Bros. Co.*, 1998 WL 122777 (N.D. Ill. 1998). An intrinsic ambiguity exists when language in an ERISA plan, if read literally, would "make you scratch your head." *Rossetto*, 217 F.3d at 544.

If the language in an ERISA plan is unambiguous, the Court should not consider extrinsic evidence. *Dugan v. R.J. Corman R.R. Co.,* 344 F.3d 662, 665 (7th Cir. 2003); *Grun v. Pneumo Abex Corp.,* 163 F.3d 411, 420 (7th Cir. 1999) (finding the plan language allowing the plaintiff "to severance compensation upon the occurrence of 'a relocation of the Company's principal executive offices or [the plaintiff's] relocation to any place other than the location at which he performed his duties prior to a change in control of the Company'" to be unambiguous).

A court may consider extrinsic evidence, however, when determining whether an extrinsic ambiguity exists. *See Rossetto,* 217 F.3d at 547. An extrinsic ambiguity is "an ambiguity (that is, something that makes it possible to interpret a document reasonably in

more than one way) that is recognized as such only when a contract clear on its face - clear, that is to the uninformed reader - is applied to a particular dispute." *Id.* at 542-43. The Seventh Circuit has warned that in contract law, the doctrine of extrinsic ambiguity should be interpreted narrowly, stating:

> The doctrine of extrinsic ambiguity is an exception to the rule that contracts clear on their face will be enforced as written. It should be interpreted narrowly lest it swallow the rule and make written contracts mere scraps of paper. Unless the evidence sought to be introduced not only is objective but would if believed make a compelling case that the contract means other than what it seems to mean, it should be kept out.

*PMC, Inc. v. Sherwin Williams Co.,* 151 F.3d 610, 615 (7th Cir. 1998).

If the terms of the plan are clear, the plan's terms are ordinarily controlling and the court normally will not look beyond the terms of the plan. *Mathews v. Sears Pension Plan,* 144 F.3d 461, 466 (7th Cir. 1998). This "four corners" rule protects contracting parties from the uncertainty that would result if a judge or jury were free to consider evidence that would contradict the written contract terms. *Id.* In limited circumstances, parties are allowed to present extrinsic evidence to demonstrate that although the language appears clear, the context of its creation requires a different interpretation. *Id.* at 466-67. Objective evidence can create an extrinsic ambiguity in otherwise clear plan terms. *See id.*

Still, courts have found that contract language contains an extrinsic ambiguity when "a literal interpretation" would "lead to an unreasonable or absurd result." *Chicago Bd. Options Exch., Inc. v. Conn. General Life Ins. Co.,* 713 F.2d 254, 258 (7th Cir. 1983). If persons knowledgeable about the circumstances surrounding the contract would find a literal

reading of the plan to be "nonsense," this could be evidence of an extrinsic ambiguity. *Fed. Deposit Ins. Corp. v. W.R. Grace & Co.,* 877 F.2d 614, 621 (7th Cir. 1989). Once an intrinsic or extrinsic ambiguity in the terms of a plan is identified, relevant objective extrinsic evidence is admissible to resolve the ambiguity. *See Rossetto,* 217 F.3d at 547.

Where courts consider extrinsic evidence to find an ambiguity, the evidence must be "objective." *Bock v. Computer Assocs. Int'l Inc.* 257 F.3d 700, 707 (7th Cir. 2001). To be considered objective, the subject matter of the evidence must relate to objective facts in the world, rather than subjective statements made by an interested party. *Mathews,* 144 F.3d at 467; *Bock,* 257 F.3d at 708 n.1.[5]

Under the deferential review standard, "the plan administrator may conclusively interpret ambiguous plan terms." *Hightshue v. AIG Life Ins. Co.,* 135 F.3d 1144, 1149 (7th Cir. 1998). The Court must view "contractual ambiguity through a lens that gives broad discretion to the plan administrator to interpret the plan." *Hess v. Reg-Ellen Mach. Tool Corp.,* 423 F.3d 653, 662 (7th Cir. 2005). Deference to the Committee's discretionary interpretation is "especially applicable" when plan language is ambiguous, "for that is precisely when the administrator exercises his grant of discretion." *Id.*

---

[5] Plaintiff also puts forth a requirement she says is implied in the case law - that the evidence was available to all contracting parties at the time of the contract formation. The Court, however, does not agree that the case law supports such a requirement. *See Central States Southeast & Southwest Areas Pension Fund v. Central Cartage Co.,* 69 F.3d 1312, 1317 (7th Cir. 1995).

