## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA N. YOUNG, On behalf of herself, and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05 C 7314 |
| | ) | CLASS ACTION |
| VERIZON'S BELL ATLANTIC CASH BALANCE PLAN, formerly known as Bell Atlantic Cash Balance Plan, formerly known as Bell Atlantic Management Pension Plan, and VERIZON COMMUNICATIONS INC., as successor in interest to Bell Atlantic Corporation, | ) ) ) ) ) ) ) | Magistrate Judge Morton Denlow |
| Defendants. | ) ) ) | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Defendants Verizon's Bell Atlantic Cash
Balance Plan and Verizon Communications Inc.

James G. Richmond (620637)
Abigail A. Clapp (6269540)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Ste. 2500
Chicago, IL 60601
Tel. (312) 456-8400
Fax (312) 456-8435

Jeffrey G. Huvelle (admitted *pro hac vice*)
Frederick G. Sandstrom (6278816)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, DC 20004
Tel. (202) 662-6000
Fax (202) 662-6291

Dated: May 28, 2009

**TABLE CONTENTS**

**PAGE**

DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW............ 1

FINDINGS OF FACT.................................................................................................. 3

    Bell Atlantic Corporation................................................................................. 3

    The Transition to the Cash Balance Plan......................................................... 3

    The Development of the Transition Factors ..................................................... 6

    The Corporate Approval of the Cash Balance Plan Design.............................. 8

    The Bell Atlantic Summary of Material Modifications.................................... 8

    Other Bell Atlantic Communications to Employees in 1995.......................... 10

    Implementation of the Opening Balance Formula.......................................... 11

    Post-Conversion Employee Communications ................................................ 12

    The Correct Formula Was Communicated to Plaintiff................................... 13

    The Actuarial Report...................................................................................... 15

    The Mistake in the July 1996 Plan Document ............................................... 15

    NYNEX........................................................................................................... 19

    No Other Claims ............................................................................................ 21

    Plaintiff's Assertion of Her Claim ................................................................. 23

    Enforcing the Mistake Would Create Windfall Benefit Increases.................. 24

    The Plan Is Underfunded ............................................................................... 27

    Increased Benefits.......................................................................................... 27

CONCLUSIONS OF LAW ...................................................................................... 31

I.      THE COURT SHOULD REFORM THE 1996 AND 1997 CASH BALANCE
       PLANS............................................................................................................ 31

       A.     ERISA Plans May Be Reformed to Correct Drafting Errors In the Absence
            of Participant Reliance on the Mistaken Language. .............................. 31

|   | 1. | The Scrivener's Error Doctrine Allows Reformation of Mistakes in the Text of an ERISA Plan | 35 |

B. The Court Should Reform § 16.5.1(a)(2) of the Cash Balance Plan to Strike the Mistaken Second Reference to the Transition Factor ... 38

    1.    Participant Communications. ... 39

    2.    Other Evidence of the Intended Formula ... 41

    3.    The Error by the Scrivener ... 43

    4.    No Reasonable Reliance on the Mistaken Language ... 44

    5.    Enforcing the Error Would Result in Windfall Benefit Increases. ... 46

II.    PLAINTIFF'S CLAIM IS TIME-BARRED. ... 49

    A.    ERISA Borrows From Pennsylvania Law to Supply a Statute of Limitations in this Case. ... 50

    B.    Pennsylvania Law Provides a Four-Year Statute of Limitations for ERISA Benefit Claims. ... 52

    C.    The Limitations Period Began to Run No Later Than February 1998, When Plaintiff Received Her Lump Sum Payment. ... 52

CONCLUSION ... 55

## TABLE OF AUTHORITIES

**PAGE**

### FEDERAL AND STATE CASES

*Air Line Pilots Ass'n v. Shuttle, Inc.*, 55 F. Supp. 2d 47 (D.D.C. 1999)............................... *passim*

*Amara v. CIGNA Corp.*, 559 F. Supp. 2d 192 (D. Conn. 2008) ................................................8, 40

*Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140 (2d Cir. 1999)................24, 31

*AT&T Corp. v. Hulteen*, 2009 U.S. LEXIS 3470 (May 18, 2009) ..........................................31, 32

*Berger v. AXA Network LLC*, 459 F.3d 804 (7th Cir. 2006)............................................50, 51, 52

*Blackshear v. Reliance Std. Life Ins. Co.*, 509 F.3d 634 (4th Cir. 2007)....................31, 35, 40, 44

*Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700 (7th Cir. 2001)......................................35, 39

*Carden v. Aetna Life Ins. Co.*, 559 F.3d 256 (4th Cir. 2009).........................................................37

*Carlson v. Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos*, 895 N.E.2d 1191
   (Ind. 2008)..................................................................................................................................37

*Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098
   (3d Cir. 1996)............................................................................................................................33

*Central Laborers' Pension Fund v. Heinz,* 541 U.S. 739 (2004) .................................................31

*Cinelli v. Security Pac. Corp.*, 61 F.3d 1437 (9th Cir. 1995) ......................................................31

*Cooley v. Southern Graphic Sys., Inc. Pension Plan*, No. 3:06CV-1-H, 2008 WL 927875
   (W.D. Ky. Apr. 4. 2008) ...........................................................................................................53

*Corcoran v. Bell Atlantic Corp.*, No. 97-cv-510 (E.D. Pa.).................................................. *passim*

*Crosby v. Rohm & Haas Co.*, 480 F.3d 423 (6th Cir. 2007)........................................................40

*Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62 (7th Cir. 1996) .......50, 52, 53

*Egelhoff v. Egelhoff*, 532 U.S. 141 (2001)...................................................................................52

*Fallin v. Commonwealth Indus., Inc.*, 521 F. Supp. 2d 592 (W.D. Ky. 2007) .............................53

*Firestone Tire & Rubber v. Bruch*, 489 U.S. 101 (1989) .............................................................32

*Flagg v. Skadden, Arps Pension Plan*, No. 07 Civ. 7392 (PKC), 2008 U.S. Dist. LEXIS 47613 (S.D.N.Y. June 18, 2008), *adhered to on reconsideration*, 2008 U.S. Dist. LEXIS 54783 (July 16, 2008)..................................................................53

*Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1 (1987)..............................................32

*Gerlib v. R.R. Donnelley & Sons Co.*, No. 95 C 7401, 2005 U.S. Dist. LEXIS 10755 (N.D. Ill. June 11, 2002)..............................................31, 35, 43, 46

*Gregorovich v. E. I. DuPont De Nemours*, Civ. No. 08-391-SLR, 2009 U.S. Dist. LEXIS 20631 (D. Del. Mar. 13, 2009) ...............................................54

*Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300 (3d Cir. 2008)...................52

*Hanes v. Roosevelt Nat'l Life Ins. Co.*, 452 N.E.2d 357 (Ill. App. Ct. 1983)..............36

*Harms v. Cavenham Forest Indus., Inc.*, 984 F.2d 686 (5th Cir. 1993) .......................46

*Hecker v. Deere & Co.*, 556 F.3d 375 (7th Cir. 2009)...................................................37

*Hickey v. Digital Equip. Corp.*, 43 F.3d 941 (4th Cir. 1995) .......................................46

*Hughes v. 3M Retiree Med. Plan*, 281 F.3d 786 (8th Cir. 2002)..................................37

*Humphrey v. United Way*, 590 F. Supp. 2d 837 (S.D. Tex. 2007) ...............................40

*Int'l Union v. Murata Erie N. Am.*, 980 F.2d 889 (3d Cir. 1992)...............31, 34, 35, 46

*Keen v. Lockheed Martin Corp.*, 486 F. Supp. 2d 481 (E.D. Pa. 2007) .......................52

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 129 S. Ct. 865 (2009)..............37

*Langley v. DaimlerChrysler Corp.*, 502 F.3d 475 (6th Cir. 2007) ...............................40

*Lockheed Corp. v. Spink,* 517 U.S. 882 (1996)............................................................32

*Mathews v. Sears Pension Plan*, 144 F.3d 461 (7th Cir. 1998)........................... *passim*

*Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516 (3d Cir. 2007) .........................52, 53, 54

*Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295 (6th Cir. 2006).........................53

*Peterson v. AT&T Co.*, 127 Fed. App'x 67 (3d Cir. 2005)............................................4

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) .....................................................32

*Prudential Ins. Co. v. S.S. Am. Lancer*, 870 F.2d 867 (2d Cir. 1989) ..........................46

*Rea v. Hershey Co. 2005 Enhanced Mut. Separation Plan*, No. 1:CV-06-1920,
    2008 U.S. Dist. LEXIS 54921 (M.D. Pa. July 15, 2008).................................................. *passim*

*Romero v. Allstate Corp.*, 404 F.3d 212 (3d Cir. 2005)....................................................53

*S.T.S. Transport Service, Inc. v. Volvo White Truck Corp.*, 766 F.2d 1089 (7th Cir. 1985) .........31

*Schroeder v. Gebhart*, 825 So. 2d 442 (Fl. Dist. Ct. App. 2002) ...................................38

*Syed v. Hercules, Inc.*, 214 F.3d 155 (3d Cir. 2000)........................................................50

*In re Estate of Tuthill*, 754 A.2d 272 (D.C. 2000) .........................................................38

*United States v. Schilling*, No. C05-3016-MWB, 2006 U.S. Dist. LEXIS 60902
    (N.D. Iowa Aug. 25, 2006) ..........................................................................................35, 36

*Wilson v. Moog Automotive, Inc. Pension Plan & Trust*, 193 F.3d 1004
    (8th Cir. 1999).......................................................................................................3, 8, 31, 45

*Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995) .......................................33

## FEDERAL STATUTES AND REGULATIONS

29 C.F.R. § 2520.104b-3....................................................................................................9

29 C.F.R. § 2520.104b-3(a)...........................................................................................8, 40

29 C.F.R. § 2520.104b-3(b)................................................................................................8

ERISA § 2(c), 29 U.S.C. § 1001(c) ..................................................................................32

ERISA § 102(a), 29 U.S.C. § 1022(a) ..............................................................................41

ERISA § 104(b)(1), 29 U.S.C. § 1024(b)(1)..............................................................8, 9, 40

ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G) ....................................................25, 48

ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) .........................................................52

## STATE STATUTES

42 Pa. Cons. Stat. § 5525(a)(8).......................................................................................52

## OTHER AUTHORITIES

Corbin on Contracts (rev. ed. 2002)................................................................................36

Farnsworth on Contracts (2d ed. 1998)...........................................................................35

Radford, Bogert & Bogert, The Law of Trusts & Trustees (3d ed. 2006)....................................37

Uniform Trust Code § 415 (2005) ..............................................................................................38

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA N. YOUNG, On behalf of herself, and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05 C 7314 |
| | ) ) | CLASS ACTION |
| VERIZON'S BELL ATLANTIC CASH BALANCE PLAN, formerly known as Bell Atlantic Cash Balance Plan, formerly known as Bell Atlantic Management Pension Plan, and VERIZON COMMUNICATIONS INC., as successor in interest to Bell Atlantic Corporation, | ) ) ) ) ) ) ) | Magistrate Judge Morton Denlow |
| Defendants. | ) ) | |

**DEFENDANTS' PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

Defendants Verizon's Bell Atlantic Cash Balance Plan and Verizon Communications Inc. submit these proposed findings of fact and conclusions of law.

Defendants have requested reformation to eliminate the drafting error that forms the basis for plaintiff Cynthia Young's claim for benefits. Courts have regularly recognized that the doctrine of reformation applies to ERISA plans, and this case presents a uniquely compelling set of facts supporting reformation. Reformation protects the integrity of the plan and promotes the central objectives of ERISA where a drafting error alters the benefit formula that all parties clearly understood and relied upon in forming their benefit expectations. Since no participant could have reasonably relied on the erroneous language in § 16.5.1(a)(2) of the Plan document, this Court should reform the Plan.

The proposed findings support five key facts relating to reformation:

- Bell Atlantic intended that participants' opening balances in the Plan would be calculated as of January 1, 1996 by multiplying the transition factor just once;

- Plan participants at all times understood and expected that the multiplication would be performed only once and they did not rely on any statement that the multiplication would be performed twice (or that the *square* of the transition factor would be multiplied by the lump-sum cashout value of their BAMPP accrued benefits);

- The Summary of Material Modifications, which Bell Atlantic was required by ERISA to send to all Plan participants to advise them of material changes in the Plan, advised participants of the one-time multiplication by the transition factor;

- <u>After</u> opening balances for 13,784 participants had been established based on a one-time multiplication, and communicated to each of them, a drafting error in a provision relating to 11,513 participants (§16.5.1(a)(2)) produced a formula calling for the opening balance to be based on the square of the transition factor; and

- Enforcing the mistaken second reference to the transition factor for these 11,513 participants would create a windfall, because these participants would receive benefits far larger than they ever expected; would burden the Plan, which is now underfunded, with over $1 billion of additional benefit liabilities; and would unfairly and perversely cause the retirement benefits of many participants who were less than 50 years old or had less than 30 years of service to exceed the retirement benefits of otherwise similarly-situated participants over age 50 or with more than 30 years service.

Defendants have also asserted the affirmative defense of statute of limitations to plaintiff's claim for additional benefits. Since ERISA has no statute of limitations for claims for benefits, a state statute must be borrowed. Pennsylvania has the most significant connection to this lawsuit, and settled Seventh Circuit law therefore requires the borrowing of the analogous Pennsylvania statute, which is the four-year limitations period for contract actions.

