**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA N. YOUNG, On behalf of herself, and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05 C 7314 |
| | ) | CLASS ACTION |
| VERIZON'S BELL ATLANTIC CASH BALANCE PLAN, formerly known as Bell Atlantic Cash Balance Plan, formerly known as Bell Atlantic Management Pension Plan, and VERIZON COMMUNICATIONS INC., as successor in interest to Bell Atlantic Corporation, | ) ) ) ) ) ) ) | Magistrate Judge Morton Denlow |
| Defendants. | ) ) ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S PROPOSED
FINDINGS OF FACT**

The Verizon defendants respond to plaintiff Cynthia Young's Proposed Findings

of Fact as follows :

**A.**     **The Parties**

**(1)**     **Cynthia Young**

1.     Plaintiff Cynthia Young is the Class representative for the Class in this action and a participant in Verizon's Bell Atlantic Cash Balance Plan. (Def.'s Answer [DE 70] ¶ 13.)

**Response:**     No dispute.

2.     Young worked at Bell Atlantic (or one of its acquired subsidiaries) from 1965 through 1997. (Young Dep. at 7:15–19.) At Bell Atlantic, Young served in several capacities over her 32 years of employment. (*Id.* at 15:11–13.) During the course of her career, she was a telephone operator, service representative, administrative assistant, communications representative, assistant manager, manager, and finished her career as a project manager. (*Id.* at 8:5–15:10.)

1

**Response:** No dispute.

3. Young was also a participant in a series of defined benefit pension plans, including the Bell Atlantic Management Pension Plan ("BAMPP"), and then the Bell Atlantic Cash Balance Plan. (Defs.' Answer [DE 70] ¶¶ 13, 21.) Young retired in 1997 when the 1997 Bell Atlantic Cash Balance Plan was the operative plan document and received a lump-sum payment of her benefit on February 2, 1998, in the amount of $286,094.89. (Young Dep. at 20:16–22; Y000391.)

**Response:** No dispute.

4. Young later received another payment of $9,558.70 related to her participation in the Cash Balance Plan due to a settlement by ~~the Plan~~ Verizon with the Equal Employment Opportunity Commission ("EEOC"). In connection with this settlement, Young signed a "Release and Waiver of Claims Form" that waived any future suits for "sex discrimination and equal pay claims." (VZ00369).

**Response:** No dispute, except as indicated above. The settlement that plaintiff references in this paragraph was between the EEOC and Verizon, not between the EEOC and the Plan. *See* Ex. D.43 at VZ00010. *See also* VZ000369-71.

### (2) The Class

5. The parties stipulated to the treatment of this action as a class action. On January 16, 2007, the Court certified a Class pursuant to Rule 23, Fed. R. Civ. P., with two subclasses.

**Response:** No dispute.

6. Subclass 1 is defined as follows:

All participants in the Bell Atlantic Management Pension Plan whose opening balances for the Bell Atlantic Cash Balance Plan were purportedly calculated using section 16.5.1 of the Bell Atlantic Cash Balance Plan and using 120% of the applicable PBGC rate.

**Response:** No dispute.

7. The class claim associated with Subclass 1 (hereinafter called the "Discount Rate Issue") is defined as follows:

Whether, in determining the benefits afforded by the Bell Atlantic Cash Balance Plan to the plaintiff and the Class, it was proper to use 120% rather than 100% of the applicable PBGC interest rate

when calculating the "opening balances," and, if improper, the remedy therefor.

**Response:**     No dispute.

8.     Subclass 2 is defined as follows:

All participants in the Bell Atlantic Management Pension Plan whose opening balances for the Bell Atlantic Cash Balance Plan were purportedly calculated using section 16.5.1(a)(2) of the Bell Atlantic Cash Balance Plan.

**Response:**     No dispute.

9.     The class claim associated with Subclass 2 (hereinafter called the "Transition Factor Issue") is defined as follows:

Whether, in determining the benefits afforded by the Bell Atlantic Cash Balance Plan to plaintiff and the Class, it was proper to apply the cash balance transition factor found in Table 1 of Section 16 of the Cash Balance Plan once rather than twice when calculating the "opening balances," and if improper, the remedy therefor.

**Response:**     No dispute.

10.     Young is the class representative for both Subclasses, which taken together are referred to as the "Class." The Class consists of 13,784 former and current management employees of Bell Atlantic and, later, Verizon. On average, these Class members had worked for Bell Atlantic for 20 years when Bell Atlantic converted to its Cash Balance Plan. (VZ27114–VZ27323.)

**Response:**     No dispute.  Subclass 1 has 11,398 members.  Ex. D.62 at

VZ27114-323.  Subclass 2 has 11,571 members, 10,808 of whom had transition factors greater

than 1.000.  Ex. D.51; Ex. D.62 at VZ27114-323.

### (3)     **Verizon**

11.     Verizon Communications Inc. ("Verizon") is a Delaware corporation with its principal place of business at One Verizon Way, Basking Ridge, NJ, 07920. Verizon transacts business in Illinois and in the Northern District of Illinois. Verizon is the successor-in-interest to Bell Atlantic. Bell Atlantic was formed in 1983 from the breakup of AT&T by the U.S. Department of Justice. (Moody's *Public Utility Manual* at 284.) It represented just one of 22 local operating companies that AT&T owned and served only the northern Atlantic states. (*Id.*) Bell Atlantic changed its name to Verizon after purchasing GTE. (Verizon 2001 Form 10-K.)

**Response:**     No dispute.

12.     As of year-end 2008, Verizon is the 17th largest corporation in the United States in terms of revenues, with $97.354 billion in revenues in 2008, a 3.8% increase over 2007. (Verizon 2008 Form 10-K.) From these revenues, Verizon ~~reaped~~ made $6.428 billion in profits, a 16.4% increase over 2007. (*Id.*) Verizon had $202.352 billion in assets as of year-end 2008. (Fortune 500, May 4, 2009; Verizon 2008 10-K.)

**Response:**     No dispute, except as modified above.

**(4)     The Plans**

13.     The Verizon Management Pension Plan is the successor plan to Verizon's Bell Atlantic Cash Balance Plan. (VZ00432.) Verizon's Bell Atlantic Cash Balance Plan was the successor plan to the Bell Atlantic Cash Balance Plan. (Defs.' Answer [DE 70] ¶ 15.) The Bell Atlantic Cash Balance Plan is the successor plan to the BAMPP. (VZ00189.) All of these plans are defined benefit pension plans as defined by ERISA. Collectively, they are referred to as "the Cash Balance Plan" or the "Plan."

**Response:**     No dispute.

**(5)     The Plan administrators**

14.     As the Court has previously held, Verizon is "both the plan sponsor and the plan's administrator." *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 575 F. Supp. 2d 892, 907 (N.D. Ill. 2008).

**Response:**     No dispute.

15.     Currently, Verizon administers the Plan through the Verizon Employee Benefits Committee ("VEBC"). (VZ12606; Letter from Gus Sandstrom to Matthew Heffner, Jan. 9, 2008.)

**Response:**     No dispute.  The Verizon Employee Benefits Committee has

delegated discretionary authority to determine "ERISA claims and appeals" to the Verizon

Claims Review Unit ("VCRU") and the Verizon Claims Review Committee ("Committee").  Ex.

D.49 at VZ12606-07, VMPP § 9.4.  This delegation includes "the discretionary power to

interpret the Plan and to decide all matters arising thereunder, including the right to remedy

possible ambiguities, inconsistencies, and omissions."  Ex. D.49 at VZ12608-09, VMPP § 9.13.

16.     The VEBC is the successor-in-interest to the Bell Atlantic Corporate Employees' Benefits Committee (the "CEBC"), which was the administrator for the Bell Atlantic Cash Balance Plan from its inception to 2000.

4

**Response:**     No dispute.

17.     The precise order and title of the Plan administrators is as follows:

(a)     Bell Atlantic Cash Balance Plan 07/06/96: Bell Atlantic Corporate Employees' Benefits Committee (VZ11604);

(b)     Bell Atlantic Cash Balance Plan 09/03/97: Bell Atlantic Corporate Employees' Benefits Committee (VZ11741);

(c)     Bell Atlantic Cash Balance Plan 10/08/98: Chairman, Bell Atlantic Corporate Employees' Benefits Committee (VZ11666);

(d)     Bell Atlantic Cash Balance Plan 07/06/99: Chairman, Bell Atlantic Corporate Employees' Benefits Committee (VZ11803);

(e)     Bell Atlantic Cash Balance Plan 12/01/99: Chairman, Bell Atlantic Corporate Employees' Benefits Committee (VZ11876);

(f)     Bell Atlantic Cash Balance Plan 05/03/00: Chairman, Bell Atlantic Corporate Employees' Benefits Committee (VZ12020);

(g)     Verizon's Bell Atlantic Cash Balance Plan 12/31/01: Chairman, Bell Atlantic Corporate Employees' Benefits Committee (prior to 01/01/00); Verizon's Bell Atlantic Corporate Employees' Benefits Committee (01/01/00-04/01/01); Verizon Employee Benefits Committee (after 04/02/01) (VZ12179);

(h)     Verizon Management Pension Plan (01/01/02): Verizon Employee Benefits Committee.

**Response:**     No dispute.

B.     **Factual Background**

(1)     **The Bell Atlantic Management Pension Plan ("BAMPP")**

18.     For decades, Bell Atlantic offered pension benefits to its salaried management employees through its Bell Atlantic Management Pension Plan ("BAMMP"). The BAMPP provided benefits in the form of a traditional pension—that is, an annuity for each participant, paid in monthly installments to the participant from the time he retired until he died. Not including certain defined exceptions and certain lump-sum cashout "windows," the BAMPP had no provision for calculating lump-sum cash-out values of participants' annuities.

**Response:**     No dispute, except as indicated above.  The BAMPP contained

three separate "window" provisions, introduced between 1991 and 1995, that permitted

participants to obtain a lump-sum cashout of their pension benefits.  Ex. D.17 at VZ00125-32 & VZ00133-35, BAMPP §§ 4.15, 4.16, 4.19.

19.     Through the years, Bell Atlantic amended the BAMPP to provide certain retirement "windows" to participants. Under these "windows," Bell Atlantic ~~would encourage~~ employees ~~to retire by offering their pension~~ could elect to receive their benefit in the form of a one-time lump-sum payment, instead of the traditional annuity. (VZ00130-132; 133-136.)

**Response:**     No dispute, except as indicated and modified above.  Bell Atlantic referred to these "windows" as "cash-out windows," both in the BAMPP and in its participant communications.  Ex. D.17 at VZ00130-32 & VZ00133-35, BAMPP §§ 4.16, 4.19; Ex. D.70 at VZ10373-74; Ex. D.71 at VZ10375-84.

20.     Section 4.19 of the BAMPP was one such cash-out "window." It provided employees with a lump-sum payment (and an accompanying method to calculate that lump-sum) to any vested participant who was an "Active Participant on his Severance from Service Date which occurs on or after December 31, 1993 and prior to December 31, 1995." (VZ00133.)

**Response:**     No dispute.

21.     The lump-sum formula for those who retired between December 31, 1993, and December 30, 1995 was as follows:

(2) Lump-sum Form of Payment.

(A) Service Pension Cash-Outs. The lump-sum payable to a Window-Eligible Employee who is eligible for a Normal or Early Retirement Service Pension shall equal the Actuarial Equivalent present value (calculated using the assumptions in subsection (c)(2)(C)) of the Service Pension otherwise payable to the Participant in the Normal Form commencing on his Annuity Starting Date, as determined under the provisions of the Plan other than this Section 4.19.

(B) Deferred Vested Pension Cash-Outs. The lump-sum payable to a Window-Eligible Employee who is eligible for a Deferred Vested Pension shall equal the Actuarial Equivalent present value (calculated using the assumptions in subsection (c)(2)(C)) of the Deferred Vested Pension otherwise payable to the Participant in the Normal Form commencing at Normal Retirement Age (or age at Severance from Service Date, if later), as determined under the provisions of the Plan other than this Section 4.19.

(VZ00134.)

     **Response:**     No dispute that plaintiff accurately quotes BAMPP § 4.19(c)(2)(A)

& (B).  Ex. D.17 at VZ00134.  The complete lump-sum cashout provision and formula are found

in BAMPP § 4.19.  *Id.* at VZ00133-35.

     22.     Nowhere in § 4.19 of the BAMPP is the term "lump-sum cashout" ever

used.  VZ00134.)

     **Response:**     No dispute, except to add that Bell Atlantic's participant

communications describing the § 4.19 lump-sum cash-out window refer to a participant's lump-

sum benefit as a "cashout" or a "lump-sum cash out."  Ex. D.1 at VZ10392; Ex. D.11 at

VZ10476; Ex. D.10 at VZ10550; Ex. D.70 at VZ10373-74; Ex. D.71 at VZ10375-84.

     23.     Section 4.19 of the BAMPP uses three assumptions for determining a

present value (VZ00134):

     (a)     The discount rate is 120% of the "PBGC interest rate in effect on
the last day of the calendar month immediately preceding the first month of the calendar
quarter in which the Severance from Service Date occurs" (VZ00134–35);

     (b)     A participant's expected life span is determined using the "Non-
Insured Unisex Pension 1984 (UP84) Mortality Table" (VZ00135); and

     (c)     A participant's age is to be "years, months and days … measured
as of the 15th day of the middle of the month of the calendar quarter containing the
Severance from Service Date" (VZ00135.) The phrase "Severance from Service Date" is
a defined as "the earlier of: (a) the date on which an Employee terminates employment
with all Participating Employers or Bell Atlantic Affiliates including, without limitation,
by reason of retirement, resignation, death, or other termination of employment."
(VZ00106.)

     **Response:**     Disputed.  Plaintiff's description of the lump-sum cashout formula

in BAMPP § 4.19 is incomplete.  The complete lump-sum cashout formula is found in BAMPP

§ 4.19(c)(2).  Ex. D.17 at VZ00134-35.  The BAMPP's prior cash-out windows also used the

same discount rate methodology, but used different age and mortality assumptions.  *Id.* at

VZ00128-29, BAMPP § 4.15(c)(4)(C); *id.* at VZ00131-32, BAMPP § 4.16(c)(2).

(2)     **The Bell Atlantic Cash Balance Plan**

24.     In the mid-1990s, Bell Atlantic began exploring an ~~drastic~~ alteration to its traditional pension plan. (Countercl. ¶ 18.) By this time, Bell Atlantic ~~had grown from a struggling regional Baby Bell after the breakup of AT&T to~~ was a full-service company with an international reach, providing regional telephone service, long-distance service, information services, equipment, data processing, computer maintenance, and cell phone service, among other things. (Bell Atlantic 1995 Form 10-K.)

> **Response:**     No dispute, except as indicated and modified above.

25.     Through Bell Atlantic's growth and technological innovation, ~~the 13,784 Class members who represent Bell Atlantic management over~~saw the company implement~~ation of~~ed such advancements as fiber optic networks, long distance rate battles, the rise of the cellular telephone, and the Internet. (Bell Atlantic 1995 Form 10-K.)

> **Response:**     No dispute, except as indicated and modified above.

26.     The average Class member's years of service at Bell Atlantic as of year-end 1995 was 20 years, meaning these managers already had approximately 8–9 years of service at the time Bell Atlantic began operations. (VZ27114–323.) Therefore, the Class members here were substantially responsible for the success of Bell Atlantic and its growth from a ~~once-struggling~~ Baby Bell to a company rivaling the size of the former pre-divestiture AT&T.

> **Response:**     No dispute to as to the first sentence. Disputed as to the second sentence both as indicated above and to the extent that the sentence implies that Class members were more responsible for Bell Atlantic's success and growth than any of Bell Atlantic's more than 60,000 associate and management employees. *See* 1996 Bell Atlantic Annual Report at 47, *available at* http://investor.verizon.com/financial/quarterly/pdf/96BEL_AR.pdf (last checked June 13, 2009).

27.     In addition ~~to the company's financial well-being as of the mid-1990s~~, the BAMPP itself, as a funded entity, was financially well-off. As of January 1, ~~2~~1996, the Plan was overfunded by $1.22 billion under the R~~D~~PA 94 method of determining liabilities. (VZ22019.)

> **Response:**     No dispute, except as modified above. Plaintiff cites no support for her assertion as to Bell Atlantic's financial well-being as of the mid-1990s.

28.     ~~So, in~~ In 1993, Bell Atlantic began exploring the possibility of converting the BAMPP to a cash balance design. After hiring William M. Mercer Inc. ("Mercer") to consult on a possible cash balance plan, Bell Atlantic decided in favor of the conversion. In addition, the

law firm of Morgan, Lewis & Bockius ("Morgan Lewis") became involved in the plan design process beginning in September 1994. (VZ10652.)

       **Response:**     No dispute, except as modified above.

     29.    Bell Atlantic was worried about plan participants' reaction to a cash balance conversion and did not want to inform the participants of the short-term and long-term expense savings it expected as a result of the conversion. Instead, Bell Atlantic wanted to develop a "communications story" for participants that would "hedge" its projected cost savings to the company through the conversion. (MER0021757.) Before the conversion, Bell Atlantic and Mercer engaged in "conditioning" plan participants. (MER0002899.) The "conditioning" was meant to get participants "used to the idea that there would be a change coming." (Moreen Dep. at 200.)

       **Response:**     Disputed as to the first and second sentences.  Bell Atlantic was

conscious of plan participants' reaction to the cash balance conversion, and engaged in an

extensive communications program to explain the conversion to plan participants.

MER0002899.  *See also* Ex. D.54 at 195-200.  According to Robert Moreen, the Mercer partner

in charge of the Bell Atlantic engagement, "Bell Atlantic probably leaned over further backwards

than any employer I've ever seen in a situation like this to treat its employees fairly.  And part of

treating its employees fairly was to explain the plan openly and clearly as to how it worked and

what the motivation was and what its effect was on them."  Ex. D.54 at 100.  Consistent with

Moreen's characterization, Bell Atlantic acknowledged that the company expected to recognize a

long-term cost savings from the conversion.  MER0021757.  *See also* Ex. D.35 at VZ12892-98.

Those communications also clearly and unambiguously described the single transition factor

formula that Bell Atlantic would use, and did use, to convert a participant's accrued benefit in

the BAMPP to an opening balance in the Cash Balance Plan.  Ex. D.1 at VZ10385-96; Ex. D.2 at

Y000827-39; Ex. D.11 at VZ10474-76; Ex. D.12 at Y000840-43; Ex. D.10 at VZ10550-52; Ex.

D.13 at VZ10519; Ex. D.14 at Y000781-818.  No dispute as to the third and fourth sentences.

     30.    In a draft press release dated October 19, 1995, Bell Atlantic stated that the "'transition formula' that will be used in converting current Bell Atlantic employees' pension

benefits to the new Cash Balance Plan on January 1, 1996," was a "unique feature[]" that "has never before been built in a contemporary retirement plan." (MER0021706.)

**Response:** Disputed. Plaintiff provides an incomplete statement of the October 19, 1995 draft press release. *See* Ex. D.72 at MER0021706-11. The quoted portion of the draft press release states, in full: "Although Bell Atlantic's new Cash Balance Plan is similar in many ways to those introduced by numerous U.S. employers in recent years, it has two unique features. The first is a "transition formula" that will be used in converting Bell Atlantic employees' pension benefits to the new Cash Balance Plan on January 1, 1996. The company believes that this approach to a transition has never before been built into a contemporary retirement plan." *Id.* at MER0021706. The draft press release further states that "Bell Atlantic's unique transition formula ensures that employees who are nearing retirement *will receive benefits at the same level after the transition as they could have expected from the old plan*. For many other Bell Atlantic employees who have fewer years of employment with the company, the application of the transition formula will align their benefits with the new Cash Balance Plan. This may result in an increase in the value of their immediate benefit. This approach results in a smooth transition from one plan to another so all employees are treated equitably." *Id.* at MER0021707 (emphasis added).

### a.    Plan document drafting

31.    Barry Peters had the primary role in drafting the Cash Balance Plan. (Peters Dep. I at 56.) In the drafting and implementation of the Cash Balance Plan, Peters was Bell Atlantic's principal representative, and he had primary responsibility for plan documentation at Bell Atlantic. (*Id.* at 50.) Barry Peters was "the person authorized by resolutions of the CEBC to maintain and publish the benefits plans adopted and amended by the Committee . . . ." (*E.g.*, VZ14438.)

**Response:** No dispute.

32.    Peters was hired by Bell Atlantic in 1986 to serve as in-house counsel for the CEBC, which acted as the plan administrator for most of the ERISA pension plans at Bell Atlantic. (*Id.* 13.) Although the Bell Atlantic in-house legal department consisted of over 100

10

attorneys from 1986–1998, Peters was the only attorney at Bell Atlantic with extensive experience and knowledge of ERISA during that time. (*Id.*) His duties at Bell Atlantic included preparing governance documentation for the board of directors and its Human Resources Committee regarding all benefit plans, serving as primary attorney for benefits matters, and being the company's ERISA expert. (*Id.* 11–14.) Peters left Bell Atlantic in 2001 to work at Mercer, from which he retired in 2007. (*Id.* 14–15.)

> **Response:** No dispute, except that Peters was not hired to serve as in-house counsel to the CEBC and Peters was not the only attorney at Bell Atlantic with responsibility for benefits matters. Peters was hired by Bell Atlantic to be the company's principal employee benefits attorney, and his duties encompassed a range of benefits responsibilities, one of which was to serve as in-house counsel to the CEBC. Ex. D.56 at 13:14-21. For some portion of the period between 1986 and 1998, a second in-house attorney also had ERISA expertise and some responsibility for benefits matters. *Id.* at 30:11-16; Ex. D.57 at 32:19-33:3.

33. Peters was also highly involved in work dealing with compensation and benefits of the corporate executives in mergers and acquisitions that Bell Atlantic engaged in during the 1990s. (*Id.* 14.)

> **Response:** No dispute.

34. In all, at least 16 current or former employees of Verizon or Bell Atlantic were involved in designing, drafting, amending, reviewing, or approving the Cash Balance Plan:

- Graham Ragland—AVP, Compensation and Benefits
- Gary Simko—Director, Benefits Planning
- Barry Peters—Senior Attorney
- Susan McClain—Manager, Strategic Planning
- David Beik—Director, Benefits Finance
- Joe Bobrowski—title unknown
- Barbara Ports—Manager, Qualified Plans
- Ted Bartley—Director, Benefits Administration
- Marie Daniely—Manager, Force Management
- Kathleen Bormuth—Manager, Qualified Plans
- Pat Hall—Specialist, Pensions
- Liz Sutanick—Manager, Pension Systems
- Rob Floyd—Specialist, Pension Systems
- Tom Ludlow—Director, Trust Financial Management
- Lee Pease—Manager, Trust Financial Management
- Rita Grazda—unknown title, Bell Atlantic Pension Department

(Defs.' Supplemental Resps. & Objections Pl.'s Second Interrogs. at 6.)

      **Response:**     Disputed. No dispute that all sixteen had some involvement in designing the Cash Balance Plan and that Barry Peters had involvement in drafting and amending the Plan. Defs.' Supplemental Resps. & Objections Pl.'s Second Interrogs. at 6. *See also* Ex. D.56 at 24-33.

      35.     In addition, Robert Abramowitz of Morgan Lewis was hired to provide outside legal assistance in the drafting of the Cash Balance Plan. Abramowitz is a Harvard Law School graduate and a specialist in ERISA who was A/V rated from Martindale-Hubble. (Abramowitz Dep. at 22:9–11; 31:2–4.) He was listed in the Best Attorneys in America, Pennsylvania Super Lawyers, Chambers, and the Legal 500. (*Id.* at 31:4–9.) He was Chairman of the Pension Committee of the Philadelphia Bar Association. (*Id.* at 32:17–21.) He chaired the Employee Benefits and Executive Compensation Interest Group of the Health Law Section of the American Bar Association. (*Id.* at 33:1–4.) He is Chairman of the Employee Benefits Subcommittee of the Tax Law Section of the American Bar Association. (*Id.* at 33:5–8.) He has written and published 8 to 10 articles on employee benefits. (*Id.* at 34:18–24.) He has been involved in the drafting and amendment of hundreds of employee benefit plans, including 10 to 20 plans that were converted to a cash balance design. (*Id.* at 37:10–21.)

      **Response:**     No dispute.

      36.     Abramowitz was assisted by Kathy Capone, a paralegal who specializes in ERISA matters (Abramowitz Dep. at 46:23–47:4), Vivian McCartle, a senior associate (Abramowitz Dep. at 46:15-23), and Marianne Grey, a benefits analyst. (MLB5044).

      **Response:**     No dispute, except to add that Capone left Morgan Lewis in June 1995, at a very early stage of the Cash Balance Plan drafting project. Ex. D.59 at 17.

      37.     Paul Strella was a partner at Mercer and an attorney who "knew the law surrounding cash balance plans very well." (Moreen Dep. at 212.) Strella was the head of the "Document Drafting" working group on the team Mercer assembled for the Bell Atlantic cash balance conversion. (MER0020675.)

      **Response:**     No dispute.

      **(i)**     **Mercer drafts 1-3**

      38.     Paul Strella of Mercer began the first draft of the Cash Balance Plan in August 1995. (Peters Dep. I at 44, 49.) Section 4.3(a)(ii) of the first draft addressed the calculation of opening balances for BAMPP participants not eligible for service pensions (such as Young). (VZ10804.) That section contains only one reference to a transition factor. (VZ10804.)

**Response:**    No dispute.

39.    Bell Atlantic did not communicate to Mercer any procedures for checking plan drafts for errors. (Moreen Dep. at 96.) Nor did Bell Atlantic ask Mercer what error-checking procedures it had in place. (*Id.*) Rather, Mercer had its own internal "peer review procedures" requiring that "[a]ny piece of work that goes to a client has to be peer-reviewed by somebody not associated directly with the project." (*Id.* at 96–97; *see also* (MER0020679 ("No advice, no deliverable, no product reaches a Mercer client without critical evaluation by other qualified senior Mercer professionals.").)

**Response:**    No dispute.

40.    Bob Abramowitz reviewed the first draft of the Cash Balance Plan. (Abramowitz Dep. at 87:6–88:7.)

**Response:**    Disputed.  Mr. Abramowitz's handwriting appears on a copy of the first draft of the Plan, but Mr. Abramowitz testified that he did not have "a specific recollection" as to whether or not he reviewed the first draft or "any specific Plan provision" in that draft of the Plan.  Ex. D.55 at 87:6-11, 91:4-17.

41.    On September 27, 1995, Mercer sent to Bell Atlantic a second draft of the Cash Balance Plan for review. (VZ13847.) Section 4.3 of the second draft contains only one reference to the transition factor. (*Id.*)

**Response:**    No dispute.

42.    On October 18, 1995, Mercer sent a third draft of the Cash Balance Plan to Bell Atlantic for review. (VZ13848.) Section 4.3 of the third draft contains only one reference to the transition factor. (*Id.*)

**Response:**    No dispute.

43.    The first, second, and third drafts were substantially prepared and reviewed in Philadelphia, Pennsylvania.

**Response:**    No dispute.

(ii)    **Bell Atlantic takes over the drafting process**

44.    Beginning with the fourth draft, Bell Atlantic took over the primary role of drafting and editing the Cash Balance Plan. Peters performed this role. The fourth draft of the Cash Balance Plan, dated April 15, 1996, was prepared by Peters at Bell Atlantic's corporate headquarters in Philadelphia, Pennsylvania. (Peters Dep. II at 149.)