# V. DISCUSSION

This case presents two issues for review. Plaintiff first argues that Defendants applied the wrong interest rate when calculating her opening account balance by using an interest rate equal to 120% of the PBGC rate rather than 100% of the PBGC rate as required under § 16.5.1 of the Cash Balance Plan ("Discount Rate Issue"). As a result, Plaintiff asserts that her opening balance was understated by more than $50,000 and the opening balance of the class was understated by approximately $336,000,000. Comp. ¶¶ 30-51. Defendants assert the Committee reasonably interpreted the Plan and used 120% of the PBGC rate as required under § 4.19 of the BAMPP when calculating the opening account balance.

Plaintiff next argues that the Committee abused its discretion when it deleted the second reference to the transition factor in the calculation of Plaintiff's opening balance ("Transition Factor Issue"). Plaintiff argues the Committee overstepped its authority by effectively re-writing the Plan terms. Plaintiff asserts the language is unambiguous, and therefore cannot be interpreted by the Committee to mean anything different than what it says. Plaintiff contends that only a court of equity has the authority to reform a contract. Defendants assert the second reference to the transition factor is ambiguous, and that upon examining extrinsic evidence and finding that the insertion of the second reference was a drafting error, the Committee appropriately interpreted the language as if the disputed language was no longer in the Plan. The Court addresses each of these issues below.

**A.**     **Because of the Large Monetary Amount at Stake, the Court Considers the Committee's Conflict of Interest a Significant Factor in its Analysis.**

A court may give less deference to an administrator's decision where it has a greater suspicion that the administrator lacked impartiality due to a conflict of interest. *Glenn,* 128 S. Ct. at 2351. The Committee suffers from an inherent conflict of interest given its status as plan administrator and plan sponsor. Furthermore, given the large monetary amount at stake, the Court considers the Committee's conflict as a significant factor in its analysis. Plaintiff's claim involves hundreds of millions of dollars on the Discount Rate issue and billions of dollars on the Transition Factor issue. Although the Committee was limited to a review of Plaintiff's individual claims, it was aware of the pendency of this class action litigation and the impact that its decision would have on other claims of similarly situated employees. Any employee sitting on the Review Unit or the Committee who is concerned about job security is likely to think twice before making a decision that could cost his or her company billions of dollars. *See Id.* Accordingly, the Court will give the Committee considerably less deference in reviewing its decision, given the fact that approximately $2.5 billion is involved and the decision to deny Plaintiff's claim was made by Verizon employees.

**B.**     **Discount Rate Issue**

Plaintiff argues that § 16.5.1 dictates the formula to be used to calculate her opening account balance. Plaintiff contends that because § 16.5.1 provides a formula for determining the present value, and because § 16.5.1(a)(2) refers to the term lump-sum cashout value without re-defining that term, the lump-sum cashout value is synonymous with the term

"present value." Accordingly, Plaintiff asserts that § 16.5.1 governs how to determine that lump-sum cashout value, which uses 100% of the PBGC rate when determining the opening account balance. Defendants, however, interpret lump-sum cashout value as not being synonymous with the term "present value" as stated in § 16.5.1. Rather, Defendants assert the lump-sum cashout value is to be determined by a formula under the 1995 BAMPP Plan, and thus uses the formula under § 4.19 of 1995 BAMPP Plan, calling for the use of 120% of the PBGC rate. The Committee denied Plaintiff's claim, agreeing with Defendants' use of 120% of the PBGC rate. The Court finds this determination reasonable, and therefore upholds the Committee's decision regarding the Discount Rate.

The Committee's determination is based on a reasonable interpretation of the relevant plan documents. The plan provisions in § 16.5.1 and § 16.5.1(a)(2) use two different terms, "present value" and "lump-sum cashout value." VZ 1100. Rather than using the term "present value," the text of §§ 16.5.1(a)(1) and (a)(2) uses the more specific term, "lump-sum cashout value" of a participant's accrued benefit "under the 1995 BAMPP Plan." VZ 1100. Thus, it is not unreasonable to interpret these terms to mean two different things. *See Taracorp, Inc. v. NL Indus., Inc.,* 73 F.3d 738, 744 (7th Cir. 1996) ("[W]hen parties to the same contract use such different language to address parallel issues . . . it is reasonable to infer that they intend this language to mean different things."). In contrast to § 16.5.1(a)(1) and § 16.5.1(a)(2), § 16.5.2(a)(1) and § 16.5.2(a)(2) use the term "present value" in calculating the opening balance formulas for participants covered by those sections, stating that those participants' opening balances shall be calculated using the "present value," not

the "lump-sum cashout value," of their accrued benefits. *See* VZ 1101. Therefore, the "present value" calculation found in § 16.5.1 would be applicable there.