## FINDINGS OF FACT

**Bell Atlantic Corporation.**

      1.    Bell Atlantic was one of the seven regional telephone operating companies created on January 1, 1984 as a result of the divestiture of AT&T. Bell Atlantic was headquartered in Philadelphia and consisted of telephone companies in Pennsylvania, New Jersey, Delaware, Maryland, Virginia, West Virginia and the District of Columbia. An agreement to merge Bell Atlantic and NYNEX, the regional telephone operating company for New York and New England, was announced in April 1996 and became final on August 14, 1997. The combined company took the name of Bell Atlantic, with headquarters in New York City and a workforce of 130,000 employees. On July 27, 1998 Bell Atlantic announced an agreement to merge with GTE, and this merger was effective on June 30, 2000, with the new company taking the name of Verizon Communications. As of 2008, Verizon had 225,000 employees. (Ex. D.50.)

      2.    The merger of Bell Atlantic and NYNEX, and the subsequent merger of Bell Atlantic and GTE, were among the largest mergers in U.S. history. Bell Atlantic after the first merger and Verizon after the second merger amended their numerous benefit plans, including pension plans and a variety of welfare plans, to provide a more uniform set of benefits to employees in the new entity. Bell Atlantic/Verizon implemented these two major mergers while at the same time transforming its business from regional telephone operations to a leading provider of national and international wireless telephone and high-speed internet services. (Ex. D.50, D.56 at 164.)

**The Transition to the Cash Balance Plan.**

      3.    Salaried employees of Bell Atlantic participated in the Bell Atlantic Management Pension Plan ("BAMPP"), a defined benefit pension plan, until December 31,

1995.  A participant's benefit under the BAMPP was expressed in the form of an annuity commencing at age 65.  The BAMPP provided that participants who attained specified age and service levels were eligible for a subsidized "Service Pension."  (Ex. D.17, BAMPP §§ 4.2-4.3, at VZ00110-12.)  The Service Pension was actuarially "subsidized" because it permitted an eligible participant to begin receiving an annuity before age 65 without a full actuarial reduction to reflect the early commencement of the participant's pension.  (*Id.*, BAMPP § 4.3, at VZ00111-12.)  As a result, upon becoming eligible for a Service Pension, a participant experienced a significant increase, or spike, in the lump-sum present value of his or her pension entitlement. (*Id.*, BAMPP §§ 4.2-4.4, at VZ00110-13; Ex. D.1 at VZ10391.)  *See generally Peterson v. AT&T Co.*, 127 Fed. App'x 67, 68 (3d Cir. 2005) (describing effect of spike, or "cliff," on pension benefits after participants reach Service Pension eligibility).

        4.      Bell Atlantic amended and restated the BAMPP effective December 31, 1995 and changed its name to the "Bell Atlantic Cash Balance Plan."  (Exs. D.3, D.4, D.18.) The Cash Balance Plan expressed a participant's benefit as a lump-sum balance, to which pay and interest credits were added on a monthly basis.  (Ex. D.18, 1996 Plan Art. IV, at VZ01064-66.)  Upon severance from the company, a participant could receive his or her pension benefit as either a lump sum or an annuity.  (*Id.*, 1996 Plan § 5.2, at VZ01067-68.)

        5.      To transition a participant from the BAMPP to the Cash Balance Plan, Bell Atlantic established opening balances under the Cash Balance Plan for each participant based on the pension entitlement that the participant had earned under the BAMPP.  (Ex. D.18, 1996 Plan § 16.5, at VZ01100-03; Ex. D.1 at VZ10392.)

        6.      The formula to establish the opening balance consisted of two steps: (1) calculating the lump-sum cashout value of the annuity a participant had earned under the

BAMPP; and (2) multiplying the lump-sum cashout value by a transition factor. (Ex. D.18, 1996 Plan §§ 16.5.1(a), at VZ01100; Ex. D.1 at VZ10392.) The opening balances of the Cash Balance participants thereafter grew through the addition of pay credits and interest credits. (Ex. D.18, 1996 Plan §§ 4.4-4.5 at VZ01065; Ex. D.1 at VZ10389-90.)

7.      The transition factors were designed so that participants who were close to reaching the age and service thresholds for a Service Pension under the BAMPP, and thus were expecting to see an upward spike in the value of their BAMPP accrued benefit, would receive a retirement benefit that approximated the expected cashout value of their Service Pension under the BAMPP. (Ex. D.1 at VZ01391-94; Ex. D.7 at MER0004806-09; Ex. D.8 at VZ13307-08.) Transition factors were carried to three decimal places and ranged from 1.000 to 3.105. (Ex. D.18, 1996 Plan Art. 16, at VZ01102-03.) The applicable transition factor depended on the participant's age and service. (*Id.*) Young participants with relatively little service had a transition factor of 1.000. (*Id.*) The closer a participant was to qualifying for a Service Pension under the BAMPP, the higher the participant's transition factor. (*Id.*) For participants 40-46 years old with 16-20 years of service, for example, the transition factors were as follows:

| YEARS OF SERVICE | | | | |
|---|---|---|---|---|
| AGE | 16 | 17 | 18 | 19 | 20 |
| 40 | 1.589 | 1.620 | 1.657 | 1.675 | 1.714 |
| 41 | 1.596 | 1.629 | 1.665 | 1.686 | 1.697 |
| 42 | 1.603 | 1.637 | 1.674 | 1.697 | 1.710 |
| 43 | 1.610 | 1.646 | 1.682 | 1.708 | 1.724 |
| 44 | 1.618 | 1.655 | 1.691 | 1.719 | 1.737 |
| 45 | 1.625 | 1.664 | 1.699 | 1.730 | 1.751 |
| 46 | 1.632 | 1.672 | 1.707 | 1.741 | 1.764 |

(*Id.* at VZ01102.) Most participants who had already become eligible for a Service Pension under the BAMPP, and had already experienced the upward spike in the value of their BAMPP accrued benefit, had a transition factor of 1.000. (*Id.* at VZ01103.) (Others who had recently

qualified for a Service Pension but not for the full early retirement benefit had transition factors between 1.000 and 1.281.) (*Id*.)

8.      Plaintiff Cynthia N. Young was a salaried employee of Bell Atlantic. As of January 1, 1996, plaintiff was approximately 48 years-old and had 27.8 years of Bell Atlantic net credited service. Her transition factor was 2.659. (Ex. D.14 at Y000811.)

9.      Opening balances were established for 13,784 BAMPP participants as of January 1, 1996. These included 2,271 participants who were already eligible for a Service Pension and 11,513 who were not eligible for a Service Pension. (Ex. D.62.)

**The Development of the Transition Factors.**

10.      Mercer Human Resources Consulting ("Mercer") was retained by Bell Atlantic in 1994 to develop the cash balance formula, including the formula for establishing the opening balances of participants who had previously earned pension entitlements under the BAMPP. (Ex. D.54 at 30.) On September 26, 1995, after extensive work, Mercer submitted its final recommendations for the Cash Balance Plan, including its final version of the transition factor table. (Exs. D.5, D.54 at 213-26.) Mercer's cover memorandum explicitly stated that the formula was developed with the express understanding that the transition factor was to be multiplied only once by the lump sum cashout value:

> The following items should be noted about the calculation of initial cash balance accounts as of January 1, 1996 using the attached recommended final transition tables: . . . The lump sum cash out value is then multiplied by the transition factor provided on the attached transition tables to calculate the actual opening balance under the cash balance plan.

(Ex. D.5 at VZ10229.)

11. Mercer's September 26 memorandum to Bell Atlantic included a 15-year projection of liabilities. (Ex. D.5 at VZ10235-36.) The projected liabilities were based on the understanding that the transition factor would be multiplied only once. (Ex. D.54 at 244.)

12. On September 27, 1995, Mercer sent to Coopers & Lybrand the specifications needed by the plan administrator to calculate the opening balances as of January 1996. (Ex. D.6.) Those specifications provided for multiplying the lump sum cashout value times the transition factor only once. (*Id.* at MER0004684-85; Ex. D.54 at 102-112, 221-228.)

13. The transition factors in the table attached to Mercer's September 26, 1995 memorandum to Bell Atlantic and its September 27 memorandum to Coopers & Lybrand are the same ones used to calculate the actual opening balances in January 1996 and the same ones contained in the tables attached to the July 1996 Cash Balance Plan. (*Compare* Ex. D.18, 1996 Plan Art. 16, at VZ01102-03 *with* Ex. D.5 at VZ10233-34 *and* Ex. D.6 at MER0004686-87.)

14. In two memoranda dated October 22, 1996 and November 14, 1997 – long after the opening balances for participants had actually been calculated – Mercer provided a detailed description of the methodology that had been used to calculate each Plan participant's January 1996 opening balance. (Exs. D.7, D.8.) Mercer's description made clear its continued understanding that the lump-sum cashout value under the BAMPP had been multiplied by the transition factor only once. (*Id.*; Ex. D.54 at 234-239.)

15. According to Robert Moreen, the Mercer partner in charge of the Bell Atlantic engagement, during the development of the Cash Balance formula, "the idea of multiplying twice by the transition factor was never once discussed." (Ex. D.54 at 105-106, 125, 243-244.) Multiplying the lump-sum cashout value by the transition factor twice would have "vitiated" the goals that guided the construction of the transition factor table because it would

have given participants benefits that were far more valuable than the benefits they could have earned under the BAMPP. (*Id.*, D.54 at 230-232.)

**The Corporate Approval of the Cash Balance Plan Design.**

16. Bell Atlantic's Corporate Employee Benefits Committee ("CEBC") adopted a resolution in October 1995 authorizing the transition from the BAMPP to the Cash Balance Plan. (Ex. D.3.) The resolution specified that a participant's opening balance in the Plan would equal "the product of the cashout value of the participant's accrued benefit. . . determined under the existing rules of BAMPP . . . times a transition factor (greater than or equal to 1.0) according to the table presented at the meeting." (*Id.* at VZ01039.) The table presented at the meeting was the Transition Factor table submitted by Mercer in September 1995. (Ex. D.5 at VZ10233-34.)

17. In November 1995 the Human Resources Committee ("HRC") of Bell Atlantic's Board of Directors approved in full "the pension plan amendments recommended by the [CEBC]." (Ex. D.4.)

**The Bell Atlantic Summary of Material Modifications.**

18. Both ERISA and regulations adopted by the Department of Labor require the administrator of an ERISA pension plan to provide participants with a Summary of Material Modifications ("SMM"), which is a written notification of material changes to the terms of the plan, as well as changes in other information required to be provided in the Summary Plan Description ("SPD"). ERISA § 104(b)(1), 29 U.S.C. § 1024(b)(1); 29 C.F.R. § 2520.104b-3(a) (2009). The SMM is an important plan document because it communicates to plan participants changes in how their benefits will be calculated. *See*, *e.g.*, *Amara v. CIGNA Corp.*, 559 F. Supp. 2d 192, 211 (D. Conn. 2008). To the extent that the changes in material plan terms are described in a timely SPD, no separate SMM need be furnished. 29 C.F.R. § 2520.104b-3(b) (2009).

19.     In October 1995, Bell Atlantic sent all BAMPP participants a booklet,
"Introducing Your Cash Balance Plan" that described the provisions of the new cash balance
formula, including the formula for calculating the opening balances of participants who had
earned pension entitlements under the BAMPP.  (Ex. D.1.)  "Introducing Your Cash Balance
Plan" constituted a Summary of Material Modifications ("SMM") under ERISA § 104(b)(1) and
29 C.F.R. § 2520.104b-3 (2009).  The SMM used the following formula to show how a
participant's lump-sum cashout benefit under the BAMPP was converted to the opening balance
under the Cash Balance Plan:



(Ex. D.1 at VZ10392.)  The SMM also explained the benefit conversion in words:

> **Step 1**:  Your current pension benefit will be calculated based on
> your age, service and pay as of December 31, 1995
>
> **Step 2**:  Next, your current benefit will be converted to a lump-
> sum cash-out value, using the same conversion method used in
> calculating a cash-out payment under the old plan. . . .
>
> **Step 3**:  Finally, to make sure the new Plan continues to provide
> you with a fair benefit, your account balance may be increased by
> multiplying the lump-sum cash-out value determined in Step 2
> times a special transition multiplier to arrive at your opening
> account balance.

(*Id.*)

20.     The SMM provided specific examples of the effect of "the transition
multiplier" on various hypothetical Plan participants.  (Ex. D.1 at VZ10393-94.)  One example,
"Alison," was a 47 year-old employee with 27 years of Bell Atlantic service on the conversion
date.  (*Id.* at VZ10394.)  The booklet explained:

> Her transition multiplier of 2.680 increases her opening account
> balance so that, together with future pay credits and interest

credits, the gap between the old plan and the new Cash Balance
Plan will be filled.

(*Id.*)  If Bell Atlantic had intended to multiply the transition factor twice, "Alison's" "special transition multiplier" would have been 7.1824 (2.68 x 2.68), not 2.68, and her opening balance would nearly triple.

21.     In communications to plan participants in October 1995, November 1995 and May 1996, Bell Atlantic repeatedly instructed participants to "please be sure to read" and "please refer to" the SMM, "Introducing Your Cash Balance Plan" (also known as "the Cash Balance brochure"), for an accurate statement of the Plan's opening balance and transition factor provisions.  (Ex. D.10 at VZ10553; Ex. D.11 at VZ10476; Ex. D.13 at VZ10519.)