**Response:**     No dispute.

45.     Peters was the only person at Bell Atlantic charged with the responsibility of ensuring that the 1996 Plan conformed to the intent of Bell Atlantic in converting the BAMPP to a cash balance design. (Peters Rule 30(b)(6) Dep. at 18–19.) He never assigned anyone else the responsibility to review the plan document in general or the transition rules specifically to avoid drafting errors. (*Id.* at 19.)

**Response:**     No dispute.

46.     The conversion of the BAMPP to the Cash Balance Plan was the single most complicated plan drafting assignment Peters ever faced in his career. (Peters Dep. I at 78:7–25.) It involved converting a decades-old traditional pension plan to something that looked more like a defined contribution plan and reviewing and accounting for numerous intricate additional plan options and amendments. (*Id.* at 78.) The BAMPP (and the Cash Balance Plan) covered tens of thousands of employees and over $5 billion in <u>actuarial benefit</u> liabilities. (VZ22019.)

**Response:**     No dispute, as modified above.

47.     Peters' time during the spring of 1996 was primarily spent on the negotiation of the NYNEX merger and the executive compensation issues surrounding that merger. (Peters Dep. I at 56.)

**Response:**     No dispute.

48.     During April 1996, Peters and his wife took a very important personal trip to China. (Peters Dep. I at 80–81.) The trip lasted four weeks. (Peters Dep. III at 162:17–20.)

**Response:**     No dispute.

49.     Bell Atlantic never instituted a written policy or procedure governing how a plan document should be drafted, checked for errors, or finalized. (Peters Rule 30(b)(6) Dep. at 17–18.)

**Response:**     No dispute.  Bell Atlantic did, however, have an established

practice for drafting a plan document.  The CEBC would "approve a recommended amendment

with its terms," and, if the amendment was material, the Board of Directors would consider and

"approve the CEBC's recommendation." Ex. D.57 at 17:15-20; *see also* Ex. D.56 at 65:8-13.

Under Bell Atlantic's practice, the drafting of the plan document incorporating the approved

amendment "should be consistent with the resolutions of the CEBC and the [B]oard" and Berry

Peters was responsible for "achieving that along with legal compliance in the drafting" process.

Ex. D.57 at 17:21-25.

### (iii)  **Fourth draft**

50.     Peters inserted the second reference to the transition factor into Section 4.3.1(a)(2) of the Fourth draft:

> In the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is the product of multiplying (A) the Participant's applicable Transition Factor described in Schedule D, times (B) the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995, or the date of status change to a non-Eligible Employee category, if earlier, *multiplied by the applicable transition factor described in Schedule C.*

(Countercl. ¶ 37; VZ11248 (emphasis added).)

**Response:**     No dispute that Peters revised § 4.3.1(a)(2) in the Fourth draft and that the revised section read as set forth above.  Disputed that Peters inserted the emphasized transition factor reference into § 4.3.1(a)(2) of the Fourth draft.  Peters inadvertently failed to delete the emphasized transition factor reference during his revision of the opening balance formula in the Fourth draft.  Ex. D.56 at 73-75.

51.     On April 9, 1996, Peters stated in an e-mail memo to Susan McClain, Joseph Ronan Jr., and Gordon Downing at Bell Atlantic and Abramowitz at Morgan Lewis that the fourth draft "reflects my review and changes of the 3rd draft that had been presented to us by Paul Strella of Mercer." (VZ11226.)

**Response:**     No dispute.

52.     Peters asked McClain in his e-mail to review the document and "share it with Kwasha Lipton, to make sure they review it with an eye to assuring that it accurately reflects the mechanics and programming that has been built into the administration of the plan." (VZ11226.)

**Response:**     No dispute.

15

53.     Peters noted in his e-mail that Abramowitz and Grey were "standing by to assist in finalizing the drafting process, and assisting us with the eventual submission of the document to the IRS." (VZ11226.) He also stated in his e-mail that "I will tell Bob [Abramowitz] not to begin any revision work until you and Kwasha have had a chance to make any changes to fix any problems that you find." (*Id.*) Finally, Peters noted that one of the "pieces that still remain to be completed" was "physically moving" the transition-related provisions, such as Section 4.3.1 to "a Section at the back of the plan that is solely devoted to transition rules." (*Id.*)

**Response:**     No dispute.

54.     Abramowitz reviewed the Fourth draft and made written notes on the document. (Abramowitz Dep. at 104:8–19.) Significantly, he underlined a portion of the sentence immediately preceding the second transition factor reference in Section 4.3.1(a)(2). (*Id.* at 106:7–108:13.)

**Response:**     No dispute that Abramowitz received a copy of the Fourth draft, that Abramowitz made written notes on the Fourth draft, and that on a copy of the Fourth draft Abramowitz underlined the words "date of status change" and "if earlier" in § 4.3.1(a)(2). Ex. D.55 at 98-108; Ex. D.22 at VZ11248. Disputed that Abramowitz reviewed the Fourth draft. Abramowitz testified that he likely would have "looked it over," but that he had no specific recollection of reviewing the entire Fourth draft. Ex. D.55 at 103:3-14. Additionally, because Morgan Lewis was not involved in the development of the Plan's opening balance formula, Abramowitz was never asked to review the accuracy of the opening balance formula in the Fourth draft or in any version of the 1996 Plan or 1997 Plan. Ex. D.57 at 19:18-20:16. *See also* Ex. D.55 at 77:23-78:20, 82:5-12, 126:3-10, 126:17-127:7, 248:11-16; Ex. D.56 at 55:8-19.

### (iv)     Fifth draft

55.     Like the fourth draft, the fifth draft of the Cash Balance Plan contains a second reference to the transition factor in Section 4.3.1(a)(2). (VZ11379.)

**Response:**     No dispute.

56.     A "blackline" version of the fifth draft sent on June 7, 1996, by Peters to Marianne Grey, a benefits analyst at Morgan Lewis, shows that Peters: (1) changed the first transition factor reference from "described in Schedule D" to "described in Schedule C," (2) immediately before the second reference to the transition factor, deleted the text "or the date of status change to a non Eligible Employee category, if earlier," and (3) immediately after the

second reference to the transition factor, added the text "For a 1995 Former Active Participant, the date on which the individual ceased to be an Eligible Employee shall be substituted for December 31, 1995 in the last phrase of the previous sentence." (VZ11446–47.)

**Response:** No dispute that the June 7, 1996 "blackline" includes, among other highlighted edits, the changes referenced in this paragraph. Note that the author of these revisions, when referring to "the last phrase of the previous sentence," apparently overlooked the phrase containing the second reference to the transition factor, which *is* the last phrase in the previous sentence but is not the phrase containing "December 31, 1995" to which the author was referring. *See* VZ11446-47.

57. Specifically, Section 4.3.1(a)(2) of the blackline version of the fifth draft reads as follows:

> **4.3.1(a)(2) Not Eligible for Service Pension**
> In the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is the product of multiplying (A) the Participant's applicable Transition Factor described in Schedule ~~DC~~ of this Section, *times* (B) the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995, ~~or the date of status change to a non-Eligible Employee category, if earlier,~~ multiplied by the applicable transition factor described in Schedule C. <u>For a 1995 Former Active Participant, the date on which the individual ceased to be an Eligible Employee shall be substituted for December 31, 1995 in the last phrase of the previous sentence.</u>

(VZ11446–47.)

**Response:** No dispute. Note that the author of these revisions, when referring to "the last phrase of the previous sentence," apparently overlooked the phrase containing the second reference to the transition factor, which *is* the last phrase in the previous sentence but is not the phrase containing "December 31, 1995" to which the author was referring.

58. In a handwritten note to Marianne Grey on the cover of the blacklined version of the fifth draft, Peters noted that "[t]his is blacklined to show changes from the prior

draft that you and Bob reviewed and commented on." (VZ11423.) Peters' handwritten note asks Grey to "print a copy . . . for Bob Abramowitz." (VZ11423.)

**Response:** No dispute.

59. Abramowitz reviewed the fifth draft (Abramowitz Dep. at 129:11–14) and it was his practice to focus on blacklined areas. (*Id.* at 69:11-20; 130:14-18). Abramowitz considers redlining or blacklining a document a method of drawing attention to changes in the document. (*Id.* at 82:13–83:6.)

**Response:** No dispute that Abramowitz reviewed the Fifth draft, that redlining or blacklining is a method of highlighting changes in a document, and that Abramowitz's general practice was to focus on blacklined areas that he was asked to review. Disputed to the extent that Young suggests that Abramowitz reviewed any specific blacklined change in the Fifth draft or any other version of the Plan. Ex. D.55 at 83:7-84:6, 130:14-24; Ex. D.57 at 19:18-20:16.

60. On or around June 7, 1996, Peters asked Abramowitz to execute the "physical move" of the transition rules to a separate section at the back of the Cash Balance Plan. (MLB 941–45; Abramowitz Dep. at 132:10–133:22.)

**Response:** No dispute.

### (v) Sixth draft

61. On July 1, 1996, Abramowitz sent a sixth draft of the Cash Balance Plan to Peters. (VZ11503.) As Peters requested, the cash balance transition provisions were moved to a separate section, Appendix B, in the sixth draft. (VZ11561–68.) The sixth draft includes the second reference to the transition factor.

**Response:** No dispute.

62. Morgan Lewis created the sixth draft sometime between June 7, 1996, when Peters sent the fifth draft with his changes—including changes immediately before and after the second transition factor reference—and July 1, 1996, when Abramowitz of Morgan Lewis sent the sixth draft to Peters. (VZ11503.)

**Response:** No dispute.

63. The sixth draft is dated "6/25/96." (VZ11505.) Abramowitz noted in his cover letter to the sixth draft his understanding that "your [Peters'] office will take care of blacklining the document." (VZ11503.) He also noted that "[t]he majority of our changes are self-explanatory or have been previously discussed with you." (VZ11503.)

**Response:**     No dispute.

**b.     Adoption of the 1996 Plan**

64.     Peters used the sixth draft to create a final plan document entitled "Bell Atlantic Cash Balance Plan Effective December 31, 1995 (7/6/96 edition)" (VZ001046-1106) (the "1996 Plan"). Peters finalized the 1996 Plan at his office in Bell Atlantic's corporate headquarters in Philadelphia, Pennsylvania, on July 6, 1996. (Peters Dep. III at 149; Defs.' Answers & Objections Pl.'s Interrogs. Regarding Defs.' Countercls. at 14.)

**Response:**     No dispute.

65.     In the 1996 Plan, Appendix B of the sixth draft was moved to a new § 16, but § 16.5.1(a)(2) of the 1996 Plan is substantially the same as Section 3.2.1(a)(2) of Appendix B of the sixth draft and contains two references to multiplication by the transition factor. (VZ13855.)

**Response:**     No dispute.

66.     The final adopted version of § 16.5.1(a)(2) states as follows:

**16.5.1(a)(2) Not Eligible for Service Pension**
In the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is the product of multiplying (A) the Participant's applicable Transition Factor described in Table 1 of this Section, times (B) the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995, *multiplied by the applicable transition factor described in Table 1 of this Section.* For a 1995 Former Active Participant, the date on which the individual ceased to be an Eligible Employee shall be substituted for December 31, 1995 in the last phrase of the previous sentence.

(VZ 01100 (emphasis added).)

**Response:**     No dispute, except as modified above.  Plaintiff's use of the term

"adopted" is misleading.  The BAMPP was amended, and the Plan was adopted, by the Human

Resources Committee ("HRC") of Bell Atlantic's Board of Directors on October 23, 1995.  Ex.

D.4 at VZ01035-36; Ex. D.57 at 17:15-20.  The cash balance conversion, including the

calculation of each participant's opening balance, occurred on December 31, 1995.  Ex. D.18 at

VZ01053; Ex. D.56 at 103:15-16, 185:16-19. Peters was authorized to draft the final Plan

document reflecting the amendments adopted by the HRC. Ex. D.57 at 17:13-18:1. That

document was finalized on July 7, 1996. Ex. D.18 at VZ01046; Ex. D.56 at 64:6-65:2.

       67.    Bell Atlantic did not have a policy or procedure in place for the CEBC to
review final plan documents to ensure they were consistent with Bell Atlantic's intent. (Peters
Rule 30(b)(6) Dep. at 18.) In practice, the CEBC never reviewed plan documents to ensure they
were consistent with Bell Atlantic's intent. (*Id.* at 18.)

       **Response:**    No dispute. Barry Peters explained that this was because "the

members of the CEBC did not have any special training in plan document preparation" and

because the CEBC members "weren't ERISA attorneys." Ex. D.57 at 18:5-7. Instead, it was

primarily Peters' responsibility to ensure that final plan documents were consistent with Bell

Atlantic's intent. *Id.* at 18:10-14.

       68.    No one on the CEBC or the Board of Directors ever reviewed the Cash
Balance Plan document prior to its ~~authorization~~ finalization in 1996. (Peters Dep. I at 82.)

       **Response:**    No dispute, except as modified above.

       69.    Bell Atlantic did not have a practice of executing its final plan documents.
(Peters Dep. I at 65–66.) In other words, no one ever signed the plan document when it was
finalized. (*Id.*) Instead, Peters was delegated the task of deciding when a plan document was
final. (*Id*.) Peters ~~authorized the final~~ finalized the 1996 Plan document on July 6, 1996 pursuant
to a grant of authority given to him by the Human Resources Committee and the Vice President
– Human Resources. (*Id.* 57, 65–66.)

       **Response:**    No dispute, except as modified above. Ex. D.56 at 65-66.

       70.    Before authorizing the Plan, Peters knew that there were few things in the
Cash Balance Plan as fundamental and basic as the use of the transition factor to calculate a
participant's benefit under § 16.5. (Peters Dep. I at 18–19.) He recognized that the transition
factor was an "important part" of the plan design. (*Id.* at 105–06.)

       **Response:**    Disputed. Peters testified that he was surprised to learn in

connection with plaintiff's administrative claim that the plan contained a second reference to the

transition factor because there were "few things in the plan as fundamental and basic" as the

single multiplication of the transition factor. Ex. D.56 at 18:11-19:4.

71.     Bell Atlantic did not have any other attorneys to assist Peters in-house with his representation of the CEBC or the cash balance conversion. (Peters Rule 30(b)(6) Dep. at 18.) Peters wanted to hire additional in-house ERISA counsel to help him fulfill his duties, but Bell Atlantic would not budget for such hires. (Peters Dep. II at 167.)

**Response:**     Disputed as to the first sentence insofar as it fails to acknowledge that Bell Atlantic's legal staff included a second lawyer, Joe Ronan, whose duties included benefits and ERISA matters. Ex. D.57 at 18:15-22; Ex. D.56 at 166:20-167:11. Disputed as to the second sentence. *See* Ex. D.56 at 166-68. Additionally, Peters testified that Bell Atlantic was "fairly generous" in permitting Peters "to hire outside counsel when needed" to assist with ERISA matters. *Id.* at 167:17-168:3.

72.     In addition to having the responsibility to monitor litigation involving benefit plans, Peters oversaw and advised on executive compensation and executive benefits arrangements, which consumed between one-third to one-half of his time throughout his employment at Bell Atlantic. (Peters Dep. II at 152–54.) Far and away, during 1996–1997, Peters spent most of his time with the NYNEX merger, negotiating terms for executive compensation and executive contracts, and negotiating who would be the CEO of the combined entity. (*Id.*) In addition to Peters, everyone above him in the chain of command, up to the general counsel of Bell Atlantic was actively involved in negotiating the CEO arrangements, compensation, and benefits. (*Id.* at 155–156.)

**Response:**     No dispute as to the first and second sentences. Disputed as to the third sentence to the extent that it suggests anything more than the fact that persons above Peters in the chain of command, including the general counsel of Bell Atlantic, were interested in monitoring, consulting, and advising on CEO employment agreements. Ex. D.56 at 155:16-156:7.

73.     The negotiations over the NYNEX/Bell Atlantic merger began just a few months before April 1996, and a key point in the negotiations was occurring in April 1996. (Peters Dep. II at 163.) Peters also was responsible for researching all of the potential employment agreements with executives to ensure synergies from the merger. (*Id.* at 160–61.) The Human Resources Department was charged with administering dozens of Bell Atlantic pension plans and was due to eliminate half the jobs at the combined entity. (*Id.*) Peters was very concerned and active in the process of determining how Bell Atlantic could retain institutional knowledge of the plans after the merger. (*Id.*)

21

**Response:** No dispute as to the first and second sentences. Disputed as to the third sentence to the extent that it suggests Bell Atlantic planned to eliminate half the jobs in the company's Human Resources Department. Ex. D.56 at 161:15-22. No dispute as to the fourth sentence.

74. April 1996 was also the time when Peters and his wife had set aside to vacation in China. (Peters Dep. II at 160–61.) Peters went to China for four weeks and another attorney took over the role of negotiating the CEO employment agreement. (*Id.*) Peters did not, however, assign anyone to take over his responsibilities with respect to the Bell Atlantic cash balance conversion while he was in China. (*Id.*)

**Response:** No dispute. Peters did not assign anyone to take over his responsibilities with respect to the Bell Atlantic cash balance conversion because "there were no pressing matters" with respect to the conversion at the time of his April 1996 trip to China. Ex. D.56 at 163:3-7.

75. Peters expected Bell Atlantic's attorneys at Morgan Lewis to review the 1996 Plan for errors with respect to the sections they worked on, but Peters did not ~~assign~~ instruct them nor expect them to review the Plan to ensure it conformed with Bell Atlantic's intent. (Peters Rule 30(b)(6) Dep. at 19–20.)

**Response:** No dispute, as modified above.

76. Abramowitz considered the conversion to a cash balance plan to be a major amendment to the plan. (Abramowitz Dep. at 68:6–10.) In that conversion, Abramowitz viewed the opening balance calculation as an important design decision (*Id.* at 77–78), although he did not spend a lot of time on it (*Id.* at 78:15–17).

**Response:** No dispute. Abramowitz did not spend a lot of time on the opening balance calculation because Mercer, not Morgan Lewis, was responsible for the development and design of the opening balance formula. Ex. D.57 at 19:18-20:16; Ex. D.55 at 82:5-12, 126:3-10.

77. Peters knew that an error in the transition section of the Plan like that alleged by Verizon would be material, if it existed, as of the finalization of the Cash Balance Plan on July 6, 1996. (Peters Dep. II at 190.)

22

**Response:**       No dispute.  Peters explained that the scrivener's error would be

material because "it would have a very material impact on the benefits of thousands of people."

Ex. D.56 at 190:17-18.

78.       Although Mercer drafted the first three plan drafts, Mercer did not review

the final 1996 Plan document. (Moreen Dep. at 87.) Mercer was "not asked to do that" by Bell

Atlantic. (*Id.*) Peters never asked Mercer to review his work on the Cash Balance Plan after he

generated the fourth draft. (Peters Rule 30(b)(6) Dep. at 20–22.)

**Response:**       No dispute.

79.       The Cash Balance Plan was not negotiated at arms-length between

multiple parties. (Peters Dep. I at 66–67; *See* Letter from Gus Sandstrom to Matthew Heffner,

Sept. 26, 2007.) For example, drafts of the Cash Balance Plan were never disseminated to, nor

reviewed by, participants. It was also not the practice of Bell Atlantic to mail plan documents to

plan participants. (Peters Dep. I at 83–84.)

**Response:**       No dispute.

c.       **The Summary Plan Description**

80.       The handbook entitled "The Big Picture" (Y000443–780), including the

section entitled "Cash Balance Plan" (Y000677–96), is the Summary Plan Description ("SPD")

of the Cash Balance Plan under ERISA § 102, 29 U.S.C. § 1022. (*See*, *e.g.*, VZ11315.)

**Response:**       Disputed.  The October 1995 brochure entitled "Introducing Your

Cash Balance Plan" is a Summary of Material Modifications (and therefore supplemented the

then-current SPD) with respect to the cash balance transition, the Plan's opening balance

formula, and Plan's benefit accrual formula.  Ex. D.1 at VZ10385-96.  The August 1996 "The

Big Picture" handbook, which was issued eight months after the cash balance transition and the

calculation of each participant's opening balance, was the successor SPD with respect to the

Plan's benefit accrual formula, but not the cash balance transition or the Plan's opening balance

formula.  Ex. D.73 at VZ11315 ("We have also assumed that a description of the transition rules

has already been provided to BAMPP participants and are not intended to be covered in the

SPD.").

81.　　The SPD was distributed to participants in August 1996. (Y000443.) The SPD was the document that some participants relied on in determining their benefits because of its format and ease of use. (Young Dep. at 97–99.)

**Response:**　　No dispute that "The Big Picture" SPD was distributed in August 1996. Disputed as to the second sentence because the previously-issued SMM, "Introducing Your Cash Balance Plan," described the cash balance transition and the opening balance formula, which "The Big Picture" did not; its format and ease of use were superior to that of "The Big Picture"; and its importance was recognized by participants, as shown by the fact that plaintiff retained it in her files for more than 10 years. Ex. D.1 at VZ10385-96; Ex. D.58 at 28-33. Plaintiff recalls that she reviewed the "Introducing Your Cash Balance Plan" SMM when she received it in October 1995 because the document explained how the Cash Balance Plan would work. Ex. D.58 at 32. Plaintiff does not recall ever having reviewed the sections of "The Big Picture" SPD relating to the Cash Balance Plan. *Id.* at 101.

82.　　The SPD explicitly stated that it was "a brief, simplified summary of the . . . benefit plans" and that the official plan document will be used to determine precisely how the plan works if there's a difference between this handbook's summary and the official plan document." (Y000451.) Young relied upon Bell Atlantic to calculate her pension correctly according to this statement. (Young Dep. at 73.)

**Response:**　　No dispute as to the first sentence. Disputed as to the second sentence. Plaintiff testified that she "relied upon . . . Bell Atlantic to calculate my pension correctly," Ex. D.58 at 73, but she did not ever review the Cash Balance Plan document prior to this litigation and does not recall having reviewed the sections of "The Big Picture" SPD relating to the Cash Balance Plan," *id.* at 85, 101.

83.　　The SPD does not conflict with the second transition factor reference in § 16.5.1(a)(2).

**Response:** Disputed. The "Big Picture" SPD does not purport to describe the cash balance transition or the opening balance formula. Ex. D.65 at Y000677–96; Ex. D.73 at VZ11315.

84.     Every written participant communication sent by Bell Atlantic to its participants concerning the Cash Balance Plan contained a disclaimer that the "Plan document" controlled over any contrary language in the communication. (Moreen Dep. at 186.) (*See, e.g.*, "Introducing Your Cash Balance Plan" Brochure, Oct. 1995 (VZ10400) ("If there is any conflict between the Plan document and this brochure, the text of the Plan document is controlling."); "Let's Talk" Communication, Oct. 1995 (VZ10441) ("If there is any conflict between the Plan document and this brochure, the text of the Plan document is controlling."); Sample "Estimated Opening Account Balance Statement" (VZ10477) ("[I]f there are any discrepancies between the information in the statement and the official Plan documents, the Plan documents will always govern."); "A Look at Your Future Today" Brochure, May 1996 (VZ10490) ("If there are any discrepancies between the information in this guide and the official Plan documents, the Plan documents will always govern.").)

**Response:** No dispute that the documents cited by plaintiff contain the quoted statements. Disputed that every written participant communication sent by Bell Atlantic contained the disclaimer referenced by plaintiff.

85.     For example, on November 7, 19957, Bell Atlantic provided Young with an estimate of her Cash Balance account. (Y000414.) That estimate included the disclaimer that if there was any conflict between the information contained in Bell Atlantic's estimate and the Plan, the Plan would control. (Y000426.)

**Response:** No dispute.

86.     The document that Verizon contends is a summary of material modifications, the "Introducing Your Cash Balance Plan" brochure at VZ10385–96 (*see* Defs.' Countercl. [DE 139] ¶ 23), is not a summary of material modifications for the following reasons:

(a)     Bell Atlantic never intended it to be a summary of material modifications;

(b)     Bell Atlantic never told participants it was a summary of material modifications; and

(c)     it was never submitted to the Department of Labor ("DOL") as required by law. ERISA § 104(a)(1)(D), 29 U.S.C. 1024(a)(1)(D) (1996) (amended by Pub. L. 105-34 § 1503 (Aug. 5, 1997) (changing requirement to require reporting of summary of material modifications only upon request by DOL); (Letter from Glenn Hara to DOL, Nov. 26, 2007, Y000863); (DOL response, Y000865-945).

**Response:**    Disputed.  As to subparagraphs (a) and (b), ERISA and the implementing regulations issued by DOL do not contain any specific requirements for a Summary of Material Modifications, except that the SMM must "furnish a summary description of any material modification to the plan," must be "written in a manner calculated to be understood by the average plan participant," and must be issued no later than 210 days after the end of the year in which the plan was amended.  *See* 29 C.F.R. § 2520.104b-3(a).  The "Introducing Your Cash Balance Plan" SMM satisfies each of those requirements.  Ex. D.1 at VZ10385-96.  And, because "The Big Picture" SPD was not issued until August 1996, more than 210 days after December 31, 1995, Bell Atlantic was required to provide a prior SMM to Plan participants, which it did in October 1995 by issuing "Introducing Your Cash Balance Plan." *See* 29 C.F.R. § 2520.104b-3(a) & (b).  As to subparagraph (c), there is no evidence that the "Introducing Your Cash Balance Plan" SMM was not filed with DOL.  The DOL does not maintain a complete record of SMMs and SPDs filed with the agency.  *See* http://www.dol.gov/ebsa/publications/how_to_obtain_docs.html (last checked June 11, 2009) ("The Taxpayer Relief Act of 1997 eliminates the requirement of plans to file SPDs and SMMs with EBSA. SPDs and SMMs filed with the agency before that date *may* be on file and are available upon request *if they are maintained*.") (emphases added).

### (3)    *Corcoran* Litigation

87.    A putative class action lawsuit entitled *Corcoran v. Bell Atlantic Corp.*, No. 97-510 (E.D. Pa.), was filed against Bell Atlantic Corporation, Bell Atlantic Management Pension Plan, and the Bell Atlantic Cash Balance Plan, among others, on January 23, 1997.

**Response:**    No dispute.

### a.    The Discount Rate Issue in *Corcoran*

88.    The *Corcoran* Complaint alleged, among other allegations, that Bell Atlantic had breached its fiduciary duty by determining the participants' opening balances in the

conversion from the BAMPP to the Cash Balance Plan using inappropriate discount rates. (*Corcoran*, Compl. ¶¶ 49–50, VZ24028–29.)

> **Response:** No dispute.