Most compelling to the Court is the fact that § 16.5.1(a)(2) specifically indicates that the lump-sum cashout value is to be determined under the 1995 BAMPP methodology. As the Committee noted in its decision letter, § 16.5.1(a)(2), which is the provision governing Plaintiff's benefits, states that "[i]n the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is the product of multiplying (A) the Participant's applicable Transition Fact described in Table 1 of this Section, *times* (B) the lump-sum cashout value of the Accrued Benefit payable at age 65 *under the 1995 BAMPP Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995.*" VZ 1100 (emphasis added). The Committee determined that the plain meaning of the phrase "lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan" incorporated the "lump-sum cashout" methodology of the BAMPP for the purpose of converting Plaintiff's accrued benefit to a lump-sum. VZ 56-57. The Committee explained: "Section 16.5.1(a)(2) [of the Cash Balance Plan], which describes specifically how to calculate the opening balance for participants ineligible for a Service Pension, provides for use of the 'lump-sum cashout value' determined under the 1995 BAMPP Plan as if the participant had separated immediately before the cash balance conversion at the end of 1995." VZ 55.

The Committee interpreted that language to mean that the lump-sum cashout value

is to be determined under the formula stated in the 1995 BAMPP Plan. Because the language in § 16.5.1(a)(2) uses such language, the Committee's interpretation to look to the 1995 BAMPP Plan to determine the lump-sum cashout value was reasonable. Because § 4.19(c)(2)(C) of the 1995 BAMPP Plan provided for determination of the lump-sum cashout value, it was proper for the Committee to apply that provision to § 16.5.1(a)(2). Furthermore, the 1995 BAMPP Plan was attached as Appendix A to the 1996 Plan which further supports the Committee's determination to apply the 1995 BAMPP methodology. VZ 1106.

Section 4.19 (c)(2)(C) states in relevant part as follows:

> (c) Determination of Pension Amount . . .
>> (2) Lump Sum Form of Payment
>>> (A) Service Pension Cash-Outs. The lump-sum payable to a Window-Eligible Employee who is eligible for a Normal or Early Retirement Service Pension shall equal the Actuarial Equivalent present value (calculated using the assumptions in subsection (c)(2)(C)) of the Service Pension otherwise payable to the Participant in the Normal Form commencing on his Annuity Starting Date . . . .
>>> (C) Actuarial Equivalent. The following assumptions shall apply for purposes of determining the Actuarial Equivalent present value of a Window-Eligible Employee's pension pursuant to this subsection(c)(2): . . .
>>> If the Actuarial Equivalent present value of the pension using the "applicable interest rate" (as defined in (c) does not exceed $25,000, the applicable interest rate. . . . *If the Actuarial Equivalent present value of the pension using the "applicable interest rate" (as defined in (c)) does exceed $25,000, 120% of the applicable interest rate*, except that the resulting present value shall not be less than $25,000.

VZ 134 (emphasis added).

Plaintiff argues that § 4.19(c)(2)(C) is not applicable because it applies only to the

1994-1995 cash-out window, which expired on December 30, 1995, one day prior to the cash balance transition. *See* § 4.19(a), VZ 133 ("Each individual who has a vested interest in his Accrued Pension Benefit pursuant to Article VI, who is an Active Participant on his Severance from Service Date which occurs on or after December 31, 1993 and prior to December 31, 1995 (hereinafter "Window-Eligible Employees") and who is not entitled to a lump sum payment under Section 4.7(d) may make the election described in subsection (b) of this Section 4.19."). But as the Committee reasoned, under § 16.5.1(a)(2), the lump-sum cashout value is to be determined under the 1995 BAMPP Plan *as if* Plaintiff had separated on December 31, 1995.