**Other Bell Atlantic Communications to Employees in 1995.**

22.     In October 1995, Bell Atlantic prepared a video for BAMPP participants to describe the transition to the Cash Balance Plan.  (Ex. D.10.)  The video, entitled "Changes," stated that the opening balance would be calculated by multiplying the participant's lump-sum cash-out value by the applicable transition factor only once.  (*Id.* at VZ10553.)

23.     In November 1995, Bell Atlantic sent personalized estimated "opening balance" statements to each BAMPP participant.  (Ex. D.11.)  These statements provided each participant with an estimate of the participant's opening balance in the Cash Balance Plan, provided a step-by-step description of the opening balance formula, and contained a table of the Plan's transition factors.  (*Id.* at VZ10475-76.)  A sample statement for a 36-year, 9-month old employee with between 14 and 15 years of service as of January 1, 1996 stated:

> STEP 1:
> Your monthly Age 65 Deferred Pension benefit as a Single Life
> Annuity estimated at 12/31/1995 is . . . . $1,520.
>
> STEP 2:

Your monthly pension converted to a lump-sum cash-out value at
12/31/1995 is . . . . $35,812.

STEP 3:
Your lump-sum amount times your transition multiplier of 1.480 is
your Estimated Opening Account Balance. . . . $53,001.

(*Id.* at VZ10476.)

**Implementation of the Opening Balance Formula.**

24.     Mercer was selected to write the specifications for the calculation of the

opening balances, and Coopers & Lybrand was retained by Bell Atlantic to do the actual

calculations.  (Ex. D.54 at 102-103, 135-136.)  Robert Maienshein of Mercer prepared the

specifications and transmitted them to Coopers & Lybrand on September 27, 1995.  (*Id.*, Ex.

D.54 at 102-110, 221-222; Ex. D.6.)  The specifications provided that the transition factor would

be multiplied only once.  (Exs. D.6, D.54 at 221-228.)

25.     Opening Balances were established for 13,784 plan participants as of

January 1, 1996.  All of the calculations were performed multiplying the transition factor only

once.  Of the 11,513 participants not eligible for a Service Pension, 10,808 had transition factors

greater than 1.000.  Most of them – approximately 8,600 – had transition factors of 1.5 or higher,

and 4,750 had transition factors of 2.000 or higher.  The 2,271 Service Pension eligible

participants for whom opening balances were established included 762 with transition factors

greater than 1.000 (none higher than 1.281, however).  (Exs. D.51, D.62.)

26.     Squaring the transition factors for the participants who were not eligible

for a Service Pension would have increased their opening balances by $1.67 billion

($1,670,000,000.00).  The opening balances of the 4,750 participants with transition factors

greater than 2.000 would have been at least doubled, and in many cases nearly tripled, if their

transition factors had been squared.  More than 5,780 participants would have received increases

- 11-

in the opening balances of $100,000 or more – increases that would have given them opening balances that exceeded the opening balances of many of the 2,271 participants whose longer service or higher age had already qualified them for a Service Pension. (Exs. D.51, D.62.)

**Post-Conversion Employee Communications.**

27. In May 1996, Bell Atlantic provided each participant in the Cash Balance Plan with a customized retirement planning guide, "A Look at Your Future Today: Your Retirement Planning Guide." (Ex. D.13.) This guide included a personalized "opening balance" statement setting forth each participant's actual opening balance calculation. (*Id.* at VZ10519.) These actual opening balance statements explained that each participant's lump sum cash-out value would be multiplied by the applicable transition factor only once. (*Id.*) For a 45 year old employee with 23 plus years of service as of January 1, 1996, the guide stated:

> STEP 1:
> Your monthly Age 65 Deferred Pension benefit as a Single Life
> Annuity estimated at 12/31/1995 is . . . . $1,847.25 .
>
> STEP 2:
> Your monthly pension converted to a lump-sum cash-out value at
> 12/31/1995 is . . . . $66,394.36
>
> STEP 3:
> Your lump-sum amount times your transition multiplier of 2.200 is
> your Estimated Opening Account Balance. . . . $146,067.60.

(*Id.*) If Bell Atlantic had intended the transition factor to be squared, the participant's opening balance would have been $312,348.72 ($66,394 x 2.200 x 2.200).

28. Starting June 30, 1996, Bell Atlantic sent quarterly statements to each participant setting forth the then-current balance in the participant's cash balance account. (*E.g.*, Ex. D.15.)

29.     By June 30, 1996, Bell Atlantic had completed more than 50,000 separate mailings to participants, each of which made clear that the lump-sum cash out was multiplied by the transition factor just once.  (Exs. D.1, D.11, D.13.)

**The Correct Formula Was Communicated to Plaintiff.**

30.     Plaintiff does not assert that she ever reviewed or relied on the mistaken language in the 1996 and 1997 plan documents.  Nor could she, since she never looked at the plans until 2008, when her lawyers were preparing her for deposition, at which time she merely "glanced" at them.  (Ex. D.58 at 84-87)

31.     The 1996 version of the Cash Balance Plan, including appendices, was nearly 150 pages.  (Exs. D.17, D.18.)  Except in the event of a specific request by a Plan participant, Bell Atlantic did not distribute to participants the restated document containing the erroneous description of the § 16.5.1(a)(2) opening balance formula.  (Ex. D.9 at VZ10400.)  Although Bell Atlantic regularly provided participants with information on how to obtain a copy of the Plan (and although Verizon continues to regularly provide this information), few requests were received for copies of the Plan document.  (Ex. D.67 at 11-12.)

32.     Plaintiff received from Bell Atlantic and retained in her personal files numerous communications plainly stating that her opening balance would be calculated based on a one-time multiplication by the transition factor.  One of the documents plaintiff received, reviewed and kept in her files was the October 1995 SMM, "Introducing Your Cash Balance Plan."  (Ex. D.2.)  Plaintiff wrote her name on this document and kept it in her files for more than 10 years with other "important" documents relating to her employment.  (Ex. D.58 at 28-37.)

33.     Plaintiff produced from her files the Estimated Opening Account Balance Statement ("Specially prepared for: Cynthia Young"), which was distributed in November 1995. (Ex. D.12.)  This document explained the calculation of the opening balance:

> STEP TWO:
> "Your . . . lump-sum cash-out value at 12/13/95 is $90,027."
>
> STEP THREE:
> "Your lump-sum amount times your transition multiplier of 2.659
> is your Estimated Opening Account Balance . . . $239,381."

(*Id.* at Y000842.)

34.     Plaintiff produced from her files the May 1996 booklet, "A Look at Your Future Today," which was sent to her at home and described the actual calculation of her opening account balance, explaining that

> STEP TWO:
> "Your monthly pension converted to a lump-sum cash-out value at
> 12/31/95 was $90,307.16"
>
> STEP THREE:
> "Your lump-sum amount times your transition multiplier of 2.659
> is your Opening Account Balance on 1/1/96 . . . $240,126.74."

(Ex. D.14 at Y000811; Ex. D.58 at 48-50).

35.     Plaintiff produced from her files the quarterly statements that she received showing her Cash Balance Account at the start of each quarter and the amount that it grew through pay and interest credits.  (Exs. D.15, D.58 at 56-57)  These statements showed that her opening balances grew from $240,126 in January 1996 to $246,004 as of March 31, 1996; to $251,030 on June 30, 1996, to $256,572 on September 30, 1996 and so on, until she cashed out her benefits in February 1998.  (Exs. D.15, D.64.)

36.     Squaring the transition factor would have produced balances far greater than the amounts communicated to plaintiff in November 1995, in May 1996, and quarterly from

- 14-

June 30, 1996 until she cashed out in February 1998.  Squaring the transition factor would have increased the estimated opening balance communicated in November 1995 from $239,581 to $636,516; squaring the transition factor would have increased the actual opening balance communicated in May 1996 from $240,126 to $638,495; squaring the transition factor would have increased each of the quarterly statements in 1996 and 1997 by approximately $400,000. This is because multiplying 2.659 twice (or squaring it) is equivalent to multiplying times 7.070281.  (Exs. D.12, D.14, D.15.)

**The Actuarial Report.**

37.     The Plan actuary, Towers Perrin, prepared an actuarial report for the Cash Balance Plan in January 1997, in which Towers Perrin determined the Plan's liabilities and assets as of January 1, 1996.  (Ex. D.16.)  This report explained that Towers Perrin's determination of the Plan's liabilities was based on the understanding that Plan's opening balances for BAMPP participants were calculated by multiplying each participant's lump sum cash-out value by the transition factor one time.  (*Id.* at VZ13263, VZ13270, VZ13274, VZ13295-96.)

38.     If the opening balances were to be calculated by multiplying each participant's lump sum cash-out value by the square of the transition factor, the Plan's liabilities would have increased by at least $1.67 billion ($1,670,000,000.00) above the amount reported by Towers Perrin.  (Exs. D.51, D.62.)

**The Mistake in the July 1996 Plan Document.**

39.     Although the Cash Balance Plan was effective as of January 1, 1996, the restated Plan document was not finalized until July 1996, long after Bell Atlantic had issued to employees the Summary of Material Modifications describing the calculation of the opening

balances and long after the actual opening balances had been calculated and communicated to all 13,784 plan participants.  (Ex. D.18.)

40.    Barry Peters was the Bell Atlantic employee responsible for ensuring that the restated Plan document was consistent with the amendment approved by the CEBC October 1995 and adopted by the HRC in November 1995.  (Ex. D.56 at 50, 65-66.)  Peters, who was located in the Philadelphia headquarters of Bell Atlantic, was the company attorney responsible for pension issues at Bell Atlantic and was counsel to the CEBC.  (Exs. D.56 at 12-14, D.57 at 149.)

41.    Six drafts of the Cash Balance Plan were prepared.  Mercer prepared the first three, completing the first in August 1995 and the third in October 1995.  (Exs. D.19, D.20, D.21, D.56 at 51-53.)  The three Mercer drafts express the opening balance formula in similar terms.  (Ex. D.19 at VZ10804-05; Ex. D.20 at VZ10971-77; Ex. D.21 at VZ11144-45.)  The relevant language in the third draft of the Plan states:

> (i)    1995 Active Participants and 1995 Former Active Participants.  In the case of a 1995 Active Participant or 1995 Former Active Participant, the opening balance of the Participant's Cash Balance Account on January 1, 1996 shall be the amount described in (I) or (II) below, as applicable:
>
> (I)    If, as of December 31, 1995, the Participant was eligible for a Normal Retirement Service Pension or an Early Retirement Service Pension under the 1995 Plan, then the amount described in this paragraph (I) is **the present value** of the immediate benefit payable commencing on January 1, 1996 under the 1995 Plan, determined as if the participant had retired on December 31, 1995, or the date of status change to a non-Eligible Employee category, if earlier, **multiplied by the applicable transition factor** described in Schedule D.

- 16-

        (II)      In the case of a Participant not described in (I) above, the amount described in this paragraph (II) is **the present value** as of January 1, 1996 of the Accrued Pension Benefit payable at age 65 under the 1995 Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995, or the date of status change to a non-Eligible Employee category, if earlier, **multiplied by the applicable transition factor** described in Schedule D.

(Ex. D.21 at VZ11145 (emphases added).)

       42.      Peters prepared Draft 4 of the Cash Balance Plan, dated April 15, 1996. (Ex. D.56 at 53.) Peters edited and reorganized the language governing the calculation of the opening balances to make the text clearer. (*Id.*, Ex. D.56 at 73-74, 81-82.) As revised, Draft 4 expressed the opening balance as "the product" of one number "times" another, setting off the two components of the opening balance formula with a capital "A" and "B" in parentheses, and with "times" in italics to emphasize that "[y]ou multiply block 'A' *times* block 'B.'" (Ex. D.56 at 58-60; 62-63; 63-64; 73-75.) The draft also made the transition factor a defined term, and highlighted this through the use of initial capitals – "Transition Factor." (*Id.*, Ex. D.56 at 58-59.) Peters' draft 4 also reversed the order of the two components of the opening balance formula, placing the more succinctly described term, the Transition Factor, first, so that the "(A) times (B)" structure was more obvious, and used a Bell Atlantic term of art, "lump-sum cashout value" for the other component of the formula. (*Id.*, Ex. D.56 at 59, 62-63.) Peters also changed the format of the transition factor table by splitting it in two, with one table for those eligible for a service pension and the other for those not eligible. VZ11500.

       43.      Thus, Peters revised § 4.3.1(a)(1) (the predecessor to Plan § 16.5.1(a)(1)) in draft 4 as follows:

        If, as of December 31, 1995, the Participant was eligible for a Normal Retirement Service Pension or an Early Retirement Service Pension under the 1995 BAMPP Plan, then the amount

> described in this paragraph (1) is t**he product of multiplying (A)
> the Participant's applicable Transition Factor described
> in Schedule C,** *times* **(B) the lump-sum cashout value** of the
> immediate annuity benefit under the 1995 BAMPP Plan,
> determined as if the Participant had retired on December 31, 1995.

(Ex. D.22 at VZ11248 (bold emphasis added).)

44.     Peters revised § 4.3.1(a)(2) (the predecessor of Plan § 16.5.1(a)(2)) as

follows:

> In the case of a Participant who is not eligible for a Service
> Pension under the 1995 BAMPP Plan as of the Transition Date, the
> amount described in this paragraph (2) is **the product of
> multiplying (A) the Participant's applicable Transition Factor
> described in Schedule D,** *times* **(B) the lump-sum cashout value**
> of the Accrued Benefit payable at age 65 under the 1995 BAMPP
> Plan, determined as if the Participant had a Severance From
> Service Date on December 31, 1995, based on Compensation paid
> through December 31, 1995, or the date of status change to a non-
> Eligible Employee category, if earlier, **multiplied by the
> applicable transition factor described in Schedule C**.