89. The plaintiffs alleged that Defendants breached their fiduciary duties by designating the September 1995 PBGC rate as the discount rate to be used when calculating opening balances. (*Corcoran*, Compl. ¶ 49.) Plaintiffs alleged that, had the December PBGC rates been applied when opening balances were calculated, the participants' benefits would have been higher due to a fall in the discount rate between September and December. (*Id.* ¶ 50.)

> **Response:** No dispute.

90. The plaintiffs' argument was based on Treasury regulations that required either (i) the PBGC interest rate be specified in the plan or (ii) using the PBGC rate in effect on the annuity starting date under 26 C.F.R. § 1.417(e)-1T(d)(9)(ii). (*Id.* ¶¶ 42–43.) The plaintiffs contended that, because the BAMPP did not specify September 1995 as the date for the PBGC rate, the December rate should be used under the Treasury regulations because December 31 would be the annuity starting date. (*Id.*)

> **Response:** Disputed because the referenced argument and Treasury
>
> Regulation are not cited or mentioned in the *Corcoran* Complaint. No dispute that the *Corcoran*
>
> plaintiffs raised this argument in opposition to Bell Atlantic's Motion to Dismiss. Ex. D.37 at
>
> VZ22586-87.

91. On May 28, 1997, the *Corcoran* plaintiffs filed an Amended Complaint. (VZ23933–83.) The relevant allegations remained the same. On June 17, 1997, prior to certification of the putative class, Defendants moved to dismiss the Amended Complaint for failure to state a claim. (*Corcoran*, Defs.' Mot. Dismiss, VZ23678–731.)

> **Response:** No dispute except dispute that any of the allegations in *Corcoran*
>
> were "relevant."

92. Bell Atlantic hired Morgan Lewis to defend the *Corcoran* litigation. Abramowitz was the responsible attorney and billing attorney at Morgan Lewis for the *Corcoran* litigation. (Peters Dep. II at 227–229; Peters Dep. Ex. 15.)

> **Response:** No dispute as to the first sentence. Disputed as to the second
>
> sentence to the extent that it implies that Abramowitz had any involvement as the responsible

attorney that was distinct from, or in addition to, his involvement as the billing attorney for the

Bell Atlantic work performed by Morgan Lewis. Ex. D.56 at 228:17-21.

93.     In the Motion to Dismiss, Defendants represented to the court that § 16.5.1
of the Cash Balance Plan was used to calculate opening balances of the participants. (*Id.* at 11.)
In support of the Motion, Defendants argued to the court as follows:

> The only claimed basis for disregarding this straightforward
> provision in the regulations is an unsupported statement by
> Plaintiffs that '[s]ince the Management Pension Plan does not
> provide for the use of the September 1995 rate under the
> circumstances, using that rate was inappropriate under the
> regulations.' That assertion is blatantly inconsistent with the
> Pension Plan. The amended Pension plan – i.e., the Bell Atlantic
> Cash Balance Plan, effective December 31, 1995 – states explicitly
> that opening cash balances are determined '<u>using the PBGC
> interest rates which were in effect for September 1995</u>.' (Ex. 1
> [Cash Balance Plan], § 16.5.1) It is hard to imagine how the plan
> document could be more specific.

(*Corcoran*, Defs.' Reply Mem. at 11–12, VZ23319–20 (emphasis in original).)

**Response:**     No dispute as to the quoted language.  Disputed to the extent that

plaintiff mischaracterizes Bell Atlantic's argument in *Corcoran*.  Bell Atlantic also asserted that

the "actuarial assumptions that were adopted as part of the 1995 amendment were determined

using *the same methodology* that was already in place in 1994 and 1995 for participants who

elected to take advantage of the temporary lump-sum feature that was made available on a trial

basis."  Ex. D.76 at VZ23692-93 (emphasis added).  Bell Atlantic further asserted that "the

methodology that was used to select an interest assumption for the 1995 amendment was

*identical to* the methodology that had been in place for almost two years."  *Id.* at VZ23694

(emphasis added).  And Bell Atlantic asserted that "the two-year pension cashout trial of 1994-

95 used a lump-sum cashout methodology that was *precisely the same* as that used under the

Pension Plan to determine the cash opening account balance as of December 31, 1995."  *Id.* at

VZ23722 (emphasis added).

94.     Defendants prevailed on their motion to dismiss. *Corcoran v. Bell Atlantic Corp.*, No. 97-510, 1997 WL 602859 (E.D. Pa. Sept. 23, 1997).

**Response:**     No dispute to the extent that the *Corcoran* litigation was dismissed.  Disputed to the extent plaintiff suggests that defendants prevailed on any argument that § 16.5.1 of the Cash Balance Plan was used to calculate opening balances of the participants. *See Corcoran*, No. 97-510, 1997 WL 602859, at *8-9 (dismissing breach of fiduciary duty claim because "amendment of a pension plan is not subject to fiduciary scrutiny under ERISA").

95.     The *Corcoran* plaintiffs appealed the decision to the Third Circuit Court of Appeals. (*Corcoran*, Appellants' Br., VZ22996–3091.)

**Response:**     No dispute.

96.     On appeal, Defendants reiterated that § 16.5.1 controlled the calculation of opening balances. Specifically, Defendants stated in their recitation of facts:

> To make these [opening balance] calculations, it was necessary to value the benefits that would have accrued in the future on an annuity basis. This required the selection of an interest or discount assumption, as well as assumptions about how long participants would have lived and continued to receive benefits. ([Cash Balance Plan] § 16.5, App. at 166-67).

> \*       \*       \*

> The 1995 cash balance amendment adopted an interest (or discount) rate that was published by the Pension Benefit Guarantee Corporation ("PBGC") for determining the present value of an annuity form of benefit. (Am. Compl. ¶¶ 43, 45, App. at 88-90; [Cash Balance Plan] § 16.5.1, App. at 166).

(*Corcoran*, Appellee's Br. at 5–6, VZ22943–44.)

**Response:**     No dispute as to the quoted language.  Disputed to the extent that plaintiff mischaracterizes Bell Atlantic's argument on appeal.  Bell Atlantic also asserted on appeal that the "methodology that was used to select an interest rate for the 1995 amendment was *identical to* the methodology that had been in place in 1994 and 1995 for participants who elected to take advantage of the temporary lump-sum feature that was made available under

BAMPP on a trial basis." Ex. D.77 at VZ22945 (emphasis added). Bell Atlantic further asserted

that "the two-year pension cashout trial of 1994-95 used a lump-sum cashout methodology that

was *precisely the same* as that used under the Pension Plan to determine the cash opening

account balance as of December 31, 1995." *Id*. at VZ22979 (emphasis added).

> 97. Defendants further argued that § 16.5.1 was used for participants who
severed from service on or after December 31, 1995, while § 4.19 was used for those who retired
on or before December 30, 1995:

> > Lump-sum pensions for eligible participants who elected to retire
> > in 1994 and 1995 were calculated using the PBGC rate that was "in
> > effect on the last day of the calendar month immediately preceding
> > the first month of the calendar quarter in which the Severance from
> > Service Date occurs." (BAMPP § 4.19(c)(2)(C), App. at 239-40).
> > In other words, if a participant in the Pension Plan elected to retire
> > from Bell Atlantic effective as of December 30, 1995, and elected
> > to receive a lump-sum benefit under the trial program, the lump-
> > sum was calculated using the September 1995 PBGC rate;
> > September 30 was the last day of the last month preceding the
> > quarter in which the lump-sum was calculated. (See *id*.). If, on the
> > other hand, the participant elected to remain employed, the
> > participant's opening cash balance under the BACBP would have
> > been calculated using the exact same PBGC rate from September
> > 1995. (BACBP § 16.5.1, App. at 166).

(*Corcoran*, Appellee's Br. at 6–7, VZ22945–46.)

> **Response:** No dispute as to the quoted language. Disputed to the extent that

plaintiff mischaracterizes Bell Atlantic's argument on appeal. Ex. D.77 at VZ22945-46; *see*

*supra* at Response to Proposed Findings ¶ 96.

> 98. Moreover, Defendants expressly disclaimed that § 4.19 of the BAMPP
was applicable to the opening balance calculation:

> > BAMPP's provisions are useful only by way of analogy. The
> > relevant Plan provisions for the purposes of this regulation are set
> > forth in the amended Pension Plan, i.e., BACBP [Bell Atlantic
> > Cash Balance Plan], and BACBP states explicitly that opening
> > cash balances are determined by "using the PBGC interest rates
> > which were in effect for September 1995." (BACBP § 16.5.1, App.
> > At 166). It is hard to imagine how the plan document could be
> > more specific.

*Corcoran*, Appellee's Br. at 40, VZ22978 (emphasis in original).

**Response:** No dispute as to the quoted language. Disputed to the extent that plaintiff mischaracterizes Bell Atlantic's argument on appeal. Ex. D.77 at VZ22945-46; *see supra* at Response to Proposed Findings ¶ 96.

99. On June 30, 1998, the Third Circuit affirmed the decision of the district court. (VZ22883–93.) The court relied on an argument of the Defendant that "[n]one of the provisions of the prior plan applied to determine the formula to be used in calculating the value of the rights of a participant who separated from service as of December 31, 1995, the date prescribed by the Cash Balance Plan to determine opening balances." (VZ22891.)

**Response:** No dispute as to the first sentence. Disputed as to the second sentence because it misquotes and characterizes the Third Circuit's decision on appeal. VZ22883-93. The quoted language comes from the *plaintiffs'* argument on appeal in *Corcoran*. *See* VZ22891 ("Indeed, plaintiffs state in their brief . . ."). The Third Circuit affirmed the district court's decision that the *Corcoran* plaintiffs failed to state a breach of fiduciary duty claim. VZ22890-92.

**b. Bell Atlantic's actual knowledge of the second transition factor reference**

100. Verizon admits that the second transition factor reference in § 16.5.1(a)(2) of the 1996 Plan was "discussed, argued, presented, or was otherwise at issue in" the *Corcoran* litigation. (Defs.' Answers & Objections Pl.'s Interrogs. Regarding Defs.' Countercls. at 16.)

**Response:** Disputed. Verizon's interrogatory response states that the "transition factor provision in § 16.5.1(a) of the 1996 Cash Balance Plan and/or the 1997 Cash Balance Plan was discussed, argued, presented, or was otherwise at issue in" the *Corcoran* litigation. Ex. D.67 at 16. Verizon's interrogatory response does not state that the *second transition factor reference* in § 16.5.1(a)(2) of the 1996 Plan was ever discussed, argued, presented, or at issue in the *Corcoran* litigation. *See generally* Ex. D.67.

101.    Specifically, the second transition factor reference was discussed in the following documents filed with the district court and the Third Circuit Court of Appeals in the *Corcoran* litigation:

(a)    the initial Complaint, filed January 23, 1997, quotes § 16.5.1(a)(2) of the 1996 Plan in its entirety, including the second transition factor reference (*Corcoran*, Compl. ¶ 40, VZ24023–24);

(b)    the Amended Complaint, filed May 28, 1997, quotes § 16.5.1(a)(2) of the 1996 Plan in its entirety, including the second transition factor reference (*Corcoran*, Am. Compl. ¶ 41, VZ22814–15);

(c)    Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint, filed August 6, 1997, quotes § 16.5.1(a)(2) of the 1996 Plan in its entirety, including the second transition factor reference. (VZ22557.) That quotation is followed by the following footnote highlighting the significance of the second transition factor reference:

> By its terms, Section 16.5.1(a)(2) appears to require that participants whose cash balance account was calculated on the basis of their deferred vested pension under the Management Pension Plan receive their transition multiplier twice. Literal application of this provision would be highly advantageous to those Plaintiffs and class members who had their opening account balance calculated on the basis of the deferred vested pension. For example, under a literal application of this provision, plaintiff Pierce, who was assigned a transition multiplier of 2.928, would receive an opening account balance of 5.8 times the lump-sum cash-out value of his pension rights under the Management Pension Plan. However, given the overall context of the Plan document, Plaintiffs assume that this represents a scrivener's error.

(VZ22557–58); and

(d)    on appeal to the Third Circuit, the *Corcoran* plaintiffs quoted § 16.5.1(a)(2) in its entirety in their opening brief, including the second transition factor reference, and highlighted the second transition factor reference by inserting "[sic]" between the word "multiplied" and the phrase "by the applicable transition factor described in table 1 of this section" (VZ23010).

**Response:**    No dispute that the referenced filings quoted § 16.5.1(a)(2) of the 1996 Plan.  No dispute that a footnote in the factual background section of the *Corcoran* plaintiffs' Opposition to Defendants' Motion to Dismiss conceded that the second transition factor reference in § 16.5.1(a)(2) was a scrivener's error.  Disputed to the extent that plaintiff

asserts that the second transition factor reference was "discussed" in any filing in the *Corcoran* case other than in the footnote in the Opposition brief. *See* Ex. D.37 at VZ22557-58. *See also* VZ24023-24; VZ22814-15; VZ23010.

102. The Corcoran Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, with footnote two discussing the second transition factor reference, was served on Michael L. Banks, Bell Atlantic's attorney at Morgan Lewis, in Philadelphia, Pennsylvania, by hand delivery on August 6, 1997. (Defs.' Answers & Objections Pl.'s Interrogs. Regarding Defs.' Countercls. at 6.)

**Response:** No dispute. Ex. D.37 at VZ22610.

103. Banks, along with Abramowitz, Richard G. Rosenblatt, and Erin F. Mulhollan at Morgan Lewis, received a copy of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss and the appellate Brief of Plaintiffs-Appellants from the *Corcoran* litigation. (Defs.' Supplemental Resps. & Objections Pl.'s Interrogs. Regarding Defs.' Countercls. at 5.) All of these attorneys reviewed both documents. (*Id.*)

**Response:** No dispute that Banks, Abramowitz, Rosenblatt, and Mulhollan received and reviewed the *Corcoran* Plaintiffs' Opposition Brief. No dispute that Banks, Abramowitz, and Mulhollan received and reviewed that *Corcoran* plaintiffs' opening appellate Brief. Disputed that Rosenblatt received or reviewed the opening appellate Brief. Rosenblatt did not bill any time to the *Corcoran* litigation between February 1998, when the Brief was filed, and July 1998, when the Third Circuit issued its opinion.

104. On or about August 8, 19979, Peters received the Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss with footnote two pointing out the second transition factor reference in § 16.5.1(a)(2) of the 1996 Plan, as he received copies of all court filings in the *Corcoran* litigation by both the plaintiffs and Bell Atlantic. (Peters Dep. II at 174–75.) In his cover letter, Banks asked Peters to review the memorandum and call him to discuss it. (VZ24230.)

**Response:** No dispute as to the first sentence, except as modified above and to the extent that plaintiff states that Peters received copies of all court filings in the *Corcoran* litigation. Ex. D.56 at 171:3-8, 174:3-9. Disputed as to the second sentence to the extent that plaintiff mischaracterizes Banks' cover letter and suggests that Peters read the Opposition Brief.

Banks' cover letter asked Peters to "[p]lease give me a call after you have reviewed it," but did

not expressly ask Peters to review the brief. *See* VZ24230. Peters does not recall receiving the

Opposition Brief, and it was not his practice to read or review filings in cases, like *Corcoran*,

that he believed "had no merit." Ex. D.56 at 174:10-175:22. In August 1997, the majority of

Peters' time was devoted to the Bell Atlantic-NYNEX merger, which closed on August 15, 1997.

Ex. D.56 at 145:10-16, 153:2-17, 176:17-19.

105.    Bell Atlantic's attorneys at Morgan Lewis forwarded a copy of the
plaintiffs' brief filed with the Third Circuit to Peters on or about February 2~~4~~3, 1998. (Defs.'
Supplemental Resps. & Objections Pl.'s Interrogs. Regarding Defs.' Countercls. at 6.)

> **Response:**    No dispute, as modified above.

106.    Bell Atlantic's attorneys at Morgan Lewis forwarded copies of various
district court pleadings, including the Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss, to Samuel F. ~~Pannicia~~ Paniccia of D'Amato & Lynch LLP on or
about October 17, 1997 ~~August 20, 1998~~. (Defs.' Supplemental Resps. & Objections Pl.'s
Interrogs. Regarding Defs.' Countercls. at 6.) Bell Atlantic's attorneys at Morgan Lewis
forwarded copies of the appellate briefing, including the plaintiffs' brief, to ~~Pannicia~~ Paniccia on
or about August 20, 1998. (*Id.*)

> **Response:**    No dispute, as modified above. Paniccia was an insurance counsel,

and Morgan Lewis did not ask him to review any pleadings or briefs, which were only sent to

Paniccia after they were filed.

107.    Banks and Bell Atlantic's other attorneys at Morgan Lewis, including
Rosenblatt and Mulhollan, read the Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss and drafted a reply brief in response, which was filed August 22,
1997. (VZ23309–32.)

> **Response:**    No dispute except to the extent plaintiff suggests that any attorney

at Morgan Lewis other than Banks, Rosenblatt, and Mulhollan drafted Bell Atlantic's reply brief.

VZ23309-32.

108.    Bell Atlantic's Reply brief comprehensively addresses each of the
arguments in the plaintiffs' Response to the Motion to Dismiss. (*See* VZ23309–32.) It
specifically addresses footnote 1 of the plaintiffs' response brief, which argued that there were
"discrepancies" between two different versions of the BAMPP ~~Plan~~. (VZ23315.)

**Response:**     No dispute as to the first sentence, to the extent plaintiff acknowledges that Bell Atlantic's Reply brief comprehensively addresses each of the legal arguments in the *Corcoran* plaintiffs' Opposition.  Disputed to the extent plaintiff asserts that the Reply brief addresses statements made in the factual background section of the *Corcoran* plaintiffs' opposition.  VZ23309-32.  No dispute as to the second sentence, except as modified above.  VZ23315.

109.    Throughout the *Corcoran* litigation, Abramowitz was copied on numerous correspondence and briefs, involving all aspects of the case. (*See e.g.*, VZ24180–81, 24202–03, 24208–09, 24230, 24232–33, 24245–47, 24261, 24270–71, 24276, 24280–81, 24296–97, 24298–99, 24308–09, 24328–29, 24337–39, 24351, 24356, 23364–65, 24388, 24400–01, 24411, 24415–16, 24447–48, 24466–74, 24488, 24490, 24518–19, 24553–54, 24583.)

**Response:**     No dispute.  Abramowitz was not a litigator, but he was the billing attorney for the Bell Atlantic work performed by Morgan Lewis.  Ex. D.56 at 228:17-21.

110.    Abramowitz was ~~extensively~~ quoted in a news article about the district court's decision in the *Corcoran* litigation. (VZ24413–14.)

**Response:**     No dispute, except as indicated above.

111.    Peters was assigned responsibility for managing the *Corcoran* litigation for Bell Atlantic and was the point of contact for outside counsel with respect to the litigation. (Defs.' Answers & Objections Pl.'s Interrogs. Regarding Defs.' Countercls. at 5.) To the extent that the management of the litigation required someone at Bell Atlantic to review or analyze the litigation, Peters was responsible for ensuring that those tasks were performed. (Defs.' Answers & Objections Pl.'s Interrogs. Regarding Defs.' Countercls. at 5.)

**Response:**     No dispute.

112.    Gordon Dow~~n~~ling, another attorney for Bell Atlantic, executed an affidavit in connection with Bell Atlantic's motion to dismiss the *Corcoran* litigation. (Defs.' Answers & Objections Pl.'s Interrogs. Regarding Defs.' Countercls. at 10.)

**Response:**     No dispute, except as modified above.

113.    In connection with the *Corcoran* litigation, Peters and Abramowitz communicated with Kwasha Lipton in 1997 regarding whether Kwasha Lipton was calculating benefits in accordance with specific language in the Cash Balance Plan. (MLB 372.)

**Response:** No dispute that, in connection with the *Corcoran* litigation, Peters communicated with Kwasha Lipton in 1997 regarding whether a proposed clarifying amendment to the Plan's anti-cutback provisions was "in accord with the existing Kwasha Lipton programming of the BA Cash Balance Plan record keeping system," and that Abramowitz was copied on that communication. MLB0000372-78. Disputed that Peters' communication discussed "whether Kwasha Lipton was calculating benefits in accordance with specific language in the Cash Balance Plan." *Id.*

114. Peters did not request or participate in a regular or periodic review of the status of the *Corcoran* litigation with Morgan Lewis. (Peters Dep. II at 169–70.) Peters never formally communicated with his superiors regarding the *Corcoran* litigation and never wrote a memo regarding the litigation, but he would in passing keep his superior informed as to the general nature of the litigation. (*Id.*)

**Response:** No dispute. Gordon Downing was Peters' superior at Bell Atlantic. Ex. D.56 at 169:20-24.

115. Peters never circulated a copy of *Corcoran* pleadings to any other in-house counsel at Bell Atlantic, and it was not his practice to do so. (Peters Dep. II at 175–176.)

**Response:** No dispute.

116. If Peters had reviewed footnote two of Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss, he would have immediately notified the chairperson of the benefits committee because it notified Bell Atlantic of a material error in a plan document and it was his duty to notify the chairperson of such errors. (Peters Dep. II at 181.)

**Response:** No dispute that Peters testified in 2009 that he would have done so if he had reviewed the footnote in 1997. Ex. D.56 at 181:15-22.

117. It was Bell Atlantic's practice in 1997 to allow Peters to correct discovered errors in the text of the final plan documents. (Peters Dep. II at 181–184.) But Bell Atlantic's practice was not to necessarily formally amend or notify participants regarding a discovered alleged drafting error. (Peters Dep. II at 181–184, 190–191.)

**Response:** Disputed. Peters *never* altered the text in a final plan document. Ex. D.56 at 187:25-188:16.

118.    During 1995–1998, all of the Morgan Lewis attorneys who worked on the Cash Balance Plan, the in-house lawyers at Bell Atlantic, and the consultants at Mercer were located in Philadelphia, Pennsylvania. (Peters Dep. II at 149.)

**Response:**    No dispute.

119.    During the pendency of the *Corcoran* litigation, Abramowitz was working on the conversion of the NYNEX pension plan to a cash balance plan that was intended to mirror the Bell Atlantic Cash Balance Plan benefits, including the transition benefits found in § 16.5.1(a)(2). (Peters Dep. II at 194–196.)

**Response:**    No dispute.  Morgan Lewis began working on the NYNEX cash balance conversion in late 1997.  The opening balance formula used in the NYNEX cash balance conversion was intended to mirror the Plan's opening balance formula.  Ex. D.27 at VZ13472; Ex. D.57 at 37.

120.    No one at NYNEX requested a copy of the briefs in the *Corcoran* litigation in the due diligence leading to the merger of NYNEX and Bell Atlantic. (Peters Dep. II at 177–178.)

**Response:**    No dispute.

121.    In *Corcoran*, Defendants joined with the plaintiffs to move the court to enter a confidentiality order regarding materials produced in discovery. (VZ23752–58.) One of the reasons Defendants provided to the court for the necessity of the order was their "strong interest in maintaining privacy with respect to salaries and benefits of current and former employees," arguing that "[d]isclosure of this information among co-workers would cause unnecessary distraction in the workplace." (VZ23754.)

**Response:**    No dispute that the parties filed a joint motion seeking a confidentiality order regarding materials produced in discovery in the *Corcoran* litigation and that plaintiff accurately quotes from the joint motion.  VZ23752-58.

### c.    **Bell Atlantic's successful argument that resolutions are not plan documents**

122.    In the *Corcoran* litigation, in response to the plaintiffs' argument that the CEBC minutes should control over the language of the Plan, Bell Atlantic argued as follows:

> Plaintiff's argument that "the Cash Balance Plan does not carry out the adjustment that the resolution indicated would be required under the proposed Cash Balance Plan" simply does not state a

37

> claim under Section 204(g). It is the plan document that creates
> rights and obligations under ERISA, not the language of a
> resolution which merely served as a recommendation to the
> Human Resources Committee
> . . . .

(Defs.' Mem. Law Opp. Pls.' Mot. Leave File Second Am. Compl. at 7.)

**Response:** No dispute, except to add that the argument plaintiff quotes was made in the alternative. For example, Bell Atlantic also argued that "the language which Plaintiffs cite in the CEBC Resolution does not support Plaintiffs' claim that the Pension Plan provided protection beyond the requirements of Section 204(g) of ERISA," and that "the language of the CEBC Resolution mirrors the benefit protected by ERISA Section 204(g)." Defs.' Mem. Law Opp. Pls.' Mot. Leave File Second Am. Compl. at 6. Bell Atlantic further argued that the *Corcoran* plaintiffs had "raised the identical language [from the CEBC Resolution] in their Opposition to Defendants' Motion to Dismiss and asserted the very same argument – that the CEBC Resolution 'provides . . . protection' beyond the legal minimum ERISA guarantees. Thus, Plaintiffs already presented this language to the Court in order to bolster their Section 204(g) claim, but the Court obviously found the language to be unavailing." *Id.* at 5-6.

123. Bell Atlantic prevailed on that argument when the district court dismissed the plaintiffs' claims alleging a cut-back in benefits in violation of Section 204(g), *Corcoran v. Bell Atlantic Corp.*, No. 97-510, 1997 WL 602859 (E.D. Pa. Sept. 23, 1997), and when the Third Circuit affirmed the dismissal, *Corcoran v. Bell Atlantic Corp.*, 159 F.3d 1350 (3d Cir. 1998).

**Response:** Disputed. Plaintiff cites to an opinion of the *Corcoran* district court that was filed *prior to* the plaintiffs' Motion for Leave to Amend. In its opinion denying the Motion for Leave to Amend, the *Corcoran* district court held that the plaintiffs were "putting old wine in an old bottle" because their § 204(g) argument had already been considered and rejected by the court. Ex. D.78 at VZ23674. The court explained: "We fail to understand,

however, how plaintiffs might characterize these submissions as 'new evidence,' as they both

appear verbatim accompanied by virtually identical arguments in their brief in opposition to

defendants' motion to dismiss." *Id.*

### (4) The 1997 Plan

124.     On September 3, 1997, the Cash Balance Plan was restated in a document
entitled "Bell Atlantic Cash Balance Plan Effective December 31, 1995 (9/3/97 edition)" (the
"1997 Plan"). (VZ13856.) Section 16.5.1(a)(2) of the 1997 Plan is identical to §16.5.1(a)(2) of
the 1996 Plan. (VZ13856.) It contains a second reference to the transition factor. (*Id.*)

**Response:**     No dispute.

125.     The 1997 Plan was finalized ~~and authorized~~ by Peters. (Peters Dep. II at
196–97.) As with the 1996 Plan, no one on the CEBC or the Board of Directors ever reviewed
the 1997 Plan document prior to its authorization. (Peters Dep. I at 82.)

**Response:**     No dispute as to the first sentence, except as indicated above.

Disputed as to the second sentence.  The 1997 Plan was restated to adopt a single amendment

clarifying the Plan's anti-cutback provision.  Ex. D.79 at VZ14925-29.  The complete text of that

amendment was reviewed and authorized by the CEBC on June 26, 1997.  *Id.* at VZ14928.

Peters finalized the 1997 Plan, which was identical to the 1996 Plan but for the CEBC

amendment, on September 2, 1997.  Ex. D.25.