The language of §§ 16.5.1(a)(1) and (a)(2) of the Plan references and incorporates the lump-sum cashout *methodology* prescribed by the BAMPP. An ERISA plan may incorporate terms and provisions from a predecessor plan, including provisions that "expired" before adoption of the current plan. *See Schoenfeld v. Navistar Intern. Transp. Corp. Non-Contributory Retirement Plan,* 1997 WL 49302 (N.D. Ill. 1997); *See Jones v. UOP, Allied-Signal, Inc.,* 1993 WL 96162 (N.D. Ill. 1993) *rev'd on other grounds,* 16 F.3d 141 (7th Cir. 1994). Thus, the Committee reasonably interpreted § 16.5.1(a)(2) as allowing Plaintiff's lump-sum cashout value to be determined as if § 4.19 still applied to her. Moreover, the BAMPP contained only one methodology for calculating the lump-sum value of a participant's "cash-out" benefit. Between 1991 and the 1995 cash balance transition, Bell Atlantic introduced a series of three lump-sum cashout "windows" for BAMPP participants. VZ 133-35, 130-32, 125-30. During each of these window periods, Bell Atlantic calculated

the lump-sum cashout value of a retiring participant's accrued benefit using the 120%/100% PBGC interest rate structure. VZ 134, 131, 129. Later re-statements of the Plan were amended prior to the institution of Plaintiff's claim, to explicitly state that 120% of the applicable PBGC rate is to be used for this type of participant. VZ 56. This further supports the Committee's determination to interpret § 16.5.1(a)(2) as also requiring such a use.

The Court agrees that the Defendants' interpretation was reasonable regardless of whether the formula for the lump-sum cashout value in the 1996 Cash Balance Plan is viewed as unambiguous or ambiguous. When presented with unclear or ambiguous language, the Committee is authorized to interpret the plan language and resolve such ambiguities. Here, the Committee carefully reviewed the provisions, and consulted with relevant documents and staff, and interpreted the plan language accordingly. Although the Committee does have a conflict of interest, its review was thorough and its interpretation was reasonable. Thus, applying the deferential standard of review, the Court upholds the Committee's decision and finds in favor of Defendants as to the Discount Rate issue.

## C.     Transition Factor Issue

Plaintiff also argues that the Committee improperly disregarded the second reference to the transition factor in § 16.5.1(a)(2). Plaintiff contends that the language regarding the second reference to the transition factor is not ambiguous, and accordingly, the Committee should not have looked to additional documents to interpret the unambiguous language. Rather, because the Committee concluded the language was a mistake, the language should have been treated as such, and the Committee should have applied to the Court for

reformation arising out of a purported scrivener's error. Defendants, however, argue that the Plan language is intrinsically ambiguous, or alternatively, that the objective evidence considered by the Committee is inconsistent with the Plan's language, making the language extrinsically ambiguous. Defendants assert the Committee properly resolved the ambiguity.

The Court agrees with Plaintiff that the language is not intrinsically ambiguous. The language clearly states that the transition factor will be multiplied a second time:

> In the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is *the product of multiplying* (A) the Participant's applicable Transition Factor described in Table 1 of this Section, *times* (B) the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995, *multiplied by the applicable transition factor described in Table 1 of this Section.*

VZ 1100 (emphasis added). Thus, the Court must consider whether the Committee's analysis and determination of the language as extrinsically ambiguous was reasonable.

**1.    The Committee Improperly Interpreted the Plan Language as Extrinsically Ambiguous.**

In its review of Plaintiff's claim, the Committee considered extrinsic evidence, most of which was objective evidence. Although the consultation from the staff members was subjective evidence, the additional plan re-statements, summary documents, and board resolutions were all factual, objective evidence. The extrinsic evidence apparently convinced the Committee that the second reference to multiplying by the transition factor was a drafting mistake, and should not have been included in § 16.5.1(a)(2).

The Committee referenced the earlier and later versions of the plan to support its conclusion that the second reference was a drafting error that should have been omitted. It also observed that all of the documents sent to the employees make no reference to the transition factor being multiplied twice, but rather indicate in several places that the transition factor is only to be multiplied once. For example, the brochure entitled "Introducing Your Cash Balance Plan" sent to employees shows the opening balance as being determined by the following formula: OLD PLAN LUMP-SUM VALUE X TRANSITION MULTIPLIER = OPENING ACCOUNT BALANCE. The brochure and other estimates sent to employees give examples and explanations of the formulas, and all show the transition factor being multiplied only once.[6]

Plaintiff disputes that evidence of a "mistake" demonstrates an extrinsic ambiguity. Plaintiff argues this language was not a term of art that could be interpreted multiple ways, but rather was language inserted into the contract that could only be interpreted one way. Thus, the Committee should not have interpreted the language as ambiguous, but rather should have treated it as a mistake or scrivener's error and sought to reform the contract in a court of equity.