(Ex. D.22 at VZ11248 (bold emphasis added).)

45.     In revising § 4.3.1(a)(2), Peters made a significant drafting error.

Working on a word processor, and attempting to make the same revisions in § 4.3.1(a)(2) as he

did in § 4.3.1(a)(1), Peters neglected to delete the "trailing clause" at the end of the paragraph,

"multiplied by the applicable transition factor." (Exs. D.22, D.56 at 58-64, 70; 73-75, 78.)

46.     As a result of Peters' mistake, the formula in § 4.3.1(a)(2) inadvertently

called for the lump sum cashout value to be multiplied by the transition factor twice: that is, the

new provision incorrectly called for the lump sum cashout value to be multiplied by the square of

the transition factor, rather than simply by the transition factor. (Ex. D.22 at VZ11248.)

47.     It was never Peters' understanding that Bell Atlantic intended that the

formula for any participant's opening balance would call for the lump sum cashout value to be

multiplied by the square of the transition factor. (Ex. D.56 at 74 ("I failed to delete this trailing

clause at the end of the paragraph. . . . I know that's an error because it's contrary to the terms of

the plan that were approved. . . . This is the first draft that I had a hands-on role in doing and this

is an error that I, therefore, made."); (*Id.* at 75) ("I'm the one who failed to strike the phrase that

had been in the prior draft at the end of the paragraph when I reformatted the paragraph."); (*Id.* at

78) ("I do not believe I was negligent.  I believe I made an error that was unintentional and I did

not know I made the error. . . . It was a good faith error which I regret."); (*Id.* at 111) ("I never

knew of the error that I had made and I never heard anyone tell me that that text problem

existed.").

    48.    The second reference to the transition factor remained in the fifth and sixth

drafts, as well as the restated July 1996 Plan document (re-numbered as § 16.5.1(a)(2)), and the

subsequent 1997 restatement of the Plan.  (Ex. D.23 at VZ11379; Ex. D.24 at VZ11565; Ex.

D.18, 1996 Plan § 16.5.1(a)(2) at VZ01100; Ex. D.25, 1997 Plan § 16.5.1(a)(2) at VZ11781.)

Peters did not realize that he had mistakenly included two references to the transition factor in

the § 16.5.1(a)(2) formula, and no one brought the mistake to his attention.  (Ex. D.56 at 75; 111,

174-75, 180-84, 202, 209-10.)

**NYNEX.**

    49.    Bell Atlantic merged with NYNEX effective August 14, 1997.  (Ex. D.50)

In September 1997 Bell Atlantic's CEBC adopted a resolution authorizing the amendment of the

NYNEX Management Pension Plan ("NYNEX Plan") to provide for a cash balance formula

("Bell Atlantic-North Plan" or "BA-North Plan") for salaried employees formerly with NYNEX.

(Ex. D.26.)  The CEBC resolution stated that one purpose of the amendment was "conforming

the design of the [NYNEX Plan] to the benefit design approved by this Committee in 1995 for

the Bell Atlantic Cash Balance Plan."  (*Id.* at VZ13469.)  The Human Resources Committee of

Bell Atlantic's Board of Directors adopted a parallel amendment on September 5, 1997, stating

that the BA-North Cash Balance Plan was to be "substantially identical" to the Bell Atlantic (South) cash balance plan, "including without limitation . . . a reasonable methodology for a one-time transition from the [NYNEX Plan's] prior benefit design to an opening account balance." (Ex. D.27 at VZ13472; Ex. D.57 at 37.)

50.     Under the Bell Atlantic-North Plan, opening balances were calculated by multiplying *once* by the transition factor, not twice.  (Ex. D.28, BA-North Plan § 16.5.1(b)(2), at VZ13650.)  The Bell Atlantic-North Plan also used exactly the same tables of transition factors that Bell Atlantic used in January 1996.  (*Compare* Ex. D.18, 1996 Plan Art. 16, at VZ01102-03 *with* Ex. D.28, BA-North Plan Art. 16, at VZ13653-54.)

51.     Numerous communications to NYNEX Plan participants confirmed that the "substantially identical" provisions of the BA-North Plan required the transition factor to be multiplied only once to calculate each participant's opening balance.  (Ex. D.29 at VZ13486-90, VZ13490-92; Ex. D.30 at VZ13531-36, VZ13537-49.)

52.     Outside counsel, Morgan, Lewis & Bockius LLP, drafted the BA-North Plan document in 1998.  (Exs. D.56 at 118, D.57 at 30.)  In drafting the provision relating to the transition formula, Morgan Lewis did not make the same mistake that Peters made in 1996.  (Ex. D.28, BA-North Plan § 16.5.1(b)(2), at VZ13650.)

53.     In preparation for the eventual merger of the two plans, Bell Atlantic's cash balance plan was then revised, "cloning" or mirroring the Bell Atlantic-North document – *i.e.*, lifting entire provisions verbatim.  (Exs. D.56 at 96-98, D.57 at 29-30.)  Since Morgan Lewis, like all others, thought that multiplication by the transition factor, not its square, was "the way we thought it was supposed to be written" (Ex. D.55 at 207), and since the BA-North document did not include the erroneous second reference to a transition factor, neither did the

1998 Bell Atlantic Plan, (Ex. D.31, 1998 Plan, § 16.5.1(b)(2), at VZ11713; Ex. D.57 at 26-28; Ex. D.56 at 103-06, 120-21.)

54.     A subsequent 1999 restatement of the Cash Balance Plan similarly stated the opening balance formula without the erroneous squaring of the transition factor.  (Ex. D.32) Effective December 1, 1999, the Cash Balance Plan and the Bell Atlantic-North Plan were merged, and the merged 1999 Plan and its 2000 restatement also stated the opening balance formula using a single transition factor.  (Exs. D.33, D.34.)

55.     In June 1999 all Bell Atlantic plan participants (including participants in the Cash Balance Plan and the Bell Atlantic-North Plan) received a special edition of Bell Atlantic's "HR & You" newsletter describing the history of the BAMPP and NYNEX Plan conversions to cash balance formulas.  (Ex. D.35.)  In February 2000 another edition of "HR & You" described some changes to the Bell Atlantic Cash Balance Plan.  (Ex. D.36.)  Both the June 1999 and the February 2000 newsletters once again made clear that each participant's opening balance had been calculated using only a single multiplication by the participant's transition factor.  (Ex. D.35 at VZ12895-97; Ex. D.36 at VZ12916.)

**<u>No Other Claims.</u>**

56.     During the period from January 1, 1996 until plaintiff filed her claim in August 2006, *no* participant asserted a claim, either through the Plan's administrative claims process or through litigation, that his or her opening balance should have been calculated by multiplying the lump sum cashout value of his or her BAMPP accrued benefit by the square of the transition factor.  (Ex. D.68.)

57.     The only record of anyone noticing the erroneous second reference to a transition factor in § 16.5.1(a)(2) is a brief filed by the plaintiffs in purported class-action ERISA case, *Corcoran v. Bell Atlantic Corp.*, No. 97-cv-510 (E.D. Pa.), which challenged a different

element of the calculation of opening balances. (Ex. D.37.) Plaintiffs' counsel in that case

(seven lawyers from three firms) observed in a footnote that "literal application" of the provision

in § 16.5.1(a)(2) "appears to require" that the transition factor be multiplied twice and that this

would be "highly advantageous" to six of the nine *Corcoran* plaintiffs, and other class members,

who were not eligible for a Service Pension. (*Id.* at VZ22557.) For these six Corcoran plaintiffs,

the potential advantage would have been as follows:

| | | | | | |
|---|---|---|---|---|---|
| (1) | Thomas Finerghty: | | (2) | Theresa (Poysden) McGee: | |
| | Opening Balance: | $188,656.47 | | Opening Balance: | $211,944.73 |
| | Transition Factor: | 2.75 | | Transition Factor: | 2.90 |
| | TF-squared OB: | $517,862.02 | | TF-squared OB: | $615,487.52 |
| | **OB Increase:** | **$329,205.55** | | **OB Increase:** | **$403,542.79** |
| (3) | John J. Nolan: | | (4) | Dave Pierce: | |
| | Opening Balance: | $171,931.20 | | Opening Balance: | $223,155.42 |
| | Transition Factor: | 2.80 | | Transition Factor: | 2.93 |
| | TF-squared OB: | $481,751.23 | | TF-squared OB: | $653,399.09 |
| | **OB Increase:** | **$309,820.03** | | **OB Increase:** | **$430,243.67** |
| (5) | Verne D. Rider: | | (6) | Ronald Townsend: | |
| | Opening Balance: | $99,904.94 | | Opening Balance: | $225,821.96 |
| | Transition Factor: | 1.79 | | Transition Factor: | 2.85 |
| | TF-squared OB: | $179,129.56 | | TF-squared OB: | $644,495.90 |
| | **OB Increase:** | **$79,224.62** | | **OB Increase:** | **$418,673.94** |

(Ex. D.62.) Squaring the transition factor would result in an aggregate increase of

$1,970,710.60, from $1.1 million to $3.1 million, in the opening balances for these six *Corcoran*

plaintiffs alone. The *Corcoran* plaintiffs and their counsel candidly acknowledged, however,

that the Plan document reflected a mistake ("a scrivener's error") and that they expected to

receive no more than the opening balance resulting from multiplying the participant's lump-sum

cashout value by the transition factor only once. (Ex. D.37 at VZ22558.)

**Plaintiff's Assertion of Her Claim.**

58.     In 2003, more than five years after plaintiff retired, she contacted the National Center for Retirement Benefits, which offered at no cost to her to review her retirement plan to determine whether a claim for additional benefits might be asserted, and entered into an agreement for such a review.  Plaintiff did so because she thought that mistakes might have been made in calculating her pension, especially with regard to the recording of her compensation. (Exs. D.58 at 70-78, D.38, D.39.)

59.     The National Center for Retirement Benefits obtained copies of plan documents, including the 1997 restatement of the Plan, which contains the erroneous second reference to the transition factor.  (Exs. D.40, D. 41, D.25.)

60.     Represented by the National Center for Retirement Benefits, plaintiff filed an administrative claim with the Committee on June 9, 2004.  (Ex. D.42.)  The National Center for Retirement Benefits read §16.5.1(a)(2) as requiring that the lump-sum cashout value be multiplied by the transition factor ("approximately 2.6") only once, but argued that plaintiff's benefit should be higher because Bell Atlantic should have used a different discount rate to calculate the lump-sum cashout value (100% – not 120% – of the PBGC rate).  (*Id.*)  The Verizon Claims Review Unit denied this claim on October 19, 2004.  (Ex. D.43.)  Plaintiff appealed the Claims Review Unit's decision to the Committee on December 6, 2004. (Ex. D.44.)  The Committee denied plaintiff's appeal in February 2005.  (Ex. D.45.)

61.     Represented by five lawyers at three firms, plaintiff filed the complaint in this action on December 30, 2005.  (Dkt. 1.)  The complaint quotes §16.5.1(a)(2), including the erroneous second reference to the transition factor, and attaches as Exhibit B the 1996 restatement of the Plan.  (*Id.* at ¶ 24 & Ex. B.)  But plaintiff challenged only the discount rate used to calculate her opening balance, arguing that her opening balance should have been larger

by $52,000.  She did argue that the transition factor should have been multiplied twice, which would have increased her opening balance by more than $400,000.  (Ex. D.66.)

62.     On July 26, 2006, three years after her representatives obtained a copy of the plan document upon which they now base Young's case, plaintiff sought leave to amend the complaint to add a claim relating to the transition factor.  (Dkt. 36.)  The Court granted the motion in August 2006 and stayed all proceedings to permit plaintiff to seek administrative review of her second claim.  (Dkt. 43.)

63.     The Claims Review Unit denied plaintiff's transition factor claim in a determination letter dated December 8, 2006.  (Ex. D.46.)  In a determination letter dated April 5, 2007, the Committee denied plaintiff's administrative appeal.  (Ex. D.47.)

64.     The Committee, after reviewing all of the evidence in the administrative record determined that Bell Atlantic's intent was to provide for a single multiplication by the transition factor, and that insertion of the second reference to the transition factor in § 16.5.1(a)(2) was a mistake.  (Ex. D.47 at VZ15646-48.)

**Enforcing the Mistake Would Create Windfall Benefit Increases.**

65.     Many employees would receive very large, unexpected increases in their opening balances if the transition factor were squared.  Delores Brecker, for example, whose salary as of December 31, 1995, was $110,000, had a transition factor of 2.91, based on her age of 47 and her service of 29.33 years.  If the transition factor were squared, her opening balance of $431,000 would increase to $1,253,000 – an increase of $822,000.  (Ex. D.62 at VZ27199.)  Likewise, if his 2.70 transition factor were squared, Patrick Hanley would see an increase in his opening balance of $956,000 – from $563,000 to $1,519,000.  (*Id.* at VZ27149.)  Similarly, if the transition factor were squared, Sharon Robson, Anthony Murray and Bruce Gordon would experience increases in their opening balances of $819,000, $827,000, and $829,000,

- 24-

respectively. (*Id.* at VZ27285, VZ27143, VZ27183.) Over 136 participants would receive unexpected increases in their opening balances of more than $500,000. (Ex. D.62.) Nearly 5,800 members of the subclass would receive unexpected increases in their opening balances of more than $100,000. (*Id.*)

66. Squaring the transition factor for employees not eligible for a Service Pension would result in plaintiff and many members of the subclass receiving benefits as of the transition date that were substantially larger than the benefits received by co-workers of the same age who received the same annual compensation, yet worked more years for Bell Atlantic. (Ex. D.62.) In effect, this would penalize many employees for their longer service. It would also violate a fundamental understanding under which Bell Atlantic participants had operated throughout their employment: that each additional year of service resulted in an increase in their retirement benefit, and that the attainment of the years of service and age required for a Service Pension would result in a substantial increase in their benefit. (Ex. D.17, BAMPP §§ 4.1-4.3, at VZ00109-12; Ex. D.1 at VZ10391-94.) Similarly, it would conflict with the objectives of Section 204(b)(1)(G) of ERISA, 29 U.S.C. § 1054(b)(1)(G), which provides that a participant's accrued benefit may not be reduced on account of any increase in his age or service.