126.     Drafting of the 1997 Plan began sometime around February 3, 1997, when
Morgan Lewis became involved in the drafting process. (MLB 2041.) Peters and Morgan Lewis
worked on drafting and reviewing the 1997 Plan during the summer and fall of 1997. (Peters
Dep. I at 77.)

**Response:**     Disputed.  The 1996 Plan was restated to adopt a single

amendment clarifying the Plan's anti-cutback provision.  Ex. D.79 at VZ14925-29.  The

amendment was drafted and reviewed by Peters and Morgan Lewis, and was authorized by the

CEBC on June 26, 1997.  *Id.* at VZ14928.  *See also* MLB0000372-78.

127.     Abramowitz, the responsible attorney and billing attorney at Morgan
Lewis on the Corcoran litigation, was involved in drafting the 1997 Plan, along with Steve

Spencer (another partner at Morgan Lewis) and Marianne Grey. (MLB 2041; Abramowitz Dep. at 168:7–16.)

> **Response:** Disputed. No dispute that the amendment clarifying the Plan's anti-cutback provision was drafted and reviewed by Peters and Morgan Lewis. Ex. D.79 at VZ14925-29. *See also* MLB0000372-78.

128. The 1997 Plan contained amendments that were specifically drafted to address issues in the then-pending *Corcoran* litigation. (MLB 372.) Peters shared these amendments with Abramowitz. (*Id.* 372.)

> **Response:** No dispute that the 1997 Plan contained amendments addressing the anti-cutback issue about which the *Corcoran* plaintiffs had raised a concern. .

129. The 1997 Plan amendment had several drafts, but those drafts were either lost or destroyed between the time of their generation and the time this lawsuit was initiated. (Peters Dep. I at 76–77.)

> **Response:** Disputed, except no dispute that several drafts of the 1997 Plan amendment were prepared and not all the drafts were retained.

### (5) Plan administration

130. Despite the Plan document requiring opening balances to be calculated using the transition factor twice in § 16.5.1(a)(2) of the 1996 and 1997 Plans, Bell Atlantic never did so. Instead, Bell Atlantic (and now Verizon) consistently calculated pension amounts for participants who retired between 1996 and the present and were covered by § 16.5.1(a)(2) using the transition factor only once.

> **Response:** No dispute that Bell Atlantic consistently calculated each Plan participant's December 31, 1995 opening balance using a single transition factor. Although Bell Atlantic repeatedly advised participants that the opening balance would be calculated using a single transition factor, no dispute that §16.5.1(a)(2) of the 1996 and 1997 Plans contains two references to the transition factor.

131. Bell Atlantic knew in 1995–1998 that inconsistencies between the language of a plan document and the way in which a plan is administered can lead to widespread benefit calculation errors. (Peters Dep. II at 202–03.)

**Response:**     No dispute that Peters testified that he knew that inconsistencies between the language in a plan document and the way in which the plan is administered can lead to widespread benefit calculation errors.  Ex. D.56 at 202:22-203:3.

132.    Bell Atlantic knew in 1995–1998 that inconsistencies between the language of a plan document and the way in which a plan is administered can lead to misleading disclosures being made to plan participants. (Peters Dep. II at 203–05.)

**Response:**     Disputed to the extent plaintiff suggests that any participant communication or disclosure relating to the 1996 or 1997 Plan was misleading because of the scrivener's error in § 16.5.1(a)(2).  Ex. D.56 at 203:4-205:7.

133.    Bell Atlantic knew in 1995–1998 that inconsistencies between the language of a plan document and the way in which a plan is administered could lead to potential challenges to the plan's tax-qualified status. (Peters Dep. II at 205.)

**Response:**     Disputed to the extent plaintiff suggests that the scrivener's error in § 16.5.1(a)(2) could lead to a meritorious challenge to the Plan's tax-qualified status.  Ex. D.56 at 205:8-207:21.

134.    Bell Atlantic knew in 1995–1998 that inconsistencies between the language of a plan document and the way in which a plan is administered can, if not discovered and reported to the IRS in a timely fashion, lead to costly fines and sanctions paid to the IRS. (Peters Dep. II at 207.)

**Response:**     Disputed. Ex. D.56 at 207.

135.    Bell Atlantic never instituted a formal periodic review of the alignment between the stated written terms of the Cash Balance Plan and the way in which it was being administered. (Peters Dep. II at 199–200, 207–208.)

**Response:**     Disputed to the extent plaintiff suggests that Bell Atlantic was required to engage in a formal periodic review of the alignment between the written text of the Plan document and the administration of the Plan.  If a Plan participant raised a question or a claim challenging the alignment between the terms of the Plan and Plan administration, Bell

Atlantic would, consistent with its fiduciary duty, review the participant's question or claim. Ex. D.56 at 207:22-210:12.

136.    Bell Atlantic knew that the plan administrator should have adopted a periodic review of the alignment between the stated written terms of the Cash Balance Plan and the way in which it was being administered.

**Response:**    Disputed.  Plaintiff does not provide any support for this assertion, which more resembles a proposed conclusion of law than a proposed finding of fact.

137.    No one at Bell Atlantic ever reviewed the alignment between § 16.5.1(a)(2)'s language and the way in which that section was being administered (*i.e.*, how opening balances were calculated under it) prior to October 1998. (Peters Dep. II at 202.)

**Response:**    No dispute, except to the extent that plaintiff suggests that Bell Atlantic reviewed the alignment between the language of § 16.5.1(a)(2) and the administration of the Plan in October 1998.  Ex. D.56 at 202:11-21.

138.    Bell Atlantic never assigned anyone to review the alignment between § 16.5.1(a)(2)'s language and the way in which that section was being administered (*i.e.*, how opening balances were calculated under it). (Peters Dep. II at 210.)

**Response:**    No dispute.

139.    Pursuant to the terms of the Plan, the plan administrator must provide a copy of the Plan documents when participants request these documents. But Verizon does not know, nor does it keep track of, how many participants requested a copy of the 1996 Plan or 1997 Plan prior to 2004. (Hr'g Tr. Mar. 4, 2009 at 32:20–24, 34:1–9.) Verizon contends that Hewitt does not have a readily searchable database of all participants who requested copies of the Bell Atlantic Cash Balance Plan. (Letter from Gus Sandstrom to Matthew Heffner, Jan. 9, 2008.) Verizon also contends that Hewitt indicated that researching those requests would be unduly burdensome. (*Id.*) Verizon contends that for it to identify all participants who requested or received a copy of the 1996 Plan or 1997 Plan would be "unduly burdensome." (Defs.' Answers & Objections Pl.'s Interrogs. Regarding Defs.' Countercls. at 11.)

**Response:**    No dispute.  Verizon knows, however, that very few participants requested copies of the plan.

140.    Approximately 1,000 Class members retired between January 1, 1996 (the effective date of the 1996 Plan, with the second transition factor reference in § 16.5.1(a)(2)) and October 3, 1998 (the date the 1998 Plan was finalized without the second transition factor reference). (Cammarata Dep. Ex. 15.) Yet when these approximately 1,000 Class members

42

retired and their benefits were computed and paid out, no one at Bell Atlantic ever checked a single calculation against the actual language of the Plan document.

**Response:** The first sentence is not disputed. As to the second sentence, no dispute that approximately 1000 participants commenced their benefits between January 1, 1996 and October 3, 1998; that not one of them asked that Bell Atlantic to calculate their benefit based on an opening balance calculated by multiplying the transition factor twice; and that Bell Atlantic has no knowledge of anyone checking whether the Plan accurately stated the formula for calculating the opening balance ((A) Transition Factor *times* (B) lump sum cash-out value), which was plainly described in the Summary of Material Modifications and was universally-understood.

### (6)     Submission of the Cash Balance Plan to the IRS

141.   On November 24, 1997, Bell Atlantic formally submitted the 1996 Plan to the IRS for a favorable determination of its tax-advantaged status. (VZ21386–492.) Bell Atlantic sought a determination from the IRS based on the face of the Plan document—the written language of the Plan. (Peters Dep. II at 218–19.)

**Response:** No dispute as to the first sentence. *See* VZ21386-492. Disputed as to the second sentence. Bell Atlantic sought a determination from the IRS based on the entirety of its determination letter submission. *Id.*

142.   The submission included a copy of the 1996 Plan, which contained the second reference to the transition factor in § 16.5.1(a)(2). (VZ21387; VZ21417–77.)

**Response:** No dispute. The submission also included the 1997 Plan amendment.

143.   Peters reviewed the planned submission, to which was attached a copy of the 1996 Plan. (VZ20883; VZ20887–990.)

**Response:** Disputed. Peters testified that he did not recall reviewing the submission, which he viewed as "very routine" and "entirely within the expertise of the law

firm" preparing the submission.  Ex. D.56 at 215:24-216:5.  The submission also included the

1997 Plan amendment.

144.    The submission failed to inform the IRS of the inconsistency between how
the Plan was administered and how it was written regarding the use of the transition factor in
Section 16.5.1(a)(2). Verizon has never informed the IRS of any drafting error or that the Plan
was not being administered pursuant to its terms. (Peters Dep. II at 214–20.)

**Response:**    No dispute as to the first sentence to the extent it acknowledges

that Bell Atlantic had not discovered the scrivener's error in § 16.5.1(a)(2) as of November 24,

1997.  Ex. D.56 at  202:15-21.  Disputed as to the second sentence to the extent that plaintiff

suggests that Bell Atlantic or Verizon was required to inform the IRS of the scrivener's error in

§ 16.5.1(a)(2).

145.    On March 26, 1998, the IRS made a favorable determination of tax-
exempt qualification of the Cash Balance Plan. (HA420–21.) That determination included both
the 1996 Plan and the 1997 Plan. (HA420.)

**Response:**    No dispute.

146.    Bell Atlantic was required by law to give notice to interested parties,
which included all participants in the Cash Balance Plan, of its request for determination as to
qualification of the Plan. (VZ21491–92; Revenue Procedure 97-6; Tres. Reg. § 1.7476-1(b).)

**Response:**    No dispute.

147.    The notice to interested parties notifies participants, among other rights,
that they may obtain a copy of the submission Bell Atlantic made to the IRS, which would have
included the 1996 Plan. (VZ21492.)

**Response:**    No dispute.

148.    The notice sent to the participants, if it exists, has not been tendered
during discovery in this case.

**Response:**    Disputed.  A copy of the notice to interested parties, which was

sent to participants, was produced to plaintiff in this case.  *See* VZ21491-42.

### (7)    **The 1998 Plan**

149.    On October 8, 1998, the Cash Balance Plan was restated in a document entitled "Bell Atlantic Cash Balance Plan Effective January 1, 1998" (VZ11650–725) (the "1998 Plan").

**Response:**    No dispute.

150.    Bell Atlantic eliminated the second reference to the transition factor in § 16.5.1(b)(2) of the 1998 Plan (which corresponds to § 16.5.1(a)(2) of the 1997 Plan). (VZ11713.)

**Response:**    Disputed.  Bell Atlantic did not refer twice to the transition factor in § 16.5.1(b)(2) of the 1998 Plan because it was never Bell Atlantic's intent that the opening balance formula would call for a second multiplication by the transition factor.  Because the 1998 Plan was drafted based on the 1998 Bell Atlantic-North Cash Balance Plan ("BA-North Plan"), which did not contain the mistaken second reference to the transition factor, the error was not carried over into the 1998 Plan.  *See* Ex. D.56 at 94-99; Ex. D.57 at 26-30

151.    Verizon does not know whether the second reference to the transition factor was removed from the Cash Balance Plan intentionally or unintentionally (Peters Rule 30(b)(6) Dep. at 24–25.)

**Response:**    Disputed.  The second transition factor was not "removed" from the Plan.  The 1998 Plan accurately reflected Bell Atlantic's intent that the transition factor be multiplied only once.  Section  16.5.1(a)(2) of the 1996 and 1997 Plans was not used as the source for the language in § 16.5.1(b)(2) of the 1998 Plan, and the possibility of carrying over the erroneous second reference to a transition factor from those plans therefore did not present itself..  Ex. D.57 at 24:2-22.

152.    Numerous documents were created during 1997 and 1998, leading up to the merger of 1997 Plan with the Bell Atlantic Cash Balance Plan for Bell Atlantic-North Participating Companies (the "North Plan"), that would have shown how the second transition factor was removed from the Cash Balance Plan. Those documents were destroyed prior to this litigation, including the following:

   (a)    a blackline comparison of an early draft North Plan and the 1997 Plan created by Abramowitz on or about December 3, 1997 (VZ21499–502);

       (b)      a blackline comparison of a draft North Plan and the 1997 Plan created by Abramowitz on December 18, 1997 (VZ21503–07);

       (c)      a blackline comparison of a draft North Plan and the 1997 Plan created by Abramowitz on March 19, 1998 (VZ21515);

       (d)      a blackline comparison of a draft North Plan and the 1997 Plan created by Abramowitz on April 23, 1998 (VZ21516); and

       (e)      a blackline comparison of a draft North Plan and the 1997 Plan created by Abramowitz on June 5, 1998 (VZ21516).

       **Response:**     Disputed.  A second reference the transition factor was not "removed" from the 1998 Cash balance Plan.  Verizon has produced documents and testimony explaining how the drafting of the 1998 did not involve copying the language from the 1996 and 1997 Plans that contained the mistaken second reference to the transition factor..  The documents referenced in subparagraphs (a) and (b) were blacklined comparisons of preliminary versions of the draft BA-North Plan, which at that time was based on the 1997 Plan document. Ex. D.56 at 97:10-21.  However, in early 1998, in response to questions from NYNEX (BA-North) employees about the BA-North cash balance conversion, Bell Atlantic changed its approach to drafting the BA-North Plan such that the 1997 Plan was no longer the specific template for that Plan. *Id.* at 96:20-100:19.  Consistent with that approach, the documents referenced in subparagraphs (c), (d), and (e) were blacklined versions of the draft BA-North Plan, and did not compare the draft BA-North Plan to the 1997 Plan or any other version of the Plan. *See* VZ21515, VZ21516, VZ21517.  Plaintiff also incorrectly states that the 1997 Plan was merged with the BA-North Plan.  On December 31, 1998, Bell Atlantic merged that 1998 Plan with the BA-North Plan.  Ex. D.33 at VZ11868; Ex. D.80 at VZ15102-03.

       153.    Bell Atlantic sent communications to NYNEX participants informing them that they would be receiving the same benefits under the North Plan as participants in the 1997 Plan, but no one reviewed the North Plan document to confirm that it mirrored the 1997 Plan document in its benefits calculations. (Peters Rule 30(b)(6) Dep. at 31–32.)

**Response:**     No dispute that Bell Atlantic designed the BA-North Plan to mirror the Plan, and that Bell Atlantic's communications with NYNEX participants indicated that the BA-North Plan used the same opening balance formula, transition factors, and PBGC discount rate assumptions as the Plan.  Ex. D.26 at VZ13465-71; Ex. D.27 at VZ13472-74; Ex. D.29 at VZ13488.  No dispute that Bell Atlantic did not compare the written text of the BA-North Plan's opening balance provisions to the written text of the 1997 Plan's opening balance provisions.  Ex. D.56 at 96:20-100:19.

154.     The merged 1998 Plan, without a second transition factor reference, was finalized by Peters on October 8, 1998, and ~~made~~ was effective ~~retroactively to~~ January 1, 1998. (VZ11650.)

**Response:**     No dispute, except as modified above, that the 1998 Plan did not contain a second transition factor, was finalized by Peters on October 8, 1998, and was effective January 1, 1998.  Disputed that the 1998 Plan was a "merged" plan.  Bell Atlantic did not merge the Plan and the BA-North Plan until December 31, 1998.  Ex. D.33 at VZ11868; Ex. D.80 at VZ15102-03.

155.     Bell Atlantic never assigned anyone the task of comparing the 1997 Plan with the 1998 Plan, and no one ever did. (Peters Dep. I at 121.) No one ever compared a redline or blackline version of the 1998 Plan with the 1997 Plan. (Peters Rule 30(b)(6) Dep. at 22–23.)

**Response:**     No dispute.  The 1998 Plan was adapted, or "cloned," from the BA-North Plan. Ex. D.56 at 96:20-100:19; Ex D.57 at 26:17-28:5.  *See also* Ex. D.31 at VZ11712 (scrivener's error in 1998 Plan § 16.5.1(a)(1) referring to "1997 NYNEX Plan," the BA-North Plan).  Accordingly, during the drafting process Bell Atlantic compared the written text of the 1998 Plan to the BA-North Plan from which it was derived.  *E.g.* Ex. D.81.

156.     Peters never assigned anyone to review the opening balance calculation language in the 1998 Plan document and the 1997 Plan document to ensure the 1998 Plan did not violate ERISA's anti-cut back rule, and no such review was ever performed by Bell Atlantic or its agents. (Peters Rule 30(b)(6) Dep. at 35–36; Abramowitz Dep. at 219:19–23.)

**Response:** No dispute, except to plaintiff's characterization of Morgan Lewis as an "agent" of Bell Atlantic. The Plan's opening balance calculation was a one-time calculation that was completed as of January 1, 1996.

157. Hewitt was hired as the plan actuary after the merger of Bell Atlantic and NYNEX and assisted in preparing plan communications to participants in the merged 1998 Plan. In so doing, Hewitt reviewed the 1997 Plan in its entirety, including § 16.5.1(a)(2), and never communicated to Bell Atlantic that it contained an error. However, Hewitt was never asked to compare the 1997 Plan and the 1998 Plan for discrepancies or changes, and never did so. (Peters Rule 30(b)(6) Dep. at 13–14.)

**Response:** No dispute except to plaintiff's characterization of the 1998 Plan as the "merged" Plan.

158. The most important, basic, and fundamental portion of the benefits determination under the Cash Balance Plan, with respect to the Class, was the opening balance formulas contained in § 16.5.1(a)(1) and (a)(2). (Peters Rule 30(b)(6) Dep. at 32–33.)

**Response:** No dispute that the opening balance formula in Plan §§ 16.5.1(a)(1) and (a)(2) was a fundamental part of the calculation a participant's benefit under the Plan. For this reason, Bell Atlantic repeatedly communicated and explained the Plan's opening balance formula to participants in the months surrounding the cash balance conversion. All of those communications described the opening balance formula using a single transition factor. *See* Ex. D.1 at VZ10392; Ex. D.10 at VZ10553; Ex. D.11 at VZ10476; Ex. D.13 at VZ10519.

159. Bell Atlantic never notified the Plan participants of its alleged error in including the second transition factor in the § 16.5.1(a)(2) of the 1996 Plan or the 1997 Plan.

**Response:** No dispute except to the extent that plaintiff suggests that Bell Atlantic failed to advise participants of a drafting error of which it had knowledge. Bell Atlantic never noticed the drafting error in § 16.5.1(a)(2) of the 1996 and 1997 Plans. Ex. D.57 at 25:14-22, 36:11-19; Ex. D.56 at 105:11-106:12, 202:11-21.

160.    Bell Atlantic never notified the Plan participants in a participant communication that it eliminated the second reference to the transition factor in § 16.5.1(b)(2) of the 1998 Plan.

**Response:**    Disputed.  Bell Atlantic did not "eliminate" a second reference to the transition factor in the 1998 Plan.  Bell Atlantic always advisd employees that the transition factor would be multiplied only once, and the 1998 Plan so provided.  Bell Atlantic was not aware that the 1996 and 1997 Plans contained mistaken language relating to the transition factor. Ex. D.57 at 25:14-22, 36:11-19; Ex. D.56 at 105:11-106:12, 202:11-21.

161.    Bell Atlantic never notified the Plan participants in a summary of material modifications that it eliminated the second reference to the transition factor in § 16.5.1(b)(2) of the 1998 Plan.

**Response:**    Disputed.  See response to No. 160.

162.    Neither Bell Atlantic nor Verizon ever notified the IRS of the elimination of the second reference to the transition factor in § 16.5.1(a)(2) of the Cash Balance Plan in the 1998 Plan document. (Peters Dep. I at 111–12.)

**Response:**    Disputed.  See response to Nos. 160-61.

**(8)    Verizon formation, executive compensation, and subsequent plan amendments**

163.    After the conversion to a cash balance plan, Bell Atlantic's middle managers continued to substantially contribute to the advancement and growth of Bell Atlantic. Bell Atlantic was in such a financially strong position that on August 14, 1997, it purchased NYNEX, another regional Baby Bell. (Bell Atlantic 1998 Form 10-K.) Only a year later, on July 27, 1998, Bell Atlantic purchased GTE. (Bell Atlantic 2000 Form 10-K.) It took two years for the purchase of GTE to clear regulatory and shareholder approval, at which point Bell Atlantic changed its name to Verizon. (Verizon 2001 Form 10-K.)

**Response:**    No dispute that Bell Atlantic merged with NYNEX, another regional Baby Bell, effective August 14, 1997, that Bell Atlantic and GTE agreed to merge on July 27, 1998, that the Bell Atlantic-GTE merger closed on June 30, 2000, and that the merged entity renamed itself Verizon.  Also no dispute that Bell Atlantic, NYNEX, GTE, and Verizon

employees have all contributed to the advancement and growth of their respective companies.

Otherwise, disputed.

164. Bell Atlantic (and Verizon) has paid its top executives handsomely. For example, the following tables set forth the total compensation paid to Bell Atlantic and Verizon executives for the years 1995-1996 and 2006-2008:

### BELL ATLANTIC COPORATION
### COMPENSATION TABLE
### 1995

Dollars in Thousands

| Name and Principal Position | Year | Salary(1) ($) | Bonus(2) ($) | Other Annual Compensation(3) ($) | Options/ SARS ($) | LTIP Payouts(4) ($) | All Other Compensation(5) ($) | Pension Compensation(6) ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Raymond W. Smith Chairman & CEO | 1995 | 842.4 | 1,000.0 | 71.9 | 1,472.8 | 262.9 | 7.5 | 10,197.9 | 13,855.4 |
| James G. Cullen Vice Chairman | 1995 | 446.7 | 499.8 | | 697.0 | 58.4 | 7.5 | 4,182.7 | 5,892.1 |
| Lawrence T. Babbio, Jr. Vice Chairman | 1995 | 434.5 | 499.8 | | 693.5 | 53.0 | 7.5 | 3,983.7 | 5,672.0 |
| William O. Albertini Executive Vice President & CFO | 1995 | 329.8 | 294.8 | | 421.9 | 45.6 | 7.5 | 2,788.5 | 3,888.1 |
| Stuart C. Johnson Group President - Large Business & Information Services, Bell Atlantic Network Services, Inc. | 1995 | 311.1 | 274.8 | | 335.7 | 23.7 | 6.8 | 1,394.3 | 2,346.4 |

(Bell Atlantic 1996 Definitive Proxy Statement Schedule 14A at 11–16.)

### BELL ATLANTIC CORPORATION
### COMPENSATION TABLE
### 1996

Dollars in Thousands

| Name and Principal Position | Year | Salary(1) ($) | Bonus(2) ($) | Other Annual Compensation ($) | Options/ SARS ($) | LTIP Payouts(3) ($) | All Other Compensation(4) ($) | Pension Compensation(5) ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Raymond W. Smith Chairman & CEO | 1996 | 905.4 | 1,200.0 | | 1,901.4 | | 7.5 | 11,654.7 | 15,669.3 |
| James G. Cullen Vice Chairman | 1996 | 555.4 | 802.5 | | 1,274.6 | | 7.5 | 6,971.2 | 9,611 |
| Lawrence T. Babbio, Jr. Vice Chairman | 1996 | 531.5 | 802.5 | | 1,240.6 | | 7.5 | 6,639.5 | 9,222.10 |
| William O. Albertini Executive Vice President & CFO | 1996 | 339.8 | 297.2 | | 415.2 | | 7.5 | 2,788.5 | 3,848.70 |
| Stuart C. Johnson Group President - Large Business & Information | 1996 | 324.3 | 283.0 | | 389.2 | | 7.5 | 1,394.3 | 2,398.00 |

Services, Bell Atlantic
Network Services, Inc.

(Bell Atlantic 1997 Definitive Proxy Statement Schedule 14A at 12–17.)

## VERIZON COMMUNICATIONS, INC.
## COMPENSATION TABLE
## 2006

Dollars in Thousands

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards(1) ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(2) ($) | All Other Compensation(3) ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Ivan G. Seidenberg Chairman & CEO | 2006 | 2,100.0 | 0.0 | 13,125.0 | 0.0 | 4,252.5 | 1,097.3 (3) | 734.4(4) | 21,309.2 |
| Lawrence T. Babbio, Jr. Vice Chairman & President | 2006 | 1,200.0 | 0.0 | 7,500.3 | 0.0 | 1,824.0 | 527.0(3) | 707.4(4) | 11,758.7 |
| Dennis F. Strigl Executive Vice President & President & CEO Verizon Wireless Joint Venture | 2006 | 1,125.0 | 0.0 | 7,031.3 | 0.0 | 2,148.7 | 537.8(3) | 482.2(4) | 11,327.0 |
| William P. Barr Executive Vice President & General Counsel | 2006 | 840.0 | 0.0 | 4,410.1 | 0.00 | 1,020.6 | 313.8(3) | 231.0(4) | 6,815.5 |
| Doreen A. Toben Executive Vice President & CFO | 2006 | 825.0 | 0.0 | 4,331.8 | 0.0 | 1,002.4 | 284.8(3) | 214.3(4) | 6,658.3 |

\*      \*      \*

The column "All Other Compensation" includes:

| Name | Personal Use of Company Aircraft ($) | Personal Use of Company Vehicle ($) | Financial Planning Allowances ($) | Personal Travel and Related Taxes ($) | Qualified Savings Plan ($) | Nonqualifed Deferral Plan ($) | Life Insurance Bonus Plan ($) |
|---|---|---|---|---|---|---|---|
| Mr. Seidenberg | 177,378 | 6,477 | 10,000 | 0 | 11,508 | 310,775 | 218,294 |
| Mr. Babbio | 358,307 | 9,057 | 10,000 | 0 | 12,100 | 143,900 | 174,001 |
| Mr. Strigl | 122,646 | 8,983 | 10,000 | 11,849 | 12,100 | 145,400 | 173,222 |
| Mr. Barr | 0 | 0 | 10,000 | 0 | 11,508 | 83,870 | 125,612 |
| Ms. Toben | 7,862 | 0 | 9,500 | 0 | 12,100 | 82,156 | 102,729 |

(Verizon 2007 Definitive Proxy Statement Schedule 14A at 38.)