When faced with language that appears to have been mistakenly included in the plan, courts expect plan administrators to treat the language as a mistake or scrivener's error, rather

---

[6]Plaintiff argues that the actual Plan language should control rather than the plan summary documents, referring to Defendants' disclaimer on those documents stating that employees should look to the actual Plan in the event of any conflict between the plan summary and the Plan. *See* VZ 12931, 13248.

than a mere ambiguity. *See Grun,* 163 F.3d at 420-21 (unambiguous language not a mutual mistake where mistake was unilateral); *Blackshear v. Reliance Standard Life Ins. Co.,* 509 F.3d 634, 642-45 (4th Cir. 2007) (distinguishing between ambiguities and clerical errors); *Gerlib v. R.R. Donnelley & Sons Co.,* 2002 WL 1285795 (N.D. Ill. 2002) (finding that plan language containing an alleged drafting error was nevertheless unambiguous). Defendants have cited no cases where a court has treated a drafting error as an extrinsic (or intrinsic) ambiguity.

The Seventh Circuit treats the doctrine of mistake and the doctrine of ambiguity as separate and distinct. *See Filipowicz v. Am. Stores Benefit Plans Comm.,* 56 F.3d 807, 814 n.3 (7th Cir. 1995) (stating that "[e]vidence that the written contract did not conform to the parties' intent [would be relevant] for a theory of mutual mistake and a request for reformation" but not for a claim of ambiguity); *Grun,* 163 F.3d at 420-21 (distinguishing between claims of ambiguity and claims of mistake); *NLRB v. Cook County Sch. Bus, Inc.,* 283 F.3d 888, 892-93 (7th Cir. 2002) (differentiating the doctrine of equitable reformation and the "clear and convincing" standard of the doctrine of mistake with regular interpretation of a contract).

Courts in other circuits also apply a different standard for alleged drafting errors in ERISA cases. *See Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.,* 85 F.3d 1098, 1104-05 (3d Cir. 1996) (applying the heightened standard of the scrivener's error doctrine and reformation by analyzing whether reformation is appropriate given the statutory goals of ERISA); *Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1295 (6th Cir. 1991)

31

(applying the clear and convincing standard in determining whether reformation because of a mistake is appropriate, and distinguishing this standard from ambiguities); *Air Line Pilots Ass'n v. Shuttle, Inc.,* 55 F. Supp. 2d 47, 52 (D.D.C. 1999) (applying the heightened standards of the doctrine of scrivener's error and equitable reformation rather than the doctrine of ambiguity). The case law carves out a separate doctrine for drafting errors, which requires parties to seek relief in court.

Defendants rely heavily on *Mathews* to support their contention that the plan language is extrinsically ambiguous. The Seventh Circuit in *Mathews* used extrinsic evidence to find that the particular plan language was extrinsically ambiguous. *Mathews,* 144 F.3d at 467-68. The *Mathews* case did not, however, involve an alleged drafting error or "mistake." Rather, the disputed language in *Mathews* was a "term of art," involving a phrase that was also used in the relevant statute and Treasury regulation. *Id.* at 467. The Court considered extrinsic evidence to determine the actual meaning of the phrase "date of distribution," assessing whether that phrase in the plan carried the same meaning as it did in the statute and regulation. *Id.* No party ever alleged that the phrase was not intended to be in the plan, but rather they argued over what the language meant. *Id.* In contrast, the parties in this case do not dispute the meaning of the language, but rather dispute whether the language should actually be in the Plan. The Committee did not find that the language means something different than what Plaintiff asserts; rather, it found that it should simply not be in the Plan, and was included as a result of a drafting error.

Because the Committee found this language to be a mistake, it should have treated it

as such, rather than as an ambiguity subject to interpretation by means of extrinsic evidence. The Committee abused its discretion in disregarding the unambiguous language and unilaterally reforming the contract.