67. Plaintiff was 48 years-old and had 27.8 years of Bell Atlantic service as of January 1, 1996. (Ex. D.14 at Y000811.) The opening balance for a participant with the same age and earnings, but 30 years of service, would have been determined under Plan § 16.5.1(a)(1) because the participant would have been eligible for a Service Pension. (Ex. D.17, BAMPP § 4.3(a), at VZ00111; Ex. D.18 1996 Plan § 16.5.1(a)(1), at VZ01100.) Not surprisingly, the participant with the additional 2.2 years of service would have been entitled to the larger benefit, $262,000 vs. $240,812. (Ex. D.47 at VZ15648.) But if the transition factor is squared in

computing plaintiff's benefit under § 16.5.1(a)(2), plaintiff with 27.8 years of Bell Atlantic service would have an opening balance of $640,321 – far more than the $262,000 earned by the otherwise identical participant with an additional two plus years of service. (*Id*.) Bryon Deboer is an example of a participant who had three years more service than plaintiff, was four years older and had a slightly higher rate of pay as of December 31, 1995. (Ex. D.62 at VZ27150.) His opening balance of $352,018 was $111,000 more than plaintiff's opening balance of $240,812. (*Id*.) But if the transition factor is squared, plaintiff's opening balance would jump ahead of Deboer's by nearly $300,000. (*Id*.)

68.     Examples of the anomalies produced by squaring the transition factor for employees not eligible for a Service Pension are numerous. Compare, for example, Rose Weinman and Mary Richardson, who were not eligible for a Service Pension, to Dorothy Baker, who was older, had more service and was higher paid. (Ex. D.62 at VZ27222, VZ27198, VZ27114.) Because her age and service had already qualified her for a Service Pension as of the date of conversion to the Cash Balance Plan (as well as her higher pay), Baker received a higher opening balance on January 1, 1995 than Weinman and Richardson ($257,000 for Baker, $210,000 for Weinman, and $221,00 for Richardson). (*Id*.) But if the transition factor is squared for Weinman and Richardson (because §16.5.1(a)(2) applies to them) but not for Baker (because §16.5.1(a)(1) applies to her), their opening balances would leapfrog far ahead of Baker's ($604,000 for Weinman and $643,00 for Richardson, as compared to $257,000 for Baker). (*Id*.) Weinman and Richardson would also leapfrog ahead of numerous other employees whose age, service and 1995 pay were greater than theirs, including the following:

| | AGE | SERVICE | 1995 SALARY | OPENING BAL | OB - TFS |
|---|---|---|---|---|---|
| Rose Weinman | 47 | 29 | $56,800 | $210,000 | $604,000 |
| Mary Richardson | 47 | 29 | $57,600 | $221,000 | $644,000 |
| Dorothy Baker | 48 | 30 | $61,500 | $257,000 | $257,000 |
| Howard Muse | 50 | 30 | $58,500 | $278,000 | $278,000 |
| David Willson | 50 | 33 | $61,900 | $294,000 | $294,000 |
| Walter Meyer | 55 | 34 | $96,000 | $520,000 | $520,000 |

(*Id.* at VZ27222, VZ27198, VZ27114, VZ27187, VZ27114.)

69.     Plaintiff and many members of the subclass would also receive benefits that exceed the benefits of many employees of NYNEX who expected to receive the same transition benefits as their peers at Bell Atlantic.  (Ex. D.48 at VZ13511, VZ13514-15.)

**The Plan Is Underfunded.**

70.     As reported in the Annual Funding Notice that was distributed to all participants in April 2009 in accordance with ERISA requirements, the Plan is currently underfunded.  (Ex. D.49.)  As of December 31, 2008, using market values to value Plan assets, as permitted by ERISA, Plan assets were $10.1 billion and Plan liabilities were $12.1 billion, leaving a shortfall of $2 billion.  (*Id.* at VZ26893, D.61.)

**Increased Benefits.**

71.     If the transition factor were now squared retroactively, benefits would likely to increase by approximately $1.1 billion ($1,100,000,000.00) or more.  (Exs. D.51-53; D.60 at 11-17; 31-48; 53-156; 192- 96.)  This is a conservative estimate, based on a detailed analysis by the Hewitt actuary who has worked on benefit calculations for Verizon employees for several years.  The analysis starts with the increase in the opening balances that would result from squaring the transition factors, which has been precisely calculated as $1.67 billion ($1,670,000,000.00) for the 10,808 participants with transition factors greater than 1.000.  For

each participant, the initial increase attributable to squaring the transition factor grows through interest credits up to the date that a participant commences his or her benefit. A number of participants, however, would receive a higher benefit in any event from an alternative benefit formula than under the Cash Balance Formula, and the increase in their Cash Balance account resulting from the squaring of the transition factor would therefore have a diminished, or no, effect on the benefit they receive. Exactly how many of the 10,808 participants would benefit from an alternative formula is not known, because it takes two-three hours to analyze how the alternative formulas would affect each participant. (Ex. D.60 at 192-95)

72.     The Hewitt actuary performed 72 individual calculations on participants chosen based on their date of benefit commencement and their transition factor (but otherwise selected blindly). (Ex. D.52.) Twenty-four of these participants commenced benefits during the period from 1996 to 2000. Twenty of the 24 received a lump sum distribution of their Cash Balance account. The remaining four of the 24 received their benefits under the "Modified Former Pension Formula" ("MFPF") – an alternative benefit calculation based on the prior BAMPP formula that Bell Atlantic adopted in 2000, retroactive to 1996 (*see* Ex. 36) – because that formula provided a lump sum benefit larger than their Cash Balance accounts. But for all four of those participants, squaring the transition factor would cause the adjusted Cash Balance account to produce a higher benefit than the MFPF formula benefit, by the amounts of $16,000, $74,000, $239,000, and $354,000. (Ex. D.52.)

73.     Approximately 2,100 participants – more than 20% of the participants with transition factors greater than 1.000 – commenced their benefits during the period from 1996 to 2000, and the increase in the opening balances for those participants would be $396 million. (Ex. D.51 at 2) The Hewitt actuary extrapolated from the experience of the 24

participants he studied and concluded that the $397 million increase in opening balances would grow to $417 million as of their benefit commencement dates. (Exs. D.52, D.53, Table 4) This calculation does not take account of interest on that amount for the period of nine to 13 years since they were paid their benefits.

74. For participants who continued their employment through 2001, it is more difficult to estimate the impact that squaring the transition factor would have on their benefit. This is because of two alternative formulas that Verizon made available after merger between Bell Atlantic and GTE. First, Verizon introduced a Highest Average Pay formula ("HAP") effective January 1, 2002, which was available to participants with both 10 or more years of net credited service as of that date and at least one hour of service after that date. (Ex. D.50, VMPP § 6A.1(b), at VZ12559-60.) Verizon also made that formula available retroactively to participants who retired between April 1, 2001 and December 31, 2001 – provided, however, they agreed to accept retiree medical benefits under a new retiree medical plan that Verizon was introducing and give up their participation in the richer Bell Atlantic retiree medical plan. (*Id.*, VMPP § 6.7, at VZ12587-88; Ex. D.60 at 68-72, 98-107.) Second, in October 2003 Verizon introduced a Management Voluntary Separation Program ("MVSP"), which was available to employees who left the company between October 1, 2003 and November 14, 2003. For each management employee electing to leave during this period, the MVSP provided, among other benefits, a 5% increase to the employee's pension benefit (under whatever formula provided the largest benefit for the employee). (Ex. D.60 at 112-17; 150.)

75. The actuary analyzed 48 participants who commenced benefits in 2001 or later, or who are still employed by Verizon. (Ex. D.52.) Because of the alternative benefit formulas introduced during this period, 22 of the 48 participants would benefit from squaring the

transition factor, and 26 would not. Those who would benefit from the squaring of the transition factor would largely be participants who had transition factors of 2.000 or higher. Many of those who would benefit from squaring the transition factor would do so to a significant extent: some would experience an increase in benefits of $540,000, $380,000, $642,000, $419,000, $367,000, $276,000, $327,000, $281,000, $215,000, and $175,000. (*Id.*)

76.     Based on the 72 participants he examined, the actuary made four separate calculations of the net increase in benefits resulting from squaring the transition factor for the 10,808 participants who had transition factors greater than 1.000. (Ex. D.53.) The four estimates all fell in a narrow range: $1.17 billion, $1.28 billion, $1.06 billion, and $1.01 billion. (Ex. D.53, Tables 1, 2, 3, and 4, respectively.)

**Statute of Limitations.**

77.     According to records maintained by the Plan's benefits administrator, 3,743 members of plaintiff's class reside in the commonwealth of Pennsylvania, more than live in any other state. (Ex. D.63.) By contrast, only 20 class members reside in the state of Illinois. (*Id.*) Plaintiff has never lived or worked in the state of Illinois. (Ex. D.58 at 5-17, 53-55.)

78.     During the period between Bell Atlantic's adoption of the Cash Balance Plan and Plaintiff's receipt of her lump sum benefit in February 1998, the Plan was not administered in Illinois. (Ex. D.64 at Y000390; D.65 at Y000695, Y000777.)

79.     The 1996 and 1997 versions of the Plan both state that "[e]xcept to the extent superseded by ERISA, all questions pertaining to the validity, construction, and operation of the Plan shall be determined in accordance with the laws of the Commonwealth of Pennsylvania." (Ex. D.18, 1996 Plan § 12.5, at VZ01090; Ex. D.25, 1997 Plan § 12.5, at VZ11770.)

## CONCLUSIONS OF LAW

I. **THE COURT SHOULD REFORM THE 1996 AND 1997 CASH BALANCE PLANS.**

   A. **ERISA Plans May Be Reformed to Correct Drafting Errors In the Absence of Participant Reliance on the Mistaken Language.**

An ERISA plan, like any contract or trust document, may be reformed where the plan contains a drafting mistake – a scrivener's error – and it is unlikely that any participant reasonably relied upon the mistake. *See, e.g.*, *Int'l Union v. Murata Erie N. Am.*, 980 F.2d 889, 907 (3d Cir. 1992); *Blackshear v. Reliance Std. Life Ins. Co.*, 509 F.3d 634, 642-44 (4th Cir. 2007); *Wilson v. Moog Automotive, Inc. Pension Plan & Trust*, 193 F.3d 1004, 1010 (8th Cir. 1999) (Heaney, J., concurring); *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 150 (2d Cir. 1999); *Cinelli v. Security Pac. Corp.*, 61 F.3d 1437, 1445 (9th Cir. 1995); *Air Line Pilots Ass'n v. Shuttle, Inc.*, 55 F. Supp. 2d 47, 53 (D.D.C. 1999); *Rea v. Hershey Co. 2005 Enhanced Mut. Separation Plan*, No. 1:CV-06-1920, 2008 U.S. Dist. LEXIS 54921, at *17-26 (M.D. Pa. July 15, 2008); *Gerlib v. R.R. Donnelley & Sons Co.*, No. 95 C 7401, 2002 U.S. Dist. LEXIS 10755; at *10-14 (N.D. Ill. June 11, 2002) (Kennelly, J.). "[N]o useful social purpose is served by enforcing the mistaken term" where the mistake, as here, is "'merely' mathematical or clerical," resulting in a term that is, for example, "either one-tenth or ten times as large as it should be." *S.T.S. Transport Serv., Inc. v. Volvo White Truck Corp.*, 766 F.2d 1089, 1093 (7th Cir. 1985)

Enforcing a mistaken term undermines ERISA's principal goals. ERISA's "central objective" is to "protect employees' justified expectations of receiving the benefits their employers promise them." *AT&T Corp. v. Hulteen*, No. 97-543, 2009 U.S. LEXIS 3470, at *27 (May 18, 2009), quoting *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004). In order to protect those justified expectations, ERISA requires pension plans to be soundly funded.

ERISA § 2(c), 29 U.S.C. § 1001(c). ERISA's principal goals – protecting employees' justified expectations and requiring sound pension funding – can be achieved, however, only if pension plans have predictable financial consequences, "both for the employer who pays the bill and the employee who gets the benefit." *AT&T*, 2009 U.S. LEXIS 3470, at *27. Correcting a drafting error that is contrary to the justified expectations of both the employer and the employees thus advances ERISA's chief goals by assuring that the plan is responsible only for the benefits that the employer and its employees justifiably expect the plan to provide.

"Nothing in ERISA requires employers to establish employee benefit plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan." *Lockheed Corp. v. Spink,* 517 U.S. 882, 887 (1996). If drafting errors must be enforced, and if employers are therefore required to fund benefits that they never intended to provide to employees who did not expect to receive those benefits, employers will be less likely to establish plans and less likely to continue to maintain the plans they have already established – contrary to both employees' interests and ERISA's objectives. *Cf. Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11 (1987) ("ERISA's preemption provision was prompted by recognition that . . . [a] patchwork scheme of [state] regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them.").