## VERIZON COMMUNICATIONS, INC.
## COMPENSATION TABLE
## 2007

| Name and | Year | Salary | Bonus | Stock | Option | Non-Equity | Change in | All Other | Total |
|---|---|---|---|---|---|---|---|---|---|

| Principal Position | | ($) | ($) | Awards(1) ($) | Awards ($) | Incentive Plan Compensation(3) ($) | Pension Value and Nonqualified Deferred Compensation Earnings(4) ($) | Compensation(5) ($) | ($) |
|---|---|---|---|---|---|---|---|---|---|
| Ivan G. Seidenberg Chairman & CEO | 2007 | 2,100,000 | 0 | 19,198,033 | 0 | 4,200,000 | 203,231 | 852,312 | 26,553,576 |
| Dennis F. Strigl President & COO | 2007 | 1,250,000 | 0 | 14,562,022 | 0 | 2,000,000 | 32,321 | 615,797 | 18,460,140 |
| William P. Barr Executive Vice President & General Counsel | 2007 | 840,000 | 0 | 7,480,222 | 0 | 1,008,000 | 80,990 | 281,402 | 9,690,614 |
| Doreen A. Toben Executive Vice President & CFO | 2007 | 825,000 | 0 | 7,346,677 | 0 | 990,000 | 20,788 | 282,860 | 9,465,325 |
| Lowell C. McAdam Executive Vice President & President & CEO Verizon Wireless Joint Venture | 2007 | 800,000 | 0 | 8,507,034 | 7,210,476(2) | 1,032,000 | 207,429 | 332,224 | 18,089,163 |

\*        \*        \*

The following table provides the detail for 2007 compensation reported in the "All Other Compensation" column:

| Name | Personal Use of Company Aircraft ($) | Personal Use of Company Vehicle ($) | Financial Planning Allowance ($) | Personal Travel ($) | Company Contributions to the Qualified Savings Plan ($) | Company Contributions to the Nonqualified Deferral Plan ($) | Company Contributions to the Life Insurance Benefit ($) | Taxes Associated with Personal Travel and Life Insurance ($) | All Other Compensation Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Mr. Seidenberg | 149,023 | 9,130 | 10,000 | 0 | 12,462 | 431,395 | 135,050 | 105,252 | 852,312 |
| Mr. Strigl | 137,889 | 13,485 | 10,000 | 8,354 | 15,700 | 220,959 | 109,018 | 100,392 | 615,797 |
| Mr. Barr | 10,317 | 0 | 10,000 | 0 | 12,462 | 116,966 | 73,912 | 57,745 | 281,402 |
| Ms. Toben | 39,889 | 0 | 9,500 | 0 | 14,600 | 113,315 | 56,630 | 48,926 | 282,860 |
| Mr. McAdam | 5,113 | 0 | 10,000 | 8,354 | 20,100 | 138,567 | 76,885 | 73,205 | 332,224 |

(Verizon 2008 Definitive Proxy Statement Schedule 14A at 30–31.)

## VERIZON COMMUNICATIONS, INC.
## COMPENSATION TABLE
## 2008

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards(1) ($) | Option Awards(2) ($) | Non-Equity Incentive Plan Compensation(3) ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(4) ($) | All Other Compensation(5) ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Ivan G. Seidenberg Chairman & CEO | 2008 | 2,100,000 | 0 | 11,365,521 | 0 | 3,740,625 | 420,738 | 946,754 | 18,573,638 |
| Dennis F. Strigl President & COO | 2008 | 1,319,231 | 0 | 7,075,305 | 0 | 1,888,125 | 122,590 | 657,410 | 11,062,661 |
| William P. Barr Executive Vice President | 2008 | 863,077 | 0 | 3,265,948 | 0 | 924,469 | 180,927 | 10,677,139 | 15,911,560 |
| Doreen A. Toben Executive Vice President & CFO | 2008 | 871,154 | 0 | 3,323,724 | 0 | 1,246,875 | 149,875 | 283,183 | 5,874,811 |
| Lowell C. McAdam Executive Vice President & President & CEO Verizon Wireless Joint Venture | 2008 | 823,077 | 0 | 4,829,516 | (696,813) | 881,719 | 1,310,261 | 288,945 | 7,436,705 |

\*    \*    \*

The following table provides the detail for 2008 compensation reported in the "All Other Compensation" column:

| Name | Personal Use of Company Aircraft ($) | Personal Use of Company Vehicle ($) | Financial Planning Allowance ($) | Personal Travel ($) | Company Contributions to the Qualified Savings Plan ($) | Company Contributions to the Nonqualified Deferral Plan ($) | Company Contributions to the Life Insurance Benefit ($) | Taxes Associated with Personal Travel and Life Insurance ($) | Employment Agreement ($) | All Other Compensation Total ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| Mr. Seidenberg | 143,489 | 15,462 | 10,000 | 0 | 12,738 | 491,226 | 150,057 | 123,782 | 0 | 946,754 |
| Mr. Strigl | 138,182 | 14,496 | 10,000 | 0 | 18,300 | 246,194 | 123,522 | 106,716 | 0 | 657,410 |
| Mr. Barr | 0 | 0 | 10,000 | 0 | 12,779 | 136,575 | 78,868 | 58,917 | 10,380,000 | 10,677,139 |
| Ms. Toben | 2,486 | 0 | 9,500 | 0 | 13,800 | 134,436 | 65,968 | 56,993 | 0 | 283,183 |
| Mr. McAdam | 1,495 | 0 | 10,000 | 8,191 | 18,300 | 129,757 | 61,770 | 59,432 | 0 | 288,945 |

(Verizon 2009 Definitive Proxy Statement Schedule 14A at 40–41.)

**Response:**    Disputed as to the relevance of executive compensation to the issues in this case and disputed as to plaintiff's use of the word, "handsomely."

165.    Around the time of the GTE purchase and approval of the deal, Bell Atlantic chose to institute new benefit formulas through amendments to the Plan. These new amendments and formulas provided greater benefits for some Cash Balance Plan participants.

**Response:**    No dispute that Bell Atlantic merged with GTE to create Verizon on June 30, 2000, that Bell Atlantic and Verizon have amended the Plan and the successor Verizon Management Pension Plan ("VMPP") at various times to adopt alternative benefit formulas, and that those alternative formulas provided larger benefits for some Plan participants than the cash balance formula.

166.    For example, after 1998, Bell Atlantic added an alternative benefit formula called the "modified former pension formula" that was applied to all participants, and even retroactively applied. That is, some participants who had retired (some as far back as 1997) and had already been paid their benefits under the terms of the Plan as of the date they retired, had their benefits recomputed and, if higher under the new "modified former pension formula," were sent another check for benefits. (Cammarata Dep. at 56–58, 64–65.) For example, one participant retired as of May 1, 1997, and, two years after she retired, received an additional payment of $71,000 due to the retroactive alternative benefit formula (an approximately 30% retroactive increase). (*Id.* at 64–65.)

**Response:**    No dispute that Bell Atlantic adopted the "Modified Former Pension Formula" ("MFPF") in 2000, that the MFPF applied retroactively to certain Plan

participants who had already received their benefits from the Plan, and that Bell Atlantic would

pay additional benefits to those participants if the MFPF calculation provided a larger benefit

(including the participant identified by plaintiff in the third sentence). Otherwise disputed. The

MFPF did not apply, retroactively or prospectively, to all participants in the Plan; only

participants who had 15 or more years of Bell Atlantic service as of September 1, 1999 were

eligible for the MFPF calculation. Ex. D.60 at 58:20-24. *See also* Ex. D.36 at VZ12910-11.

The MFPF, which was based on the BAMPP benefit formula, did not provide a larger benefit for

all participants. Plaintiff, for example, was eligible for the MFPF calculation, under which her

February 1998 retirement benefit would have been only $190,797.96. Ex. D.74 at VZ15644.

167.    The Cash Balance Plan instituted other retroactive alternative benefit formulas. As of January 1, 2002, the Plan retroactively calculated benefits for retirees who commenced their pension benefit payments between April 1, 2001, and December 31, 2001. (Cammarata Dep. at 69.) For these retirees who had already left the company under the old Plan terms, the Plan would compute their benefits in three different ways and pay them the greatest amount. (*Id.* at 69–77.) If the new benefit formula led to a greater benefit calculation than the participants had already received, the Plan would send them another payment. (*Id.* at 70–77.)

**Response:**     No dispute as to the first sentence, otherwise disputed. Bell

Atlantic merged with GTE to create Verizon on June 30, 2000, and the merged company adopted

the VMPP effective January 1, 2002. The VMPP incorporated GTE's prior pension benefit

formula, known as the "Highest Average Pay" ("HAP") formula. Ex. D.49 at VZ12559-60,

VMPP § 6A.1(b). Verizon also made the HAP formula available retroactively, and on a

voluntary basis, to certain Plan participants that retired from Bell Atlantic between April 1, 2001

and December 31, 2001, provided that those participants agreed to forego their Bell Atlantic

retiree medical benefits for a less-generous Verizon retiree medical benefit plan. *Id.* at

VZ12587-88, VMPP § 6.7. *See also* Ex. D.60 at 74:2-8. Bell Atlantic would pay additional

benefits to those participants, if they elected the HAP formula and the HAP formula provided a

larger benefit.  Ex. D.60 at  74:23-75:11.  The HAP formula did not provide a larger benefit for

all participants.  *Id.* at 74:9-16.

168.    Going forward after January 1, 2002, the Verizon Management Pension
Plan continued to offer participants the greater of three alternative benefit formulas that could
dramatically increase their benefits over what they had been entitled to under the Bell Atlantic
Cash Balance Plan. (Cammarata Dep. at 87–88; Cammarata Dep. Ex. 16.)

**Response:**    No dispute that after January 1, 2002, the VMPP offered some, but

not all, participants the greater of three alternative benefit formulas and that for some participants

the benefit calculated under the MFPF or HAP formulas was larger than the benefit calculated

under the Plan's cash balance formula.

169.    Effective after January 1, 2002, the Verizon Management Pension Plan
was also modified to provide participants with annuity calculations that provided for the best of
multiple calculations (in this instance, four). (Cammarata Dep. at 101–06.)

**Response:**    Disputed.  A participant's benefit calculated under the Plan's cash

balance formula was expressed as a lump sum account balance.  By contrast, a participant's

benefit calculated under the HAP formula was expressed as an annuity payable at normal

retirement age.  Ex. D.49 at VZ12559-60, VMPP § 6A.1(b).  To convert a participant's annuity

benefit calculated under the HAP formula to a lump sum, the VMPP used the most beneficial of

four combinations of discount rate and mortality assumptions.  Ex. D.60 at 98:22-107:6.

170.    Since 2002, the Verizon Management Pension Plan has also included two
retirement windows. These retirement windows were also applied retroactively for some
participants. (Cammarata Dep. at 115-16.)

**Response:**    No dispute.  One of the two retirement windows, the Management

Voluntary Separation Program, was introduced in September 2003, but made available to certain

participants that had left Verizon after August 21, 2003.  Ex. D.49 at VZ12437-48, VMPP Art.

XXXV.  The second retirement window, the Early Retirement Enhancement, was introduced in

August 2002, but made available to certain participants that had left Verizon after June 1, 2002.

*Id.* at VZ12488-93, VMPP Art. XXXIV.

171.    Verizon froze the Verizon Management Pension Plan formulas as of June 30, 2006. As of that date, employees could no longer accrue increased pay credits or use a higher salary after that date to attain greater benefits under formulas that used that variable. Interest credits would continue to accrue under the Plan, though. (Cammarata Dep. at 90–91.)

**Response:**    No dispute.

### (9)    Verizon's reliance on literal plan terms in litigating claims for benefits

172.    Verizon (and Bell Atlantic before it) has an extensive history of arguing in favor of strict adherence to written plan terms in litigation against participants, some of which is summarized below.

**Response:**    No dispute that Verizon and Bell Atlantic have taken the position

in previous litigation that benefits should be paid in accordance with the terms of the written plan

documents.  Disputed that this position conflicts with Verizon's request for reformation of a plan

where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably

relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide

benefits that were not expected by participants and impose a huge, unanticipated liability on the

plan, and (4) failing to reform the plan would create perverse differentials in the benefits of

younger, shorter-service employees over older, longer-service employees.

### a.    *Todisco v. Verizon Comms., Inc.*, 01-12116 (D. Mass. 2001)

173.    Richard Todisco, a Verizon employee, called a Verizon hotline on several occasions between November 1999 and January 2000 to inquire about his options for obtaining supplemental life insurance. *Todisco v. Verizon Comms. Inc.*, 497 F.3d 95, 97 (1st Cir. 2007). He was informed during a period of open enrollment that he had the right to increase the level of his life insurance benefits to $176,000 without submitting any statement of his current health. *Id.*

**Response:**    No dispute that Todisco *alleged* that he was told by Verizon that he

could increase the level of health insurance benefits without submitting a health statement.  With

that qualification, no dispute.

174. Todisco elected to purchase the supplemental life insurance, and he named his wife as the beneficiary on the additional coverage. *Id.* He did not submit a statement of his health. *Id.* Todisco then died. *Id.*

**Response:** No dispute.

175. Verizon refused to pay Mrs. Todisco the additional $88,000 in supplemental life insurance benefits, maintaining that, under the written terms of the plan, Todisco was required to submit a statement of health to be eligible for the supplemental life insurance. *Id.*

**Response:** No dispute.

176. Mrs. Todisco sued Verizon, eventually seeking reformation of the plan documents and seeking benefits under the reformed participant documents. *Id.* In response to Mrs. Todisco's reformation claim, Verizon argued that reformation is available under ERISA as an equitable remedy only when the terms of a written instrument result from mutual mistake or fraud. (*Todisco*, Supplemental Mem. Supp. Def.'s Mot. J. on Pleadings [DE 50] at 7.) Verizon argued, "if only one party is mistaken as to the terms of [a] written instrument at its formation, reformation is not available." (*Id.*)

**Response:** No dispute.

177. Verizon prevailed on that issue when, on August 25, 2004, the district court granted its Motion for Judgment on the Pleadings and dismissed Mrs. Todisco's claim for reformation. (*Todisco*, Order [DE 54].)

**Response:** Disputed. The court found that reformation was unavailable in situations where the misunderstanding arises only *after* the formation of the contract. *See* Memorandum and Order, 13-14 (Aug. 25, 2004). The plaintiff never alleged facts sufficient to show that the misunderstanding arose before the formation of the contract. *Id.* As such, the court granted the defendants' motion for judgment on the pleadings. *Id.* In so doing, the court granted Mrs. Todisco leave to file an amended complaint asserting an equitable estoppel claim. *Id.* at 15.

178. On October 29, 2004, Mrs. Todisco moved to amend her complaint to add a claim for equitable estoppel. *Todisco*, 497 F.3d at 98. The district court denied the motion to amend, holding that it would be futile. *Id.* First, the court held that plaintiff was seeking compensatory monetary damages, not equitable relief. *Id.* Second, the court held that an ERISA plaintiff could assert a claim for equitable estoppel only when the defendant's misrepresentation

concerned a plan provision about which there could be reasonable disagreement. *Id.* Since the plan was not ambiguous, the court concluded that Mrs. Todisco's claim was not viable. *Id.*

> **Response:** No dispute.

179. On appeal, Verizon argued that Mrs. Todisco's motion for leave to amend was futile because "reliance on statements that are contrary to the clear terms of a plan cannot be reasonable as a matter of law." (*Todisco*, Br. of Def.-Appellee Verizon at 14). It argued that "courts have consistently held that, as a matter of law, reliance cannot be reasonable if it is contrary to the terms of the plan." (*Id.* at 39).

> **Response:** No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents. Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

180. Verizon prevailed on that issue when the First Circuit affirmed the judgment of the district court. *Todisco*, 497 F.3d at 103.

> **Response:** Disputed. The First Circuit affirmed the judgment of the district court for two reasons. First, and despite her claim for reliance damages, the court held that ERISA authorizes equitable relief only and that Todisco's claims sought legal relief. *Todisco v. Verizon Commc'ns, Inc.*, 497 F.3d 95, 100 (1st Cir. 2007). Second, the court held that ERISA § 502(a)(1)(B) authorized suits for benefits due "under the terms of his plan" and that Todisco's equitable estoppel claim sought benefits expressly *not* authorized by the plan. *Id.* at 101.

### b. *Gramm v. Bell Atlantic Mgmt. Pension Plan*, No. 95-4889 (D. N.J. 1995)

181. Walter Gramm was a Bell Atlantic employee and participant in the BAMPP. (VZ25209.) Before he retired, Bell Atlantic sent two plan communications and orally

assured Gramm that he would be receiving $543,203.54. (VZ25211-12.) But after Gramm retired and took another job, Bell Atlantic paid him approximately 10% less than what they had told him in their informal communications. (VZ25214.) Gramm sued to recover the benefits promised to him in the previous plan communications. (VZ25215.)

**Response:** Disputed. The court, in construing the facts for purposes of cross-

motions for summary judgment, found that Gramm worked for Bell Atlantic from 1963-1993, at

which time he voluntarily retired under Bell Atlantic's 1992 Force Management Plan ("FMP").

*See Gramm v. Bell Atlantic Mgt.*, 983 F.Supp 585, 586 (D.N.J. 1997). According to Gramm,

Bell Atlantic told him on several occasions that his early retirement lump-sum distribution would

be $543,203.54. *Id.* at 587. He then notified Bell Atlantic of his desire to retire under the FMP,

and Bell Atlantic granted his claim. *Id. at* 586-88. Approximately two weeks later, Gramm

alleged, Bell Atlantic notified him that there had been an error in calculating his benefit – the

calculation failed to apply an early retirement discount – and that he would receive only

$488,885.57, not $543,203.54. *Id.* at 588. At the same time, Bell Atlantic told Gramm that he

did not have to retire early under the FMP. *Id.* at 588. Gramm decided to retire anyways. *Id.* He

then sued Bell Atlantic for the difference, bringing claims under ERISA for equitable estoppel

and breach of fiduciary duty. 983 F. Supp. at 588-89 & n.11

182. Bell Atlantic moved for summary judgment, arguing that ERISA requires participant benefits to be paid pursuant solely to the "express terms" of the written participant document. (VZ26114.) Defendants also contended that equitable claims are not cognizable under ERISA in the absence of ambiguous plan documents and that equitable principles cannot be used to obtain benefits beyond what the plain language of a plan provides. (VZ26115-V226118.) Defendants argued that a plan participant cannot reasonably rely on documents that contradict a plan's terms when the plan unambiguously spells out the participant's benefits and that, therefore, "Gramm cannot possibly prove that his alleged reliance on the erroneous Pension Calculation Summary Sheet was reasonable." (VZ26119–20.)

**Response:** Disputed. The court denied Gramm's equitable estoppel claim. As

Bell Atlantic argued, the fact that Gramm had in his possession the Plan document and the SPD –

both of which made clear the existence of the early retirement discount – rendered his reliance on

the oral representation unreasonable. *Gramm*, 983 F. Supp. at 591. Furthermore, his reliance was unreasonable for the additional reason that he was told about the discount *before* he formally retired and he was given the opportunity *not* to retire after learning of the lower distribution that he would receive. *Id.* Moreover, even if Gramm's reliance were reasonable, his equitable estoppel claim would fail for the independent reason that he failed to show "extraordinary circumstances" attending the misrepresentation. *Id.*

183.    The district court and the court of appeals found in Bell Atlantic's favor.

**Response:**    No dispute that the district court ruled in Bell Atlantic's favor. The Verizon defendants have not been able to identify an appellate decision in this matter, so they respectfully reserve the right to dispute the existence of an appellate court decision favorable to Bell Atlantic.

c.    <u>***Wagner v. Bell Atlantic Corp.*, No. 96-113 (W.D. Pa. 1996)**</u>

184.    William Wagner received a written participant communication informing him that he could receive a monthly pension estimated at $1,175.95 if he retired, due to a round of Bell Atlantic layoffs. (VZ24721.) After Wagner retired, Bell Atlantic said its participant communication was incorrect and that he was entitled to only $981.92 per month for early retirement. (*Id.*) Wagner filed suit on for what he was promised in the participant communication. *Wagner v. Bell Atlantic Corp.*, No. 96-113 (W.D. Pa. 1996).

**Response:**    No dispute.

185.    Bell Atlantic moved for summary judgment, arguing that ERISA requires participants' benefits to be paid pursuant solely according to the terms of the written plan document. (*See Wagner*, Br. Supp. Defs.' Mot. Summ. J. [DE 8] at 15.) It also argued that "ERISA places preeminent emphasis on the Plan Document due to ERISA's writing requirement . . . ." (*Id.*)

**Response:**    The Verizon defendants have been as yet unable to obtain copies of the documents plaintiff cites in paragraph 185. Consequently, and pending future review of the documents cited in this paragraph, the Verizon defendants respectfully reserve the right to dispute this paragraph in its entirety.

186. Bell Atlantic prevailed on these issues when, on March 6, 1997, the court granted summary judgment, holding that "it is unreasonable for a beneficiary, who has access to the plan itself, to rely on extrinsic information regarding his rights under the plan that contradicts the plain language of the plan" and that "[i]n the face of the unambiguous written terms of the Pension Plan," Wagner could not rely on the inaccurate representation from Bell Atlantic. (VZ24723–24.)

**Response:** Disputed. Because the Verizon defendants have been as yet unable to obtain a copy of the plaintiff's summary judgment papers, they respectfully reserve the right to dispute whether Bell Atlantic "prevailed on these issues." No dispute that Young accurately quotes from the *Wagner* opinion. Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

### d. *VEBC v. Poinsett*, No. 03-796 (M.D. Fla. 2003)

187. Sheila Poinsett was a participant in the Verizon Management Pension Plan. (*VEBC v.* Poinsett, No. 03-796 (M.D. Fla. 2003) (Compl. [DE 1] at 2).) Verizon, as plan administrator, sent Poinsett a written participant communication informing her she was eligible to receive a lump-sum payment of $504,101.94. (*Poinsett*, Defs.' Answer & Affirmative Defenses [DE 19] at 4.) However, after retiring and receiving her benefit, Verizon sued Poinsett because its written participant communication was incorrect, and the Plan only entitled Poinsett to $300,047.62. (Compl. [DE 1] at 3.)

**Response:** Disputed. Ms. Poinsett worked for BellSouth before Verizon. When she retired from Verizon, she was entitled to a lump-sum pension distribution of $201,345.76. However, due to an administrative error that incorrectly included her years of service with BellSouth in the benefit calculation, Poinsett received $508,412.01. In its effort to recover the overpayment, the VEBC asserted its right "to appropriate equitable relief to enforce

the terms of the plan providing that" Poinsett was entitled to $201,345.76. *See* Complaint

Seeking Restitution and Injunctive Relief, ¶¶ 6-8, 15 (Apr. 28, 2003)

       188.    Verizon argued that ERISA requires participant benefits to be paid
pursuant only to the terms of the written plan document. (*Poinsett*, Memo Supp. Pl.'s Mot.
Summ. J. Recoup Overpaid Funds [DE 32] at 7–10.) The basis of the suit was that the
overpayment to Poinsett was due to a calculation error that did not comport with the
unambiguous plan language in violation of ERISA. (*Id.* at 4–5.) The VEBC also argued that
equitable principles cannot be used to rewrite plan terms. (*Id.* at 11–14.) Specifically, it argued
that the doctrine of equitable estoppel could not be used to modify the unambiguous terms of a
plan or to enlarge the amount of benefits a participant is due under a plan. (*Id.*)

      **Response:**    Disputed. Poinsett raised the affirmative defenses of, *inter alia*,

equitable estoppel (that Verizon told her that her benefit would be $504,101) and waiver (that

Plan representatives told her she could keep the overpayment). The VEBC argued that neither

defense had merit. On the equitable estoppel claim, the VEBC contended that "the doctrine of

estoppel cannot be used to modify the terms of an ERISA plan or enlarge the amount of benefits

a participant is due under the Plan." *See* Memorandum in Support of Plaintiff's Motion for

Summary Judgment to Recoup Overpaid Funds, 11 (Mar. 8, 2004).

       189.    Verizon prevailed on these issues when, on July 22, 2004, the district
court granted the VEBC summary judgment. (*Poinsett*, Order [DE 42].) On November 10, 2004,
the court entered a judgment in favor of the VEBC ordering Poinsett to return $350,921.05 to the
Plan (the original $300,047.62 overpayment plus $50,873.43 in interest earned). (*Poinsett*,
Judgment [DE 55].)

      **Response:**    Disputed, except no dispute that the district court granted the

VEBC's motion for summary judgment on Poinsett's affirmative defenses and ordered Poinsett

to return $350,921 to the Plan (and ordered the VEBC to indemnify Poinsett for any adverse tax

consequences resulting from her receipt of the overpayment).

### e.   *VEBC v. Fleming*, No. 05-1244 (N.D. Tex. 2005)

       190.    Steven Fleming (a member of the Class in this case) was a participant in
the Verizon Management Pension Plan. (*VEBC v. Fleming*, No. 05-1244 (N.D. Tex. 2005)
(Compl. [DE 1]) at 1).) Verizon sent Fleming written participant communications offering a
termination incentive compensation package worth $535,122.18. (*Fleming*, Am. Countercl. [DE

31] at 2–9.) After accepting the offered package and retiring, Verizon sued Fleming because the written participant communication did not comport with the Plan document, which provided for Fleming to receive $188,166.52 less. (*Fleming*, Compl. [DE 1] at 2-4.)

> **Response:** Disputed. When Mr. Fleming retired from Verizon, he was entitled to a pension distribution of $346,955.66. Due to an administrative error, however, he received $535,122.18. In its effort to recover the overpayment, the VEBC asserted its right "to appropriate equitable relief to enforce the terms of the Plan providing that" Fleming was entitled to only $346,955.66. *See* Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 6-7, 13 (June 17, 2005).

191. Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written plan document. (*See Fleming*, Compl. ¶¶ 7, 13.) Fleming filed a counterclaim, arguing that he would not have retired if he had known that he was entitled to only $349,955.66 under the Plan. (*Fleming*, Counter-Def.'s Br. Supp. Mot. Dismiss [DE 34] at 3.) Verizon responded that ERISA does not authorize relief based on representations by a company that contradict written plan terms. (*Id.*)

> **Response:** No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents. Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

192. Verizon prevailed on these issues when, on March 14, 2006, the district court granted the VEBC Counter-Defendant's Motion to Dismiss Counter-Plaintiff's Claims. (*Fleming*, Order [DE 39].) The parties later settled, and on October 27, 2006, the district court dismissed the case with prejudice (*Fleming*, Order [DE 55]).

**Response:**     Disputed.  The court dismissed Fleming's counterclaims on the grounds they were preempted by ERISA.  Since the litigation was thereafter resolved by means of a settlement, neither party prevailed.

### f.     *VEBC v. Ballerini*, Case No. 05-01245 (N.D. Tex. 2005)

193.     John Ballerini (a Class member in this case) was a participant in the Verizon Management Pension Plan. (*VEBC v. Ballerini*, No. 05-1245 (N.D. Tex. 2005) (Compl. [DE 1] at 1–2).) Verizon sent written participant communications to Ballerini informing him that he was entitled to receive a lump-sum pension payment of $636,357.56. (*Id*. 14.) After Ballerini retired and accepted his payment, Verizon sued Ballerni alleging that the written communication did not comport with the Plan document, which provided for Ballerini to receive $159,268.27 less. (*Ballerini*, Pl.'s First Am. Compl. [DE 30] at 3.)