2. **The Committee Abused Its Discretion When It Improperly Reformed the Contract By Disregarding the Second Reference to the Transition Factor.**

Under the so-called "scrivener's error" doctrine[7], "the mistake of a scrivener in drafting a document may be reformed based upon parol evidence, provided the evidence is 'clear, precise, convincing and of the most satisfactory character' that a mistake has occurred and that the mistake does not reflect the intent of the parties." *Gerlib,* 2002 WL 1285795. In determining whether such a reformation is appropriate, one can consider whether the results without reformation would be absurd or create a windfall. *Id.*

In this case, although the Committee did not use the words "reformation," "clear and convincing," "windfall," or "absurd," it appears to have analyzed all of the factors that make up such an analysis. It was convinced the second reference was a mistake, and discussed all of the documents contradicting the second reference. Plaintiff argues that reformation is outside of the Committee's authority, and can only be done by a court of equity.

a. **Seventh Circuit Case Law Regarding ERISA Reformation**

The case law in this Circuit places clear limits on the Committee's authority to

---

[7] Defendants state that under the deferential standard of review, the Court should confine its analysis to whether the term was ambiguous, and reserve any discussion about the scrivener's error defense. However, the Court finds it necessary to address the scrivener's error issue, in part, in its review of the Committee's decision.

unilaterally reform the Plan. Under the Plan, the Committee had the power to not only resolve ambiguities, but to also "resolve any other matter under the Plan which is raised by the claimant or identified by the respective committee." 1996 Cash Balance Plan, VZ 1088. Even with this broad discretion, however, the company is bound by the terms of the plan. *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998); *See* 29 U.S.C. § 1104(a)(1)(D) ("a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan . . ."). The Seventh Circuit has stated that "[i]nterpretation and modification are different; the power to do the first does not imply the power to do the second." *Cozzie,* 140 F.3d at 1108. Accordingly, although the Committee is given the power to interpret ambiguities in the plan, it is not given the power to modify or reform the plan. *See Swaback v. Am. Info. Technologies Corp.,* 103 F.3d 535, 540 (7th Cir. 1996) (stating that a fiduciary or administrator of an ERISA plan does not have the discretion to "controvert the plain meaning of a plan").

In *Gerlib*, the Court held that an administrator's decision to reform the contract was inappropriate because the result without reformation was not absurd nor would it produce a windfall. *Gerlib,* 2002 WL 1285795. It also found the evidence of the mistake was not clear or convincing. *Id.* The court did not, however, reference any rule of law restricting an administrator's decision to reform the contract, but only ruled that it was not an appropriate outcome in that case. *Id.*

In *Grun,* the Seventh Circuit held that a mutual mistake did not occur in the drafting

of otherwise unambiguous ERISA plan language. *Grun,* 163 F.3d at 421-22. But the Court did not discuss whether it was within the Plan Administrator's authority to conduct such an analysis. *Id.* Rather, it overturned the district court's decision that a mutual mistake had occurred. *Id.*

In *NLRB v. Cook County School Bus, Inc.,* the court agreed with the National Labor Relations Board's decision affirming the ALJ's ruling recommending an order to reform the collective bargaining agreement due to a mutual mistake. *NLRB,* 283 F.3d at 893-896. But unlike the Committee in this case, this Board on its own petitioned the Court to have its order to reform the contract enforced, pursuant to 29 U.S.C. § 160(e). *Id.* at 891.

### b. Case Law in Other Circuits Regarding Reformation

The case law in other jurisdictions is clear that an ERISA plan administrator does not have the authority to unilaterally reform the plan agreement, regardless of what the plan language might authorize it to do. For example, the Fourth Circuit in *Blackshear* states that the doctrine of equitable reformation is only to be used in a court of equity. *Blackshear,* 509 F.3d at 642. The court states that when interpreting an ERISA plan, "the administrator cannot simply 'reform' a plan to correct what it unilaterally perceives to be a mistake or error contained in the plan's written terms. Rather, reformation, like other forms of equitable relief, must be requested by the party seeking to reform the contract granted by the court." *Id.* The court indicated that the district court, in reviewing the administrator's decision under an abuse of discretion standard, did not apply the doctrine of equitable reformation. *Id.* at 643. The court chose not to remand the case to the district court to decide the reformation issue,

however, finding on its own that reformation in that case would be inappropriate because evidence of the mistake was not clear and convincing, particularly because the error at issue was also included in the summary plan documents. *Id.* at 643-44 (stating "in this case, the SPD and the plan itself agree; there is utterly no indication of an error or mistake. This case is unlike one where a clerical scrivener's error would be apparent.")