Federal courts have been instructed "to develop a federal common law of rights and responsibilities under ERISA-regulated plans," *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 110 (1989) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987)), and to "tailor" this developing common law to "the policies of ERISA" and "the distinctive characteristics of pension plans." *Mathews v. Sears Pension Plan*, 144 F.3d 461, 465 (7th Cir. 1998). Although

one element of the statutory scheme is that ERISA "is built around reliance on the face of written plan documents," *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995), courts have repeatedly recognized that pension plans may nevertheless be reformed to correct a scrivener's error.  In doing so, courts have carefully balanced ERISA's respect for the written terms of a benefit plan, ERISA's central objectives, and the reality that complex ERISA plan documents occasionally contain drafting errors.  *See Air Line Pilots Ass'n*, 55 F. Supp. 2d at 53 ("While ERISA's statutory goal of ensuring certainty is a relevant consideration in deciding when courts should equitably reform a plan, it does not prevent a court from exercising its equitable powers.").

        The Third Circuit has explained how reformation may be permitted without undercutting ERISA's emphasis on the written terms of a plan:

> [I]n circumstances where a court can establish that no plan participants were likely to have relied upon the scrivener's error in question in determining their rights and obligations under the plan, allowing reformation of the scrivener's error does not thwart ERISA's statutory purpose of ensuring that plan participants can rely upon the language.

*Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1105 n.2 (3d Cir. 1996).  In *Rea*, the court acknowledged "the importance of allowing plan participants to read and rely on plan documents for their rights" but concluded that reformation would not contravene "this policy goal" because it was "unlikely" that any participant "would have relied on the error."  2008 U.S. Dist. LEXIS 54921, at *22-23; *see also Air Line Pilots Ass'n*, 55 F. Supp. 2d at 53 (in view of ERISA goal to ensure that employee rights can be determined from plan documents, courts are "more inclined" to reform mistaken plan language "[w]hen the scrivener's error is such that the employees could not have relied on it")

In *Murata*, the error was the inadvertent omission of a plan provision that in the event of a plan termination, excess funds would revert to the company. The Third Circuit concluded that reliance on this omission would not have led participants to believe that the plan would be terminated with a surplus and that they would receive it. *See* 980 F.2d at 907. Absent such reliance, application of the scrivener's error doctrine was appropriate because "ERISA's goal of providing clear Plan documents" was "less pertinent." *Id*. The drafting error in *Air Line Pilots Ass'n* resulted in a significantly more generous formula for disability benefits for former pilots of Eastern Airlines, which had been acquired by Trump. The court found that no pilot would have relied on the mistaken provision "in hopes of receiving generous disability benefits because no person plans to become disabled." Moreover, since the mistaken provision provided "a windfall" – disability benefits substantially higher than the pilots' former salaries at Eastern – "no pilot could have reasonably relied" on it. 55 F. Supp. 2d at 47.

The federal district court in *Rea* reformed an exclusionary provision in Hershey's ERISA-governed voluntary severance plan to state, correctly, that an employee could not obtain the enhanced severance benefits if his or her departure would have an "adverse effect" on Hershey's business operations. *See* 2008 U.S. Dist. LEXIS 54921, at *17-26. Although Hershey had clearly and accurately advised employees that eligibility for the enhanced benefits was dependent on business needs, the severance plan itself stated that an employee could be denied participation in the plan if his termination would have an "adverse affect" on the company's operations. *Id.* at *8-15. The court reformed the plain in light of participant communications that accurately summarized the eligibility requirements, the fact that adhering to the dictionary definition of "affect" made the plan provision "nearly incomprehensible," and the court's view

that it was "unlikely that Rea or other prospective [plan] participants would have relied on the error" in the plan provision. *Id.* at *20-24.

        Reformation of a mistake in a plan document is especially appropriate where, as in this case, and in *Rea*, the employer has accurately described the plan provision in summaries distributed to employees but then makes an error in drafting the plan itself. This is because, as the Seventh Circuit has recognized, "[w]orkers rely on the summary plan documents, not on the bulky and legalistic plan itself." *See Mathews*, 144 F.3d at 469; *Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700, 709 (7th Cir. 2001) ("Summaries have an established significance in benefits cases.") (citing *Mathews*). In such circumstances, it is not merely "unlikely" that participants have relied on the mistaken plan language; it is plain that they did not do so.

        In addition, courts have limited the reformation of ERISA plans by requiring that the party seeking reformation present evidence that is "'clear, precise, convincing and of the most satisfactory character' that a mistake has occurred and that the mistake does not reflect the intent of the parties." *Murata*, 980 F.3d at 907. *See also Blackshear*, 509 F.3d at 642 (quoting *Murata*); *Gerlib*, 2002 U.S. Dist. LEXIS 10755, at *10-11 (quoting *Murata*); *Air Line Pilots Ass'n*, 55 F. Supp. 2d at 53 (scrivener's error doctrine permits reformation where "clear and convincing evidence demonstrates that a mistake was made in the drafting of an instrument so that the written agreement fails to express the true agreement of the parties").

       **1.**    **The Scrivener's Error Doctrine Allows Reformation of Mistakes in the Text of an ERISA Plan.**

        "The classic case for reformation is a scrivener's or word processor's error." *See* 2 Farnsworth on Contracts (2d ed. 1998), § 7.5. Although the scrivener's error doctrine is often characterized as a remedy for "mutual mistake," reformation is appropriate where a mistake is made by one party's draftsman. *See United States v. Schilling*, No. C05-3016-MWB, 2006 U.S.

Dist. LEXIS 60902, at *48 (N.D. Iowa Aug. 25, 2006) ("Where the mistake is in the expression

of the contract, the proper remedy is reformation, and it normally makes no difference if the

mistake is mutual or unilateral."). *See also* 7 Corbin on Contracts (rev. ed. 2002), § 28.45

(hereinafter "Corbin") ("[T]he mutual-unilateral dichotomy adds nothing to the analysis of

reformation problems."). This is because a unilaterally drafted contract is the written expression

of an antecedent mutual understanding or agreement. *See*, *e.g.*, Corbin, § 28.45, at 283-84

("mutuality of the mistake" is "encompassed in the requisite that there be a prior agreement that

the provision be included in the writing"). The "mutuality" of the mistake is not in the drafting

of the contract itself, but in the failure of the written document to reflect the parties' mutual

understanding. *Id.* at 283 ("[E]very unintended variance between the prior agreement and the

writing is deemed to constitute a mutual mistake."). *See also*, *e.g.*, *Hanes v. Roosevelt Nat'l Life*

*Ins. Co.*, 452 N.E.2d 357, 362 (Ill. App. Ct. 1983) ("While some courts have held in analogous

situations that a scrivener's error . . . is a unilateral mistake barring reformation, this result stems

from an erroneous emphasis upon the mistaken 'act' of the insurer's draftsman in inserting the

incorrect figure in the policy, whereas the issue is properly one of the mistaken belief of the

parties regarding the correctness of the written instrument.") (citations omitted).

But even if a scrivener's error in a plan document is characterized as a unilateral

mistake, reformation is appropriate. In developing common law under ERISA, courts adapt

common law rules of contract interpretation and construction where "the general law doesn't fit

the issue because of something either in ERISA or in the nature of a pension plan." *Mathews*,

144 F.3d at 466. A distinctive characteristic of ERISA plans is that, like trust documents, they

are commonly drafted by one party – the plan sponsor or the settlor of the trust – for the benefit

of another party – the plan's participants or the beneficiaries of the trust, without consultation or

consent.  *See Mathews*, 144 F.3d at 466-67; *see also* Dkt. 132, Aug. 5, 2008 Tr. at 34 ("[W]hat I'm saying is in drafting the plans, there's only one party drafting the plan.  The beneficiaries are not at the table.  It's a unilateral document.")  Since the law of trusts underlies both the ERISA statute and the promises in all benefit plans, *see*, *e.g.*, *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 129 S. Ct. 865, 871 (2009) (explaining that trust law "serves as ERISA's backdrop"); *Hecker v. Deere & Co.*, 556 F.3d 575, 579-80 (7th Cir. 2009) (same), courts routinely look to the law of trusts in construing plan documents.  *See*, *e.g.*, *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 261 (4th Cir. 2009) ("[C]ourts are to apply trust-law principles to ERISA determinations."); *Hughes v. 3M Retiree Med. Plan*, 281 F.3d 786, 790 (8th Cir. 2002) ("We look to the law of trusts when interpreting ERISA plan documents.").

The law of trusts allows reformation of a unilateral scrivener's error by the trust settlor that causes the terms of the trust to be inconsistent with the settlor's intent:

> If, due to a mistake, the trust does not contain the terms that were intended by the settlor, the settlor or other interested party may maintain a suit in equity to have the instrument reformed to so that it will contain the terms that were actually agreed upon or that reflect the testator's actual intent.  The more common type of error, which may be made by the settlor or the scrivener, is a drafting error that is referred to as a mistake in expression.

Radford, Bogert & Bogert, The Law of Trusts & Trustees, § 991 at 130-32 (3d ed. 2006).  *See also*, *e.g.*, *Carlson v. Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos*, 895 N.E.2d 1191, 1199 (Ind. 2008) ("Because a settlor usually receives no consideration for the creation of a trust, a unilateral mistake on the part of the settlor is ordinarily sufficient to warrant reformation.");

*Schroeder v. Gebhart*, 825 So. 2d 442, 445 (Fla. Dist. Ct. App. 2002) (same); *In re Estate of Tuthill*, 754 A.2d 272, 274-75 (D.C. 2000) (same).[1]

Although ERISA plans typically resemble trust documents in that they are not the product of arms' length bargaining between two parties, they differ in one important respect. ERISA mandates disclosure of the key plan terms to participants, through the Summary of Material Modifications ("SMM") and the Summary Plan Description, which must be provided to all participants. Where a drafting error in the plan itself misstates a key term, such as the benefit formula here, or the plan eligibility requirements in *Rea*, the prior, ERISA-mandated communications to participants correctly advising them of the intended provision establish the mutual understanding that makes reformation appropriate under a traditional contract analysis, even without resort to trust law principles.

**B.    The Court Should Reform § 16.5.1(a)(2) of the Cash Balance Plan to Strike the Mistaken Second Reference to the Transition Factor.**

The evidence here satisfies all of the requirements for reformation of a drafting error in an ERISA plan. First, the evidence permits no dispute as to the formula that Bell Atlantic intended to use to create opening balances. Second, the 50,000 separate mailings to plan participants explaining the intended formula and its impact on each participant establish that Bell Atlantic and the plan participants had a mutual understanding as to the correct formula. Third, these same 50,000 mailings, 13,784 of which consist of the ERISA-mandated Summary of Material Modifications, correctly describing the plan formula in plain and simple terms, preclude any argument that participants reasonably relied on the mistaken language in the "bulky and

---

[1]    *Cf.* Uniform Trust Code § 415 (2005) ("The court may reform the terms of a trust, even if unambiguous, to conform the terms to the settlor's intention if it is proved by clear and convincing evidence that both the settlor's intent and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement.").

legalistic plan." *Mathews*, 144 F.3d at 469. Fourth, the drafting history shows with unusual specificity exactly how the scrivener erred while making a stylistic change. Fifth, participants would receive a windfall if the mistake is enforced – benefit increases far beyond what they could have reasonably expected, imposing huge liabilities on the plan and perversely penalizing longer-service participants by giving them no benefit increase but producing unexpectedly large increases in the benefits of similarly-situated co-workers who had less service.

The evidence supporting each of these propositions satisfies the "clear and convincing" standard required for reformation. Moreover, nearly all the evidence is objective – a higher standard not imposed in reformation cases but required by the Seventh Circuit in the related context of extrinsic ambiguity. *See Mathews*, 144 F.3d 461.

### 1. Participant Communications.

The key evidence is the series of communications during the period from October 1995 through June 30, 1996, accurately advising participants of the intended opening balance formula. Over 50,000 separate mailings to the Plan's 13,784 participants described the Plan, its opening balance provisions, and each participant's opening balance calculation. Defs.' Proposed Findings of Fact ("Facts") ¶¶ 18-23, 27-29, 32-35. *See also* Dkt. 131, Aug. 28, 2008 Op. at 30 ("The brochure and other estimates sent to employees give examples and explanations of the formulas, and all show the transition factor being multiplied only once."). Participant communications summarizing the plan "have an established significance in benefits cases," *Bock*, 257 F.3d at 709, "because the summary is what the plan beneficiaries actually read," *Mathews*, 144 F.3d at 466.

Here, the participant communications serve quadruple duty, conclusively establishing (1) the formula that Bell Atlantic intended, (2) the mutual understanding of Bell Atlantic and the participants as to the formula, (3) that the different statement of the formula in

the July 1996 Plan document was an error and (4) that no participant could have reasonably relied on the mistaken statement of the formula in the subsequent Plan document.

One of the mailings was the Plan's SMM – the brochure entitled, "Introducing Your Cash Balance Plan" – which was distributed to all participants in October 1995. Facts ¶¶ 18-19; 32. The SMM, like the summary plan description ("SPD"), is "among the most important disclosures" provided to plan participants, and is "intended to serve as the primary source from which employees can learn about their pension benefits." *Amara v. CIGNA Corp.*, 559 F. Supp. 2d 192, 211 (D. Conn. 2008). This is because ERISA requires that plan sponsors provide participants with either an SMM or an updated SPD whenever an ERISA plan is significantly amended. *See* ERISA § 104(b)(1), 29 U.S.C. § 1024(b)(1); 29 C.F.R. § 2520.104b-3(a) (2009). *See also*, *e.g.*, *Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 479 n.1 (6th Cir. 2007) (SMM is part of plan's SPD); *Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 428 (6th Cir. 2007) ("After a company validly amends a plan, plan administrators need not immediately update and republish the summary plan document; they may instead furnish employees with a summary of material modifications[.]").