**Response:**     Disputed.  Mr. Ballerini was employed by Verizon on two separate occasions, and he received a lump-sum pension distribution after each retirement.  Because of an administrative error, however, the benefit calculation for the second distribution did not properly offset the prior pension distribution that he received after his first retirement.  This error caused Ballerini to receive approximately $160,000 more than he was entitled to under the Plan.  In its effort to recover the overpayment, the VEBC asserted its right to "appropriate equitable relief to enforce the terms of the Plan providing that" Ballerini should have received only $480,000 ($160,000 less than he actually received).  *See* Plaintiff's First Amended Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive Relief,  ¶¶ 5-7, 13 (May 16, 2006).

194.     Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Ballerini*, Br. Supp. Third-Party Defs.' Mot. Dismiss [DE 40] at 4–5.) Verizon also argued that ERISA does not authorize relief based on employer representations that contradict written participant terms. (*Id.*)

**Response:**     No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents.  Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has

altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

195. Verizon prevailed on these issues when, on February 1, 2007, the parties settled the case. (*Ballerini*, Resp. Opp. VEBC Mot. Withdraw Attorney [DE 63].)

**Response:** Disputed. Since the litigation was resolved by means of a settlement, neither party prevailed.

### g. *VEBC v. Brooks*, No. 05-1253 (N.D. Tex. 2005)

196. Linda Brooks (a Class member in this case) was a participant in the Verizon Management Pension Plan. (*VEBC v. Brooks*, No. 05-1253 (N.D. Tex. 2005) (Compl. [DE 1] at 1).) After Brooks retired and received a lump-sum payment of $338,337.15., Verizon sued Brooks alleging that the payment did not comport with the Plan document, which entitled to Brooks to $155,822.11 less. (*Brooks*, Compl. [DE 1] at 3.)

**Response:** Disputed. Ms. Brooks worked for Verizon on two separate occasions. After her first retirement, she received a lump-sum pension distribution of $130,585.74. After her second retirement, she received a distribution of $338,337.15. Under the terms of the Plan, however, Brooks was entitled to receive only $182,555.04. The overpayment resulted from a benefit calculation that did not properly offset the prior pension distribution that she received after her first retirement. The VEBC sought a constructive trust on the overpaid funds. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss and Alternative Motion to Transfer Venue, 2-4. (Feb. 6, 2006).

197. Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Id.* at 1–8.)

**Response:** No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents. Disputed that this

position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

198.    Verizon prevailed on these issues when the parties settled the case and the court dismissed the case with prejudice (*Brooks*, Order [DE 30]).

**Response:**    Disputed.  Since the litigation was resolved by means of a settlement, neither party prevailed.

### h.    *VEBC v. Melissa Adams*, No. 05-1793 (N.D. Tex. 2005)

199.    Melissa Adams (a Class member in this case) was a participant in the Verizon Management Pension Plan. (*VEBC v. Adams*, No. 05-1793 (N.D. Tex. 2005) (Compl. [DE 1] at 1–2).) After Adams retired and received a lump-sum payment of $381,039.67, Verizon sued Adams alleging that the payment did not comport with the Plan document, which entitled Adams to $220,106.94 less. (*Id.* at 1-4.)

**Response:**    Disputed.  Adams worked for Verizon on two separate occasions. After her first retirement, she received a lump-sum pension distribution that fully satisfied the pension she earned under the Plan.  At the time of her second retirement, Adams was entitled to a pension distribution of $160,932.73.  However, because of an administrative error that occurred when the second distribution calculation failed to offset properly the first distribution, she received $381,039.67 instead.  *See* Plaintiff's First Amended Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 5-8 (Apr. 7, 2006).  No dispute that Verizon sued Adams alleging that the overpayment that the $381,039.67 was in excess of what she was entitled to receive under the Plan.

200.     Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Adams*, Pl.'s Resp. Def.'s Mot Dismiss [DE 30] at 2–3.)

**Response:**     No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents.  Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

201.     Verizon prevailed on these issues when the parties later settled the case. (*Adams*, Joint Settlement Status Rep. [DE 45].)

**Response:**     Disputed.  Since the litigation was resolved by means of a settlement, neither party prevailed.

### i.     *VEBC v. Leonard*, No. 06-258 (N.D. Tex. 2006)

202.     Charles Leonard (a Class member in this case) was a participant in the Verizon Management Pension Plan. (*VEBC v. Leonard*, No. 06-258 (N.D. Tex. 2006) (Compl. [DE 1] at 1).) Verizon sent written participant communications to Leonard informing him that he was entitled to receive a lump-sum pension payment of $489,744.52 (*Id* 1-3.) After Leonard retired and accepted his payment, Verizon sued Leonard alleging that the written participant communication did not comport with the Plan document, which provided for Leonard to receive $249,900.84 less. ((*Leonard*, Compl. [DE 1].)

**Response:**     Disputed.  Mr. Leonard worked for Verizon from 1971-1996 and again from 1998-2003.  After his first retirement, Leonard received a lump-sum pension distribution of $156,674.58.  At the time of his second retirement, he was entitled to a distribution of $239,843.68.  Due to an administrative error, however, he received $489,744.52.  The error occurred when the benefit calculation for the second distribution failed discount the

previous retirement payment. The VEBC initiated the lawsuit to recover the overpayment. *See* Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, 1-4 (June 30, 2008).

203. Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written plan document. (*Leonard*, Pl.'s Br. Opp. Def.'s Mot. Summ. J. [DE 33] at 5–9.)

**Response:** No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents. Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

204. Verizon prevailed on these issues when, in August 2008, the parties settled the case. (*Leonard*, Notice of Proposed Settlement [DE 39].)

**Response:** Disputed. Since the litigation was resolved by means of a settlement, neither party prevailed.

### j. *VEBC v. Michael Adams*, No. 06-2057 (N.D. Tex. 2006) (transferred to W.D. Pa. 2007)

205. Michael Adams was a participant in the Verizon Pension Plan for Mid-Atlantic Associates. (*VEBC v. Michael Adams*, No. 06-2057 (N.D. Tex. 2006) (Compl. [DE 1] at 2).) Verizon sent several written participant communications to Adams informing him that he was entitled to receive a lump-sum pension payment of approximately $430,000. (*Adams*, Br. Supp. Def.'s Mot. Dismiss Lack Juris. or Failure to Join Necessary Party or Transfer Venue [DE 7] at 5.) After Adams retired and accepted his payment, Verizon sued Adams alleging that the written participant communications did not comport with the Plan document, which provided for Adams to receive $231,167.90 less. (Compl. [DE 1].)

**Response:**        Disputed.  Mr. Adams worked for AT&T from 1965-2000 and for Verizon from 2000-2003.  When he left AT&T, Adams received a lump-sum pension distribution of $183,391.01.  Before leaving Verizon, Adams ported his service from AT&T to Verizon.  When he retired from Verizon, Adams was entitled to a lump-sum pension distribution of $198,851.49.  However, because of an administrative error that occurred when the benefit calculation failed to offset properly the lump-sum payment that Adams received from AT&T, Adams received $430,019.39 instead.  The VEBC asserted that this error caused Adams to receive more money "than he was entitled to receive under the Plan."  *See* Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, 3-4 (Feb. 26, 2007).

206.    Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Adams*, Pl.'s Memo. Opp. Mot. Dismiss [DE 34] at 3–9.)

**Response:**        No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents.  Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

207.    Verizon prevailed on these issues when, on November 19, 2007, the district court denied Adams's Motion to Dismiss (*Adams*, Mem. Order. [DE 39]) and when the parties later settled the case [DE 53].

**Response:**        Disputed.  Since the litigation was resolved by means of a settlement, neither party prevailed.  Moreover, Adams' motion to dismiss argued that the VEBC's claim was not proper under ERISA and that the VEBC sought legal, not equitable,

relief.  The magistrate judge denied Adams's motion, finding, *inter alia*, that the VEBC sought

equitable relief and that the VEBC can bring a claim for equitable restitution.  *See* Report and

Recommendation, 1 (Oct. 11, 2007).  The District Court adopted the magistrate's report and

recommendation.  *See* Memorandum Order (Nov. 19, 2007).

### k.     *VEBC v. Chappell*, No. 05-658 (N.D. Tex. 2005)

208.    Joyce Chappell (a Class member in this case) was a participant in the
Verizon Management Pension Plan. (*VEBC v. Chappell*, No. 05-658 (N.D. Tex. 2005) (Compl.
[DE 1] at 1–2).) After Chappell retired and received a lump-sum payment of $260,913.42,
Verizon sued Chappell, alleging that the payment did not comport with the Plan document,
which required Chappell to receive $246,195.97 less. (*Id.* at 1-3.)

**Response:**     Disputed.  Ms. Chappell worked for Verizon from 1968-1995 and

again from 2000-2001.  After her first retirement, she received a lump-sum pension distribution

of $221,323.96.  After her second retirement, and despite being entitled to only $14,717.45, she

received a distribution of $260,913.42.  The overpayment resulted from an administrative error

that occurred when the benefit calculation did not properly offset the prior pension distribution

that Chappell had received after her first retirement.  In its effort to recover the overpayment, the

VEBC asserted a right "to appropriate equitable relief to enforce the terms of the Plan providing

that" Chappell should have received only $14,717.45.  *See* Complaint Seeking Recovery of

Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 5-8, 13 (Apr. 5, 2005).

209.    Verizon argued that ERISA requires participant benefits to be paid
pursuant solely to the terms of the written participant document. (*Chappell*, Compl. [DE 1] at 3–
4.)

**Response:**     No dispute that Verizon stated that in this litigation, benefits

should be paid in accordance with the terms of the written plan documents.  Disputed that this

position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has

altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan

language, (3) enforcement of the mistaken term would both provide benefits that were not

expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

210.    Verizon prevailed on these issues when, in December 2005, the parties settled the case and the district court dismissed it with prejudice (*Chappell*, Order [DE 18]).

**Response:**    Disputed.  Since the litigation was resolved by means of a settlement, neither party prevailed.

### l.    *VEBC v. Jaeger*, No. 05-1860 (N.D. Tex. 2005)

211.    Henry Jaeger (a Class member in this case) was a participant in the Verizon Management Pension Plan. (*VEBC v. Jaeger*, No. 05-1860 (N.D. Tex. 2005) (Compl. [DE 1]) at 1–2).) After retiring and receiving a lump-sum payment of $393,080.01, Verizon sued Jaeger alleging that the payment did not comport with the Plan document, which required Jaeger to receive $205,827.61 less. (*Id.* at 1-3.)

**Response:**    Disputed.  Mr. Jaeger retired from Verizon as part of its 2003 Management Voluntary Separation Program, under which he was entitled to $187,252.40.  Due to an administrative error, however, he received $393,080.01 instead.  Mr. Jaeger's pension was subject to a Qualified Domestic Relations Order ("QDRO") which required Jaeger to take part of his benefit in the form of a 50% Qualified Joint and Survivor Annuity.  The overpayment was based on a benefit calculation that was not properly offset to account for the QDRO and the annuity he was receiving.  In its effort to recover the overpayment, the VEBC asserted its right to "equitable relief to enforce the terms of the Plan providing that" Jaeger was entitled only to $187,252.40.  *See* Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 5-8, 13 (Sept. 19, 2005).

212.    Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Id.* at 3–4.)

**Response:**    No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents.  Disputed that this

position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has

altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan

language, (3) enforcement of the mistaken term would both provide benefits that were not

expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to

reform the plan would create perverse differentials in the benefits of younger, shorter-service

employees over older, longer-service employees.

213.    Verizon prevailed on these issues when, in January 2007, the parties filed
a stipulation voluntarily dismissing the case with prejudice (*Jaeger*, Stipulation [DE 36]),
presumably after the parties settled.

**Response:**    Disputed.  Since the litigation was resolved by means of a

settlement, neither party prevailed.

### m.    *VEBC v. Felton*, No. 05-971 (N.D. Tex. 2005)

214.    Yvonne Felton (a Class member in this case) was a participant in the
Verizon Management Pension Plan. (*VEBC v. Felton*, No. 05-00971 (N.D. Tex. 2005) (*Felton*
Compl. [DE 1] at 1–2).) Verizon sent Felton written participant communications informing her
that she was entitled to receive a lump-sum pension payment of approximately $460,000.
(*Felton*, Br. Supp. Def.'s Mot. Dismiss Lack Juris. or Failure to Join Necessary Party or Transfer
Venue [DE 7] at 5.) After Felton retired and accepted her payment, Verizon sued Felton alleging
that the written participant communications did not comport with the Plan document, which
required Felton to receive $161,588.03 less. (*Felton*, Compl. [DE 1] at 1-3.)

**Response:**    Disputed.  Ms. Felton worked for Verizon from 1973-1996 and

again from 2001-2003.  After her first retirement, Felton received a pension distribution of

$103,695.20.  After her second period of employment, she was entitled to a distribution of

$304,921.60.  Because of an administrative error that occurred when the second benefit

calculation failed to offset properly the prior pension distribution, *see* Counter-Defendant's Brief

in Support of Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6), at 6 (Feb. 23,

2006) (hereinafter "Counter-Defendant's Brief"), however, she received $466,509.63 instead.  In

its effort to recover the overpayment, the VEBC asserted its right to "equitable relief to enforce

the terms of the Plan providing that" Felton was entitled to only $304,921.60. *See* Complaint

Seeking Recovery of Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 6-7, 13

(May 12, 2005).

215.    Verizon argued that ERISA requires participant benefits to be paid
pursuant solely to the terms of the written participant document. (*Id.* at 1–9; Counter-Def.'s Br.
Support Mot. Dismiss [DE 28] at 9–11.) Verizon also argued that ERISA does not authorize
relief based on employer representations that contradict written plan terms. (*Id.* at 9–11.)

**Response:**    No dispute that Verizon stated that in this litigation, benefits

should be paid in accordance with the terms of the written plan documents. Disputed that this

position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has

altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan

language, (3) enforcement of the mistaken term would both provide benefits that were not

expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to

reform the plan would create perverse differentials in the benefits of younger, shorter-service

employees over older, longer-service employees.

216.    Verizon prevailed on these issues when, on April 24, 2006, the district
court granted Counter-Defendant's Motion to Dismiss (*Felton*, Order [DE 36]) and on May 19,
2008, when the court granted the Motion for Summary Judgment. (*Felton*, Order [DE 97].) On
May 22, 2008, the district court entered a final judgment awarding the Plan $161,588.03 plus
interest. (*Felton*, Final J. [88].)

**Response:**    Disputed. As to the motion to dismiss, Felton brought three

counterclaims against the VEBC, one of which was for negligent misrepresentation. Felton

argued that she did not receive the pension benefits that she was promised under the Plan. The

VEBC moved to dismiss on the ground that her claim was preempted ERISA. *See* Counter-

Defendant's Brief at 4, 8-9. The court, relying on ERISA's broad preemption provisions,

granted the VEBC's motion to dismiss. *See* Order, 10-11 (Apr. 24, 2006). As to the summary

judgment motion on its restitution claim, the VEBC argued that its claim was equitable in nature.

*See* Plaintiff's Brief in Support of Motion for Summary Judgment, 5 (Apr. 10, 2008). The court

agreed, and entered summary judgment for the VEBC. *See* Order (May 19, 2008).

### n.    *VEBC v. Sanford*, No. 05-1792 (N.D. Tex. 2005)

217.    Roger Sanford was a participant in the Verizon Pension Plan for Mid-
Atlantic Associates. (VEBC *v. Sanford*, No. 05-1792 (N.D. Tex. 2005) (*Sanford*, Compl. [DE 1]
at 1–2).) After Sanford retired and received a lump-sum payment of $58,317, Verizon sued
Sanford, alleging that the payment did not comport with the Plan document, which required
Sanford to receive $44,217.20 less. (*Id.*)

**Response:**    Disputed.  Mr. Sanford worked for Verizon from 1969-1999 and

again from 2000-2002.  After his first retirement, Sanford received a lump sum pension

distribution that fully satisfied the pension that he earned.  After his second retirement, he

received a distribution of $58,317.  Under the terms of the Plan, however, Sanford was only

entitled to $14,099.80.  The overpayment resulted from an administrative error that occurred

when the benefit calculation failed to offset properly the first pension distribution that Sanford

received.  In its effort to recover the overpayment, the VEBC asserted its right "to appropriate

equitable relief to enforce the terms of the Plan providing that" Sanford was entitled only to

$14,091.  *See* Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive

Relief, ¶¶ 5-8, 13 (Sept. 7, 2005).

218.    Verizon argued that ERISA requires participant benefits to be paid
pursuant solely to the terms of the written plan document. (*Id.* at 4.)

**Response:**    No dispute that Verizon stated that in this litigation, benefits

should be paid in accordance with the terms of the written plan documents.  Disputed that this

position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has

altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan

language, (3) enforcement of the mistaken term would both provide benefits that were not

expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to

75

reform the plan would create perverse differentials in the benefits of younger, shorter-service

employees over older, longer-service employees.

219.    Verizon prevailed on these issues when, in July 2006, the parties settled the case (*Sanford*, Agreed Mot. Dismiss Prejudice [DE 21]), and the district court dismissed the case with prejudice. (*Sanford*, Order [DE 22].)

**Response:**    Disputed.  Since the litigation was resolved by means of a settlement, neither party prevailed.

### o.    *VEBC v. Glaid*, No. 05-1984 (N.D. Tex. 2005) (transferred to W.D. Pa.)

220.    Timothy Glaid was a participant in the Verizon Management Pension Plan. (*VEBC v. Glaid*, No. 05-1984 (N.D. Tex. 2005) (*Glaid*, Compl. [DE 1] at 2).) Verizon sent Glaid a series of written participant communications informing him he would receive between $600,000-650,000 if he retired early. After Glaid retired and received a $665,000 lump-sum payment, Verizon sued Glaid, alleging that its written participant communications were inconsistent with the Plan document, which required Glaid to receive $396,509.31 less. (*Glaid*, Compl. [DE 1] ¶ 9.)

**Response:**    Disputed.  Mr. Glaid worked for AT&T from 1974-1998; when he

retired from AT&T, he received a lump-sum pension distribution of $282,786.33.  Glaid then

worked for Verizon from 1999-2003.  During that time, Glaid ported his service from AT&T to

Verizon.  At the time of his retirement from Verizon, Glaid was entitled to a lump-sum pension

distribution of $269,362.19.  However, due to an administrative error that occurred when the

benefit calculation failed to offset properly the prior distribution that Glaid collected after his

retirement from AT&T, Glaid received $665,509.31 instead.  In its effort to recover the

overpayment, the VEBC argued that "[u]nder the terms of the Plan, Glaid is not entitled to"

$665,509.31 and asserted its right "to appropriate equitable relief to enforce the terms of the

Plan."  *See* Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive

Relief, ¶¶ 5-9, 14 (Oct. 6, 2005).

221.    Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written plan document. (*Glaid*, Pl.'s Memo. Opp. Mot. J.

Pleadings [DE 63] at 4–7.) It argued that "as a matter of law, neither oral nor informal written modifications to a plan are enforceable." (*Glaid*, Pl.'s Memo. Opp Def.'s Mot. Dismiss Lack Juris or Alternatively Transfer Venue [DE 24] at 18.) Verizon therefore contended that even if Verizon made affirmative representations regarding the benefits Glaid would receive, those representations were not enforceable. (*Id.*)

       **Response:**     No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents. Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

       222.    Verizon prevailed on these issues when, on November 28, 2006, the district court denied Glaid's Motion to Dismiss (*Glaid*, Memo. Op. & Order [DE 41]) and the parties settled the case thereafter.

       **Response:**     Disputed. Glaid moved to dismiss for lack of personal and subject matter jurisdiction. Glaid argued that the court lacked personal jurisdiction over him because he had insufficient contacts with the forum state (Texas). The court held that personal jurisdiction was proper because, under ERISA, an individual need only have minimum contacts with the United States, not the forum state. In her subject matter jurisdiction argument, Glaid contended only that the funds plaintiff sought to recover were not "specifically identifiable" because they had been commingled with other of the defendant's money and assets. The court found that the funds were specifically identifiable and that, therefore, it had subject matter jurisdiction over the plaintiff's claim. *See* Memorandum Opinion and Order, 2-4 (Nov. 28, 2006). Moreover, since the litigation was resolved by means of a settlement, neither party prevailed.

**p.** *VEBC v. Spiliotis*, **No. 06-2078 (N.D. Tex. 2006)**

223.    James Spiliotis was a participant in the Verizon Pension Plan for New York and New England Associates. (*VEBC v. Spiliotis*, No. 06-2078 (N.D. Tex. 2006) (*Spiliotis*, Compl. [DE 1] at 3).) Verizon told Spiliotis that if he resigned he would be entitled to a lump-sum distribution of $338,291.91. (*Spiliotis*, Def.'s Br. Supp. Def.'s Mot Dismiss [DE 7] at 5–6.) After retiring and receiving his lump-sum payment, Verizon sued Spiliotis, alleging its participant communications were inconsistent with the terms of the Plan document, which required Spiliotis to receive $52,300.29 less. (*Spiliotis*, Compl. [DE 1] ¶¶ 6–7.)

**Response:**    Disputed.  When Mr. Spiliotis retired from Verizon in 2003, he was entitled to a lump-sum pension distribution of $285,991.32.  However, due to an administrative error that occurred when the VEBC failed to apply an offset from a QDRO, Spiliotis received $338,291.91 instead.  The VEBC sued to recover this overpayment.  *See* Plaintiff Verizon Employee Benefits Committee's Response to Defendant's Motion to Dismiss Complaint and/or Transfer Venue to the District of Massachusetts, 3-4 (Jan. 31, 2007).  Spiliotis moved to dismiss the complaint, arguing that, *inter alia*, the court lacked personal jurisdiction, the VEBC lacked standing to sue under ERISA, and the VEBC had unclean hands.  In the alternative, Spiliotis argued that the court should transfer venue.  The court denied the motion. *See* Memorandum Order, 2-8, 13 (Aug. 9, 2007).

224.    Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written plan document. (*Spiliotis*, Pl.'s Resp. Def.'s Mot. Dismiss Compl. and/or Transfer Venue [DE 8] at 3–4.)

**Response:**    No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents.  Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to

reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

225.    Verizon prevailed on these issues when, on August 9, 2007, the district court denied Spiliotis's Motion to Dismiss the Complaint and/or Transfer Venue (*Spiliotis*, Mem. Order [DE 19]) and, in January 2008, the parties settled the case (*Spiliotis*, Joint Mot. Dismiss with Prejudice [DE 21]).

**Response:**    Disputed.  Spiliotis moved to dismiss the complaint on the grounds that (1) the court lacked personal jurisdiction, (2) the plaintiff lacked standing to sue under ERISA, (3) plaintiff sought legal rather than equitable relief, (4) plaintiff had unclean hands, (5) state law precluded recovery, and (6) he was "not amendable to suit under ERISA" because he was no longer a plan "participant."  *See* Memorandum Order, 2-9.  The court denied the motion.  *Id.* at 13.  Moreover, since the litigation was resolved by a settlement, neither party prevailed.

### q.    *VEBC v. Regen*, No. 05-2403 (N.D. Tex. 2005)

226.    Frances Regen was a participant in the Verizon Mid-Atlantic Associates Pension Plan. (*VEBC v. Re*gen, No. 05-2403 (N.D. Tex. 2005) (Regen, Compl. [DE 1] at 1.) After retiring and receiving a lump-sum payment of $34,270.84, Verizon sued Regan three years later, alleging that the payment did not comport with the Plan document, which required Regan to receive $13,964.68 less. (*Id.* at1- 3.)

**Response:**    Disputed.  Ms. Regen worked for Verizon from 1989-1995 and again from 1997-2002.  Following her first retirement, Regen received a lump-sum pension distribution that fully satisfied the pension she earned under the Plan.  Following her second retirement, Regen was entitled to a lump-sum benefit of $20,306.16.  Due to an administrative error that occurred when the second benefit calculation failed to offset properly the prior pension distribution, however, she received $34,270.84 instead.  In its effort to recover the overpayment, the VEBC asserted its right to "appropriate equitable relief to enforce the terms of the Plan providing that" Regen is entitled to $20,306.16 only.  *See* Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 5-8, 13 (Dec. 7, 2005).

227.    Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Regen*, Compl. [DE 1] at 4–5.)

**Response:**    No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents.  Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

228.    Verizon prevailed on that issue when, on August 29, 2006, the district court entered a default judgment in favor of the VEBC and judgment was rendered against Regen in the amount of $13,964.68. (*Regen*, Default J. [DE 15].)

**Response:**    Disputed that Verizon "prevailed on these issues" because the district court entered a default judgment.

### r.    *VEBC v. Fitzgerald*, No. 05-2165 (N.D. Tex. 2005) (dismissed and later refiled as No. 06-482 (N.D. Tex. 2006))

229.    Sally Fitzgerald was a participant in the Verizon Management Pension Plan. (*VEBC v. Fitzgerald*, No. 05-2165 (N.D. Tex. 2005) (Compl. [DE 1] at 1–2).) Verizon represented to Fitzgerald that if she elected an early retirement her lump-sum distribution would be approximately $700,000. (Def.'s Answer [DE 6] at 5.) After Fitzgerald retired and received her lump-sum payment, Verizon sued Fitzgerald nearly four years later, alleging that the representations were inconsistent with the Plan document, which required Fitzgerald to receive $155,862.26 less. (Compl. [DE 1] ¶ 7.) T

**Response:**    Disputed.  Ms. Fitzgerald worked for Verizon from 1962-1983 and again from 1987-2001.  Following her retirement in 2001, Fitzgerald received three lump sum benefit payments totaling $741,689.59.  The amount of the first payment was calculated under the Modified Former Pension Formula.  The second and third payments were calculated under the Highest Average Pay Formula.  The third payment, however, was not reduced by the amount

of the second distribution; this administrative error caused Fitzgerald to receive an overpayment of $155,862.26. In its effort to recover the overpayment, the VEBC asserted its right "to appropriate equitable relief to enforce the terms of the Plan providing that" Fitzgerald was entitled to a total benefit of $585,827, not $741,690. *See* Plaintiff's Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 5-7, 13 (Mar. 17, 2006)

230.     Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Fitzgerald*, Compl. [DE 1] at 4–5; Pl.'s Resp. Def.'s Mot. J. Pleadings [DE 37] at 3.)

**Response:**     No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents. Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

231.     Verizon prevailed on these issues when, on July 12, 2007, the district court denied Fitzgerald's Motion for Judgment on the Pleadings, and in January 2008, when the parties settled the case and the court dismissed the case without prejudice (*Fitzgerald*, Order [DE 57]).

**Response:**     Disputed. The only issue raised in Fitzgerald's Motion for Judgment on the Pleadings was that the plaintiff's suit was barred by the applicable statute of limitations. *See* Defendant's Motion for Judgment on the Pleadings, 3 (Nov. 29, 2006). The court denied the motion, finding itself unable to "conclude based on the pleadings alone" that the plaintiff's claim was time-barred. *See* Memorandum Opinion and Order, 13 (July 12, 2007). Moreover, since the litigation was resolved by means of a settlement, neither party prevailed.