Courts in other circuits have also all stated that equitable reformation is a remedy appropriately granted by a court. *See Ramsey v. Colonial Life Ins. Co. of America,* 12 F.3d 472, 479-80 (5th Cir. 1994) (stating that a court can reform a contract where both parties are mistaken as to a material aspect of the contract); *Audio Fidelity Corp. v. Pension Ben. Guaranty Corp.,* 624 F.2d 513, 518 (4th Cir. 1980) ("a court of equity can reform a contract to correct a mistake"); *Air Line Pilots Ass'n,* 55 F. Supp. 2d at 52 (stating that equitable reformation is a remedy more appropriately granted by a court, rather than being obtained through arbitration). In fact, courts do not take lightly the decision of whether to apply the doctrine of scrivener's error in ERISA cases. For example, the Third Circuit has identified tension between the scrivener's error doctrine and the statutory purposes of ERISA stating "[a] plan document containing a scrivener's error might mislead an employee into believing he had rights or obligations that he did not, in fact, have." *Cent. Pa. Teamsters Pension Fund,* 85 F.3d at 1104 (quoting *Int'l Union of Electronic, Elec., Salaried, Machine and Furniture Workers, AFL-CIO v. Murata Erie North America, Inc.,* 980 F.2d 889, 907 (3d Cir. 1992)).

### c. ERISA Goals and Principles

In determining whether to apply the doctrine of scrivener's error to a particular case,

courts often consider the underlying purposes of ERISA, a source which this Court finds instructive. Congress enacted ERISA "'to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits.'" *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 830 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113 (1989); *See generally* 29 U.S.C. §1001. To this end, "ERISA contains certain safeguards and protections which help guarantee the equitable character and the soundness of private pension plans." *Boggs v. Boggs,* 520 U.S. 833, 845 (1997). Under ERISA, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (I) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan . . ." 29 U.S.C. § 1104. One of the primary statutory goals of ERISA is to insure that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." *Murata,* 980 F.2d at 907.

ERISA embodies the law of trusts, and therefore courts are guided by principles of trust law when determining appropriate standards of review in ERISA cases. *Firestone,* 489 U.S. at 110, 111. In making such a determination, the Supreme Court has acknowledged that "[a] trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable." *Id.* at 112. But, "[a] trustee who is in doubt as to the interpretation of the instrument can protect himself by obtaining instructions from the court." *Id.* Similarly, recognizing that disputes regarding the

interpretation of the plans under ERISA may arise, most benefits plans authorize administrators to resolve these disputes, and the courts defer to the administrators in making their determinations. Although many plans give administrators broad authority to interpret ambiguities that arise out of the plan, courts emphasize the importance of preserving the written plan, and warn administrators against modifying unambiguous language. Just as a trustee is advised to do, a plan administrator "in doubt" should also seek to obtain instructions from the court.

While courts apply a deferential standard of review where the plan grants its administrator broad discretion, the general or default rule for ERISA cases is *de novo* review. *Rush Prudential HMO, Inc. v. Moran,* 526 U.S. 355, 385-86 (2002); *See Firestone,* 489 U.S. at 115 ("a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."); *Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 330 (7th Cir. 2000) (noting that courts particularly favor the application of plenary review where the plan documents create uncertainty regarding the scope of review). Although courts give deference to administrative law judges, agencies, or other courts when reviewing a previous ruling, "crucial differences exist between findings of fact made by a private entity such as a plan administrator and findings made by duly authorized administrative law judges, agencies, or federal district courts." *Ramsey v. Hercules Inc.,* 77 F.3d 199, 205 (7th Cir. 1996). The latter bodies are required to provide claimants with certain procedural protections when making fact findings

in their cases, providing claimants with a full and fair hearing, including the opportunity to put on witnesses, cross-examine other witnesses, and argue their case before a judge or body with "acknowledged expertise." *Id.*

In contrast, plan administrators "neither enjoy the acknowledged expertise that justifies deferential review for agency cases . . . nor are they unbiased fact finders like the courts." *Id.; See Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1564 n.7 (11th Cir. 1990) ("the individuals who occupy the position of ERISA fiduciaries are less well-insulated from outside pressures than are decisionmakers at government agencies."). They also do not provide claimants with similar procedural safeguards such as the ability to make their case in a full hearing with opportunities to interview and cross-examine witnesses. *See Herzberger,* 205 F.3d at 332 ("The Social Security Administration is a public agency that denies benefits only after giving the applicant an opportunity for a full adjudicative hearing before a judicial officer, the administrative law judge. The procedural safeguards thus accorded, designed to assure a full and fair hearing, are missing from determinations by [ERISA] plan administrators."). Plan administrators are required to give a claimant an opportunity for a "full and fair review," but such review does not carry with it the same procedural protections as that which is afforded to claimants before a court or administrative body. 29 U.S.C. § 1133; *See Crespo,* 294 F. Supp. 2d at 993. Instructively, when an initial decision in "an agency lacks the crucial procedural safeguards, the Administrative Procedure Act requires the federal courts to review both fact and law *de novo.*" *Herzberger,* 205 F.3d at 332. Thus, a rule prohibiting plan administrators from unilaterally reforming a contract