Courts have declined claims for reformation where a plan summary is consistent with the plan document containing an alleged scrivener's error. *See Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 644 (4th Cir. 2007) (denying reformation where "the SPD and the plan itself agree; there is utterly no indication of an error or mistake."); *Humphrey v. United Way*, 590 F. Supp. 2d 837, 845 (S.D. Tex. 2008) (denying reformation where the SPD did not conflict with allegedly erroneous plan document).

Here, as required by ERISA, the SMM was "written in manner calculated to be understood by the average plan participant," *see* ERISA § 102(a), 29 U.S.C. § 1022(a), and clearly explained the correct formula:

> Finally . . .your account balance may be increased by multiplying the lump-sum cash-out value . . . *times a special transition multiplier* to arrive at your opening account balance

Facts ¶ 19 (emphasis added).  The SMM also described the formula as mathematical terms:

| OLD PLAN LUMP SUM VALUE | X | TRANSITION MULTIPLIER | = | OPENING ACCOUNT BALANCE |
|---|---|---|---|---|

In contrast to the "bulky" and "legalistic" plan document, *see* Facts ¶ 31, this straightforward description of the Plan's opening balance formula was "written, unambiguous, [and] a presumptively reliable guide to the plan itself."  *Mathews*, 144 F.3d at 468.

The estimated and actual opening balance statements that Bell Atlantic sent to Plan participants in November 1995 and May 1996 also unambiguously described the intended formula.  The statements were personalized for each participant, and explained each step of the math, multiplying the participant's lump sum cash out value just once times the transition factor. Facts ¶¶ 23, 27.  Plaintiff's November 1995 estimate, for example, stated that her opening balance would be $239,381, the product of the predicted lump sum cashout value $90,027, multiplied *once* by her transition factor, 2.659.  Facts ¶ 33.  Plaintiff's May 1996 statement similarly informed her that her actual January 1, 1996 opening balance was $240,126.74, her final lump sum cashout of $90,307.16 multiplied *once* by her 2.659 transition factor.  Facts ¶ 34.

### 2.     Other Evidence of the Intended Formula.

The record includes many other contemporaneous documents – objective evidence – demonstrating that Bell Atlantic intended that the participant's lump sum cash out

value be multiplied by the transition factor just once and that the plan document reflected a subsequent drafting error. A single multiplication was –

- Reflected in the Plan amendment that authorized the Cash Balance Plan. Facts ¶¶ 16-17;

- Set forth in final memorandum provided to Bell Atlantic on September 26, 1995 by Mercer, which had been retained to develop the formula and the transition factors. Facts ¶ 11;

- Used in numerous analyses prepared by Mercer in the development of the formula. Facts ¶ 24;

- Part of the specifications that Mercer on September 27, 1995 provided to Coopers & Lybrand, which had been retained to administer the transition to the Cash Balance formula. Facts ¶¶ 12, 24;

- Set forth in the October 1996 and November 1997 memoranda by Mercer describing the operation of the Cash Balance formula. Facts ¶ 14;

- Used by Coopers & Lybrand to calculate the opening balances for each of the 13,784 Plan participants as of January 1, 1996. Facts ¶¶ 12-13, 24-25; and

- Used by the Plan's actuary, Towers Perrin, to determine the Plan's benefit liabilities and funding obligations. Facts ¶ 37.

When he was deposed by plaintiff, Robert Moreen, the partner in charge of Mercer's work in developing the Plan's opening balance formula, explained, "*in the entire design process*, from beginning to end, and in the whole economic calculations around this transition, *the idea of multiplying twice by the transition factor was never once discussed*." Facts ¶ 15 (Ex. D.54 at 106) (emphasis added). All of this evidence demonstrates that Bell Atlantic intended for the participant's lump sum cash out value to be multiplied by the transition factor just once, and that plan participants could not have reasonably relied on any other statement of the formula.

### 3. The Error by the Scrivener.

The evidence of the mistaken statement of the opening balance formula in the plan is clear, convincing and of the most satisfactory character.

Without doubt, a mistake happened. If the formula in the plan were correct, then the 50,000 communications that Bell Atlantic sent were *all* mistaken, including the SMM that Bell Atlantic was required under ERISA to provide to each participant and the preliminary and final individual statements setting forth the calculation of each participant's balance. But Bell Atlantic, Mercer and Coopers & Lybrand were all involved in preparing these 13,784 calculations and the 50,000 communications. No plausible reason exists for supposing that the wrong formula was used to perform all of these calculations and that the wrong formula was described in all of the communications to participants.

The record includes the drafting history of the plan and shows the stylistic changes made in two parallel provisions, §§ 4.3.1(a)(1) and (2) in the fourth draft, dated April 15, 1996, and the failure to delete the phrase, "multiplied by B," in the latter provision, when the stylistic revision was made changing the expression of the formula from "A multiplied by B" to "the product of B *times* A." Barry Peters, a former employee of Bell Atlantic who prepared the fourth draft, candidly admitted under examination by plaintiff that not deleting "this trailing clause" was an error that he made, and which he regretted. Facts ¶¶ 39-48. Peters never noticed his scrivener's error, which, he noted, was "contrary to the terms of the plan that were approved" by Bell Atlantic. *Id*.

The clear evidence of a mistake here contrasts with other cases where courts have rejected reformation based on insufficient evidence of an error. In *Gerlib,* 2005 U.S. Dist. LEXIS 10755, at *10-14, the evidence as to whether the benefits provided to those meeting a "rule of 75" eligibility provision included supplemental retirement benefits was highly mixed

and "d[id] not even suggest" that the reference in the plan to supplemental benefits was a mistake. In *Blackshear*, both the insurance policy and the SPD of the hospital provided that non-exempt employees were eligible for life insurance without the six month waiting period that applied to exempt employees. After Verdie Blackshear, a non-exempt nurse, died, the hospital's vice president denied the claim for life insurance proceeds, explaining that the waiting period "should" apply to both categories of employees, and the hospital invoked reformation in the subsequent suit for benefits. *See* 509 F.3d at 637-38. There being no evidence of any intent by the hospital, prior to Verdie Blackshear's death, to impose a waiting period on non-exempt employees, the Fourth Circuit rejected reformation because there was "utterly no indication of an error or mistake." *Id.* at 643-44.

### 4. No Reasonable Reliance on the Mistaken Language.

The absence of reasonable reliance on the mistaken plan language is an important element of a reformation claim under ERISA. In *Blackshear*, for example, having received an SPD stating that no waiting period applied to a non-exempt employees, Verdie Blackshear died thinking that her beneficiaries would receive the life insurance proceeds promised by her employer. *See* 509 F.3d at 636-37. Here, by contrast, *no one* relied on the mistaken language in the Plan.

Plaintiff does not even assert that she or other plan participants relied on the mistaken language in the Plan. In light of Bell Atlantic's 50,000 communications accurately describing the formula, "[s]uch a claim would be hard to take seriously." *Mathews*, 144 F.3d at 469. Plaintiff in fact never read the Plan, instead merely "glancing" at it for the first time 11 years after she received her benefits, while preparing for her deposition in 2009. Facts ¶ 30 (Ex. D.58 at 85). The same is certainly true for the nearly all of the class. Although Bell Atlantic provided the Plan document to participants upon request, few ever made such requests. Facts

¶ 31. *See also Wilson*, 193 F.3d at 1006 (correcting drafting mistake in plan's early retirement provisions where there was "no evidence" that plan participants were ever told "that they would be eligible for early retirement" under the erroneously expressed provision). Here, not one participant asserted a claim based on the mistaken language during the ten-year period from the adoption of the plan with the mistaken statement of the formula until plaintiff sought to amend her complaint in 2006. Facts ¶ 56.

The few who did read the erroneous plan provision either recognized instantly that it was a mistake, or failed to see that it varied from the one-time multiplication that everyone expected based on the 50,000 plus communications sent by Bell Atlantic to participants. The only record of participants noticing the mistake in the plan is a brief filed by the plaintiffs in purported class-action ERISA case, *Corcoran v. Bell Atlantic Corp.*, No. 97-cv-510 (E.D. Pa.). Counsel for the *Corcoran* plaintiffs (seven lawyers from three law firms) observed in a footnote that "literal application" of the plan provision "appears to require" that the transition factor be multiplied twice. Although this would have been "highly advantageous" to six *Corcoran* plaintiffs, whose opening balances would have increased by $1,970,710.60, from $1.1 million to $3.1 million, the *Corcoran* plaintiffs candidly acknowledged that the Plan document reflected a mistake ("a scrivener's error"). Facts ¶ 57.

Those who continued to believe that the formula called for a one-time multiplication of the transition factor even after reading the mistaken plan provision include plaintiff's representatives, the National Center for Retirement Benefits ("NCRB") and plaintiff's current counsel, five lawyers at three separate law firms, all of whom asserted claims on her behalf relating to the discount factor but performed their own "corrected" recalculation of her benefit multiplying the transition factor only once. Facts ¶¶ 58-62. Far from relying on the

mistake in the plan, plaintiff through her counsel never even noticed it – despite quoting the mistaken language in full in the initial complaint filed in this action – until nearly three years after her representatives obtained the plan document.

### 5. Enforcing the Error Would Result in Windfall Benefit Increases.

Equity "abhors a windfall," *Prudential Ins. Co. v. S.S. Am. Lancer*, 870 F.2d 867, 871 (2d Cir. 1989), and courts "have not looked favorably" on attempts to obtain "windfall recoveries" from ERISA plans, *Hickey v. Digital Equipment Corp.*, 43 F.3d 941, 948 (4th Cir. 1995). *See also Harms v. Cavenham Forest Indus., Inc.*, 984 F.2d 686, 693 (5th Cir. 1993) (windfall recoveries are "abhorred by ERISA"). Courts have therefore been strongly inclined to reform an ERISA plan where a scrivener's error would otherwise provide a windfall recovery to plan participants. *See, e.g., Murata*, 980 F.2d at 907; *Gerlib*, 2002 U.S. Dist. LEXIS 10755, at *10-11 (reformation is appropriate when a scrivener's error would create a "windfall"); *Air Line Pilots Ass'n*, 55 F. Supp. 2d at 53 ("When the scrivener's error is such that the employees could not have relied upon it, and indeed would receive a 'windfall' if the plan were not reformed, courts have been more inclined to intervene and change the terms of the plan to reflect the parties' true intent.").

Enforcement of the mistaken second reference to the transition factor would create a series of anomalous and perverse windfalls. Multiplying plaintiff's lump sum cash out value a second time by the transition factor of 2.659 raises her opening balance from approximately $240,000 to over $640,000, an unexpected increase of over 165%. Facts ¶ 67. This windfall cannot be reconciled with the stated purpose of the Plan's transition factors, which was to "fill the gap" between the value of plaintiff's cash balance account and the expected value of her BAMPP service pension. Facts ¶¶ 7, 20, 67. *See also Shuttle, Inc.*, 55 F. Supp. 2d at 53

(reformation appropriate where disability benefits would be $2500 per month *more* than the pilot would have received if still employed).

The *Corcoran* plaintiffs provide another example of the windfall increases. The opening balances of the six *Corcoran* plaintiffs who would benefit from the mistaken language would unexpectedly increase by $1.97 million, with three of them each receiving increases exceeding $400,000. Facts ¶ 57. Numerous other participants would also receive windfall increases. Facts ¶ 65.

Across the class, the opening balances of the 11,513 participants to whom the mistaken formula applied would increase by $1.67 billion ($1,670,000,000.00), increasing the present value of the Plan's projected benefit liabilities as of January 1, 1996 by nearly 30%. Facts ¶ 38. The opening balances of nearly 5,800 participants would unexpectedly increase by at least $100,000; and 136 class members would reap unexpected increases in their opening balances of more than $500,000. Facts ¶ 65.

Enforcing the mistaken second reference to the transition factor is likely to increase the present value of Plan benefits by more than $1.1 billion (plus interest). Facts ¶¶ 71-76. This is a substantial figure by any standard, but especially now given the current under-funded status of the Verizon Management Pension Plan. As of December 31, 2008, the fair market value of the assets held by the VMPP was $10.1 billion, approximately $2.0 billion less than the Plan's benefit liabilities of $12.1 billion. Facts ¶ 70. Moreover, the cost of the additional benefits would be even greater if Verizon had not made available alternative benefit formulas to achieve a variety of business purposes, including the integration of the GTE and Bell Atlantic pension plans, workforce reductions, and reduced retiree medical costs. Facts ¶ 74.

The benefit increases generated by mistaken language also result in perverse disparities. Whereas plaintiff's opening balance increases to $640,000, a participant of the same age as plaintiff but with two years *more* service than her would receive an opening balance of only $262,000 because the longer-service employee's benefits would have been calculated under § 16.5.1(a)(1), which did not contain the same drafting error. Facts ¶ 67. Favoring shorter-service participants over those with longer-service would violate a fundamental understanding under which Bell Atlantic participants had operated throughout their employment: that each additional year of service resulted in an increase in their retirement benefit, and that the attainment of the years of service and age required for a Service Pension would result in a substantial increase in their benefit. *E.g.* Facts ¶ 3. It would also conflict with the objectives of ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G), which provides that a participant's accrued benefit may not be reduced on account of any increase in his age or service.