**s.**     *VEBC v. Osmon*, No. 06-674 (N.D. Tex. 2006)

232.    Marlene Osmon was a participant in the GTE California Incorporated Plan for Hourly-Paid Employees' Pensions. (*VEBC v. Osmon*, No. 06-674 (N.D. Tex. 2006) (*Osmon*, Compl. [DE 1] at 1).) After retiring and receiving a lump-sum payment of $154,426.81, Verizon sued Osmon, alleging the payment was inconsistent with the terms of the Plan document, which required Osmon to receive $126,161.03 less.

**Response:**     Disputed. Ms. Osmon worked for Verizon from 1961-1994 and again from 1999-2004. After her first retirement, Osmon received a pension distribution that accounted for all of her service through 1994. Soon after starting her second period of employment with Verizon, Osmon received an in-service pension distribution that accounted for her service from 1998-1999. Following her second retirement, Osmon received a lump-sum pension distribution of $154,426.81. "Under the terms of the Plan," however, she was only entitled to $28,265.78. The overpayment resulted from an administrative error that occurred when the benefit calculation for the last distribution failed to offset properly the prior pension distributions that Osmon had received. In its effort to recover the overpayment, the VEBC asserted its right "to appropriate equitable relief to enforce the terms of the Plan providing that" Osmon was entitled only to $28,265.78. See Plaintiff's Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 5-7, 13 (Apr. 14, 2006).

233.    Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Osmon*, Compl. [DE 1] at 4–5.)

**Response:**     No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents. Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to

reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

234.    Verizon prevailed on these issues when the parties settled the case and, on September 14, 2007, when the district court dismissed the suit with prejudice. (*Osmon*, Order [DE 37].)

**Response:**    Disputed.  Since the litigation was resolved by means of a settlement, neither party prevailed.

### t.    *VEBC v. Fincher*, No. 07-740 (N.D. Tex. 2007)

235.    Rodney Fincher was a participant in the GTE California Incorporated Plan for Hourly-Paid Employees' Pensions. (*VEBC v. Fincher*, No. 07-740 (N.D. Tex. 2007) (*Fincher*, Compl. [DE 1] at 1–2).) After Fincher retired and received a lump-sum payment of $261,375.74, Verizon sued Fincher, alleging the payment was inconsistent with the terms of the Plan document, which required Fincher to receive $143,892.13 less. (Compl. [DE 1] 1-3.)

**Response:**    Disputed.  Mr. Fincher had two separate periods of employment with Verizon.  After the first, he received a pension distribution of $139,353.48.  At the time of his second retirement, he was entitled to a distribution of $117,483.61.  However, because of an administrative error that occurred when the second benefit calculation did not properly offset the prior pension distribution, Fincher received $261,375.74.  In its effort to recover the overpayment, the VEBC asserted its right to "equitable relief to enforce the terms of the Plan providing that" Fincher was entitled to $117,483.61.  *See* Plaintiff's Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 5-7, 13 (Apr. 26, 2007).

236.    Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Id.* at 4–5.)

**Response:**    No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents.  Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan

language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

237.    Verizon prevailed on these issues when, on July 29, 2008, the district court entered default judgment in favor of the VEBC in the amount of $143,892.13. (*Fincher*, Final Default J. [DE 17].)

**Response:**    Disputed that Verizon "prevailed on these issues" because the district court entered a default judgment.

### u.    *VEBC v. Beal*, No. 06-677 (N.D. Tex. 2006)

238.    Patricia Beal was a participant in the Verizon Management Pension Plan. (*VEBC v. Beal*, No. 06-676 (N.D. Tex. 2006) (*Beal*, Compl. [DE 1] at 1–2.) After Beal retired and received a lump-sum payment of $97,060.26, Verizon sued Beal more than two years later, alleging that the payment was inconsistent with the terms of the Plan document, which required Beal to receive $11,041.19 less. (*Id.* at 1-3.)

**Response:**    Disputed.  Ms. Beal was an employee of Verizon until her termination in November 2003.  In January 2004, Beal received a lump-sum pension distribution of $97,060.26, though under the terms of the Plan she was entitled only to $86,019.07.  The overpayment resulted from an administrative error that occurred when her benefit calculation applied a pension benefit enhancement that was offered under a separation program in which she was not eligible to participate.  In its effort to recover the overpayment, the VEBC asserted its right to "appropriate equitable relief to enforce the terms of the Plan providing that" Beal should have received only $86,019.07.  *See* Plaintiff's Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 5-6, 12 (Apr. 14, 2006).

239.    Verizon argued that ERISA requires participant benefits to be paid pursuant only to the terms of the written participant document. (*Id.* at 3–4.)

**Response:** No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents. Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

240. Verizon prevailed on these issues when, on August 22, 2006, the district court entered a default judgment in favor of the VEBC. (*Beal*, Final Default J. [DE 13].)

**Response:** Disputed that Verizon "prevailed on these issues" because the district court entered a default judgment.

### v. *VEBC v. Willett*, No. 06-678 (N.D. Tex. 2006)

241. Kenneth Willett was a participant in the GTE Supply Pension Plan for Union Represented Employees. (*VEBC v. Willett*, No. 06-678 (N.D. Tex. 2006) (Compl. [DE 1] at 1–2).) After Willet retired and received a lump-sum payment of $344,670.85, Verizon sued Willet nearly three years later, alleging that the payment was inconsistent with the terms of the Plan document, which required Willet to receive $311,431.71 less. (*Id.* at 3.)

**Response:** Disputed. Mr. Willett worked for Verizon from 1967 through 2003. In 2000, Willett received an in-service pension distribution for $269,044.17 that accounted for all of his service with Verizon through 1999. When he retired, Willett received an additional lump-sum distribution of $344,670.85. Under the terms of the Plan, however, Willett was entitled only to $33,239.14. The overpayment resulted from an administrative error that occurred when the second distribution failed to offset properly the in-service distribution that he received in 2000. In its effort to recover the overpayment, Verizon asserted its right "to appropriate equitable relief to enforce the terms of the Plan providing that" Willett was entitled

only to $33,239.14. *See* Plaintiff's Complaint Seeking Recovery of Overpayment, Constructive

Trust, and Injunctive Relief, ¶¶ 5-7, 13 (Apr. 14, 2006).

242. Verizon argued that ERISA requires participant benefits to be paid
pursuant only to the terms of the written participant document. (*Willett*, Compl. [DE 1] at 4–5.)

**Response:** No dispute that Verizon stated that in this litigation, benefits

should be paid in accordance with the terms of the written plan documents. Disputed that this

position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has

altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan

language, (3) enforcement of the mistaken term would both provide benefits that were not

expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to

reform the plan would create perverse differentials in the benefits of younger, shorter-service

employees over older, longer-service employees.

243. Verizon prevailed on these issues when, on September 11, 2006, the
district court entered default judgment in favor of the VEBC imposing a constructive trust in the
amount of $311,431.71 on the funds in Willett's Individual Retirement Account. (*Willett*, Order
[DE 10].)

**Response:** Disputed that Verizon "prevailed on these issues" because the

district court entered a default judgment.

### w. *VEBC v. Norton*, No. 06-679 (N.D. Tex. 2006)

244. Christina Norton was a participant in the Verizon Pension Plan for Mid-
Atlantic Associates. (VEBC *v. Norton*, No. 06-679 (N.D. Tex. 2006) (*Norton*, Compl. [DE 1] at
1–2).) After Norton retired and received a lump-sum payment of $265,471.26, Verizon sued
Norton approximately three and a half years later, alleging the payment was inconsistent with the
Plan document, which required Norton to receive $11,726.47 less. (*Id.*)

**Response:** No dispute.

245. Verizon argued that ERISA requires participant benefits to be paid
pursuant solely to the terms of the written participant document. (*Id.* at 3–4.)

**Response:** No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents. Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

246. Verizon prevailed on these issues when, in July 2006, the parties settled the case (*Norton*, Agreed Mot. Dismiss with Prejudice [DE 5]), and the district court dismissed it with prejudice (*Norton*, Order [DE 6]).

**Response:** Disputed. Since the litigation was resolved by means of a settlement, neither party prevailed.

        **x.**     ***VEBC v. Large*, No. 06-680 (N.D. Tex. 2006) (transferred to District of New Jersey, No. 07-3816)**

247. Sandra Large was a participant in the Verizon Pension Plan for Mid-Atlantic Associates. (*VEBC v. Large*, No. 06-680 (N.D. Tex. 2006) (Compl. [DE 1] at 1–2.) After Large retired and received a lump-sum payment of $201,935.19, Verizon sued Large approximately three and a half years later, alleging the payment was inconsistent with the Plan document, which required Large to receive $41,697.41 less. (*Id.*)

**Response:** Disputed. Ms. Large worked for Verizon from 1971-1995 and again from 1996-2002. Following her first retirement, she received a lump-sum pension distribution of $30,290.25. At the time of her second retirement, Large was entitled to receive a distribution of $160,237.78; due to an administrative error, however, Large received $201,935.19 instead. The error occurred when the second benefit calculation failed to offset properly the prior pension distribution that Large received after her first retirement. In its effort to recover the overpayment, the VEBC asserted its right to "equitable relief to enforce the terms of the Plan

providing that" Large is entitled to only $160,237.78. *See* Plaintiff's Complaint Seeking

Recovery of Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 6-7, 13 (Apr. 14, 2006).

248.    Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Id.* at 4.)

**Response:**    No dispute that Verizon stated that in this litigation, benefits

should be paid in accordance with the terms of the written plan documents.  Disputed that this

position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has

altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan

language, (3) enforcement of the mistaken term would both provide benefits that were not

expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to

reform the plan would create perverse differentials in the benefits of younger, shorter-service

employees over older, longer-service employees.

249.    Verizon prevailed on these issues when, on April 3, 2008, the parties settled the case and it was dismissed by the district court. (*Large*, Order [DE 26].)

**Response:**    Disputed.  Since the litigation was resolved by means of a

settlement, neither party prevailed.

y.    ***VEBC v. Mateo*, No. 06-681 (N.D. Tex. 2006)**

250.    Caesar Mateo was a participant in the Verizon Management Pension Plan. (*VEBC v. Mateo*, No. 06-681 (N.D. Tex. 2006) (*Mateo*, Compl. [DE 1] at 1–2).) After Mateo retired and received a lump-sum payment of $320,796.59, Verizon sued Mateo two years later, alleging the payment was inconsistent with the Plan document, which required Mateo to receive $285,396.50 less. (*Id.*)

**Response:**    No dispute.

251.    Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Mateo*, Compl. [DE 1] at 3–4.)

**Response:**    No dispute that Verizon stated that in this litigation, benefits

should be paid in accordance with the terms of the written plan documents.  Disputed that this

position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has

altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan

language, (3) enforcement of the mistaken term would both provide benefits that were not

expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to

reform the plan would create perverse differentials in the benefits of younger, shorter-service

employees over older, longer-service employees.

251. Verizon prevailed on that issue when, on March 21, 2007, the district court entered a default judgment in favor of the VEBC imposing a constructive trust in the amount of $285,396.50. (*Mateo*, Default J. [DE 19].)

**Response:** Disputed that Verizon "prevailed on these issues" because the

district court entered a default judgment.

### z.    *VEBC v. Boyer*, No. 06-1539 (N.D. Tex. 2006)

253. Christine Boyer was a participant in the Verizon Management Pension Plan. (*VEBC v. Boyer*, No. 06-1539 (N.D. Tex. 2006) (*Boyer*, Compl. [DE 1] at 1–2).) Verizon communicated to Boyer that she had in excess of $300,000 in the plan. (*Boyer*, Br. Supp. Def.'s Mot Dismiss Am. Compl. and/or Transfer Venue [DE 19] at 3.) After Boyer opted to retire and received a lump-sum payment of $323,160.45, Verizon sued Boyer over two years later, alleging that the communication was inconsistent with the terms of the Plan document, which required Boyer receive nothing. (*Id.* at 3.)

**Response:** Disputed. Ms. Boyer was an employee of Bell Atlantic until April

1994, at which time she became an employee of AT&T. In 1999, while still employed with

AT&T, she ported her Bell Atlantic service to AT&T, which under the Bell Atlantic Plan's terms

had the effect of transferring liability for her accrued benefit from Bell Atlantic to AT&T. When

she later retired, and due to an unspecified administrative error, Boyer received a lump-sum

pension distribution of $323,160.45 from Bell Atlantic. Under the terms of Bell Atlantic's Plan,

however, she was not entitled to any distribution. The VEBC asserted its right to "appropriate

equitable relief to enforce the Plan's terms" under which Boyer was not entitled to any benefits.

*See* Plaintiff's First Amended Complaint Seeking Recovery of Overpayment, Constructive Trust, and Injunctive Relief, ¶¶ 5-7, 13 (Oct. 17, 2006).

254. Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Boyer*, Resp. Def.'s Mot Dismiss Am. Compl. and/or Transfer Venue [DE 21] at 3.)

**Response:** No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents. Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

255. Verizon prevailed on these issues when, on February 22, 2007, the district court denied Boyer's Motion to Dismiss the Amended Complaint and/or to Transfer Venue to the Middle District of Florida. (Order [DE 22]) and on April 8, 2008, when the district court dismissed the case with prejudice after the parties settled (*Boyer*, Joint Mot. Dismiss Prejudice [DE 48]; Order [DE 49]).

**Response:** Disputed that Verizon "prevailed on these issues." Boyer's motion to dismiss argued that the VEBC is not a "person," and therefore cannot be a "fiduciary" with standing to sue under ERISA § 1132(a)(3). The district court denied Boyer's motion (on February 16, 2007), after finding that the Committee has standing to sue under § 1132(a)(3). Additionally, because the litigation was resolved by means of a settlement, neither party prevailed.

### aa.  *VEBC v. Blackwell*, No. 05-1791 (N.D. Tex. 2005)

256. Charles Blackwell was a participant in the GTE Midwest Incorporated Plan for Hourly Paid Employees. (*VEBC v. Blackwell*, No. 05-1791 (N.D. Tex. 2005) (*Blackwell*, Compl. [DE 1] at 1–2).) After Blackwell retired and received a lump-sum payment of

$133,150.32, Verizon sued Blackwell, nearly five years later, alleging that the payment was inconsistent with the Plan document, which required Blackwell to receive $86,090.58 less. (*Id.* at 1-3.)

> **Response:**   No dispute.

257.   Verizon argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written participant document. (*Id.* at 3–4.)

> **Response:**   No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents.  Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

258.   Verizon prevailed on these issues when, on February 13, 2006, the parties settled the case and the district court dismissed it. (*Blackwell*, Mot. Dismiss [DE 6] and Order [DE 7].)

> **Response:**   Disputed.  Since the litigation was resolved by means of a settlement, neither party prevailed.

259.

> **Response:**   None required.

### bb.   **Varney v. NYNEX Mgmt. Pension Plan, 07-695 (E.D.N.Y. 2007)**

260.   Lillian Varney was a former employee of NYNEX, a predecessor corporation to Verizon. (*Varney v.* NYNEX *Mgmt. Pension Plan*, 07-695 (E.D.N.Y. 2007) (*Varney*, Mem. Supp. Defs.' Mot. Dismiss [DE 26] at 2).)

> **Response:**   No dispute.

261.    In January 2006, Varney's son, Richard Varney, notified Verizon of Varney's death and filed a claim for benefits under the pension and life insurance plans. (Compl. [DE 1] ¶ 20–21.) Verizon sent Mr. Varney a series of notices indicating that he was eligible to receive a lump-sum payment of $99,269.74 as Lillian Varney's beneficiary. (*Id.* ¶ 30.) Verizon later asserted that these notices had been sent in error because, under the plain language of the plans, Mr. Varney was not entitled to benefits. (*Varney*, Mem. Supp. Defs.' Mot. Dismiss [DE 26] at 1.)

**Response:**      Disputed.  Mr. Varney is Ms. Varney's son and sole beneficiary.

Mr. Varney filed this lawsuit alleging that Ms. Varney was a participant in two NYNEX ERISA

plans (a pension plan and a life insurance plan) and that he was Ms. Varney's beneficiary under

those plans.  In May 2006, the Benefits Center mailed notices to Mr. Varney mistakenly telling

him that he was eligible to receive a lump-sum payment of $99,269.74 as Ms. Varney's

beneficiary under the pension plan.  In one of those notices, NYNEX explicitly reserved its right

to "correct any errors" and that if, for example, it is determined "at any time that the information

provided on this statement conflicts with the benefit defined by the Verizon Management

Pension Plan, the Verizon Management Pension Plan will prevail."  The VEBC later determined

that Mr. Varney was not entitled to a death benefit under the terms of the Plan.  In July 2006, the

Benefits Center notified Mr. Varney that the representations made in the prior mailings had been

sent in error and that he needed to submit additional information before his eligibility for benefits

could be determined.  Mr. Varney filed this lawsuit in response.  *See id.* at 1-5.

262.    On February 16, 2007, Mr. Varney filed suit against Verizon under an equitable estoppel theory. (Varney, Compl. [DE 1] at 12.) In response, Verizon contended that ERISA requires participant benefits to be paid pursuant solely to the terms of the written plan document. (*Varney*, Mem. Supp. Defs.' Mot. Dismiss [DE 26] at 8–14, 18–20.) Verizon argued that the terms of the Plans controlled, not the notices that stated Mr. Varney was entitled to a lump-sum of $99,269.74. (*Id.*)

**Response:**      No dispute that Verizon stated that in this litigation, benefits

should be paid in accordance with the terms of the written plan documents.  Disputed that this

position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has

altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

263. Verizon also argued that Mr. Varney could not reasonably rely on the notices he received because they contained a disclaimer stating, "Verizon reserves the right to correct any errors. If it's determined at any time that the information provided on this statement conflicts with the benefit defined by the Verizon Management Pension Plan, the Verizon Management Pension Plan, will prevail. The federal law known as ERISA requires that a plan be operated in accordance with its terms." (*Id.* at 20.)

**Response:** Disputed as to completeness. The VEBC also argued that Varney's reliance claim was a "conclusory allegation" unsupported by factual allegations of actual reliance. *See* Memorandum in Support of Verizon Defendant's Motion to Dismiss. No dispute that Verizon stated that in this litigation, benefits should be paid in accordance with the terms of the written plan documents. Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

### cc. Davis v. Verizon New England Inc., 04-007 (D. Mass. 2004)

264. Lawrence Davis was a participant in a Special Accident Insurance plan (SAI) offered by Verizon New England Inc., a subsidiary of Verizon. (*See Johnson v. Verizon New England Inc.*, No. 05-1639 (Mass. Sup. Court 2005); Answer and Affirmative Defenses of Defendants Verizon New England, Inc. & Howard White ¶ 2.) The Plan document contained exclusion for accidents involving alcohol, but the SPD did not. (*Davis*, Pl.'s Resp. Opp. Def.'s

Mot. Dismiss [DE 25] at 4.) Davis died in an accident with a blood alcohol content of 0.15, and Verizon refused to pay SAI benefits. (*Davis*, Am. Compl. [DE 62] ¶ 13.)

> **Response:**  No dispute.

265. On January 1, 2004, Mrs. Davis filed suit against the VEBC arguing that the SPD led her to believe that she was entitled to SAI Benefits. (*Id.* at 5.) In response, the defendants argued that ERISA requires participant benefits to be paid pursuant solely to the terms of the written plan document, not the SPD. (*Davis*, Defs.' Partial Mot. Dismiss & Incorporated Mem. Law [DE 64] at 6–8.)

> **Response:**  Disputed.  The defendants argued, *inter alia*, that plaintiff's claim sought legal rather than equitable relief.  *See* Defendants' Partial Motion to Dismiss and Incorporated Memorandum of Law, 6-7 (Aug. 5, 2004).  In the alternative, the defendants argued that even if plaintiff's claim were treated as one for equitable relief, it would nonetheless fail because the plaintiff made no factual showing of reasonable, detrimental reliance.  *Id.* at 7-8.  No dispute that Verizon stated in this litigation that benefits should be paid in accordance with the terms of the written plan documents.  Disputed that this position conflicts with Verizon's request for reformation of a plan where (1) a drafting error has altered an intended plan formula, (2) no participant reasonably relied on the mistaken plan language, (3) enforcement of the mistaken term would both provide benefits that were not expected by participants and impose a huge, unanticipated liability on the plan, and (4) failing to reform the plan would create perverse differentials in the benefits of younger, shorter-service employees over older, longer-service employees.

266. Defendants prevailed on that issue when, on September 22, 2004, the Magistrate Judge filed his recommendation that Davis's claim for "Detrimental Reliance Upon Inaccurate Summary Plan Description" be dismissed (*Davis*, Order [DE 74]) and the district court judge affirmed the recommendation (*Davis*, Order [DE 78]).

> **Response:**  Disputed.  The magistrate judge found that the plaintiff's claim for "detrimental reliance upon inaccurate summary plan description" sought legal, rather than equitable, relief, and that legal relief is unavailable under ERISA.  *See* Recommended Decision

on Defendant's Motion to Dismiss, 7-9 (Sept. 22, 2004).  The district court judge "concur[red]

with the recommendations of the United States Magistrate Judge for the reasons set forth in his

Recommended Decision."  *See* Order Affirming the Recommended Decision of the Magistrate

Judge (Nov. 2, 2004).

### (10)   Young's claims for benefits

#### a.   Initial request for documents

267.    Young retained the National Center for Retirement Benefits ("NCRB") to
review her benefit calculations. On April 8, 2003, NCRB requested, on Young's behalf, the
following documents from Verizon:

(a)    a "full and complete copy of the existing plan (including
amendments and retroactive amendments) relied upon to determine the benefits which
[she is] receiving or have received,"

(b)    a "copy of the Summary Plan Description in effect at the time [she]
received a lump-sum payout or commenced receiving monthly income,"

(c)    "[a]ll supporting documents used in determining and calculating
the final benefit—including, but not limited to, all payroll records and service records

(d)    "[c]opies of any written communications to or from [her]
pertaining to the plan or plans, including my election forms,"

(e)    the "[w]orksheet used in calculating final benefits,"

(f)    "[i]f any of the plan benefits which [she is] receiving, or have
received, are based upon participation in any prior plan, include a full and complete copy
of any and all prior plans and all supporting documents (worksheets, payroll records,
service records, etc.) used in calculating any entitlement thereunder."

(Y000052–53.)

**Response:**    No dispute as to the first sentence.  No dispute as to the second

sentence to the extent that the NCRB faxed an "Authorization for Release of Retirement Plan

Records" form to Verizon on April 8, 2003, and that the cover letter accompanying the form

indicated that the NCRB was requesting a copy of the "worksheet used in calculating final

benefits" for plaintiff.  *See* Y000051-53.  Otherwise, disputed to the extent that plaintiff's

assertion conflicts with the authorization form and cover letter.  *Id.*

268.    Verizon responded to this request on October 21, 2003. (Y000034.) It did
not produce the document Verizon now claims is the Summary of Material Modifications
(VZ10385–96). (*See* Defs.' Countercl. [DE 139] ¶ 23.) Nor did Verizon send any of the CEBC or
HRC resolutions.

**Response:**    No dispute.  Verizon responded to the NCRB request by two letters

dated October 21, 2003, and provided the 1997 Plan and the benefit calculation worksheet

requested by the NCRB.  Ex. D.41.  The NCRB did not request the SMM, the CEBC resolutions

recommending amendment of the Plan, or the HRC resolutions authorizing and adopting the

amendments recommended by the CEBC.  *See* Y000051-53.

### b.    Discount rate issue claim for benefits

### (i)    VCRU denial of the discount rate claim

269.    On June 9, 2004, NCRB filed Young's initial claim for benefits on the
ground that Verizon incorrectly applied a discount rate of 120% of the PBGC rate, instead of
100%. (VZ00002–03.) The claim was submitted to the Verizon Claims Review Unit ("VCRU"),
to whom the Plan Administrator, the VEBC, had delegated initial claims responsibility. (Defs.'
Resps. & Objections Pl.'s Second Interrogs. at 8.) The VCRU was comprised entirely of Hewitt
Associates employees. (Shoenecker Dep. at 34:18–20.)

**Response:**    No dispute.  Seven months after obtaining the 1997 Plan from

Verizon, NCRB filed plaintiff's initial claim for benefits on the ground that Bell Atlantic

incorrectly applied a discount rate of 120% of the PBGC rate, instead of 100%.  Ex. D.42 at

VZ00002-03; Ex. D.44 at VZ00046-47.  The NCRB claim letter stated that "[o]ur client's

opening balance is based on the present value of her 12/31/95 accrued benefit, multiplied by a

transition factor set forth in Table 1 of the Plan and is computed as follows: Opening balance =

accrued benefit * transition factor * lump sum factor."  Ex. D.42 at VZ00002.

270.    Because Young's claim was submitted by NCRB, it was referred to
Verizon's outside counsel, the law firm of Covington & Burling, which also represents Verizon
in this case. (VZ00029.) Kathy Capone, a senior advisor at Covington & Burling, was routinely

assigned to defend participant claims when the participant was represented by counsel. (Capone Dep. at 26:20–23.)

> **Response:** Disputed. Schoenecker routinely asked Kathy Capone to assist in the drafting of decision letters on appeals filed by counsel or the NCRB on behalf of participants. Capone was employed by Covington & Burling as a senior advisor on benefits; she is not a lawyer, and she was not outside counsel. Ex. D.75 at 59:20-64:20. Schoenecker asked Capone to assist in the drafting of the letter responding to plaintiff's appeal. Subsequently, when plaintiff filed suit, Verizon retained Covington & Burling lawyers.

271.    In response to Young's June 9, 2004, claim for benefits, the VCRU and Verizon drafted a denial letter. This letter was reviewed or edited by Capone; Bobbie Moore, a member of the VCRU and Hewitt employee; Colleen Yurosavage, another employee of Hewitt; and Kevin Cammarata, the actuary at Hewitt assigned to the Young claim. (Shoenecker Dep. at 39–40.)

> **Response:** No dispute that that the VCRU denial letter was initially drafted by Bobby Moore and reviewed or edited by Kathy Capone and Colleen Yarusavage, and that the benefit calculation in the VCRU denial letter was reviewed Kevin Cammarata. Ex. D.75 at 39-40. Disputed that Kevin Cammarata reviewed or edited the denial letter. Ex. D.60 at 182:15-20.

272.    It was abnormal for Shoenecker to talk with outside counsel regarding ongoing claims. (Shoenecker Dep. at 62:21–63:23.) Shoenecker was directed to discuss Young's claim with Capone by Donna Chiffriller, a senior executive in Verizon's human resources department, because Young was represented by a pension advocacy group. (Shoenecker Dep. at 63:24–64:7.)

> **Response:** Disputed as to the implication that Schoenecker discussed this claim with outside counsel (Capone was not outside counsel). Disputed that Chiffriller directed Schoenecker to discussed the claim with Capone. No dispute that Chiffriller asked Schoenecker to consult with her regarding the claim and that he asked Capone to assist in the drafting of the decision letters.

273.    The VCRU denied Young's discount rate claim by letter dated October 19, 2004. (VZ00010–15.)

**Response:** No dispute.

274. In its denial letter, the VCRU quoted § 16.5.1(a)(2), "as in effect in 1997 when Ms. Young terminated employment" (VZ00011 n.1), as follows:

> Section 16.5.1(a)(2) provides that the opening cash balance account is determined by multiplying the "Transition Factor described in Table 1" by "the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan [*i.e.*, the Bell Atlantic Management Pension Plan ("BAMPP") as it existed on December 31, 1995], determined as if the participant had a Severance from Service Date on December 31, 1995, based on Compensation paid through December 31, 1995."