39

where such lack of neutrality and procedural safeguards exists, and allowing only a court to do so by means of a *de novo* review, provides the protections that should be afforded to plan participants under ERISA.

ERISA was created to give employees access to the court system to bring claims arising out of their benefits plan. *See* 29 U.S.C. § 1132 (empowering participants, beneficiaries, and fiduciaries to file a civil action in part to enforce the rights of a participant or beneficiary or to obtain other equitable relief). Accordingly, a dispute regarding whether specific plan language should be modified, language which employees may have relied upon and the modification of which could result in the gain or loss of hundreds of thousands of dollars for an employee, and billions of dollars to a class of employees, is more appropriately reserved for decision by the court. *Firestone,* 489 U.S. at 112. Where unambiguous plan terms afford an employee a benefit, and the plan sponsor asserts that those terms were mistakenly included in the plan, a court should resolve the dispute. Importantly, multi-employee pension agreements such as this do not involve arm's length negotiations. Rather, they are one-sided agreements where the plan sponsors totally control the drafting of the plan. *See Central States,* 69 F.3d at 1315. Accordingly, a plan sponsor's decision to effectively re-write the contract must be subject to *de novo* judicial review. Such a rule is consistent with the underlying purpose of ERISA.

For these reasons, the Court finds the Committee abused its discretion when upon finding a mistake, it decided to disregard the "mistaken" language and deny Plaintiff's claim. Because of this, and in light of the parties' care to limit this stage of the proceedings to the

administrative record, the Court finds that upon determining the language was a mistake, the Committee should have sought to reform the plan document in court. Accordingly, the Court holds the relevant plan language, although possibly a scrivener's error, is unambiguous, and the Committee abused its discretion in rewriting the Plan on its own. If Defendants choose to seek reformation under the theory of mistake or scrivener's error, they are free to move this Court to do so. At this stage of the proceedings, however, the Court finds the Committee's decision to disregard the second reference to the transition factor was an abuse of its discretion.[8]

---

[8] Other arguments raised by the parties in their briefs in support of their respective positions, including the issue of judicial estoppel, are not addressed in this opinion because those matters were not raised as part of the administrative record. These arguments are reserved for the second phase of the proceedings in this case.

# VI. CONCLUSION

ERISA was created to protect the rights of employees in employee benefits plans. Judicial review of decisions made by plan administrators is an essential component of that protection. The Defendants have a conflict of interest and their decision to deny Plaintiff's claim has been carefully examined by this Court based on the administrative record. Because the plan documents accord the plan administrators broad discretion, this Court has applied an abuse of discretion standard. **Therefore, for the reasons set forth in this opinion, the Court finds that the Committee's interpretation and decision regarding the Discount Rate was reasonable, but that the Committee's decision regarding the Transition Factor was an abuse of its discretion.**

**SO ORDERED THIS 28th DAY OF AUGUST, 2008**


_____

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies Sent to:**

Matthew Thomas Heffner
Matthew Todd Hurst
Arthur T. Susman
Susman Heffner & Hurst LLP
Two First National Plaza
Suite 600
Chicago, IL 60603

Counsel for Plaintiff


Allen Channon Engerman
Law Offices of Allen C. Engerman, P.A.
4800 North Federal Highway
Suite 300-D
Boca Raton, FL 33431

Counsel for Plaintiff

Jeffrey C. Engerman
Law Offices of Jeffrey C. Engerman, PC
12400 Wilshire Boulevard
Seventh Floor
Los Angeles, CA 90025

Counsel for Plaintiff

Abigail A. Clapp
James G. Richmond
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 2500
Chicago, IL 60601

Counsel for Defendants

Jeffrey Huvelle
Frederick G. Sandstrom
Covington & Burling
1201 Pennsylvania Ave., NW
Washington, DC 20004

Counsel for Defendants