This anomalous result – participants receiving substantially larger benefits than their older and more senior co-workers – would apply throughout the membership of the Plan. Facts ¶ 68. For example, Rose Weinman, was 47 years old and had 29.1 years of credited service on the transition date. Her opening balance, calculated under § 16.5.1(a)(2), was $210,693. *Id.* Another participant, David Willson, was 51 years and had 32.5 years of credited service on the transition date, and was therefore eligible for a service pension under the BAMPP. *Id.* His opening balance, calculated under § 16.5.1(a)(1), was $293,748. The difference between Willson's opening balance and Weinman's reflects not only Willson's higher age and service, but also reflects Willson's higher Bell Atlantic salary – Willson's 1995 salary was $61,900, whereas Weinman's 1995 salary was $56,800. Nevertheless, if Weinman's lump-sum cashout

- 48-

value is multiplied by the transition factor a second time, her opening balance would jump to $604,477, leapfrogging Willson's unchanged opening balance by more than 100%. Facts ¶ 68.

Moreover, the scrivener's error would create another unexplainable anomaly – former Bell Atlantic employees whose benefits were calculated under § 16.5.1(a)(2) would have benefits up to three times larger than their former NYNEX co-workers, with identical age, service, and salary, whose benefits were calculated under the parallel Bell Atlantic-North Cash Balance Plan. Facts ¶¶ 49-51, 55, 69. Not only is this discrepancy inconsistent with any reasonable participant expectation, it is also inconsistent with Bell Atlantic's repeated statements to Plan participants that the Plan and the NYNEX Plan used the *same* conversion assumptions, transition factors, and opening balance formulas. Facts ¶¶ 51, 55.

In short, clear and convincing – and objective – evidence demonstrates that the second reference to the transition factor was an error because it did not reflect the formula that both Bell Atlantic and the Plan participants expected; that the enforcing error would generate a windfall to plaintiff and many other participants; that no plan participant could have reasonably relied upon the error; and that no participant in fact relied upon the error. The Court should grant reformation and strike the erroneous second reference to the transition factor from the opening balance formula in § 16.5.1(a)(2).

## II. PLAINTIFF'S CLAIM IS TIME-BARRED.

Plaintiff's claim that Bell Atlantic should have calculated her opening balance by using the transition factor a second time also fails because it is time-barred. Pennsylvania law supplies the statute of limitations that governs plaintiff's claim because Pennsylvania is the state with the most significant relationship to the dispute. Under Pennsylvania law, the applicable limitations period for plaintiff's benefits claim is the four-year period that applies to breach of

- 49-

contract claims. This four-year limitations period began running as early as September 1996 when Bell Atlantic made clear that the July 1996 plan document had not changed its calculation of plaintiff's account balance, and no later than February 1998 when plaintiff received her lump sum payment. Because plaintiff waited until 2007 to file this action, plaintiff's claim is time-barred.

### A. ERISA Borrows From Pennsylvania Law to Supply a Statute of Limitations in this Case.

Federal law does not specify a statute of limitations applicable to an ERISA claim for the underpayment of plan benefits. Courts addressing such claims therefore borrow the most analogous state law statute of limitations. *See Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 65 (7th Cir. 1996). Federal common law governs the choice of which state's law will be borrowed. *See Berger v. AXA Network LLC*, 459 F.3d 804, 809-10 & n.7 (7th Cir. 2006); *Syed v. Hercules, Inc.*, 214 F.3d 155, 159 (3d Cir. 2000).

"In fashioning a choice of law rule to govern [the] quest for the most appropriate state limitations period," a court's task "when the underlying claim is a *federal* claim, is to fashion a *federal* choice of law rule." *Berger*, 459 F.3d at 809-10. After considering the choice of law principles set forth in *Restatement (Second) of Conflicts of Law*, the importance that ERISA attaches to "uniformity of treatment" of plan participants nationwide, and the relevant case law, the Seventh Circuit in *Berger* adopted a practical approach for choosing which state's statute of limitations to apply to an ERISA claim. "Under this approach," the court observed, "a federal court selects a statute of limitations from the forum state's law unless another state has more significant contacts with the dispute." 459 F.3d at 813. The forum state's law of limitations is not a "presumptive choice," but is only the "starting point" in the choice of law analysis. *Id.*

*Berger* illustrates when another state will be deemed to have "more significant contacts to the dispute" than the forum state. In *Berger*, a class of several thousand insurance agents brought an ERISA action against the insurer AXA, alleging that AXA had wrongly deprived them of ERISA benefits by reclassifying them as independent contractors instead of full-time corporate employees. *See id.* at 805-07. The reclassification decision had been made in New York, where AXA had its headquarters. *Id.* at 809, 813. Although both of the named plaintiffs resided in the forum state of Illinois, "other members of the class reside[d] in states other than Illinois," leading the court to observe that "Illinois is simply a spoke rather than the hub of this lawsuit." *Id.* at 813. The Seventh Circuit concluded that "New York is the state with the most significant relationship to the parties and to the transaction," and therefore borrowed a New York statute of limitations to govern the action." *Id.* at 813-14.

Here, too, Illinois is not "the hub of this lawsuit." The hub is Pennsylvania – the state where Bell Atlantic had its headquarters during the relevant period, where the Cash Balance Plan was developed and drafted, and where a large percentage of the participants worked. Facts ¶ 1. More putative class members (3,743) live in Pennsylvania than in any other state. Facts ¶ 77. Moreover, here, as in *Berger*, "it is not entirely irrelevant" that the Cash Balance Plan contained a choice of law provision that designates Pennsylvania law to fill in any gaps in the ERISA statute. *See* 459 F.3d at 813; *see also* Facts ¶ 79. Illinois' connection to the lawsuit, by contrast, is at most a slender spoke. Plaintiff never lived nor worked in Illinois, and only 20 putative class members now reside in Illinois. Facts ¶ 77. Although the Verizon Management Pension Plan is *currently* administered in Illinois, it was not administered in Illinois during the 1995-97 period when this dispute arose. Facts ¶ 78.

- 51-

ERISA reflects a strong interest in "uniformity of treatment" of plan participants. *Berger*, 459 F.3d at 814. Where, as here, residents of many states have essentially the same claim, ERISA's objective of promoting uniform plan administration would be thwarted if the rights of a given Plan participant (and the Plan) depended upon the particular state in which the participant happened to reside or file a lawsuit. "Indeed, were we to follow [that] theory to its logical end, this class action would be governed by a 'crazy quilt' of limitations periods and the federal interest in uniformity would be rendered nugatory." *Id.* at 814. *See also Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001) ("Uniformity is impossible, however, if plans are subject to different legal obligations in different States."). Resort to Pennsylvania law for the statute of limitations in this action thus furthers ERISA's important goal of achieving uniform treatment of plan participants.

**B.     Pennsylvania Law Provides a Four-Year Statute of Limitations for ERISA Benefit Claims.**

The Pennsylvania statute of limitations most analogous to the claims asserted in this action is the limitations period for breach of contract claims. *See Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 305-06 (3d Cir. 2008) ("The statutory limitation most applicable to a claim for benefits under Section 1132(a)(1)(B) is a breach of contract claim.") (citation omitted); *Keen v. Lockheed Martin Corp.*, 486 F. Supp. 2d 481, 487 (E.D. Pa. 2007) (same). The Pennsylvania statute of limitations for breach of contract is four years. *See* 42 Pa. Cons. Stat. § 5525(a)(8) (2009). *See also Hahnemann Univ. Hosp.*, 514 F.3d at 306.

**C.     The Limitations Period Began to Run No Later Than February 1998, When Plaintiff Received Her Lump Sum Payment.**

While ERISA borrows from state law to supply a statute of limitations to ERISA benefit claims, federal common law determines when the limitations period began to run. *See Daill*, 100 F.3d at 65; *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 520 (3d Cir. 2007).

This Circuit applies the "clear repudiation" rule to ERISA claims. *Daill*, 100 F.3d at 66-67; *Miller*, 475 F.3d at 520-21. "This rule provides that when a fiduciary gives a claimant a clear and unequivocal repudiation of benefits, that alone is adequate to commence accrual [of the limitations period], regardless of whether the repudiation is formal or not." *Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 302 (6th Cir. 2006). The "clear repudiation" rule therefore "avoids a myriad of ills that would accompany any rule that required the denial of a formal application for benefits before a claim accrues." *Romero v. Allstate Corp.*, 404 F.3d 212, 223 (3d Cir. 2005) (citing *Daill*, 100 F.3d at 66-67)

In a case alleging an underpayment of benefits, a "clear repudiation" takes place, at the latest, at the time of the initial underpayment. *See Miller*, 475 F.3d at 522. As one court explained:

> Here, there can be no question that Plaintiffs received "clear and unequivocal" notice of the amount of benefits they would be receiving no later than when they received their lump-sum distributions. Any expectation of a sum greater than what was received was "repudiated" at that time, and could not reasonably have been maintained beyond that point. Plaintiffs received no further payments or indication that further payments would be forthcoming during the years between the lump-sum payments and the filing of this action.

*Fallin v. Commonwealth Indus., Inc.*, 521 F. Supp. 2d 592, 597 (W.D. Ky. 2007). *Accord Flagg v. Skadden, Arps Pension Plan*, No. 07 Civ. 7392 (PKC), 2008 U.S. Dist. LEXIS 47613, at *9-12 (S.D.N.Y. June 18, 2008) (cash balance plan participant's underpayment claim accrued upon receipt of letter accompanying lump sum payment), *adhered to on reconsideration*, 2008 U.S. Dist. LEXIS 54783, at *3 (July 16, 2008); *Cooley v. Southern Graphic Sys., Inc. Pension Plan*, No. 3:06CV-1-H, 2008 WL 927875, at *1 (W.D. Ky. Apr. 4. 2008) (claim for increased benefits accrued on date that check was issued to plaintiff making lump sum payment). As these courts recognize, the underpayment itself serves as a "clear repudiation" of any alleged right to receive

a greater payment from the plan. *See Miller*, 475 F.3d at 522-23. *See also Gregorovich v. E. I. DuPont De Nemours*, Civ. No. 08-391-SLR, 2009 U.S. Dist. LEXIS 20631, at *10 (D. Del. Mar. 13, 2009) ("Because an underpayment is adverse to the beneficiary, it repudiates his rights under a plan.").

Here, no reason exists to depart from this established rule. Plaintiff received a lump sum distribution of her account balance in February 1998. Facts ¶ 35 (Y000390). Plaintiff was fully aware at that time that her opening account balance had been calculated by multiplying her lump sum cashout value by the transition factor only once. Plaintiff's November 1995 estimated opening balance statement and May 1996 actual opening balance statement both explained that her January 1, 1996 opening balance, calculated by multiplying the participant's lump sum cash out value by the transition factor only once, was approximately $240,000, Facts ¶¶ 33-34, and the quarterly statements she received from Bell Atlantic thereafter tracked the steady growth of the account through the addition of monthly pay credits and interest credits. Facts ¶ 35; *see also* Facts ¶ 4; Ex. D.58 at 57.

Indeed, the quarterly statement that plaintiff received on September 30, 1996 constituted a clear repudiation of the claim that the opening balance should have been calculated by using the transition factor a second time. Plaintiff's statement for the second quarter of 1996 explained that her account balance grew from $246,004.66 on April 1, 1996, to $251,030.12 on June 30, 1996. Facts ¶ 35. The plan document completed as of July 7, 1996 included the erroneous second reference to the transition factor. Facts ¶ 39. But the September 30, 1996 quarterly statement made clear to plaintiff that her account balance had not suddenly increased by $400,000 as a result of multiplying her lump sum cash out value by the transition factor of 2.659 a second time. Facts ¶ 35.

Plaintiff was thus aware by September 30, 1996, and certainly by early 1998, that her opening account balance would not be recalculated by using the transition factor a second time.  Nevertheless, plaintiff did not file *any* claim for additional pension benefits until more than *six years* later, in June 2004.  Facts ¶ 60.  Plaintiff did not seek to assert her transition factor claim until July 2007.  Facts ¶ 62.  And plaintiff did not submit this claim to the plan administrator until August 2007.  *Id.*  Plaintiff's transition factor claim is therefore time-barred.

## CONCLUSION

The Court should reform the 1996 and 1997 Plans to correct a drafting error on which no participant reasonably relied and which would create windfall benefit increases for many participants.

Respectfully submitted,

Defendants Verizon's Bell Atlantic Cash
Balance Plan and Verizon Communications Inc.

By:     /s/ Abigail A. Clapp
        James G. Richmond (620637)
        Abigail A. Clapp (6269540)
        Greenberg Traurig, LLP
        77 West Wacker Drive, Ste. 2500
        Chicago, IL  60601
        Tel. (312) 456-8400
        Fax (312) 456-8435

        Jeffrey G. Huvelle (admitted *pro hac vice*)
        Frederick G. Sandstrom (6278816)
        Covington & Burling LLP
        1201 Pennsylvania Ave., N.W.
        Washington, DC  20004
        Tel. (202) 662-6000
Dated:  May 28, 2009          Fax (202) 662-6291

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 28, 2009, I served the foregoing Defendants' Proposed Findings of Fact and Conclusions of Law, along with an Index of Exhibits, on plaintiff's attorneys of record in this case.

/s/ Abigail A. Clapp
Abigail A. Clapp