(VZ00011.)

**Response:** No dispute.

275. The period ending the last sentence in the VCRU's quotation of § 16.5.1(a)(2) in its initial denial letter does not appear in the 1997 Plan (or any other iteration of the Cash Balance Plan). Rather, that sentence ends, "based on Compensation paid through December 31, 1995, *multiplied by the applicable transition factor described in Table 1 of this Section.*" (VZ00237 (emphasis added).)

**Response:** No dispute to the extent that the VCRU did not purport to quote the entirety of § 16.5.1(a)(2) in the initial denial letter. Ex. D.59 at 60:14-61:4. Disputed to the extent that plaintiff asserts that the location of the period within the quotation was misleading or inappropriate. The location of the period at the end of the VCRU's quotation of § 16.5.1(a)(2) reflects appropriate English usage and grammar: "As nicely expressed in William Strunk Jr. and E. B. White's *Elements of Style*, 'Typographical usage *dictates* that the comma be inside the [quotation] marks, though logically it often seems not to belong there' (p. 36; see bibliog. 1.1). The same goes for the period." The Chicago Manual of Style ¶ 6.8 (15th ed. 2003) (emphasis added); *see also* Ex. D.59 at 60:23-61:2.

276. Although it denied Young's initial discount rate claim, Verizon interpreted her claim as "a claim asking for a recalculation of her opening cash balance account as of January 1, 1996." (VZ00018.) Verizon recalculated Young's opening balance and concluded that it should have been "$686.09 larger than the amount originally calculated by the Plan and

credited to Ms. Young's cash balance account . . . ." (VZ00013.) Verizon later sent Young a check for $975.59. (Y000852.)

> **Response:** Disputed. Verizon interpreted plaintiff's claim as challenging the 120%/100% PBGC rate structure. Ex. D.43 at VZ00010-13.

277. Young appealed the denial of her discount rate claim to the Verizon Claims Review Committee ("Committee"), to which the VEBC had delegated appeals responsibility (Defs.' Resps. & Objections Pl.'s Second Interrogs. at 8), on December 6, 2004 (VZ00046–47).

> **Response:** No dispute.

### (ii) Committee denial of the discount rate issue claim

278. When Young appealed her claim, the VCRU prepared a written summary of the claim and the relevant plan provisions for the members of the Committee. (Shoenecker Dep. at 98:8–14.)

> **Response:** No dispute.

279. The members of the Committee were provided with the written summary, and many of them had copies of plan documents. (Shoenecker Dep. at 99:12–15.) The summary was drafted by Capone and reviewed by Shoenecker prior to being submitted to the Committee members. (*Id*. at 100:17–19.) The summary states that the issue was whether Young was eligible for additional pension benefits under the Cash Balance Plan. (VZ00267.)

> **Response:** No dispute. The members of the Committee were also provided with copies of plaintiff's June 9, 2004 initial claim letter, the VCRU's October 19, 2004 decision letter, and plaintiff's December 6, 2004 appeal letter.

280. Under the section "Relevant Plan Provisions," the summary quotes § 16.5.1(a)(2) of the 1997 Plan as follows:

> **16.5.1(a)(2) Not Eligible for Service Pension**
> In the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is the product of multiplying (A) the Participant's applicable Transition Factor described in Table 1 of this Section, *times* (B) the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on

Compensation paid through December 31, 1995, multiplied by the
applicable transition factor described in Table 1 of this Section….

(VZ00272.) Notably, the summary includes the second transition factor reference followed by an
ellipsis.

> **Response:** No dispute except as to plaintiff's unsupported suggestion that it is
notable that an ellipsis follows the second transition factor reference.

281.    The summary, along with other materials provided by the VCRU, was
given to the Committee members approximately a week in advance of the meeting where
Young's claim would be decided. (Shoenecker Dep. at 98:10–14.)

> **Response:** No dispute, as modified above.

282.    Shoenecker, along with all the members of the Committee present at the
meeting, read the version of § 16.5.1(a)(2) contained in the summary. (Shoenecker Dep. at
136:23–137:8.)

> **Response:** No dispute that Schoenecker read the summary and that the
summary was provided to the members of the Committee present at the meeting. Ex. D.75 at
98:10-14, 137:2-4. Disputed that all the members of the Committee present at the meeting read
the version of § 16.5.1(a)(2) contained in the summary. Many members of the Committee had
their own copies of the Plan documents. *Id.* at 99:12-15.

283.    The members of the Committee present at the meeting included David
Beik, Donna Chiffriller, Kathy Costenbader, Bill Gist, Stephanie Wallace, Ka Wong, and
Stephanie Zweben. (VZ00415.) Also attending ~~from Verizon~~ was Sharon Jukins, Dr. Brian
Morris, Andrew Nebens, Dr. Rukhsana Sadiquli, and Marc Schoenecker. (*Id.*) Nebens is an
attorney; Jukins is in Verizon's human resources department; Beik was in the pension finance
department; Chiffriller was a senior person in the human resources department; Costenbader was
in the disability management group of the human resources department; Gist was in the pension
and benefit department; Wong was in the pension finance department; and Zweban was in the
human resources department. (Shoenecker Dep. at 108–09.)

> **Response:** No dispute except as modified above and to the extent that plaintiff
suggests that all of non-Committee members were present for the discussion of plaintiff's claim.
Of the non-Committee members, Jukins, Nebens, and Schoenecker were Verizon employees.
Ex. D.75 at 102:5-16. Morris and Sadiquli were not Verizon employees, and their role as

advisors to the Committee did not extend to pension claims. *Id.* Rita Galgano, an employee of Verizon's pension department with extensive experience in pension matters, also attended the meeting and was available to answer questions from the Committee regarding the relevant plan provisions. *Id.* at 102:18-19, 109:3-22; VZ00274.

284. The VCRU members in attendance included Liz Albarran, Chris Clouse, Phil Co, Heather Hayden, Nicole Peterlin, DeeAnn Ring, and Sam Schultz. (VZ00415.)

> **Response:** No dispute.

285. The Committee denied Young's appeal of her discount rate claim. (VZ00050–57.)

> **Response:** No dispute.

286. Shoenecker discussed the Committee's decision with Capone, who then created the first draft of the appeal denial letter. (Shoenecker Dep. at 113:2–6.) Shoenecker provided an outline for Capone of how to prepare the letter, including the provisions to be included. (*Id.* at 115:19–116:4.)

> **Response:** No dispute as to the first sentence. Disputed as to the second sentence. Schoenecker testified that he "would have discussed with her . . . some outline of how to go about preparing the letter," including some discussion of the relevant plan provisions. Ex. D.75 at115:19-116:4.

287. Shoenecker reviewed a draft of the letter denying Young's appeal. (Shoenecker Dep. at 113:10–12.) The draft letter was then reviewed by members of the VCRU (*Id.* at 113:12–14) and Chiffriller (*Id.* at 113:15–16). The final denial letter was dated February 16, 2005. (VZ00050–57.)

> **Response:** No dispute.

288. Like the summary provided to the Committee, the final appeal denial letter sent to Young quoted § 16.5.1(a)(2). Unlike the summary, however, the quoted section in the denial did not contain the second transition factor reference. Instead, it read as follows:

> **16.5.1(a)(2) Not Eligible for Service Pension**
> In the case of a Participant who is not eligible for a Service
> Pension under the 1995 BAMPP Plan as of the Transition Date, the
> amount described in this paragraph (2) is the product of
> multiplying (A) the Participant's applicable Transition Factor

> described in Table 1 of this Section, *times* (B) the lump-sum
> cashout value of the Accrued Benefit payable at age 65 under the
> 1995 BAMPP Plan, determined as if the Participant had a
> Severance from Service Date on December 31, 1995, based on
> Compensation paid through December 31, 1995…

(VZ00053–54.)

**Response:**     No dispute. Plaintiff's representatives had a copy of the 1996 plan, which contained the entirety of §16.5.1(a)(2), as did the team of lawyers who subsequently filed suit on her behalf.

289.     Capone inserted the ellipsis into the quotation of § 16.5.1(a)(2), thereby eliminating the second transition factor from the Committee's denial letter. (Shoenecker Dep. 117:13–16.)

**Response:**     Disputed. Capone quoted a selected portion of § 16.5.1(a)(2) and used ellipses to flag the fact that the quotation did not purport to include the entirety of the provision. Capone routinely used ellipses where she qoutes only the portions of plan provisions relevant to a claim.

290.     Verizon claims that the Committee omitted the second transition factor reference from its quotation of § 16.5.1(a)(2) in the Committee's denial letter because it had determined that it was not relevant to Young's claim. (Shoenecker Dep. at 120:1–6.)

**Response:**     Disputed to the extent it suggests that the Committee specifically addressed the propriety of quoting selected, relevant portions of plan provisions. Schoenecker testified that he believed Capone prepared the initial draft of the letter, using ellipses to indicate where material was omitted, and that he believes it was appropriate to omit the language containing the second reference to the transition factor because it was not relevant to plaintiff's claim. Ex. D.75 at 117:10-118:6.

291.     Young instituted this lawsuit on December 30, 2005, to recover benefits due to her pursuant to ERISA Section 502, 29 U.S.C. § 1132, on her discount rate claim. (Compl. [DE 1].)

**Response:** No dispute, as modified above. Dkt. 1, Compl., ¶¶ 32-35 & Prayer for Relief ¶¶ (B) & (D). Although the complaint quoted the language from § 16.5.1(a)(2) referring twice to the transition factor, and although the complaint attached the 1996 plan which contains the mistaken double reference to the transition factor, the lawsuit filed on December 30, 2005 did not assert that the transition factor should be multiplied twice in calculating the opening balance.

### c. Transition factor claim for benefits

292. On July 26, 2006, Young moved to amend her Complaint to add a claim for benefits based on Verizon's failure to calculate her opening balance using the second transition factor reference. (Mot. Amend [DE 36].)

**Response:** No dispute.

293. Verizon treated the Amended Complaint adding the transition factor claim as a new administrative claim for benefits and took an extended amount of time to answer the claim. (VZ13687.)

**Response:** No dispute that the VCRU agreed to treat plaintiff's Amended Complaint as new administrative claim after the Court ordered plaintiff to exhaust the administrative review process for her transition factor claim. *See* Dkt. 43. Disputed that the VCRU took an extended amount of time to decide plaintiff's transition factor claim. The VCRU decided plaintiff's transition factor claim within the review period prescribed by ERISA. *See* Ex. D.82. *See also* 29 C.F.R. § 2560.503-1(f).

294. During the four months after the Amended Complaint was filed, the VCRU, with the assistance of Covington & Burling gathered evidence to build the administrative record and deny the claim. (Capone Dep. at 91:5–11.) In all, at least 29 people were involved in preparing the administrative response to Young's transition factor and discount rate claims: Dave Beik, Kate Berg, Bill Block, Kevin Cammarata, Kathy Capone, Gary Castillo, Donna Chiffriller, Chris Clouse, Kathy Costenbader, Grace Dobson, Jonathan Eng, Dan Fish, Rita Galgano, Florence Garber, Bill Gist, Sharon Jukins, Bobbie Moore, Jeff Norris, Arleen Preston, DeeAnn Ring, Marc Schoenecker, Kay Skinner, Phillip Storms, Pascale Thomas, Brian Waggenspack, Stephanee Wallace, Ka Wong, Colleen Yarusavage, and Stephanie Zweben. (Defs.' Supplemental Resps. & Objections Pl.'s Interrogs. Regarding Defs.' Countercls. at 8.) Verizon's

discovery responses also indicate that interviews were conducted with Peters and Moreen. (Defs.' Resps. & Objections Pl.'s Second Interrogs. at 24.)

   **Response:**  Disputed as to the first sentence, except no dispute that Capone assisted the VCRU in putting together the administrative record with respect to the transition factor claim. No dispute that the persons listed in the second sentence were involved in some way in the administrative review process for plaintiff's discount rate or transition factor claims.

   295.  The VCRU denied the transition factor claim by letter dated December 8, 2006, on the grounds that the second transition factor reference in § 16.5.1(a)(2) was a "mistake" and that, therefore, the Plan contained an ambiguity that the VCRU could interpret as requiring multiplication by the transition factor only once. (VZ13682–83.)

   **Response:**  Disputed. The basis for the VCRU's decision is stated in the VCRU's denial letter. Ex. D.46 at VZ13666-85.

   296.  Young appealed the denial, and the appeal was denied by the Committee by letter dated April 5, 2007, on the same grounds as the VCRU denial. (VZ15645–50.)

   **Response:**  No dispute except as to the last phrase. The grounds for the Committee's denial of the transition factor appeal are stated in the Committee's denial letter, which also incorporated the VCRU's denial letter. Ex. D.47 at VZ15645-70.

   297.  As this Court noted in its opinion of August 8, 2008, the VCRU and the Committee had a fiduciary duty in deciding Young's transition factor claim to act "solely in the interest of the participants and beneficiaries" and to give the claim "full and fair review . . . ." *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 575 F. Supp. 2d 892, 916, 917 (N.D. Ill. 2008). It also held that, in light of ERISA's "underlying purposes," the lack of "acknowledged expertise" of plan administrators, the conflict of interest involved, the lack of "procedural protections," and the fact that the Cash Balance Plan was not the result of "arm's length negotiations," Verizon "abused its discretion when upon finding a mistake it decided to disregard the 'mistaken' language and deny Plaintiff's claim." *Id.* at 917–18. Instead, the Court held, "upon determining the language was a mistake, the Committee should have sought to reform the plan document in court." *Id.* at 918.

   **Response:**  No dispute that paragraph 297 quotes selected portions of the Court's opinion.

**(11)    Effects of enforcing the second transition factor reference**

298.    In terms of changes in opening balances under the Cash Balance Plan as of December 31, 1995, using the actual Plan language would increase the Class members' benefits an average of $122,903.65. (VZ27114–323.)

**Response:**    Disputed.  Squaring the transition factor would increase the

Subclass 2 members' total opening balances by $1,672,400,100, an average of $154,737.24 for

parrticipants with a transition factor greated than 1.000.  Ex. D.51; Ex. D.62 at VZ27114-323.

Plaintiff incorrectly performs her calculation by assuming that the transition factors of all 13,784

members of Subclass 1 and Subclass 2 should be squared.  Ex. D.62 at VZ27114-323.  However,

her transition factor claim only applies to the 11,513 members of Subclass 2 whose opening

balances were calculated under § 16.5.1(a)(2).  *Id.*  Of those 11,513 participants, 10,808 had

transition factions greater than 1.000.  Ex. D.51.

299.    In terms of a percentage increase in the projected liabilities of the Cash Balance Plan as of January 1, 1996, using the actual Plan language would increase the Plan's liabilities by 32.1%. (VZ 22019; VZ27114–323.)

**Response:**    Disputed.  As of January 1, 1996, the sum of the Plan's opening

balances was $1,885,060,182.  Ex. D.62 at VZ27114-323.  Those account balances translated to

an actuarially projected benefit liability of $5,279,375,506.  *See* VZ22019.  Squaring the

transition factor would increase the Plan's opening balance liability by $1,672,400,100, an

increase of 88.7%.  Ex. D.51; Ex. D.62 at VZ27114-323.

300.    Document VZ27119–323 represents a true and correct statement of the opening balances calculated for each participant under the Cash Balance Plan and the amount of each participant's opening balance had the actual plan language been used.

**Response:**    No dispute.

301.    In terms of dollars per years of service to Bell Atlantic, using the actual Plan language would increase the Class members' benefits an average of $5,886.19 per year of service. (VZ27114–323.)

**Response:**      Disputed.  Plaintiff does not explain how she performs this calculation, but she appears to divide the aggregate opening balance increase if the second transition factor were applied to all 13,784 members of subclass 1 and subclass 2 by the combined service of those 13,784 class members as of December 31, 1995.  Ex. D.62 at VZ27114-323.  So performed, the calculation substantially overstates the denominator by including over 2,000 participants who were service pension eligible on the transition date, and did not have their opening balances calculated under § 16.5.1(a)(2).  *Id.*

302.    In terms of an increase to their average yearly salary and benefits (total compensation package), using the actual Plan language would increase the Class members' benefits an average of 9.8%. (*Id.*)

**Response:**      Disputed.  Plaintiff does not explain how she performs this calculation but, among other problems, the calculation is presumably flawed by plaintiff's failure to use the correct denominator, as in her prior calculations.

303.    As of July 1997, Bell Atlantic's pension benefit equaled 4.5% of the employees' pay. (VZ20863.)

**Response:**      No dispute that a July 18, 1997 Bell Atlantic presentation states that the company's average annual pension contribution for all employees – associates and managers – was 4.5% of the employees' pay.  *See* VZ20863.  Disputed to the extent plaintiff suggests that a Bell Atlantic employee's pension benefit upon retirement was only 4.5% of the employee's salary.

304.    As of January 1, 1998, the Cash Balance Plan had a surplus of $2.3 billion. (Bell Atlantic Cash Balance Plan Form 5500.) Based on market value, assets exceeded all accrued benefits by more than 42%. (VZ20052.)

**Response:**      No dispute that as of January 1, 1998, the market value of the Plan's assets exceeded the present value of the Plan's accrued benefits by approximately $2.3 billion, or 42%.  *See* VZ20052.  Disputed to the extent that plaintiff characterizes this as a

surplus.  As of January 1, 1996, the market value of the Plan's assets exceeded the present value

of the Plan's accrued benefits by approximately $992 million, or 17%.  *Id.*  As of December 31,

2008, the market value of the Plan's assets is approximated $2 billion *less* than the present value

of the Plan's accrued benefits.  *See* Ex. D.69 at VZ26893.  In other words, the Plan is

*underfunded* by approximately $2 billion, or 20%.  *Id.*; Ex. D.61 at 59:6-10.

305.    Defined benefits plans of other large corporations carry at least as much
pension liability as the Cash Balance Plan would have under a plain language reading of §
16.5.1(a)(2). *See* Financial Week, The List: Funded Status of Largest Defined Benefit Plans,
June 16, 2008,
http://www.financialweek.com/apps/pbcs.dll/article?AID=/20080616/CHARTWIDE/25934088;
Pensions & Investments Online, *Funded Status of Largest Defined Benefit Plans*, June 9, 2008,
http://www.pionline.com/apps/pbcs.dll/article?AID=/20080609/CHART/609757873/1019/reg&t
emplate=printart).

**Response:**    No dispute that the data referenced by plaintiff indicates that only

six corporations – General Motors, AT&T, IBM, Boeing, Ford, and General Electric – carried a

larger benefit obligation than Verizon as of December 31, 2007.  Disputed to the extent that

plaintiff seeks to compare Bell Atlantic's pension liability as of January 1, 1996 (or January 1,

1998) to the current pension liability of "other large corporations."

### (12)    Lost evidence

306.    Defendants have produced all documents still in existence from their law
firms, consultants, and employees related to the elimination of the second transition factor from
the 1998 Plan. (Hr'g Tr., Nov. 28, 2007, at 43:2–18.)

**Response:**    Disputed.  The 1998 Plan correctly stated that the transition factor

was multiplied once in the opening balance calculation, as Bell Atlantic always intended and

consistently advised participants.  Defendants have produced documents and tesitimony

explaining how the 1998 Plan was drafted and, in particular, that the provision in the 1996 and

1997 Plans containing the mistaken second reference was not copied, and therefore was not

inadvertently included in, the 1998 Plan.

307.    Moreen testified that Mercer probably created more documents during the plan design process than what was produced. (Moreen Dep. at 129.) He also testified that it is "certainly safe to assume" that e-mails were lost (*id.* at 129–30) and that not every e-mail from Bell Atlantic employees to Mercer employees was printed out and saved (*id.* at 208).

**Response:**    No dispute as to the first sentence.  No dispute as to the second sentence to the extent Moreen testified that it is "certainly safe to assume" that not every e-mail sent between Mercer employees and between Mercer and Bell Atlantic employees in the mid-1990's has been saved to the present day. Ex. D.54 at 129:17-24.  Mercer produced over 32,000 pages of documents related to its work on the Bell Atlantic cash balance transition.

308.    Peters testified that his memory of events in 1994, 1998 has eroded (Peters Dep. I at 38), and as a result relevant evidence in form of witness testimony has been lost.

**Response:**    Disputed that Peters' memory of the relevant events is deficient. Among other facts, Peters has a clear recollection of that Bell Atlantic at all times intended that the transition factor be multiplied only once; that he performed the drafting revision and inadvertently failed to delete the second, dangling reference to the transition factor; the drafting process that led to the 1998 plan "cloning language from the NYNEX/Bell Atlantic North plan, which contained no error; and that no one ever brought the error to his attention until after plaintiff asserted her claim.  No dispute that Peters remembered certain events that occurred in the 1990's more clearly at that time than he does now.

309.    Robert Moreen was the Mercer partner in charge of the Bell Atlantic conversion. Moreen's memory of his involvement with the cash balance plan was "[c]ertainly worse" at the time of his deposition than it was in 1994 and worse even than it was ten years before in 1997. (Moreen Dep. at 49–50.)

**Response:**    Disputed that Moreen's memory of the relevant facts is deficient. Moreen has a clear recollection that in all the work that he and others performed at Mercer in connection with the development of the opening balance formula, no consideration was ever given to multiplying the transition factor twice, and doing so would undercut the objectives that

108

guided Mercer's work in developing the formula. No dispute that Moreen's memory of certain

events in 1994 and 1997 is not as good today than it was in 1994 and 1997.

310.    On sixty separate occasions during his deposition, Abramowitz could not
recall what happened in regards to various aspects of drafting the Plan. These included basic
matters such as the scope of his representation of Bell Atlantic, what he was responsible for
during the drafting of the Plan, what his various team members did in regards to the Plan, what
work he performed in regards to key sections of the Plan, whether he was asked to look at § 16,
or any matters related to the *Corcoran* litigation, despite being the responsible attorney for that
matter. (*See* Abramowitz Dep.)

**Response:**    No dispute that Abramowitz had very little recollection of the work

he performed on this assignment for this client more than 10 years ago.

311.    E-mails were regularly sent regarding the design and drafting of the Cash
Balance Plan in 1996, 1997, and 1998, and many of those emails have been lost or destroyed
since the time of their creation and the time that Plaintiff filed her lawsuit. (*E.g.*, VZ10718.)

**Response:**    Disputed that e-mails were regularly sent regarding the design and

drafting of the Cash Balance Plan. Although e-mails were sent regarding the design and drafting

of the Plan, e-mail was not the regular form of communication between Bell Atlantic, Morgan

Lewis, Mercer, and other parties involved in the design and drafting process. Ex. D.54 at 208:4-

16. Paper copies of many of the e-mails sent regarding the design and drafting of the Plan were

produced in this litigation.

312.    Between 1995 and 1999, Bell Atlantic used a Novell network operating
system, and used cc:Mail, a distributed system for e-mail. (Letter from Gus Sandstrom to
Matthew Heffner, Jan. 9, 2008.)

**Response:**    No dispute.

313.    Between 1995 and 1999, Bell Atlantic's corporate policy was to retain cc:
Mail messages for 30 days. (Letter from Gus Sandstrom to Matthew Heffner, Jan. 9, 2008.)
Thereafter, Bell Atlantic would delete e-mail from its system to preserve server storage space.
(*Id.*) System backups were performed by local administrative teams, using Maynard Systems
software. (*Id.*) Bell Atlantic's corporate policy was to rotate backup tapes daily, and to maintain
those tapes for three months; thereafter, Bell Atlantic would re-rotate each backup tape into
service and overwrite any previously stored information. (*Id.*)

**Response:**    No dispute.

314. Starting in 1998, Bell Atlantic transitioned its corporate email to Lotus Notes. (Letter from Gus Sandstrom to Matthew Heffner, Jan. 9, 2008.) Initially, Bell Atlantic did not limit the retention period for Lotus Notes. (*Id.*) But, due to storage space issues with Bell Atlantic's servers, the company instituted a 60-day retention period in early 2001. (*Id.*) Upon implementing the 60-day retention period, Bell Atlantic created a complete tape of backup of its e-mail system; that back-up was retained for two years and was subsequently destroyed. (*Id.*) Subsequent backup tapes were initially retained for 30 days before destruction; that retention period was later reduced to 14 days. (*Id.*)

> **Response:** No dispute.

315. Verizon ~~did not~~ <u>does not have any information regarding any Bell Atlantic policy or procedure to</u> save any employee's computer hard drives during the period between 1995 and 2000. (Letter from Gus Sandstrom to Matthew Heffner, Jan. 9, 2008.) Verizon also stated that it does not have any information suggesting that Bell Atlantic maintained any policy or procedure requiring backup of employees' computer hard drives during that period. (*Id.*)

> **Response:** No dispute, as modified above.

316. Verizon's Records Retention Schedule requires "[p]ermanent" retention of records regarding "Employee Benefit Files," which covers "[r]ecords related to employee benefits," including "pension information and benefits calculations . . . ." (VZ20285.)

> **Response:** No dispute. Bell Atlantic's Corporate Records Retention Schedule required that "Pension Records" be retained in office for the active life of the record, and be retained in inactive storage for six years after the active life of the record.

317. Verizon's Records Retention Schedule requires "[p]ermanent" retention of records regarding "Employee Benefit Plans," which covers "[p]lans showing the benefits provided to employees under various categories of benefits," including "pension plans . . . ." (VZ20285.)

> **Response:** No dispute. Bell Atlantic's Corporate Records Retention Schedule required that "Pension Records" be retained in the office for the active life of the record, and be retained in inactive storage for six years after the active life of the record.

318. Verizon's Records Retention Schedule requires "[p]ermanent" retention of records regarding "Pension Plan–Government Filings," which covers "[r]ecords showing the status and condition of pension funds, submitted to government regulatory authorities under [ERISA] (Form 5500)." (VZ20285.)

**Response:**    Disputed.  Verizon's Records Retention Schedule requires that

"Pension Plan - Government Filings" be retained for the "Current Year + 6," meaning that

records must be retained for six years after the record is created.  Ex. D.83 at VZ20261,

VZ20285.


Respectfully submitted,

Defendants Verizon's Bell Atlantic Cash
Balance Plan and Verizon Communications Inc.

By:    /s/ Abigail A. Clapp _____
James G. Richmond (620637)
Abigail A. Clapp (6269540)
Greenberg Traurig, LLP
77 West Wacker Drive, Ste. 2500
Chicago, IL  60601
Tel. (312) 456-8400
Fax (312) 456-8435

Jeffrey G. Huvelle (admitted *pro hac vice*)
Frederick G. Sandstrom (6278816)
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington, DC  20004
Tel. (202) 662-6000
Dated:  June 22, 2009                 Fax (202) 662-6291

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 22, 2009, I served the foregoing Defendants' Response to

Plaintiff's Proposed Findings of Fact on plaintiff's attorneys of record in this case.

/s/ Abigail A. Clapp
Abigail A. Clapp