# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA N. YOUNG, on behalf of herself, and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 05 C 7314 |
| v. | ) ) | Magistrate Judge Morton Denlow |
| VERIZON'S BELL ATLANTIC CASH BALANCE PLAN, formerly known as Bell Atlantic Cash Balance Plan, formerly known as Bell Atlantic Management Pension Plan, and VERIZON COMMUNICATIONS, INC., as successor in interest to Bell Atlantic Corporation, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This ERISA class action presents the issue of whether a billion dollar scrivener's error should be reformed or enforced as written. Plaintiff Cynthia N. Young ("Plaintiff" or "Young") alleges that Defendants Verizon's Bell Atlantic Cash Balance Plan (the "Plan") and Verizon Communications, Inc. ("Verizon") (collectively "Defendants") improperly calculated her pension benefits, and those of similarly situated employees. Plaintiff seeks judicial review of the final decision of the Plan Administrator denying her claims for additional benefits. In their counterclaim, Defendants seek reformation of the Plan to correct an alleged scrivener's error.

This Court previously considered these issues applying a deferential standard of review to the Plan administrators' decisions to deny Plaintiff's claims based upon the administrative record. *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 575 F.Supp. 2d 892 (N.D. Ill. 2008). ("Phase I Trial.")  Because this case raises novel issues under ERISA and will likely proceed to the Seventh Circuit Court of Appeals, the Court now reviews these issues applying a *de novo* standard of review, while permitting the parties to introduce additional evidence.  It is the Court's intention to decide all issues in such a way that the reviewing court can finally resolve the case without the necessity for a later remand.

The Court conducted a second trial on September 1 and 2, 2009 and heard closing arguments on October 5, 2009.  ("Phase II Trial.") The Court has carefully considered the testimony of the two witnesses who testified at the trial, the deposition excerpts of the witnesses included in the parties' exhibits, the parties' trial exhibits, the parties' agreed statement of facts, the parties' proposed findings of fact and conclusions of law, the parties' briefs and the closing arguments of counsel.

The following constitute the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.  To the extent certain findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law.  Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings of fact.

# I. ISSUES PRESENTED

1.     Whether the Defendants properly used an interest rate of 120% of the PBGC rate, rather than 100% of the PBGC rate, in calculating Plaintiff's opening balance ("Discount Rate Issue").

ANSWER:     Yes.

2.     Whether there was a scrivener's error in Plan § 16.5.1(a)(2) by reason of a second reference to the transition factor in the calculation of the opening balance ("Transition Factor Issue").

ANSWER:     Yes.

3.     Whether the Defendants are entitled to reformation of the Plan to eliminate the second reference to the transition factor in Plan § 16.5.1(a)(2).

ANSWER:     Yes.

4.     Whether Plaintiff's claims are barred by the statute of limitations.

ANSWER:     No.

5.     Whether Defendants' claims are barred by the statute of limitations.

ANSWER:     No.

## II. FINDINGS OF FACT

**A.      The Parties.**

1.      Plaintiff Cynthia N. Young is the Class representative for the Class in this action.  AG ¶ 1.[1]  She testified by means of a deposition. (DX 58.)

2.      Young worked at Bell Atlantic (or one of its acquired subsidiaries) from 1965 through 1997.  During the course of her career, she was a telephone operator, service representative, administrative assistant, communications representative, assistant manager, and manager, and she finished her career as a project manager.  AG ¶ 2.

3.      Young was a participant in a series of defined benefit pension plans, including the Bell Atlantic Management Pension Plan ("BAMPP"), and then the 1996 and 1997 Bell Atlantic Cash Balance Plan ("Cash Balance Plan").  Young retired in 1997 when the 1997 Bell Atlantic Cash Balance Plan was the operative plan and received a lump-sum payment of her benefit on February 2, 1998, in the amount of $286,094.89. AG ¶ 3.

4.      Young later received another payment of $9,558.70 related to her participation in the Cash Balance Plan due to a settlement by the Plan with the Equal Employment Opportunity Commission ("EEOC").  AG ¶ 4.

5.      Defendant Verizon Communications, Inc. ("Verizon") is a Delaware

---

[1]The Parties' Agreed Statement of Facts (hereinafter, "AG ¶ ___") (Dkt. 178.) References to "PX __" and "DX __" are references to Plaintiff's and Defendants' trial exhibits, respectively.  The parties prepared a Joint Index of Trial Exhibits with cross references to Bates numbers. (Dkt. 186.)  Reference to "Dkt. __" are references to docket entries.  References to "T. __" are references to the September 1 and 2, 2009 trial transcript.  The Court has provided selected citations to the factual record.  These are intended to be representative citations and there may be other factual support in the record that is not specifically cited.

corporation with its principal place of business in Basking Ridge, New Jersey. Verizon is the successor-in-interest to Bell Atlantic Corporation ("Bell Atlantic"). Bell Atlantic was one of seven regional telephone operating companies created on January 1, 1984 as a result of the divestiture of AT&T. It represented one of 22 local operating companies that AT&T owned and served the northern Atlantic states. Bell Atlantic was headquartered in Philadelphia and consisted of telephone companies in Pennsylvania, New Jersey, Delaware, Maryland, Virginia, West Virginia and the District of Columbia. An agreement to merge Bell Atlantic and NYNEX, the regional telephone operating company for New York and New England, was announced in April 1996 and became final on August 14, 1997. The combined company took the name of Bell Atlantic, with headquarters in New York City and a workforce of 130,000 employees. On July 27, 1998, Bell Atlantic announced an agreement to merge with GTE, and this merger was effective on June 30, 2000, with the new company taking the name of Verizon Communications, Inc. AG ¶ 5.

6.     The merger of Bell Atlantic and NYNEX, and the subsequent merger of Bell Atlantic and GTE, were both large mergers. Bell Atlantic after the first merger and Verizon after the second merger amended their numerous benefit plans, including pension plans and a variety of welfare plans. Bell Atlantic/Verizon implemented these two major mergers and transformed its business from regional telephone operations to a leading provider of national and international wireless telephone and high-speed internet services. AG ¶ 6.

7.     Verizon is "both the plan sponsor and the plan's administrator." *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 575 F. Supp. 2d 892, 907 (N.D. Ill. 2008). AG

¶ 6. In 2008, Verizon earned $6.4 billion in profits on revenues of $97.4 billion. (PX 204 and 205.)

**B.      The Class.**

8.      The parties stipulated to the treatment of this action as a class action. On January 16, 2007, the Court certified a Class pursuant to Rule 23, Fed. R. Civ. P., with two subclasses. AG ¶ 8; Dkt. 61.

9.      Subclass 1 is defined as follows:

> All participants in the Bell Atlantic Management Pension Plan whose opening balances for the Bell Atlantic Cash Balance Plan were purportedly calculated using section 16.5.1 of the Bell Atlantic Cash Balance Plan and using 120% of the applicable PBGC rate.

Dkt. 61.

10.      The class claim associated with Subclass 1 (hereinafter called the "Discount Rate Issue") is defined as follows:

> Whether, in determining the benefits afforded by the Bell Atlantic Cash Balance Plan to the plaintiff and the Class, it was improper to use 120% of the applicable PBGC interest rate when calculating the "opening balances," and, if proper, the remedy therefor.

Dkt. 61.

11.    Subclass 2 is defined as follows:

All participants in the Bell Atlantic Management Pension Plan whose opening balances for the Bell Atlantic Cash Balance Plan were purportedly calculated using section 16.5.1(a)(2) of the Bell Atlantic Cash Balance Plan.

Dkt. 61

12.    The class claim associated with Subclass 2 (hereinafter called the "Transition Factor Issue") is defined as follows:

Whether, in determining the benefits afforded by the Bell Atlantic Cash Balance Plan to plaintiff and the Class, it was proper to apply the cash balance transition factor found in Table 1 of Section 16 of the Cash Balance Plan once rather than twice when calculating the "opening balances," and if improper, the remedy therefor.

Dkt. 61.

13.    Young is the class representative for both Subclasses, which taken together are referred to as the "Class." The Class, consisting of both Subclasses, includes approximately 13,784 former and current management employees of Bell Atlantic and later Verizon. AG ¶ 13.

**C.    The Pension Plans and the Transition to the Cash Balance Plan.**

14.    The Verizon Management Pension Plan is the successor plan to Verizon's Bell Atlantic Cash Balance Plan. (PX 206 at VZ432.) Verizon's Bell Atlantic Cash Balance Plan was the successor plan to the Bell Atlantic Cash Balance Plan (the foregoing are hereinafter referred to as the "Cash Balance Plan" or the "Plan"). The Bell Atlantic Cash Balance Plan is the successor plan to the Bell Atlantic Management Pension Plan ("BAMPP"). (DX 18

at VZ1053).  All of these plans are defined benefit pension plans as defined by ERISA.  The effective dates of these plans were as follows:

- BAMPP - for decades prior to December 31, 1995

- Bell Atlantic Cash Balance Plan 7/6/96 - effective 12/31/95

- Bell Atlantic Cash Balance Plan 9/3/07 Restatement - effective 12/31/95

- Bell Atlantic Cash Balance Plan - 10/8/98 - effective 1/1/98

- Bell Atlantic Cash Balance Plan 7/6/99 - effective 1/1/98

- Merged Bell Atlantic & Bell Atlantic-North Plan 12/1/99 - effective 1/1/99

- Verizon's Bell Atlantic Cash Balance Plan 12/31/01 - effective 1/1/99

- Verizon Management Pension Plan 1/1/02 - effective 1/1/02

15.     This litigation principally involves the events surrounding the adoption and completion of the Bell Atlantic Cash Balance Plan on July 6, 1996 to replace the BAMPP effective December 31, 1995.

**D.     Benefits Under the BAMPP**.

16.     The BAMPP was the principal pension plan that applied to non-union management employees of Bell Atlantic.  (T.81.)  Salaried management employees of Bell Atlantic participated in the BAMPP, a defined benefit pension plan, for decades until December 31, 1995.  A participant's benefit under the BAMPP was expressed in the form of an annuity commencing at age 65.  The BAMPP provided that participants who attained specified age and service levels were eligible for a "Service Pension."  (DX 17, BAMPP §§ 4.2-4.3, at VZ110–12.)  The Service Pension permitted an eligible participant to begin

receiving an annuity before age 65 without a full actuarial reduction to reflect the early commencement of the participant's pension. (*Id.*, BAMPP § 4.3, at VZ111–12.) AG ¶ 14.

17. The BAMPP was structured to provide a very significant increase in the value of the benefit once a participant reached a long-term service point, referred to as a "cliff," which gave an incentive for employees to spend their entire careers with the company. (T. 81.) This took place when the participant became eligible for a Service Pension. (DX 17, BAMPP §§ 4.2-4.4, at VZ 110-13; DX 1 at VZ 10391).

18. Although a participant's retirement benefit was traditionally paid as an annuity, the BAMPP also included certain "windows," during which participants could elect to receive their retirement benefits in the form of a one-time lump sum payment, instead of the traditional annuity. (DX 17 at VZ130–32 & VZ133–35, BAMPP §§ 4.16, 4.19.) AG ¶ 15.

**E.     Use of Pension Benefit Guaranty Corporation ("PBGC") Interest Rate.**

19. Section 4.19 of the BAMPP was one such cash-out "window." It provided for a lump-sum payment (and an accompanying method to calculate that lump-sum) to any vested participant who was an "Active Participant on his Severance from Service Date which occurs on or after December 31,1993 and prior to December 31, 1995." (DX 17 at VZ133.)

20.     The lump-sum formula for those who retired between December 31, 1993, and December 30, 1995 was as follows:

(2)     Lump-sum Form of Payment.

(A)     Service Pension Cash-Outs.  The lump-sum payable to a Window-Eligible Employee who is eligible for a Normal or Early Retirement Service Pension shall equal the Actuarial Equivalent present value (calculated using the assumptions in subsection (c)(2)(C)) of the Service Pension otherwise payable to the Participant in the Normal Form commencing on his Annuity Startign Date, as determined under the provisions of the Plan other than this Section 4.19.

(B)     Deferred Vested Pension Cash-Outs.  The lump-sum payable to a Window-Eligible Employee who is eligible for a Deferred Vested Pension shall equal the Actuarial Equivalent present value (calculated using the assumptions in subsection (c)(2)(C)) of the Deferred Vested Pension otherwise payable to the Participant in the Normal Form commencing at Normal Retirement Age (or age at Severance from Service Date, if later), as determined under the provisions of the Plan other than this Section 4.19.

(DX 17 at VZ134.)

21.     Section 4.19 of the BAMPP uses three assumptions for determining a lump-sum cashout value (DX 17 at VZ134):

(a)     The discount rate is 120% of the "PBGC interest rate in effect on the last day of the calendar month immediately preceding the first month of the calendar quarter in which the Severance from Service Date occurs." (DX 17 at VZ134-35);

(b)     A participant's expected life span is determined using the "Non-Insured Unisex Pension 1984 (UP84) Mortality Table." (DX 17 at VZ135); and

(c)     A participant's age is to be "years, months and days . . . measured as of the 15th day of the middle of the month of the calendar quarter containing the Severance from Service Date, and that age shall be rounded down to a number of whole months." (*Id*.)

22.     The Court incorporates by reference its discussion of the background facts to the selection of the appropriate Pension Benefit Guaranty Corporation ("PBGC") interest rate ("Discount Rate Issue") from its prior decision. *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 575 F.Supp. 2d 892 at 899-903.

23.     Bell Atlantic consistently applied the same PBGC formula under the BAMPP to determine the actuarial equivalent amount, namely "using 120% (or 100% if your cashout is under $25,000) of the Pension Benefit Guaranty Corporation (PBGC) rates that were in effect ..." (T. 170; DX 70 at VZ10374 for 1993; DX 71 at VZ10380 for the 1994-95 Cashout Option Period.)

24.     In converting the BAMPP to the Cash Balance Plan, Bell Atlantic communicated to its participants that it would continue to use the "same conversion method used in calculating a cashout payment under the old plan." (DX 1 at VZ10392.) Bell Atlantic sent Estimated Opening Account Balance Statements to each participant in the Cash Balance Plan, which explained in Step 2:

> Step 2: Your accrued benefit is converted to a lump-sum value applying the same method used today to determine lump-sum cashouts and is based on the PBGC interest rate of 5%.

(DX 11 at VZ10476.)

25.     The Cash Balance Plan planning documents also reveal an intention to use the

same PBGC methodology as before.  In the September 26, 1995 memo from Rob Maienshein at Mercer Human Resources Consulting ("Mercer") to Bell Atlantic, he explains: "The beginning account balance as of 1/1/96 will be determined using the lump-sum cashout value of accrued benefits based on the PBGC graded rate structure with an immediate rate of 5.0% (120% of the rate structure will be used for cashout values over $25,000) and the UP-84 mortality table."  (DX 5 at VZ10229.  See also, 9/27/95 memo from Maienshein, DX 6 at MER4684; 10/22/96 memo from Maienshein, DX 7 at MER4806.)

26.    This formula was consistently applied thereafter.  In a memo from Robert Moreen ("Moreen"), the Mercer Partner in charge of the Bell Atlantic assignment, dated November 14, 1997, he reviews the three steps in calculating the initial account balances in the Cash Balance Plan.  At step two, he explains: "Determine the lump-sum value of the accrued benefit as of December 31, 1995, using interest (5% PBGC rates, including 120% rates) and mortality (UP-84) assumptions, and calculation procedures, established for use in lump-sum payments from the [BAMPP]."  (DX 8 at VZ13307; PX 54 at 238-39.)  Moreen testified by means of a deposition. (PX 54.)

27.    This formula was made more explicit in the 1998 Cash Balance Plan adopted on October 8, 1998.  (DX 31 at 11712-13.) (". . . and using the deferred PBGC rates for individuals who were not then eligible for a Service Pension or 120% of the PBGC rate if the present value, using the PBGC rate, is $25,000 or more.")  This clarifying language also appeared in the April 22, 1998 draft of the 1998 Cash Balance Plan.  (PX 471 at MLB 547; T. 162 - 63.)

**F.     The Development of the Transition Factors.**

28.     In 1994, Bell Atlantic began to consider a new pension plan design.  (T. 82.)
Bell Atlantic hired Mercer to start from scratch, analyze the current Plan, and come up with
a new plan that "employees could believe in and is fair."  (T. 83.)  Mercer worked with the
Bell Atlantic design team to interview employees, conduct focus groups and to perform an
immense amount of statistical analysis to help design a plan consistent with Bell Atlantic's
new business model.  (T. 83-84.)  Mercer ultimately recommended a cash balance plan with
gradually and predictably increasing values, thereby eliminating the "cliffs" present in the
BAMPP.  (T. 84-85.)  One of the big challenges facing Bell Atlantic was to develop a
transition formula  to fairly treat participants in the BAMPP as they were transitioned to the
Cash Balance Plan.  (T. 85-87.)

29.     Mercer assisted in developing the cash balance formula, including the formula
for establishing the opening balances of participants who had previously earned pension
benefits under the BAMPP.  (T.83-86; DX 54 at 30.)  Mercer also assisted in preparing the
specifications for the calculation of the opening balances.  Coopers & Lybrand was retained
by Bell Atlantic to perform the opening balance calculations. (DX 54 at 102-03, 135-36.)
AG ¶ 22.

30. On September 26, 1995, Mercer submitted a memorandum to Bell Atlantic, which included a copy of the plan's transition factor table and a 15-year projection of liabilities. (DX 5, DX 54 at 213–26.) AG ¶ 23. The projected liabilities were based on the transition factor being multiplied once, not twice. (DX 54 at 243-44). Mercer's cover memorandum submitting its final recommendation for the Cash Balance Plan explained that the transition factor was to be multiplied only once by the lump-sum cashout value:

> The following items should be noted about the calculation of initial cash balance accounts as of January 1, 1996 using the attached recommended final transition tables:
>
> *    *    *
>
> The lump sum cash out value is then multiplied by the transition factor provided on the attached transition tables to calculate the actual opening balance under the cash balance plan.

(DX 5 at VZ 10229; T. 88-89.) The projected liabilities were predicated on multiplying the transition factor only once. *(Id.)*

31. On September 27, 1995, Mercer sent Coopers & Lybrand the specifications to calculate the opening balances as of December 31, 1995. (DX 6 at MER4684-85; DX 54 at 102–112, 221–228.) AG ¶ 24. Those specifications provided for multiplying the lump-sum cashout value times the transition factor only once, not twice. *(Id.)*

32. The transition factors in the table attached to Mercer's September 26, 1995 memorandum to Bell Atlantic and its September 27 memorandum to Coopers & Lybrand were the same ones used to calculate the actual opening balances in January 1996 and the

same ones contained in the tables attached to the July 1996 Cash Balance Plan. (Compare DX 18, 1996 Plan Art. 16, at VZ 1102-03 with DX 5 at VZ 10233-34 and DX 6 at MER 4686-87.) These documents and the related testimony by Moreen, the Mercer Partner in charge of the Bell Atlantic engagement, and Barry Peters, the in-house counsel responsible for drafting the Cash Balance Plan, fully support a finding that Defendants intended to multiply the transition factor only once. (DX 54 at 234-44; T. 88-89.)

33. Mercer created two additional memoranda, dated October 22, 1996, and November 14, 1997, relating to and describing the methodology that had been used to calculate opening balances. (DX 7, DX 8.) AG ¶ 25. Mercer's description confirmed its continued understanding that the lump-sum cash-out value under the BAMPP had been multiplied only once by the transition factor. (*Id*.; DX 54 at 234-44.)

34. According to Moreen, during the development of the Cash Balance formula, "the idea of multiplying twice by the transition factor was never once discussed." (DX 54 at 105-06, 125, 243-44.)

35. Multiplying the lump-sum cashout value by the transition factor twice would have "vitiated" the goals that guided the construction of the transition factor table because it would have given participants benefits that were far more valuable than the benefits they could have earned under the BAMPP. (*Id*., DX 54 at 230-32.) On October 22, 1996, Mercer provided Bell Atlantic with a detailed explanation of how the transition multipliers were developed. (DX 7.) Mercer begins the explanation as follows:

the Transition Multipliers were developed in order to provide a

> smooth transition between the ultimate retirement benefit level
> of the old Bell Atlantic Management Pension Plan (BAMPP)
> and the new Bell Atlantic Cash Balance Plan. The Multipliers
> were developed to be applied to the 12/31/95 lump sum value of
> the BAMPP accrued benefit producing the opening account
> balance under the Cash Balance Account.

(*Id.* at MER 4806; DX 54 at 232-37.)

## G. The Corporate Approval of the Cash Balance Plan Design.

36.     Bell Atlantic's Corporate Employee Benefits Committee ("CEBC") adopted a resolution in October 1995 authorizing the transition from the BAMPP to the Cash Balance Plan. (DX 3.) AG ¶ 26. The resolution specified that a participant's opening balance in the Plan would equal "the product of the cashout value of the participant's accrued benefit on the Effective Date (determined under the existing rules of BAMPP as of 12/31/95) times a transition factor (greater than or equal to 1.0) according to the table presented to this meeting..." (DX 4 at VZ 1039.) The table presented at the meeting was the Transition Factor table submitted by Mercer in September 1995. (DX 5 at VZ10233-34.)

37.     In November 1995 the Human Resources Committee ("HRC") of Bell Atlantic's Board of Directors approved the amendment of the BAMPP, effective December 31, 1995, to create the Cash Balance Plan. (DX 4.) AG ¶ 27.

## H. Pre-Conversion Communications to Participants.

38.     Bell Atlantic clearly and consistently communicated to its employees that the transition factor would be multiplied only once in establishing the employees' opening balances.

16

39.     In or around October 1995, Bell Atlantic created a communication plan relating to the Cash Balance Plan. (PX 431, VZ10534-36.) AG ¶ 28. One of the objectives of the communications plan was to "provide clear understanding of the plan design provisions, while placing special emphasis on the plan's transition features." (PX 431 at VZ10534). The communications plan also called for all management employees who were participants as of 1/1/96 to receive a retirement planning guide in March 1996 "to show employees their plan balances as of 12/31/95." (*Id*. at 10535).

40.     In October 1995, Bell Atlantic sent all BAMPP participants a brochure entitled "Introducing Your Cash Balance Plan." (DX 1.) AG ¶ 29. The brochure contains a graph to show the differece between the BAMPP with its "cliff" and the Cash Balance Plan, which provides steadily growing benefits. (DX 1 at VZ10391.) The brochure described the provisions of the new cash balance formula, including the formula for calculating the opening balances of participants who had earned pension entitlements under the BAMPP. (DX 1.) "Introducing Your Cash Balance Plan" constituted a Summary of Material Modifications ("SMM") under ERISA § 104(b)(1) and 29 C.F.R. § 2520.104b-3 (2009) because it described material changes in the plan and was "written in a manner calculated to be understood by the average plan participant." The document was intended to be a SMM and was designed to accurately and visually communicate the summary of changes to the Plan participants. (T. 102-105, 182). The SMM used the following formula to show how a participant's lump-sum cashout benefit under the BAMPP would be converted to the opening balance under the new Cash Balance Plan:

| OLD PLAN LUMP SUM VALUE | X | TRANSITION MULTIPLIER | = | OPENING ACCOUNT BALANCE |
|---|---|---|---|---|

(DX1 at VZ10392.)  The SMM also explained the benefit conversion in words:

> Step 1:  Your current pension benefit will be calculated based on your age, service and pay as of December 31, 1995.
>
> Step 2:  Next, your current benefit will be converted to a lump-sum cash-out value, using the same conversion method used in calculating a cash-out payment under the old plan. . . .
>
> Step 3:  Finally, to make sure the new Plan continues to provide you with a fair benefit, your account balance may be increased by multiplying the lump-sum cash-out value determined in Step 2 times a special transition multiplier to arrive at your opening account balance.

(*Id*.)  The terms "lump-sum cash out" and "transition multiplier" were defined in the SMM as follows:

> Lump-Sum Cash Out.
>
> Full payment of the value of your cash balance account at one time.
>
> Transition Multiplier.
>
> A number used to figure your opening account balance in the Cash Balance Plan on January 1, 1996.  This number is based on your age and service.  Your multiplier may increase your initial account balance to ensure equitable treatment during the transition to the Cash Balace Plan.

(*Id*. at 10386.)

41.  The SMM provided hypothetical examples of the impact of "the transition

multiplier" on Plan participants. (DX 1 at VZ10393-94.) One example, "Alison," was a 47 year-old employee with 27 years of Bell Atlantic service on the conversion date. (*Id*. at VZ10394.) The SMM explained:

> Her transition multiplier of 2.680 increases her opening account balance so that, together with future pay credits and interest credits, the gap between the old plan and the new Cash Balance Plan will be filled.

(*Id*.) If Bell Atlantic had intended to multiply the transition factor twice, "Alison's" transition multiplier would have been 7.1824 (2.68 x 2.68), not 2.68, and her opening balance would nearly triple.

42. The SMM also contained the following disclaimer in small print on the back page: "If there is any conflict between the Plan document and this brochure, the text of the Plan document is controlling." (*Id*. at VZ10396).

43. In letters to plan participants in October 1995, November 1995 and May 1996, Bell Atlantic repeatedly instructed participants to "please be sure to read" and "please refer to" the SMM, "Introducing Your Cash Balance Plan" (which Bell Atlantic referred to as "the Cash Balance brochure"), for an accurate statement of the Plan's opening balance and transition factor provisions. (DX10 at VZ10553; DX11 at VZ10476; DX13 at VZ10519.) These documents also contained disclaimers that in the event there were discrepancies between these communications and the Plan, the Plan would govern. (DX11 at VZ10477; DX13 at VZ10490.)

44. In October 1995, Bell Atlantic prepared a video for BAMPP participants,

entitled "Changes," to describe the transition to the Cash Balance Plan. (DX 10.) AG ¶ 30.

In the video, Bell Atlantic explained that the participants would receive a statement with an

opening account balance and an explanation of how the transition factor applied to their

account. (*Id*. at VZ 10553.)

45. In November 1995, Bell Atlantic sent estimated "opening account balance"

statements to BAMPP participants. (DX 11.) AG ¶ 31. These statements provided each

participant with an estimate of his or her opening balance in the Cash Balance Plan, provided

a step-by-step description of the opening balance formula, and contained a table of the Plan's

transition factors. (*Id.* at VZ10475-76.) A sample statement for a 36-year, 9-month old

employee with 14 years and 3 months of service as of January 1, 1996 stated:

> STEP 1:
> Your monthly Age 65 Deferred Pension benefit as a Single Life
> Annuity estimated at 12/31/1995 is . . . . $1,520.
>
> STEP 2:
> Your monthly pension converted to a lump-sum cash-out value
> at 12/31/1995 is . . . . $35,812.
>
> STEP 3:
> Your lump-sum amount times your transition multiplier of 1.480
> is your Estimated Opening Account Balance. . . . $53,001.

(*Id.* at VZ10476.) The statement explains that the Step 2 calculation uses "the same method

used today to determine lump-sum cash outs and is based on the PBGC interest rate of 5%."

(*Id.*)

## I.      Implemention of the Cash Balance Plan as of January 1, 1996.

46. Bell Atlantic amended and restated the BAMPP effective December 31, 1995,

and changed its name to the "Bell Atlantic Cash Balance Plan." (DX 3, 4, 18). The Cash

Balance Plan expressed a participant's benefit as a lump-sum balance, to which pay and interest credits were added on a monthly basis. (DX 18, 1996 Plan Art. IV, at VZ1064–66.) AG ¶ 16. Upon severance from the company, a participant could receive his or her pension benefit as either a lump sum or an annuity. (*Id*., 1996 Plan, § 5.2, at VZ 1067-68). Bell Atlantic began implemention of the Cash Balance Plan as of January 1, 1996, however, the Plan document was not finalized until July 6, 1996.

47.    The Cash Balance Plan provided opening balances for each participant. Those opening balances were established for all 13,784 active BAMPP participants retroactive to January 1, 1996. (DX 62). AG ¶ 17. These included 2,271 participants who were already eligible for a Service Pension and 11,513 who were not eligible for a Service Pension. (DX 62). These opening balances were based on their pension entitlement earned under the BAMPP. (DX 18, 1996 Plan § 16.5 at VZ 1100-03; DX 1 at VZ 10392).

48.    All of the calculations were performed by multiplying the transition factor only once. Of the 11,513 participants not eligible for a Service Pension, 10,808 had transition factors greater than 1.000. Most of them–approximately 8,600–had transition factors of 1.5 or higher, and 4,750 had transition factors of 2.000 or higher. The 2,271 Service Pension eligible participants for whom opening balances were established included 762 with transition factors greater than 1.000. (DX51, DX62.)

49.    One variable in the calculation of opening balances was the annuity that participants had earned under the BAMPP. (DX 18, 1996 Plan § 16.5 at VZ1100-03; DX 1 at VZ10392). AG ¶ 18.

50.     The formula to establish the opening balance consisted of two steps: (1) calculating the lump-sum cashout value of the participant's annuity under the BAMPP; and (2) multiplying the lump-sum cashout value by a transition factor.  (DX 18, 1996 Plan § 16.5.1(a) at VZ 1100; DX 1 at VZ10392.)  The opening balances of the Cash Balance Plan participants thereafter grew through the addition of pay credits and interest credits.  (DX 18, 1996 Plan §§ 4.4-4.5 at VZ 1065; DX 1 at VZ10389-90.)

51.     The transition factors were designed so that participants who were close to reaching the age and service thresholds for a Service Pension under the BAMPP, and thus were expecting to see an upward spike in the value of their BAMPP accrued benefit, would receive a retirement benefit that approximated the expected cashout value of their Service Pension under the BAMPP.  (T. 83-87; DX 1 at VZ 1391-94;  DX 7 at MER 4806-09; DX 8 at VZ13307-08.)  Transition factors were carried to three decimal places and ranged from 1.000 to 3.105.  (DX 18, 1996 Plan Art. 16, at VZ 1102-03.)  The applicable transition factor depended on the participant's age and service.  (*Id.*)  Young participants with relatively little service had a transition factor of 1.000.  (*Id.*)  The closer a participant was to qualifying for a Service Pension under the BAMPP, the higher the participant's transition factor.  (*Id.*)  For participants 40-46 years old with 16-20 years of service, for example, the transition factors were as follows:

| YEARS OF SERVICE | | | | | |
|---|---|---|---|---|---|
| **AGE** | **16** | **17** | **18** | **19** | **20** |
| **40** | 1.589 | 1.620 | 1.657 | 1.675 | 1.714 |
| **41** | 1.596 | 1.629 | 1.665 | 1.686 | 1.697 |
| **42** | 1.603 | 1.637 | 1.674 | 1.697 | 1.710 |
| **43** | 1.610 | 1.646 | 1.682 | 1.708 | 1.724 |
| **44** | 1.618 | 1.655 | 1.691 | 1.719 | 1.737 |
| **45** | 1.625 | 1.664 | 1.699 | 1.730 | 1.751 |
| **46** | 1.632 | 1.672 | 1.707 | 1.741 | 1.764 |

(*Id.* at VZ 1102.) Most participants who had already become eligible for a Service Pension under the BAMPP, and had already experienced the upward spike in the value of their BAMPP accrued benefit, had a transition factor of 1.000. (*Id.* at VZ 1103.) Transition factors were carried to three decimal places and ranged from 1.000 to 3.105 depending on a participant's age and service. (DX 18, 1996 Plan Art. 16, at VZ1102–03.) AG ¶ 19.

52. Multiplying the transition factors twice, rather than once, for the participants who were not eligible for a Service Pension would have increased their opening balances by $1.67 billion. The opening balances of the 4,750 participants with transition factors greater than 2.000 would have been at least doubled, and in many cases nearly tripled, if their transition factors had been squared. More than 5,780 participants would have received increases in the opening balances of $100,000 or more – increases that would have given them opening balances that exceeded the opening balances of many of the 2,271 participants whose longer service or higher age had already qualified them for a Service Pension. (DX51, DX62.)

53. Young was a salaried employee of Bell Atlantic. As of January 1, 1996, Young

was approximately 48 years-old and had 27.8 years of Bell Atlantic net credited service. Her transition factor was 2.659.  (DX 14 at Y811.)  AG ¶ 20.

54.     The average Class member's years of service at Bell Atlantic as of year-end 1995 was 20 years.  (DX at VZ27114-323.)  AG ¶ 21.

**J.     Post-Conversion Employee Communications**.

55.     Following the conversion, Bell Atlantic and Verizon consistently communicated to the participants that the transition factor would be multiplied only once in determining the participant's opening account balance and the same BAMPP method for determining the lump-sum cash out value was being used in the Cash Balance Plan.

56.     In May 1996, Bell Atlantic provided each participant in the Cash Balance Plan with a customized retirement planning guide, "A Look at Your Future Today: Your Retirement Planning Guide."  (DX13.)   AG ¶ 32. This guide included a personalized "opening balance" statement setting forth each participant's actual opening balance calculation.  (*Id.* at VZ10519.)  These actual opening balance statements explained that each participant's lump sum cash-out value would be multiplied by the applicable transition factor only once.  (*Id.*)  The sample page further explains at Step 3: "Your account balance may have been increased by applying a transition multiplier to the lump-sum value of your pension benefit at 12/31/95.  Transition multipliers vary by age and service." (*Id.*)   The Retirement Planning Guide contained the following disclaimer: "If there are any discrepancies between the information in this guide and official Plan documents, the Plan documents will always govern."  (DX 13 at VZ10490.)

57.     Starting June 30, 1996, Bell Atlantic sent participants a quarterly statement that, among other information, set forth the participant's current balance in the cash balance plan.  (Eg., DX 15.)  AG ¶ 33.  By June 30, 1996, Bell Atlantic had completed more than 50,000 separate mailings to participants, each of which made clear that the lump-sum cash out was multiplied by the transition factor just once.  (DX1, DX11, DX13.)

58.     In August 1996, Bell Atlantic issued a summary plan description for the Cash Balance Plan as part of a document entitled "The Big Picture."  (PX 232 at 678-96.)

**K.     Communications to Plaintiff.**

59.     There is no evidence that the Plaintiff or any class member ever relied upon the transition factor being multiplied more than once in determining the participant's opening balance.  Prior to this litigation, no class member ever claimed the transition factor was to be multiplied more than once in determining their opening balance.

60.     Plaintiff does not assert that she ever reviewed or relied on the mistaken language in the 1996 and 1997 Plans.  She never looked at the Plans until 2008,

when her lawyers were preparing her for deposition, at which time she merely "glanced" at them.  (DX 58 at 84-87.)

61.     The 1996 version of the Cash Balance Plan, including appendices, was nearly 150 pages because the Appendix included the BAMPP.  ( DX17, DX18.)  Except in the event of a specific request by a Plan participant, Bell Atlantic did not distribute to participants the restated document containing the erroneous description of the § 16.5.1(a)(2) opening balance formula.  (DX9 at VZ10400.)  Although Bell Atlantic regularly provided participants with information on how to obtain a copy of the Plan, few requests were received for copies of the Plan document.  (DX67 at 11-12.)

62.     Plaintiff received from Bell Atlantic and retained in her personal files numerous communications plainly stating that her opening balance would be calculated based on a one-time multiplication by the transition factor.  (DX 58 at 28-46.)  One of the documents Plaintiff received, reviewed and kept in her files was the October 1995 SMM, "Introducing Your Cash Balance Plan."  (DX12.)  Plaintiff wrote her name on this document and kept it in her files for more than 10 years with other "important" documents relating to her employment.  (DX58 at 28-37.)

63.     Plaintiff also produced from her files the Estimated Opening Account Balance Statement ("Specially prepared for: Cynthia Young"), which was distributed in November 1995.  (DX12.)  This document explained the calculation of Plaintiff's opening balance as follows:

        STEP 1:

> Your monthly age 65 Deferred Pension benefit as a Single Life
> Annuity estimated at 12/31/95 is . . . $2,160.
>
> STEP 2:
> Your monthly pension converted to a lump-sum cash-out value
> at 12/31/95 is . . . $90,027.
>
> STEP 3:
> Your lump-sum amount times your transition multiplier of 2.659
> is your Estimated Opening Account Balance . . . $239,381.

(*Id.* at Y842.)

64.    Plaintiff produced from her files the May 1996 booklet, "A Look at Your Future Today," which was sent to her home and described the actual calculation of her opening account balance on January 1, 1996 as follows:

> STEP 1:
> Your monthly Age 65 Deferred Pension benefit as a Single Life
> Annuity at 12/31/95 was . . . $2,166.70.
>
> STEP 2:
> Your monthly pension converted to a lump-sum cash-out value
> at 12/31/95 was . . . $90,307.16
>
> STEP 3:
> Your lump-sum amount times your transition multiplier of 2.659
> is your Opening Account Balance on 1/1/96 . . . $240,126.74.

(DX14 at Y811; DX58 at 48-51).

65.    Plaintiff produced from her files the quarterly statements she received showing her Cash Balance Plan Account status at the start of each quarter and the amount it increased through pay and interest credits.  (DX15, DX58 at 56-57.)  Following her retirement, she cashed out her account in February 1998.  (DX 58 at 68, DX15, DX 64.)

66.    Squaring the transition factor would have produced balances far greater than

the amounts communicated to Plaintiff in November 1995, in May 1996, and quarterly from June 30, 1996 until she cashed out in early 1998.  Squaring the transition factor would have increased the estimated opening balance communicated to Plaintiff in November 1995 from $239,581 to $636,516.

**L.      The Actuarial Report.**

67.      The Plan actuary, Towers Perrin, prepared an actuarial report for the Cash Balance Plan in January 1997, in which Towers Perrin attempted to determine the Plan's liabilities and assets as of January 1, 1996.  (DX16.)  AG 51.  This report was based on the understanding that the Plan's opening balances for BAMPP participants were calculated by multiplying each participant's lump sum cash-out value by the transition factor one time.  (*Id.* at VZ13295-96.)

68.      If the opening balances were to be calculated by multiplying each participant's lump sum cash-out value by the square of the transition factor, the Plan's liabilities would have increased by at least $1.67 billion above the amount reported by Towers Perrin.  (*Id.* at VZ13263, VZ13270, VZ13274; DX51, DX62.)

**M.      Drafting History of the July 1996 Cash Balance Plan.**

69.      The drafting history of the Cash Balance Plan demonstrates by clear and convincing evidence that a scrivener's error and mistake were made in the drafting of the restated Plan document by including two references to the transition factor in § 16.5.1(a)(2) of the Plan.

70.      The restated Plan document was finalized on July 6, 1996, and was effective

December 31, 1995.  (DX 18.)  AG ¶ 35.  The restated Plan document was finalized after Bell Atlantic calculated the actual opening balances and communicated them to all 13,784 plan participants.  (DX18.)

71.     Barry Peters ("Peters") joined Bell Atlantic in 1986 to serve as in-house counsel responsible for all ERISA matters and employee benefit issues.  (T. 76-80; DX 56 at 13.)  Although the Bell Atlantic in-house legal department consisted of over 100 attorneys from 1986-1998, Peters was the only attorney at Bell Atlantic with extensive experience and knowledge of ERISA during that time.  (*Id*.)  His duties at Bell Atlantic included preparing governance documentation for the board of directors and its Human Resources Committee regarding all benefit plans, benefits matters, and being the company's ERISA expert.  (DX 56 at 11-14.)  Peters left Bell Atlantic in 2001 to work at Mercer Human Resources Consulting until he retired in 2007.  (*Id*. 14-15.)  Peters testified at trial and by means of two depositions. (T. 73-199, DX 56-57.)

72.     Peters was also highly involved in work dealing with compensation and benefits of the corporate executives in mergers and acquisitions that Bell Atlantic engaged in during the 1990s.  (T. 78-79; DX 56 at 14.)

73.     Peters was the Bell Atlantic employee responsible for coordinating and steering the plan documentation process. (DX 56 at 50.)  Peters was located in the Philadelphia headquarters of Bell Atlantic, and he was counsel to the Corporate Employees Benefits Committee ("CEBC.") (T. 77-78; DX 56 at 12–14, 149.)  Peters was "the person authorized by resolutions of the CEBC to maintain and publish the benefits plans adopted and amended by the Committee . . ."  (PX 219 at VZ14438.)

74.     Peters was the only person at Bell Atlantic charged with the responsibility of ensuring that the 1996 Plan conformed to the intent of Bell Atlantic in converting the BAMPP to a cash balance design.  (DX 57 at 18–19.)  He never assigned anyone else the responsibility to review the plan document in general or the transition rules specifically to avoid drafting errors.  (*Id*. at 19.)  AG ¶ 43.

75.     The conversion of the BAMPP to the Cash Balance Plan was the single most complicated plan drafting assignment Peters ever faced in his career.  (DX 56 at 78:7–25.)  It involved converting a decades-old traditional pension plan to a new formula that looked more like a defined contribution plan and reviewing and accounting for numerous intricate additional plan options and amendments.  (*Id*. at 78.)  The BAMPP (and the Cash Balance Plan) covered tens of thousands of employees and over $5 billion in liabilities.  (VZ22019.)  AG ¶ 44.

76.     Robert Abramowitz ("Abramowitz"), a partner in the law firm of Morgan Lewis and Bockius ("Morgan Lewis") was hired to provide outside legal assistance in the drafting of the Cash Balance Plan.  (T. 205-06.)  Abramowitz is an expert in ERISA.  (T. 204-05; DX 55 at 33-34.)  He has been involved in the drafting and amendment of hundreds of emloyee benefit plans, including 10 to 20 plans that were converted to a cash balance design.  (DX 55 at 37).  He testified at trial and by deposition.  (T. 203-59, DX 55.)

77.     Abramowitz was assisted by Kathy Capone, an ERISA paralegal, Vivian McCardell, a senior associate, and Marianne Grey, a benefits analyst.  (T. 206-207.)  Ms. Capone testified by means of a deposition. (DX 59.)

78. Paul Strella ("Strella") was a principal at Mercer and an attorney who "knew the law surrounding cash balance plans very well." (DX 54 at 212; DX 21 at VZ11119.) Strella was the head of the document drafting working group on the team Mercer assembled for the Bell Atlantic cash balance conversion. (PX 222 at MER20675.)

79. Six drafts of the Cash Balance Plan exist. Mercer was engaged to prepare the initial drafts "to have a high level of confidence that it would reflect the design that Mercer had been so intimately involved in." (T. 57 at 20.) Strella prepared the first three drafts, completing the first in August 1995, the second in September 1995, and the third in October 1995. (T. 90, 93; DX 19, 20, 21; DX 56 at 51-53). The three Mercer drafts express the opening balance formulas for Service Pension eligible and non-Service Pension eligible participants in similar terms, using a single transition factor. (DX 19 at VZ10804–05; DX 20 at VZ10971–77; DX 21 at VZ11144–45.) AG ¶ 37. The relevant language in the third draft of the Plan prepared by Mercer states:

> (i)    1995 Active Participants and 1995 Former Active Participants. In the case of a 1995 Active Participant or 1995 Former Active Participant, the opening balance of the Participant's Cash Balance Account on January 1, 1996 shall be the amount described in (I) or (II) below, as applicable:
>
> (I)    If, as of December 31, 1995, the Participant was eligible for a Normal Retirement Service Pension or an Early Retirement Service Pension under the 1995 Plan, then the amount described in this paragraph (I) is the present value of the immediate benefit payable commencing on January 1, 1996 under the 1995 Plan, determined as if the participant had retired on December 31, 1995, based on Compensation paid through December 31, 1995, or the date of status change to a non-Eligible Employee category, if earlier, **multiplied by the applicable transition factor** described in Schedule D.
>
> (II)    In the case of a Participant not described in (I) above, the amount described in this paragraph (II) is the present value as of January 1, 1996 of the Accrued Pension Benefit payable at age 65 under the 1995 Plan, determined as if the Participant had a Severance From Service Date on December 31,

1995, based on Compensation paid through December 31, 1995, or the date of status change to a non-Eligible Employee category, if earlier, **multiplied by the applicable transition factor** described in Schedule D.

(DX 21 at VZ11145 (emphasis added).)

80.     Beginning with Draft 4, Mercer was no longer responsible for preparing revisions to the draft plan. (T. 93; DX 56 at 149.) Peters prepared Draft 4 of the Cash Balance Plan, dated April 15, 1996. (T. 95, DX 56 at 53; see also DX 22.) Draft 4 is the first draft of the Plan that contains a second reference to the transition factor in the opening balance formula for nonservice pension eligible participants. (DX 22 at VZ11248.) AG ¶ 38.

81.     The introduction of the second reference to the transition factor in the opening balance formula was a scrivener's error made by Peters. Peters edited and reorganized the language governing the calculation of the opening balances in an effort to make the text more clear. (DX56 at 73-74; T. 97-100.) As revised, Draft 4 expressed the opening balance as "the product" of one number "times" another, setting off the two components of the opening balance formula with a capital "A" and "B" in parentheses, and with "times" in italics to emphasize that "[y]ou multiply block 'A' *times* block 'B.'" (DX56 at 58-60; 62-64; 73-75.) The draft also made the transition factor a defined term, and highlighted this through the use of initial capitals – "Transition Factor." (DX56 at 58-59.) Peters' Draft 4 also reversed the order of the two components of the opening balance formula, placing the more succinctly described term, the Transition Factor, first, so that the "(A) times (B)" structure was more obvious, and used a Bell Atlantic term of art, "lump-sum cashout value" for the other

32

component of the formula. (DX56 at 59, 62-63.) Peters also changed the format of the transition factor table by splitting it in two, with one table for those eligible for a service pension and the other for those not eligible. (DX 22 at VZ 11248.) It was Peters' practice to perform all drafting and make all changes "on screen on the word processor." (T. 130-31.)

82. Thus, Peters revised § 4.3.1(a)(1) (the predecessor to Plan § 16.5.1(a)(1)) in draft 4 as follows:

> **4.3.1(a)(1) If Eligible for Service Pension:**
> If, as of December 31, 1995, the Participant was eligible for a Normal Retirement Service Pension or an Early Retirement Service Pension under the 1995 BAMPP Plan, then the amount described in this paragraph (1) is **the product of multiplying (A) the Participant's applicable Transition Factor described in Schedule C,** *times* **(B) the lump-sum cashout value** of the immediate annuity benefit under the 1995 BAMPP Plan, determined as if the Participant had retired on December 31, 1995.

(DX22 at VZ11248 (bold emphasis added).

83. Peters revised § 4.3.1(a)(2) (the predecessor of Plan § 16.5.1(a)(2)) and mistakenly inserted the second reference to the transition factor into the Fourth draft:

> **4.3.1.(a)(2) Not Eligible for Service Pension:**
> In the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is **the product of multiplying (A) the Participant's applicable Transition Factor described in Schedule D,** *times* **(B) the lump-sum cashout value** of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995, or the date of status change to a non-Eligible Employee category, if earlier, **multiplied by the applicable transition factor described in**

33

**Schedule C**.

(DX 22 at VZ11248 (bold emphasis added).)

84.     In revising § 4.3.1(a)(2), Peters made a drafting error in one of the most important provisions in the Plan.  Working on a word processor, and attempting to make the same revisions in § 4.3.1(a)(2) as he did in § 4.3.1(a)(1), Peters neglected to delete the "trailing clause" at the end of the paragraph, "multiplied by the applicable transition factor described in Schedule C."  (DX22, DX56 at 58-64, 70, 73-75, 78; T. 100-01.)

85.     As a result of Peters' mistake, the formula in § 4.3.1(a)(2) called for the lump sum cashout value to be multiplied by the transition factor twice; rather than once as intended.  (DX 22 at VZ11248; T. 100-01.)

86.     The Court accepts Peters' testimony that he made a drafting mistake that was inconsistent with the authorization he was given. ("I made an error ... I failed to delete the words at the very end of the second paragraph."); (T. 100-01) ("I failed to delete this trailing clause at the end of the paragraph that says 'Multiplied by the applicable transition factor described in Schedule C.'   I know that's an error because it's contrary to the terms of the plan that were approved. . . . This is the first draft that I had a hands-on role in doing and this is an error that I, therefore, made.") (DX 56 at 74); ("I believe I made an error that was unintentional and I did not know I made the error. . . . It was a good faith error which I regret."); (*Id.* at 111) ("I never knew of the error that I had made and I never heard anyone tell me that that text problem existed.") (*Id*. at 78); ("I was always working electronically so that I could share my work more efficiently with both people in my company and elsewhere,

and I must not have seen clearly the words that had been left at the end of that paragraph ... It was unfortunately my own mistake by my own hand.") (T. 101.)

87.  On April 9, 1996, Peters stated in an e-mail memo to Susan McClain, Joseph Ronan Jr., and Gordon Downing at Bell Atlantic and Abramowitz at Morgan Lewis that the Fourth draft "reflects my review and changes of the 3rd draft that had been presented to us by Paul Strella of Mercer."  (PX 226 at VZ11226.)   In his e-mail, Peters asked McClain to review the document and "share it with Kwasha Lipton [the company performing the intricate computer programming to calculate the benefits], to make sure they review it with an eye to assuring that it accurately reflects the mechanics and programming that has been built into the administration of the plan."  (*Id*.)  Peters noted in his e-mail that Abramowitz and Grey, his paralegal, were "standing by to assist in finalizing the drafting process, and assisting us with the eventual submission of the document to the IRS."  (*Id*.)  He also instructed Abramowitz "not to begin any revision work until you [McClain] and Kwasha have had a chance to make any changes to fix any problems that you find."  (*Id*.)  Finally, Peters noted that one of the "pieces that still remain to be completed" was "physically moving" the transition-related provisions "to a Section at the back of the plan that is solely devoted to transition rules."  (*Id*.)

88.  Abramowitz reviewed the Fourth draft and made written notes on the document.  (T. 223-25; PX 225 at VZ11248.)  Significantly, he underlined a portion of the sentence immediately preceding the second transition factor reference in Section 4.3.1(a)(2). (*Id*.)  He clearly read this entire paragraph but did not notice an error.  (T. 225.)  Abramowitz

understood that responsibility for the transition factors rested with Mercer and Bell Atlantic. (T. 215.)

89. Peters was negligent in failing to notice and correct the scrivener's error in the Fifth draft. Like the Fourth draft, the Fifth draft of the Cash Balance Plan contains a second reference to the transition factor in Section 4.3.1(a)(2). (PX 227 at VZ11379.) The changes suggested by Abramowitz in Section 4.3.1(a)(2) were made and blackline versions were prepared. (PX 228 at VZ11447.) Changes were noted immediately before and immediately after the second reference to the transition factor. (*Id*.)

90. Peters also prepared the Fifth draft dated June 6, 1996 (DX 23), which he sent to Marianne Grey, a benefits analyst at Morgan Lewis, on June 7, 1996. (PX228 at VZ11446-47.) AG ¶ 39. The "blackline" version of the Fifth draft shows that Peters: (1) changed the first transition factor reference from "described in Schedule D" to "described in Schedule C," (2) immediately before the second reference to the transition factor, he deleted the text "or the date of status change to a non Eligible Employee category, if earlier," and (3) immediately after the second reference to the transition factor, he added the sentence "For a 1995 Former Active Participant, the date on which the individual ceased to be an Eligible Employee shall be substituted for December 31, 1995 in the last phrase of the previous sentence." (PX 228 at VZ11446–47.) Despite all of the changes made immediately before and immediately after the second reference to the transition factor, Peters claims no one brought the issue of the second transition factor to his attention. (T. 140-41; PX 228 at VZ11446-47.) Peters made approximately 240 changes to the Fourth draft in preparing the

Fifth draft.  (T. 133.)

91.     Specifically, Section 4.3.1(a)(2) of the blackline version of the Fifth draft reads as follows:

**4.3.1(a)(2) Not Eligible for Service Pension**
In the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is the product of multiplying (A) the Participant's applicable Transition Factor described in Schedule ~~D~~C *times* (B) the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995, ~~or the date of status change to a non-Eligible Employee category, if earlier,~~ **multiplied by the applicable transition factor described in Schedule C**. <u>For a 1995 Former Active Participant, the date on which the individual ceased to be an Eligible Employee shall be substituted for December 31, 1995 in the last phrase of the previous sentence.</u>

(PX 228 at VZ11446-47.) (Emphasis added.)

92.     In a handwritten note to Grey on the cover of the blacklined version of the Fifth draft, Peters noted that "[t]his is blacklined to show changes from the prior draft that you and Bob reviewed and commented on."  (PX 228 at VZ11423.) Peters' handwritten note asks Grey to print a copy for Abramowitz.  (*Id*.)

93.     On or around June 7, 1996, Peters asked Abramowitz to execute the "physical move" of the transition rules to a separate section at the back of the Cash Balance Plan.  (PX 448, DX 55 at 132-33.)  Peters did not expect Morgan Lewis to review the transition factor formula.  (T. 143.)

94.     On July 1, 1996, Abramowitz sent a Sixth draft of the Cash Balance Plan to

Peters. (DX 24.) This was the first draft prepared by Morgan Lewis. (T. 229.) As Peters requested, the cash balance transition provisions were moved to a separate section, Appendix B, in the Sixth draft. (DX 24 at VZ11561–68.) The Sixth draft also includes the second reference to the transition factor. (*Id*. at VZ11565.) Abramowitz does not recall anyone at Morgan Lewis ever bringing the second transition factor reference to his attention. (T. 225-26.)

95. The Sixth draft is dated 6/25/96. (DX 24 at VZ11505.) Abramowitz noted in his cover letter to the Sixth draft his understanding that "your [Peters'] office will take care of blacklining the document." (*Id*. at VZ11503.) He also noted that "[t]he majority of our changes are self-explanatory or have been previously discussed with you." (*Id*. at VZ11503.)

96. Peters used the Sixth draft to create a final plan document entitled "Bell Atlantic Cash Balance Plan Effective December 31, 1995 (7/6/96 edition)" (DX 18 at VZ1046-1106) (the "1996 Plan"). AG ¶41. Peters finalized the 1996 Plan at his office in Bell Atlantic's corporate headquarters in Philadelphia, Pennsylvania, on July 6, 1996. (DX 56 at 149.)

97. In the 1996 Plan, Appendix B of the Sixth draft was moved to a new § 16, entitled December 31, 1995 Transition Plan, but § 16.5.1(a)(2) of the 1996 Plan is substantially the same as Section 3.2.1(a)(2) of Appendix B of the Sixth draft. (T. 135-36.)

98. The final, adopted version of §§ 16.5.1(a)(1) and (a)(2) state:

**16.5.1(a)(1) If Eligible for Service Pension**
If, as of December 31, 1995, the Participant was eligible for a Normal Retirement Service Pension or an Early Retirement Service Pension under the

1995 BAMPP Plan, then the amount described in this paragraph (1) is the product of multiplying (A) the Participant's applicable Transition Factor described in Table 2 of this Section, *times* (B) the lump-sum cashout value of the immediate annuity benefit under the 1995 BAMPP Plan, determined as if the Participant had retired on December 31, 1995, ignoring any compensation paid after the date of the last paycheck for salary earned in December 1995. For a 1995 Former Active Participant, the date on which the individual ceased to be an Eligible Employee shall be substituted for December 31, 1995 in the last phrase of the previous sentence.

**16.5.1(a)(2) Not Eligible for Service Pension**
In the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is the **product of multiplying (A) the Participant's applicable Transition Factor described in Table 1 of this Section,** *times* **(B) the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan**, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995, **multiplied by the applicable transition factor described in Table 1 of this Section.** For a 1995 Former Active Participant, the date on which the individual ceased to be an Eligible Employee shall be substituted for December 31, 1995 in the last phrase of the previous sentence.

(DX 18 at VZ1100) (emphasis added).  This was a key provision for anyone who had an

opening cash balance.  (T. 236.)  According to Abramowitz, this provision on a scale of 1 to

10 ranks as a 10 in terms of importance.  (*Id*.)

99.     In practice, the CEBC and the HRC never reviewed plan documents to ensure

they were consistent with Bell Atlantic's intent.  (DX 57 at 17-18.) It was primarily Peters'

responsibility to ensure that final plan documents were consistent with Bell Atlantic's intent.

(*Id*. at 18.) Bell Atlantic did not have a practice of executing its final  plan documents.  (DX

56 at 65–66.)  In other words, no one ever signed the plan document when it was finalized.

(*Id*.)  Instead, Peters was delegated the task of deciding when a plan document was final.

(*Id.*) Peters finalized the 1996 Plan document on July 6, 1996 pursuant to a grant of authority given to him by the HRC and Bell Atlantic's Vice President – Human Resources. (*Id*. at 57, 65–66.) AG ¶ 45.

100.    Mercer did not review the final 1996 Plan document. (DX 54 at 87.) Peters never asked Mercer to review his work on the Cash Balance Plan after he generated the Fourth draft. (DX 57 at 20-22.) AG ¶ 48. Peters did request Susan McLanin to ask Kwasha Lipton to review the Plan "to confirm that it stated how the plan was being administered." (T. 125-26.) He is not certain that it happened. (T. 131-32.) Abramowitz has no recollection of seeing a second reference to the transtion factor in the 1996 or 1997 Plans. (T. 218-19.)

101.    April 1996 was also the time when Peters and his wife had set aside to vacation in China. (T. 128-29; DX 56 at 160–61.) Peters went to China for four weeks, but he did not assign anyone to take over his responsibilities with respect to the Bell Atlantic cash balance conversion while he was in China. (*Id*.) AG ¶ 47.

102.    The Cash Balance Plan was not negotiated at arms-length between multiple parties. (DX 56 at 66-67.) AG ¶ 49.

**N.    *Corcoran* Litigation**.

103.    A putative class action lawsuit entitled *Corcoran v. Bell Atlantic Corp.*, No. 97-cv-510 (E.D. Pa.), was filed against Bell Atlantic Corporation, the Bell Atlantic Management Pension Plan, and the Bell Atlantic Cash Balance Plan, among others, on January 23, 1997. AG ¶ 52. In Count II of the amended complaint in *Corcoran*, plaintiffs

alleged that Bell Atlantic violated its fiduciary duty by adopting the new Cash Balance Plan which (1) did not use a four-year age set-back for its mortality assumptions, and (2) used a PBGC interest rate for September 1995, rather than December 1995, in calculating opening balances. (PX 475 at VZ22890.) The district court did not reach the merits, but dismissed the claim because the decisions did not have fiduciary ramifications. (*Id*.) The Third Circuit affirmed, holding that the opening cash balance assumptions constituted "a design function and non-fiduciary in light of *Lockheed* [*Corp. v. Spink*, 517 U.S. 882, 890 (1996)."] (*Id*. at VZ22891.)

104.    The only record of anyone noticing the erroneous second reference to the transition factor in § 16.5.1(a)(2) is footnote 2 in a brief filed by the plaintiffs in the *Corcoran* case which reads as follows:

> By its terms, Section 16.5.1(a)(2) appears to require that participants whose cash balance account was calculated on the basis of their deferred vested pension under the Management Pension Plan receive their transition multiplier twice. Literal application of this provision would be highly advantageous to those Plaintiffs and class members who had their opening account balance calculated on the basis of the deferred vested pension. For example, under a literal application of this provision, plaintiff Pierce, who was assigned a transition multiplier of 2.928, would receive an opening account balance of 5.8 times the lump-sum cash-out value of his pension rights under the Management Pension Plan. However, given the overall context of the Plan document, **Plaintiffs assume that this represents a scrivener's error.**

*(*DX 37 at VZ22557-58.) (Emphasis added.)

For these six *Corcoran* plaintiffs, the potential advantage of multiplying the transition factors twice would be an aggregate increase in the operating balances of approximately $2 million,

from $1.1 million to $3.1 million. (DX62.) The *Corcoran* plaintiffs and their counsel acknowledged in the footnote, however, that the Plan document contains "a scrivener's error" and they expected to receive no more than the opening balance resulting from multiplying the participant's lump-sum cashout value by the transition factor only once. (DX37 at VZ22558.)

105. Bell Atlantic hired Morgan Lewis to defend the Corcoran litigation. Abramowitz was the billing attorney at Morgan Lewis for all Bell Atlantic benefit matters, including the *Corcoran* litigation. (DX 56 at 227–29; Peters Dep. Ex. 15.) AG ¶ 53.

106. On June 17, 1997, Bell Atlantic moved to dismiss the *Corcoran* complaint for failure to state a claim. AG ¶ 54.

107. The *Corcoran* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, which contained the footnote referenced above, was served on Michael L. Banks, Bell Atlantic's attorney at Morgan Lewis, in Philadelphia, Pennsylvania, by hand delivery on August 6, 1997. AG ¶ 55.

108. On or about August 8, 1997, Peters, Abramowitz, and Morgan Lewis attorneys Steven Spencer, Richard Rosenblatt, and Erin Mulhollan, received the Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss. (DX 56 at 174–75; VZ24230.) AG ¶ 56. Abramowitz received and reviewed the brief; he probably read footnote 2, but he has no specific recollection. (T. 217-18, 251.) In his cover letter, Banks asks Peters to review the memorandum and to call him to discuss it. (PX 246 at VZ24230.) Peters denies he read a footnote because, as the scrivener, "bells would have gone off for

42

me," and he would have taken action, including notifying the chair of the benefits committee and his human resources department clients, and he would have corrected the error. (T. 171-72, 177; DX 56 at 181.) Peters claims that he first learned of the mistake several years ago during the course of this litigation when he was contacted by a Morgan Lewis paralegal. (T. 112-13.)

109. On August 22, 1997, Bell Atlantic filed a reply brief in response to the Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss. (VZ23309-32.) AG ¶ 57.

110. Bell Atlantic prevailed on its motion to dismiss. *Corcoran v. Bell Atlantic Corp.*, No. 97-510, 1997 WL 602859 (E.D. Pa. Sept. 23, 1997). AG ¶ 58.

111. The *Corcoran* plaintiffs appealed the decision to the Third Circuit Court of Appeals. AG ¶ 59.

112. Bell Atlantic's attorneys at Morgan Lewis forwarded a copy of the plaintiffs' brief filed with the Third Circuit to Peters on or about February 24, 1998. AG ¶ 60.

113. On June 30, 1998, the Third Circuit affirmed the decision of the district court. (PX 475 at VZ22883-93.) AG ¶ 61.

114. It was Bell Atlantic's practice in 1997 to allow Peters to correct discovered errors in the text of the final plan documents. (T. 174; DX 56 at 181-84.) Bell Atlantic's practice was not necessarily to formally amend or notify participants regarding a discovered alleged drafting error. (*Id*. at 181-84, 190-91.)

**O.     The 1997 Plan Amendment.**

115.     Defendants knew or should have known of the existence of the drafting error in Plan § 16.5.1(a)(2) in early or mid-August, 1997.  No corrective action was taken at that time.

116.     On September 3, 1997, the Cash Balance Plan was restated in a document entitled "Bell Atlantic Cash Balance Plan Effective December 31, 1995 (9/3/97 edition)" (the "1997 Plan").  (VZ13856.)  The 1997 Plan contains a second reference to the transition factor in the opening balance formula for non-Service Pension eligible employees.  (*Id*.)  The 1997 Plan was finalized by Peters.  (DX 56 at 196–97.)  AG ¶ 62.  Section 16.5.1(a)(2) of the 1997 Plan is identical to § 16.5.1(a)(2) of the 1996 Plan.  Both contain a second reference to the transition factor.

117.     The September 1997 restatement incorporated a single amendment clarifying the Plan's anti-cutback provision that was adopted in response to the *Corcoran* litigation.  (DX 79 at VZ14925-29.)  The amendment was drafted and reviewed by Peters and Morgan Lewis, and was authorized by the CEBC on June 26, 1997.  (PX 276 at MLB372-78; DX 79 at VZ14928.)  AG ¶ 63.

118.     Drafting of the 1997 Plan began sometime around February 3, 1997, when Morgan Lewis became involved in the drafting process.  (PX 279 at MLB2041.)  Peters and Morgan Lewis worked on drafting and reviewing the 1997 Plan during the summer and fall of 1997.  (DX56 at 77.)

**P.     Submission of the Plan to the IRS.**

119.    On November 24, 1997, Bell Atlantic formally submitted the 1996 Plan to the IRS for a favorable determination of its tax-advantaged status. (VZ21386–492.)  AG ¶ 64.

120.    The submission included a copy of the 1996 Plan and the 1997 Plan amendment.  (T. 136; VZ21387; VZ21417–77.)  AG ¶ 65.

121.    On March 26, 1998, the IRS made a favorable determination of tax-exempt qualification of the Cash Balance Plan.  (PX 285 at HA420–21.)  AG ¶ 66.  That determination included both the 1996 Plan and the 1997 Plan.  (PX 285 at HA 420.)

**Q.     NYNEX Merger and Bell Atlantic-North Plan.**

122.    The negotiations over the NYNEX/Bell Atlantic merger began just a few months before April 1996, and a key point in the negotiations was occurring in April 1996, at the same time as Peters worked to complete the fourth draft of the Plan.  (DX 56 at 160.)  Additionally, Peters was responsible at this time for researching all of the potential employment agreements with NYNEX and Bell Atlantic executives to ensure synergies from the merger.  (*Id.* at 160–61.)  Furthermore, Bell Atlantic's Human Resources Department, which was charged with administering dozens of Bell Atlantic pension plans, was due to lose a number of jobs at the combined entity, and Peters was also at this time very concerned and active in the process of determining how to retain institutional knowledge of the various NYNEX and Bell Atlantic benefit plans after the merger.  (*Id.*)  AG ¶ 46.

123.    Bell Atlantic merged with NYNEX effective August 14, 1997.  (DX50) AG

¶ 67.  The merger began with negotiations early in 1996, culminating in a merger agreement in the first half of 1996, and finally closed as a merger in August, 1997.  (T. 108.)  In September 1997 Bell Atlantic's CEBC adopted a resolution authorizing the amendment of the NYNEX Management Pension Plan ("NYNEX Plan") to provide for a cash balance formula ("Bell Atlantic-North Plan" or "BA-North Plan") for salaried employees formerly with NYNEX.  (DX26.)  AG ¶ 68.  In other words, the NYNEX Plan would be amended and become the Bell-Atlantic North Plan.  The CEBC resolution stated that one purpose of the amendment was "conforming the design of the BA-North Plan to the benefit design approved by this Committee in 1995 for the Bell Atlantic Cash Balance Plan." (*Id.* at VZ13469.)  The Human Resources Committee of Bell Atlantic's Board of Directors adopted a parallel amendment on September 5, 1997, stating that the BA-North Cash Balance Plan was to be "substantially identical" to the Bell Atlantic (South) Cash Balance Plan, "including without limitation . . . to provide for a reasonable methodology for a one-time transition from the [NYNEX Plan's] prior benefit design to an opening account balance ...."  (DX27 at VZ13472; DX57 at 37.)

124.    Outside counsel, Morgan, Lewis & Bockius LLP, drafted the BA-North Plan document for Bell Atlantic starting in late 1997 and continuing through the first half of 1998. (DX 56 at 118, DX 57 at 30.)  The BA-North Plan was completed in the summer of 1998, and was effective retroactively to December 31, 1997.  AG ¶ 69.  Peters claims that despite receving black-line copies of the BA-North Plan comparing the document to the Cash Balance Plan, he did not see the error in the Cash Balance Plan.  (T. 157-59; PX 289.)

Somewhere along the line, the reference to the second transition factor was removed from the Cash Balance Plan. (T. 160.)

125. Bell Atlantic sent a number of communications to participants in the NYNEX Plan regarding the conversion to the BA-North Plan. (DX 29, 30.) AG ¶ 70.

126. The final Bell Atlantic-North Plan contains only one reference to the transition factor in the opening balance formula for non-service pension eligible participants. (DX 28, BA-North Plan § 16.5.1(b)(2), at VZ13650.) AG ¶ 71.

**R.    The 1998 Plan.**

127. In preparation for the merger of the plans of Bell Atlantic and BA-North, an amended and restated Bell Atlantic Plan was completed on October 8, 1998 ("1998 Plan"). (DX 31.) The 1998 Plan contained only one reference to the transition factor in its recitation of the opening balance formula for non-Service Pension eligible participants. (DX 31, 1998 Plan, § 16.5.1(b)(2), at VZ11713; DX 57 at 26-28; DX 56 at 103-06, 120-21.) A subsequent 1999 restatement, issued prior to the plan merger, also stated the opening balance formula for non-Service Pension eligible participants using a single transition factor. (DX 32 at VZ11848.) AG ¶ 72. The effective date of the 1998 Plan was January 1, 1998. (DX 31.)

128. Bell Atlantic eliminated the second reference to the transition factor in § 16.5.1(b)(2) of the 1998 Plan (which corresponds to § 16.5.1(a)(2) of the 1997 Plan). (DX31 at VZ11713.) The second reference to the transition factor in § 16.5.1(b)(2) was in an April 22, 1998 draft of the 1998 Plan. (PX 472 at MLB 548; T. 163-64.)

129. Verizon claims it does not know how the second reference to the transition

factor was removed from the 1998 Plan.  (DX 57 at 24-25.) ("I, neither I [Peters] nor anyone else at Bell Atlantic has any idea how that phrase disappeared from a document draft.")  The Court finds that it was removed intentionally to correct the mistake that appeared in the 1996 and 1997 Plans.

130.    Numerous document drafts were created during 1997 and 1998, leading up to the merger of the 1997 Plan with BA-North Plan that would have shown how the second transition factor was removed from the Cash Balance Plan. Those documents were destroyed prior to this litigation being instituted.  Verizon has produced all documents still in existence from its law firms, consultants and employees related to the transition factor reference in the 1996, 1997, and 1998 Plans.

131.    Bell Atlantic sent communications to NYNEX participants informing them that they would be receiving the same benefits under the North Plan as participants in the 1997 Plan, but no one reviewed the North Plan document to confirm that it mirrored the 1997 Plan document in its benefits calculations.  (DX57 at 31–33.)

132.    The most important, basic, and fundamental portion of the benefits determination under the Cash Balance Plan, with respect to the Class, was the opening balance formulas contained in §§ 16.5.1(a)(1) and (a)(2).  (T. 97, 127, DX57 at 32.)

133.    Bell Atlantic never notified the Plan participants of its error in including the second transition factor in § 16.5.1(a)(2) of the 1996 Plan or the 1997 Plan.

134.    Bell Atlantic never notified the Plan participants in a participant

communication that it eliminated the second reference to the transition factor in § 16.5.1(b)(2) of the 1998 Plan.

135.    Bell Atlantic never notified the Plan participants in a summary of material modifications that it eliminated the second reference to the transition factor in § 16.5.1(b)(2) of the 1998 Plan.

136.    Neither Bell Atlantic nor Verizon ever notified the IRS of the elimination of the second reference to the transition factor in § 16.5.1(a)(2) of the Cash Balance Plan in the 1998 Plan document.  (DX56 at 111-12.)

**S.    The Merger of the Bell Atlantic and the Bell Atlantic-North Plans.**

137.    Bell Atlantic merged the Bell Atlantic Plan and the BA-North Plan on December 31, 1998, and a merged Plan document was completed on December 1, 1999. (DX 33 at VZ11862, VZ11868; DX 80 and VZ15102-03.)  AG ¶ 73.

138.    The merged 1999 Plan and its 2000 restatement both stated the opening balance formula for non-Service Pension eligible participants using a single transition factor.  (DX 33, 34.)  AG ¶ 74.

139.    In June 1999 and February 2000, Bell Atlantic prepared "HR & You" newsletters.  AG ¶ 75.

140.    Under the Bell Atlantic-North Plan, opening balances were calculated by multiplying the transition factor once.  (DX28, BA-North Plan § 16.5.1(b)(2), at VZ13650.) The Bell Atlantic-North Plan also used the same transition factor tables that Bell Atlantic

used in January 1996. (*Compare* DX18, 1996 Plan Art. 16, at VZ1102-03 *with* DX28, BA-North Plan Art. 16, at VZ13653-54.)

141.    Numerous communications to NYNEX Plan participants confirmed that the "substantially identical" provisions of the BA-North Plan required the transition factor to be multiplied only once to calculate each participant's opening balance. (DX29 at VZ13486-92, DX30 at VZ13531-49.)

**T.    No Other Claims**.

142.    During the period from January 1, 1996 until Plaintiff filed her claim in August 2006, no participant asserted a claim, either through the Plan's administrative claims process or through litigation, that his or her opening balance should have been calculated by multiplying the lump sum cashout value of his or her BAMPP accrued benefit by the square of the transition factor.

**U.    Other Verizon Litigation.**

143.    Between 2003 and 2008, Verizon filed suit against a number of participants seeking repayment of alleged benefit overpayments resulting from administrative errors in calculating benefits under the terms of a Verizon pension plan. AG ¶ 76. (See PX 304-80.)

144.    Verizon has also been sued by a number of participants seeking additional benefits from the Plan and other company-sponsored benefit plans. These lawsuits include *Gramm v. Bell Atlantic Mgmt.*, 983 F. Supp. 585 (D.N.J. 1997), *Wagner v. Bell Atlantic Corp.*, No. 96-113 (W.D. Pa. 1996), and *Todisco v. Verizon Comms. Inc.*, 497 F.3d 95 (1st

Cir. 2007).  AG ¶ 77.

**V.  Plaintiff's Assertion of Her Claim.**

145.  In 2003, Young contacted the National Center for Retirement Benefits ("NCRB") to review her retirement plan and her benefit payment.  (DX 58 at 70–78, DX 38, 39.)  AG ¶ 78.  Plaintiff did so because she thought mistakes might have been made in calculating her pension, particularly with regard to the recording of her compensation. (DX58 at 70-78, DX 38, DX 39.)

146.  The NCRB obtained copies of plan documents, including the 1997 restatement of the Plan, which contains the erroneous second reference to the transition factor.  (DX40, DX 41, DX25.)

147.  On behalf of Young, the NCRB filed an administrative claim on June 9, 2004. (DX 42.) The NCRB argued that Young's benefit should be higher because Bell Atlantic should have used a different discount rate to calculate the lump-sum cashout value (100% – not 120% – of the PBGC rate). (*Id.*) The Verizon Claims Review Unit denied this claim on October 19, 2004.  (DX 43.) Young appealed the Claims Review Unit's decision to the Committee on December 6, 2004.  (DX 44.) The Committee denied Young's appeal in February 2005.  (DX 45.) AG ¶ 79.  The initial administrative claim did not include a claim regarding the transition factor.  (DX 42.)

148.  Plaintiff's counsel filed the initial complaint in this action on December 30, 2005.  (Dkt. 1.)  In that complaint, Plaintiff challenged only the discount rate used to

calculate her opening balance, arguing that her opening balance should have been larger by $52,000. AG ¶ 80. The complaint quotes § 16.5.1(a)(2), including the second reference to the transition factor, but did not contend that the transition factor should have been multiplied twice. (Dkt. 1 at ¶ 24 and Ex. B, DX 66 at ¶ 3.)

149. On July 26, 2006, Young sought leave to amend the complaint to add a claim relating to the transition factor. (Dkt. 36.) The Court granted the motion in August 2006 but stayed all proceedings to permit Verizon to review the transition factor claim in the administrative process. (Dkt. 43.) AG ¶ 81.

150. The Claims Review Unit denied Plaintiff Young's transition factor claim in a determination letter dated December 8, 2006. (DX 46.) Plaintiff appealed, and in a determination letter dated April 5, 2007, the Committee denied Plaintiff's administrative appeal. (DX 47.) AG ¶ 82. The Committee determined that Bell Atlantic's intent was to provide for a single multiplication by the transition factor, and that the insertion of the second reference to the transition factor in § 16.5.1(a)(2) was "a mistake and cannot be applied to increase Ms. Young's benefits." (DX 47 at VZ15646-48.)

**W.    Plan Funding.**

151. As of January 1, 1996, the market value of the Plan's assets exceeded the present value of the Plan's accrued benefits by approximately $992 million. (PX 396 at VZ20052.) AG ¶ 83.

152. As of January 1, 1998, the last available figures before the merger of the Cash

Balance Plan with the BA-North Plan, the market value of the Plan's assets exceeded the present value of the Plan's accrued benefits by approximately $2.3 billion. (PX 425 at Y991.) AG ¶ 84.

153. The Verizon Management Pension Plan ("VMPP") is the result of a number of mergers of previously separate plans, including the BAMPP, the NYNEX Plan, and GTE's defined benefit plan for management employees. (DX 61 at 61.) The VMPP has subsequently undergone several additional spinoffs and divestitures. (*Id*. at 62, 66, 69-70.) AG ¶ 85.

154. As of December 31, 2008, an unaudited Annual Funding Notice prepared by the plan's actuaries pursuant to the Pension Protection Act of 2006 indicated that the market value of the VMPP's assets was approximately $10.1 billion and the market value of the Plan's liabilities was approximately $12.1 billion. (DX 69 at VZ26893.) AG ¶ 86. The Court was not provided up-to-date information as of the date of closing arguments.

## X. Plan Administration.

155. Bell Atlantic (and now Verizon) has consistently calculated pension amounts for participants who retired between 1996 and the present who were covered by § 16.5.1(a)(2) using the transition factor only once. AG ¶ 87.

## Y. The Financial Impact of Enforcing the Second Transition Factor.

156. The financial impact of enforcing the second transition factor is over $1 billion in additional benefits to the class. (T.261-63.) Document VZ27114-323 represents

Verizon's best approximation of the effect of the second transition factor reference on opening balances. (DX 62.) The names, dates, transition factors, opening balances and effect of multiplying the transition factor twice are all approximately correct. Applying the transition factor twice would have increased opening balances by $1.67 billion ($1,670,000,000.00) for the 10,808 participants with transition factors greater than 1.000. AG ¶ 88.

157.    It is not known to what extent the increase in opening balances would affect the actual benefits these participants would receive, because a number of participants were eligible to receive benefits under alternative formulas and benefit windows that may have provided a higher benefit than the Plan's cash balance formula. AG ¶ 89.

158.    Many employees would receive very large, unexpected increases in their opening balances if the transition factor were squared. Delores B., for example, whose salary as of December 31, 1995, was $110,000, had a transition factor of 2.91, based on her age of 47 and her service of 29.33 years. If the transition factor were squared, her opening balance of $431,000 would increase to $1,253,000 – an increase of $822,000. (DX62 at VZ27199.) Likewise, if his 2.70 transition factor were squared, Patrick H. would see an increase in his opening balance of $956,000 – from $563,000 to $1,519,000. (*Id.* at VZ27149.) Similarly, if the transition factor were squared, Sharon R., Anthony M. and Bruce G. would experience increases in their opening balances of $819,000, $827,000, and $829,000, respectively. (*Id.* at VZ27285, VZ27143, VZ27183.) Over 136 participants would receive unexpected increases in their opening balances of more than $500,000. (DX62.) Nearly 5,800 members

of the subclass would receive unexpected increases in their opening balances of more than $100,000. (*Id.*)

159. Squaring the transition factor for employees not eligible for a Service Pension would result in Plaintiff and many members of the subclass receiving benefits as of the transition date that were substantially larger than the benefits received by co-workers of the same age who received the same annual compensation, yet worked more years for Bell Atlantic. (DX62.) In effect, this would penalize many employees for their longer service. It would also violate a fundamental understanding under which Bell Atlantic participants had operated throughout their employment: that each additional year of service resulted in an increase in their retirement benefit, and that the attainment of the years of service and age required for a Service Pension would result in a substantial increase in their benefit. (DX17, BAMPP §§ 4.1-4.3, at VZ109-12; DX1 at VZ10391-94.)

160. Plaintiff was 48 years old and had 27.8 years of Bell Atlantic service as of January 1, 1996. (DX14 at Y811.) The opening balance for a participant with the same age and earnings, but 30 years of service, would have been determined under Plan § 16.5.1(a)(1) because the participant would have been eligible for a Service Pension. (DX 17, BAMPP § 4.3(a), at VZ111; DX18 1996 Plan § 16.5.1(a)(1), at VZ1100.) Not surprisingly, the participant with the additional 2.2 years of service would have been entitled to the larger benefit, $262,000 vs. $240,812. (DX47 at VZ15648.) But if the transition factor is squared in computing Plaintiff's benefit under § 16.5.1(a)(2), then Plaintiff, with 27.8 years of Bell Atlantic service, would have an opening balance of $640,321 – far more than the $262,000

earned by the otherwise identical participant with an additional two-plus years of service. (*Id.*) Byron D. is an example of a participant who had three years more service than Plaintiff, was four years older and had a slightly higher rate of pay as of December 31, 1995. (DX62 at VZ27150.) His opening balance of $352,018 was $111,000 more than Plaintiff's opening balance of $240,812. (*Id.*) But if the transition factor is squared, Plaintiff's opening balance would jump ahead of Byron D.'s by nearly $300,000. (*Id.*)

161. Examples of the anomalies produced by squaring the transition factor for employees not eligible for a Service Pension are numerous. Compare, for example, Rose W. and Mary R., who were not eligible for a Service Pension, to Dorothy B., who was older, had more service and was higher paid. (DX 62 at VZ27222, VZ27198, VZ27114.) Because her age and service had already qualified her for a Service Pension as of the date of conversion to the Cash Balance Plan (as well as her higher pay), Dorothy B. received a higher opening balance on January 1, 1995 than Rose W. and Mary R. ($257,000 for Dorothy B., $210,000 for Rose W., and $221,00 for Mary R.) (*Id.*) But if the transition factor is squared ("TFS") for Rose W. and Mary R. (because §16.5.1(a)(2) applies to them) but not for Dorothy B. (§ 16.5.1(a)(1) applies to her), their opening balances would leapfrog far ahead of Dorothy B.'s ($604,000 for Rose W. and $643,00 for Mary R., as compared to $257,0007 for Dorothy B.) (*Id.*) Rose W. and Mary R. would also leapfrog ahead of numerous other employees whose

age, service and 1995 pay were greater than theirs, including the following:

(*Id.* at VZ27222, VZ27198, VZ27114, VZ27187, VZ27114.)

162.    Plaintiff and many members of the subclass would also receive benefits that exceed the benefits of many employees of NYNEX who expected to receive the same transition benefits as their peers at Bell Atlantic.  (DX48 at VZ13511, VZ13514-15.)

**Z.    Location of Class Members and Activities Giving Rise to This Lawsuit.**

163.    According to records maintained by the Plan's benefits administrator, approximately 3,743 members of the class reside in the Commonwealth of Pennsylvania, more than live in any other state. (DX 63.) Approximately 20 class members reside in Illinois. (*Id.*) Plaintiff has never lived or worked in the state of Illinois. (DX 58 at 5–17, 53–55.)  AG ¶ 90.

|           | AGE | SERVICE | 1995 SALARY | OPENING BALANCE | OB - TFS |
|-----------|-----|---------|-------------|-----------------|----------|
| Rose W.   | 47  | 29      | $56,800     | $210,000        | $604,000 |
| Mary R.   | 47  | 29      | $57,600     | $221,000        | $644,000 |
| Dorothy B.| 48  | 30      | $61,500     | $257,000        | $257,000 |
| Howard M. | 50  | 30      | $58,500     | $278,000        | $278,000 |
| David W.  | 50  | 33      | $61,900     | $294,000        | $294,000 |
| Walter M. | 55  | 34      | $96,000     | $520,000        | $520,000 |

164.    During 1995–1998, all of the Morgan Lewis attorneys who worked on the Cash Balance Plan, the in-house lawyers at Bell Atlantic, and the consultants at Mercer were

located in Philadelphia, Pennsylvania. (DX 56 at 149.) AG ¶ 91.

165.    From July 1996 until at least 2002, the Plan was not administered in Illinois. (DX 64 at Y390; DX 65 at Y695, Y777.) The Plan has been administered in Illinois since sometime after its merger into the VMPP on January 1, 2002.  AG ¶ 92.

166.    The 1996 and 1997 versions of the Plan both state that "[e]xcept to the extent superseded by ERISA, all questions pertaining to the validity, construction, and operation of the Plan shall be determined in accordance with the laws of the Commonwealth of Pennsylvania." (DX 18, 1996 Plan § 12.5, at VZ1090; DX 25, 1997 Plan § 12.5, at VZ11770.)  AG ¶ 93.

## III.  CONCLUSIONS OF LAW

### A.    Procedural History.

Plaintiff alleges that Defendants miscalculated her pension benefits under § 16.5.1(a)(2) of the Plan by: 1) calculating her opening balance using 120% of the PBGC rate instead of 100% ("Discount Rate Issue"), and 2) calculating her opening balance by multiplying her lump-sum cashout value by her applicable Transition Factor once instead of twice ("Transition Factor Issue").   Plaintiff's claims are brought under ERISA §§ 502(a)(1)(B) and (a)(3), 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3).  This Court has jurisdiction over the claims pursuant to ERISA § 502(e), 29 U.S.C. § 1132(e).  The parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c)(1).

At the Phase I trial, this Court applied the deferential "abuse of discretion" standard of review to Defendants' determination to deny Plaintiff benefits under the Plan. *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 575 F.Supp. 2d 892 (N.D. Ill. 2008). As to Plaintiff's Discount Rate claim, the Court upheld Defendants' decision to calculate Plaintiff's opening account balance at 120% of the PBGC rate, instead of 100%, as a reasonable interpretation within Defendants' discretion. *Id.* at 910. As to Plaintiff's Transition Factor claim, the Court found Defendants did abuse their discretion by disregarding "unambiguous" Plan terms requiring the Transition Factor to be multiplied twice in calculating Plaintiff's opening balance–terms that Defendants claim were a "scrivener's error." *Id.* at 918. This Court held that "upon determining the language was a mistake, the Committee should have sought to reform the plan document in court . . . subject to *de novo* judicial review." *Id.*

Following issuance of the Phase I opinion, Defendants took up the Court's invitation to file a counterclaim for equitable reformation of the Plan's Transition Factor provision in § 16.5.1(a)(2) on theories of scrivener's error and mistake. Dkt. 139. The parties engaged in extensive discovery.

The Court subsequently held a Phase II bench trial, where it considered both the Discount Rate Issue and Transition Factor Issue *de novo*. The Court also heard evidence on Defendants' reformation counterclaim, including the in-court testimony of two witnesses, and received numerous exhibits in evidence, including depositions. Dkt. 186.

## B.    Statute of Limitations.

Before reaching the merits of the case, the Court must first address Defendants'

argument that both of Plaintiff's ERISA benefits claims are barred by the statute of limitations because Plaintiff was "on notice" of the benefit denial in 1998, when she retired and received her lump-sum pension benefits under the Plan. Plaintiff additionally asserts that Defendants' reformation counterclaim is untimely because the limitations period started running in 1996, when the Plan was finalized and approved with the second reference to the Transition Factor.

ERISA does not contain a statute of limitations for suits brought to recover benefits under § 502. *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 873 (7th Cir. 1997). When a federal statute does not provide direction, the court's inquiry is guided by principles of federal common law. *Berger v. AXA Network LLC*, 459 F.3d 804, 808 (7th Cir. 2006). Federal courts generally borrow from either federal or state statutes of limitations, whichever is most consistent with the law and policy underlying the federal cause of action. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 355 (1991); *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 465 (7th Cir. 1991).

One of ERISA's fundamental goals is to protect plan participants by requiring plan terms be communicated to them in writing. 29 U.S.C. § 1001(b). In line with that purpose, ERISA actions are authorized under § 502(a) to enforce or recover benefits due under the "terms of the plan." 29 U.S.C. § 1132(a)(1)(B), (a)(3). Thus, characterizing § 502(a) claims as akin to written contract claims for purposes of the applicable statute of limitations is consistent with the underlying purposes of ERISA. In looking for the most compatible statute of limitations for ERISA § 502(a) actions, the Seventh Circuit has repeatedly

borrowed from state statutes pertaining to written contracts. *Leister v. Dovetail, Inc.*, 546 F.3d 875, 880 (7th Cir. 2008); *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 65 (7th Cir. 1996); *Jenkins v. Local 705 Int'l Brotherhood of Teamsters Pension Plan*, 713 F.2d 247, 253 (7th Cir. 1983).

Once the appropriate limitations period has been determined, the next relevant question is when the limitations period begins to run. While courts borrow from state law to supply a statute of limitations for ERISA § 502 actions, federal common law determines when the limitations period accrues. *Daill,* 100 F.3d at 65; *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 520 (3d Cir. 2007). Generally, the federal "discovery rule" holds that a claim accrues once the defendant performs the alleged wrongful act and once the plaintiff discovers it. *Tolle v. Caroll Touch, Inc.*, 977 F.2d 1129, 1139 (7th Cir. 1992). However, ERISA-specific concerns may provide for a different accrual date based on the nature of the action involved. *Id.*

Therefore, to determine whether Plaintiff's claims and Defendants' counterclaim are barred, the Court must consider: 1) what limitations period applies; and 2) the accrual date of the claim.

## 1. Plaintiff's Claims

### a. Applicable Limitations Period

The parties raise two possible states whose statute of limitations might apply: Illinois or Pennsylvania. The most analogous Illinois statute of limitations is the ten-year limitations period for suits pertaining to written contracts. 735 ILCS 5/13-206; *Lumpkin*, 933 F.2d 449,

464-65 (7th Cir. 1991). Plaintiff advocates for application of the Illinois statute, as the Plan has been administered here since 2002. On the other hand, Defendants contend that Pennsylvania's four-year limitations period for breach of contract claims should apply. 42 Pa. Cons. Stat. § 5525; *Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 305-06 (3d Cir. 2008). Defendants claim that Pennsylvania was the "hub" of this case during the most relevant time period.

To determine which limitations period applies, the forum state's statute is the "starting point." *Berger v. AXA Network LLC*, 459 F.3d 804, 813 (7th Cir. 2006). However, if another state has "a limitations period that is more compatible with the federal policies underlying the federal cause of action, that state's limitations law ought to be employed . . . ." *Berger*, 459 F.3d at 813. To decide whether to import another state's statute of limitations, the Seventh Circuit looks to the state with the most "significant connection" to the action. *Id.*

The *Berger* case illustrates the "significant connection" analysis. In *Berger*, a class of insurance agents brought an ERISA action in Illinois, alleging the defendant wrongly deprived them of ERISA benefits by reclassifying them as independent contractors. The reclassification decision was made at the defendant's New York headquarters. And although both of the named plaintiffs resided in the forum state of Illinois, "other members of the class reside[d] in states other than Illinois," leading the court to observe that "Illinois is simply a spoke rather than the hub of this lawsuit." *Id.* Furthermore, the court found it "not entirely irrelevant" that the ERISA plan at issue contained a choice of law provision naming New

York as the forum for any non-ERISA disputes, as it spoke to the parties "justified expectations" of where potential litigation would ensue. *Id.* at 813-14. The Seventh Circuit concluded that "New York is the state with the most significant relationship to the parties and to the transaction" and thus it better served the federal policies at issue to displace the Illinois statute of limitations with New York's. *Id.* at 813-14; *see also Jenkins*, 713 F.2d at 251 (court determined Illinois statute of limitations applied because the operative events happened there, including location of plan administrator, plan headquarters, and plan investment agents).

Under the *Berger* considerations, Pennsylvania law applies in the present case because it is more closely connected to the parties, it was specified in the pension plan, and it was the "hub" of the decisions made relating to Plaintiff's claim. Pennsylvania is where Defendant was headquartered during the time period most relevant to this claim (the 1990s), where the Plan was drafted, and where the most putative Class members (3,743) still live. In addition, Plaintiff never lived or worked in Illinois during the most relevant time periods to the case, and only a handful of Class members (20) currently reside in Illinois. Furthermore, the pension plan in the present case contains a choice of law provision that designates Pennsylvania law to fill in any gaps in the ERISA statute. (PX 231 at VZ1090.)

Therefore, Pennsylvania's four-year statute of limitations will be applied to Plaintiff's claims to recover benefits under ERISA § 502.

### b. Accrual of Plaintiff's Claim

It is well established in this Circuit that ERISA § 502(a)(1)(B) benefit claims begin

to accrue only after a "clear and unequivocal repudiation of rights under the Pension Plan which has been made known to the beneficiary." *Daill*, 100 F.3d at 66. Defendants argue that Plaintiff's causes of action accrued when she received her lump sum pension payment in February 1998, the time when the alleged underpayment occurred. Plaintiff, on the other hand, argues that no "clear repudiation" occurred until the claims review committee denied her final appeals on the Discount Rate claim on February 16, 2005 and on the Transition Factor claim on April 5, 2007.

Plaintiff presents the more compelling argument. An ERISA § 502(a)(1)(B) claim accrues at the time benefits are denied. *Tolle*, 977 F.2d at 1139. In this Circuit, an ERISA plaintiff is required to exhaust all administrative remedies before bringing an action challenging a denial of benefits. *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 662 (7th Cir. 2005). Therefore, an ERISA action logically accrues after the final administrative appeal is denied in writing. *Riemma v. Bekins Van Lines Co.*, 1996 WL 99899, at *6 (N.D. Ill. Feb. 29, 1996).

Furthermore, most other circuits addressing the issue have also found that an ERISA claim accrues only when all administrative appeals have been exhausted. *See, e.g., White v. Sun Life Assurance Co. of Canada,* 488 F.3d 240, 246 (4th Cir. 2007); *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 230 (5th Cir. 1997); *Stevens v. Employer-Teamsters Council No. 84 Pension Fund*, 979 F.2d 444, 451 (6th Cir. 1992).

Defendants cite a Third Circuit case for the proposition that a "clear repudiation" of ERISA benefits occurs upon the initial denial of benefits. *Miller v. Fortis Benefits Ins. Co.*,

475 F.3d 516 (3d Cir. 2007). In *Miller*, the court held that a § 502(a)(1)(B) claim for benefits accrued at the date of the underpayment, because this was the point the plaintiff could be considered "on notice" of the alleged injury. *Miller*, 475 F.3d at 521-22. However, the *Miller* court specifically noted that this approach "diverges from that of other courts confronting the same issue." *Miller,* 475 F.3d at 523.

This Court declines to follow the Third Circuit's reasoning because the better argument is that Plaintiff's Discount Rate claim accrued in February 2005 and Transition Factor claim accrued in April 2007, following receipt of the respective final administrative denials from Defendants. Those dates represent the "clear and unequivocal repudiation of rights under the Pension Plan which has been made known to the beneficiary." *Daill*, 100 F.3d at 66. This result promotes the ERISA policy of requiring an exhaustion of administrative remedies prior to instituting litigation. *Ruttenberg,* 413 F.3d at 662. Therefore, both of Plaintiff's claims are timely under the four-year Pennsylvania statute of limitations.

### 2. Defendants' Counterclaim

#### a. Applicable Limitations Period

The Court applies the above analysis to ascertain the applicable statute of limitations for Defendants' counterclaim. Absent a governing ERISA provision, the Court again looks to the most analogous state statute. For the reasons set forth above, the Court will borrow from Pennsylvania law, which applies the four-year statute of limitations for contract claims in suits for reformation. *Bowes v. Travelers Ins. Co.*, 173 F. Supp. 2d 342, 346 (E.D. Pa.

2001).

### b. Accrual of Defendants' Counterclaim

While the four-year period provided by Pennsylvania state law applies, the Court must look to federal law to determine the accrual date for an ERISA reformation counterclaim. *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004). The parties assert two alternative theories–Plaintiff contends the limitations period began running in 1996, when Defendants published the Plan with the mistake, and Defendants argue the limitations period began when Plaintiff raised the mistake in the present action.

Under Pennsylvania law, a suit for reformation accrues at the time the error is committed, regardless of whether the parties had knowledge of the mistake. *Firestone & Parson, Inc. v. Union League of Philadelphia*, 672 F. Supp. 819, 822 (E.D. Pa. 1987). However, this rule is in conflict with the federal "discovery rule," which provides that a statute of limitations begins to run when a claimant knew or should have known of the facts giving rise to the cause of action. *Barry*, 377 F.3d at 688. In a reformation claim, the discovery rule means that "where the parties, by their actions, consistently construe a contract in a manner that conflicts with its plain meaning, the time to seek reformation does not begin to run until one of the parties repudiates the past construction and elects to rely on the plain meaning of the contract terms." *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1549 n. 13 (9th Cir. 1990). Even if a party is negligent in failing to discover its mistake, mere negligence is not a bar to reformation. Restatement (Second) of Contracts §

508 (1981); *Olivas v. ITT Hartford Life and Annuity Ins. Co.,* 1995 WL 349855, at *2 (9th Cir. June 9, 1995) (failure to discover clerical error in contract did not bar reformation).

Here, Defendants consistently paid out benefits under the Plan using a one-time multiplication of the applicable Transition Factor. The Plan beneficiaries, including Plaintiff, accepted these benefits without complaint about the Transition Factor calculation until 2006, when Plaintiff amended her complaint in the present action. While the error was brought to Defendants' attention in 1997 in a footnote of the *Corcoran* brief, the plaintiffs in that case did not raise a claim against Defendants for a different interpretation of the Transition Factor provision. Thus, while Defendants were arguably negligent for failing to "discover" the error in 1997, it was not enough to have started the limitations period running, because the *Corcoran* plaintiffs did not repudiate the past course of dealing. Therefore, the Court concludes that Defendants' reformation counterclaim accrued in 2006, when Plaintiff raised the issue in this action. Therefore, Defendants' counterclaim for reformation is timely under the four-year Pennsylvania statute of limitations.

**C.    *De Novo* Standard of Review.**

Unlike deferential review, where the Court looks to the reasonableness of the Plan administrator's decision, the *de novo* standard requires the Court to review the case with a fresh eye. In fact, the Court is not technically "reviewing" any decision, but rather making its own independent determination about the merits of the dispute and the employee's entitlement to benefits. *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). The Seventh Circuit put it this way:

> [W]hen *de novo* consideration is appropriate in an ERISA case ... the court can and must come to an independent decision on both the legal and factual issues that form the basis of the claim. What happened before the Plan administrator or ERISA fiduciary is irrelevant. [Cite omitted]. That means that the question before the district court ... was the ultimate question whether [the plaintiff] was entitled to the benefits he sought under the plan.

*Id.* This Court will now address both issues raised in this case under the *de novo* standard.

## D.   Discount Rate Issue.

Plaintiff contends Defendants incorrectly calculated her opening account balance because it used an interest rate equal to 120% of the PBGC rate, instead of 100%. Plaintiff argues that because § 16.5.1 provides a formula for determining the "present value," and because § 16.5.1(a)(2) refers to the term "lump-sum cashout value" without re-defining that term, the "lump-sum cashout value" is synonymous with the term "present value." Accordingly, Plaintiff asserts that § 16.5.1 governs how to determine that lump-sum cashout value, which uses 100% of the PBGC rate when determining the opening account balance.

Defendants, however, interpret "lump-sum cashout value" as not being synonymous with the term "present value" as stated in § 16.5.1. Rather, Defendants assert the "lump-sum cashout value" is to be determined by a formula under the 1995 BAMPP Plan, and thus uses the formula under § 4.19 of the 1995 BAMPP calling for a calculation of 120% of the PBGC rate.

Although the Court will review Plaintiff's Discount Rate claim *de novo* for the sake of thoroughly addressing all issues for possible appellate review, the Court concludes this issue was properly within Defendants' discretion. *See Young*, 575 F. Supp. 2d at 905-12.

When a plan administrator has discretion, the Court reviews its decision under an "abuse of discretion" standard to determine whether it was reasonable. *Metro. Life Ins. Co. v. Glenn,* --- U.S. ---,---, 128 S. Ct. 2343, 2348 (2008). In Phase I, the Court held Defendants' interpretation of the Plan language to mean that the lump-sum cashout value is to be determined under the formula stated in the 1995 BAMPP Plan was reasonable. *Young*, 575 F. Supp. 2d at 910. Therefore, the issue was appropriately decided in Phase I under the deferential standard of review.

### 1. *De Novo* Review of Discount Rate Issue

Applying the *de novo* standard, the Court concludes that Defendants correctly used 120% of the PBGC rate pursuant to § 4.19 of the 1995 BAMPP, instead of 100%, in determining Plaintiff's opening account balance. The Court first looks to the provision of the Plan governing Plaintiff's benefits, which indicates that the lump-sum cashout value is to be determined under the 1995 BAMPP methodology. Specifically, § 16.5.1(a)(2) states that:

> [i]n the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is the product of multiplying (A) the Participant's applicable Transition Fact described in Table 1 of this Section, *times* (B) the lump-sum cashout value of the Accrued Benefit payable at age 65 *under the 1995 BAMPP Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995.*

(PX 231 at VZ 1100) (emphasis added).) The 1995 BAMPP Plan was attached as Appendix A to the 1996 Plan. Under § 4.19(c)(2)(C) of the BAMPP, "[i]f the Acturarial Equivalent

present value of the pension using the 'applicable interest rate' (as defined in (c)) does exceed $25,000, 120% of the applicable interest rate" was to be used. (DX 17 at VZ 134.) An ERISA plan may incorporate terms and provisions from a predecessor plan, including provisions that "expired" before adoption of the current plan. *Young*, 575 F. Supp. 2d at 911.

Furthermore, Bell Atlantic communicated to the plan participants that it would continue to use the "same conversion method used in calculating a cashout payment under the old plan." (DX 1 at VZ 10392.) Specifically, Estimated Opening Account Balance Statements sent to participants explained that "[y]our accrued benefit is converted to a lump-sum value applying the same method used today to determine lump-sum cashouts and is based on the PBGC interest rate of 5%." (DX 11 at VZ 10476.) For participants with cashout balances over $25,000, that meant that 120% of the rate structure was used. Bell Atlantic consistently applied 120% of the rate structure to balances over $25,000 under the Plan. Restatements of the Plan beginning in 1998 were amended to explicitly state that 120% of the applicable PBGC rate is to be used for this type of participant. Given these considerations, Defendants properly used 120% of the PBGC rate to calculate Plaintiff's opening balance.

### 2. Defendants Are Not Judicially Estopped From Asserting That § 4.19 of the BAMPP Applies

Plaintiff asserts that Defendants are judicially estopped from arguing that § 4.19 of the BAMPP controls present value calculations under § 16.5.1(a) of the Plan, claiming they took an inconsistent position in *Corcoran v. Bell Atl. Corp.* The *Corcoran* litigation commenced in 1997 and challenged the Discount Rate calculation in determining

participants' opening balances when the BAMPP converted to the Cash Balance Plan. The *Corcoran* plaintiffs alleged that December 1995 PBGC rates should have been used in the calculation, while Defendants argued they properly applied September 1995 PBGC rates.

Judicial estoppel provides that a party who prevails on one factual or legal ground in a lawsuit cannot later repudiate that ground in subsequent litigation based on the same underlying facts. *Urbania v. Cent. States, S.E. & S.W. Areas Pension Fund*, 421 F.3d 580, 589 (7th Cir. 2005). For judicial estoppel to apply, three requirements must be met: 1) the latter position must be clearly inconsistent with the earlier position; 2) the facts at issue must be the same in both cases; and 3) the party to be estopped must have prevailed upon the first court to adopt the position. *Id.*

Here, the third element of judicial estoppel is clearly not met. The district court in *Corcoran* dismissed the plaintiffs' breach of fiduciary duty claim on the grounds that the claim failed to implicate any fiduciary duty. *Corcoran v. Bell Atl. Corp.*, 1997 WL 602859, at *8-9 (E.D. Pa. Sept. 23, 1997). The Third Circuit affirmed on the same grounds. *Corcoran v. Bell Atl. Corp.*, 159 F.3d 1350 (Table) (3d Cir. 1998) (full text at PX 475). Thus, the courts never reached the issue of the correct Discount Rate calculation, and Defendants did not "prevail" on any argument related to the interpretation of § 16.5.1(a).

Furthermore, the position Defendants took in the *Corcoran* litigation was not clearly inconsistent with their position here. In *Corcoran*, the parties did not dispute the application of the 120%/100% PBGC rate structure in calculating opening balances under the Plan. The dispute was whether the calculation should have been based on the PBGC rate for September

or December 1995.  In fact, in *Corcoran*, Defendants asserted to the trial court that "the actuarial assumptions that were adopted as part of the 1995 amendment [adopted by the Human Resources Committee of the Bell Atlantic Board of Directors in October 1995 to establish the new Cash Balance Plan] were determined using the same methodology that was already in place in 1994 and 1995" under § 4.19 of the BAMPP.  (DX 76 at VZ23692-93.) This argument was reiterated by Defendants on appeal.  (PX 243 at VZ22945.)  Defendants take the same position before this Court.  Accordingly, Plaintiff's judicial estoppel argument is rejected.

**E.      Transition Factor Issue – Defendants' Counterclaim for Reformation.**

Plaintiff additionally claims she was wrongly denied benefits because Defendants incorrectly calculated her opening balance formula by multiplying her lump-sum cashout value only once by her applicable Transition Factor.  Plaintiff argues that § 16.5.1(a)(2) requires Defendants to multiply her Transition Factor twice.  Defendants contend the language in § 16.5.1(a)(2) calling for a second multiplication of the Transition Factor was a mistake due to a "scrivener's error," and call upon the Court to reform it to eliminate the second reference to the Transition Factor, shown below in bold:

> **16.5.1(a)(2) Not Eligible for Service Pension**
> In the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is the product of multiplying (A) the Participant's applicable Transition Factor described in Table 1 of this Section, *times* (B) the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on

Compensation paid through December 31, 1995, **multiplied by the applicable transition factor described in Table 1 of this Section**. For a 1995 Former Active Participant, the date on which the individual ceased to be an Eligible Employee shall be substituted for December 31, 1995 in the last phrase of the previous sentence.

## 1.     Reformation of an ERISA Plan Under § 502(a)(3)

Plaintiff argues reformation is not a form of relief authorized by ERISA § 502(a)(3), which provides that an ERISA fiduciary may bring a civil action: "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain *other appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. 1132(a)(3) (emphasis added). For this Court's jurisdiction to be "secure," Defendants' counterclaim for equitable relief under ERISA must be appropriate under § 502(a)(3). *See Gutta v. Standard Select Trust Ins. Plans*, 530 F.3d 614, 620 (7th Cir. 2008); *see also Harris Trust and Sav. Bank v. Provident Life and Acc. Ins. Co.*, 57 F.3d 608, 615 (7th Cir. 1995) (counterclaim for restitution and unjust enrichment constitute appropriate equitable relief under § 502(a)(3)).

### a.     The Supreme Court's Definition of "Appropriate Equitable Relief"

The text of ERISA does not specifically delineate what constitutes "appropriate equitable relief" under § 502(a)(3), but several Supreme Court opinions have addressed the issue. In *Mertens v. Hewitt Associates*, the Court narrowly construed § 502(a)(3), stating that "[e]quitable relief must mean *something* less than *all* relief." 508 U.S. 248, 259 n. 8 (1993) (emphasis in original). The Court based this assertion on the distinction between classic legal relief and "those categories of relief that were *typically* available in equity (such as

injunction, mandamus and restitution, but not compensatory damages)." *Id*. at 256 (emphasis in original). The court held the plaintiff's claim for compensatory damages was precluded as a "classic" form of legal relief not authorized by § 502(a)(3). *Id.* at 255.

In *Great-West Life & Annuity Ins. Co. v. Knudson*, the Court determined that a plan administrator's restitution action was not "appropriate equitable relief" when it sought reimbursement for benefit overpayment from a claimant from unidentified funds. 534 U.S. 204 (2002). The Court once again defined "equitable relief" under § 502(a)(3) as "those categories of relief that were *typically* available in equity." *Id.* at 210 (emphasis in original). Although the *Great-West* Court stated that restitution was typical equitable relief, it nonetheless denied the plan administrator's claim, noting that "not all relief falling under the rubric of restitution is available in equity." *Id.* at 212. Since the plaintiff sought to impose personal liability for a contractual obligation to pay money, the Court characterized its request as an action at law and therefore unavailable under § 502(a)(3). *Id.* at 220-21.

However, when presented with a set of facts where the funds sought were separate, identifiable, and in the defendant's possession, the Supreme Court held § 502(a)(3) authorized the plaintiff's restitution action because it was an equitable lien on particular property and therefore a traditional form of equitable relief. *Sereboff v. Mid Atl. Med. Servs.*, 547 U.S. 356, 363 (2006). Once again, the Supreme Court interpreted § 502(a)(3) to authorize only "those categories of relief that were *typically* available in equity." *Id.* at 361 (emphasis in original).

### b.    Reformation Is "Appropriate Equitable Relief" Under § 502(a)(3)

Defendants' request for reformation is entirely consistent with the *Mertens* rationale because reformation is "most decidedly a remedy available *in a court of equity.*" *Blackshear v. Reliance Standard Life Ins. Co.,* 509 F.3d 634, 642 (4th Cir. 2007) (emphasis in original). Generally, the doctrine of reformation is available in cases where parties to a contract reached a valid agreement, but the agreed-upon understanding was not properly conveyed in writing. 27 Richard A. Lord, *Williston on Contracts*, § 70:21 (4th ed.). This is sometimes due to a "scrivener's error" on the part of the drafting party. Restatement (Second) of Contracts § 155 (1981). When a court finds by clear and convincing evidence that the written instrument does not reflect the agreed understanding, it may reform the document. *Patton v. Mid-Continent Sys.*, 841 F.2d 742, 746 (7th Cir. 1988).

Before the merger of courts of law and equity, reformation was a traditional equitable remedy. *See William Cramp & Sons Ship & Engine Bldg. Co. v. United States,* 239 U.S. 221, 233 (1915) (well established principles of equity jurisprudence requires reformation where mutual mistake is shown); *Hearne v. Marine Ins. Co.*, 87 U.S. 488, 490 (1874) ("the reformation of written contracts for fraud or mistake is an ordinary head of equity jurisdiction"); 2 D. Dobbs, *Law of Remedies*, § 11.6(3), p. 751 (2d ed. 1993) ("Reformation is historically an equitable remedy, not a legal one.").

The Seventh Circuit clearly opened the door for reformation of an ERISA plan in circumstances similar to the present case. *Filipowicz v. Am. Stores Benefit Plans Comm.,* 56 F.3d 807, 814 n.3 (7th Cir. 1995). In *Filipowicz*, a summary plan description limited certain insurance benefits to twelve months, while the group insurance plan itself was silent on the

issue of how long benefits would last. This was due to an admitted drafting error. While not allowing the defendants to unilaterally alter the unambiguous language in the plan, the court specifically noted that "[e]vidence that the written contract did not conform to the parties' intent would be relevant for a theory of mutual mistake and a request for reformation . . . ." 56 F.3d at 814 n.3. Other Seventh Circuit cases have also recognized the availability of reformation as a form of relief available under ERISA. *Johnson v. Allsteel, Inc.*, 259 F.3d 885, 890 (7th Cir. 2001) (claim for reformation of an ERISA plan allowed to proceed); *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 421 (7th Cir. 1998) (where there is mutual mistake in the formation of a contract the court can disregard unambiguous words); *see also Board of Tr. of U. of Ill. v. Ins. Corp. of Ireland, Ltd.*, 969 F.2d 329, 332 (7th Cir. 1992) (insurance contracts may be reformed when clear and convincing evidence compels the conclusion that the writing does not properly reflect true intentions of parties due to mutual mistake) (applying Illinois law).

Courts in other circuits have also expressly stated that reformation is "appropriate equitable relief" under § 502(a)(3) pursuant to the Supreme Court's guidance in *Mertens, Great-West, and Sereboff. See Ross v. Rail Car Am. Group Disability Income Plan*, 285 F.3d 735, 741 (8th Cir. 2001) (participant's claim for equitable reformation arises under § 502(a)(3) in light of *Great-West*); *Nechis v. Oxford Health Plans*, 421 F.3d 96, 103 (2d Cir. 2005) (reformation for mutual mistake would be appropriate for § 502(a)(3) claim); *DePace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543, 566-67 (E.D.N.Y. 2003) (reformation an appropriate equitable remedy under ERISA § 502(a)(3) and consistent with *Great-West*

reasoning); *Ramsey v. Colonial Life Ins. Co. of Am.*, 12 F.3d 472, 479-80 (5th Cir. 1994) (court can reform an ERISA-governed policy where both parties are mistaken as to a material aspect of the contract).

Given the above considerations, the Court has jurisdiction over Defendants' counterclaim because reformation falls within the meaning of "appropriate equitable relief" under § 502(a)(3).

### 2.      Factors to Consider in ERISA Plan Reformation

Having determined that Defendants' counterclaim for reformation may proceed, the Court next turns to the applicable principles for ERISA plan reformation. Analyzing Defendants' reformation counterclaim falls within the purview of this Court's power to develop a federal common law of rights and obligations under ERISA-regulated plans. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110 (1989). In developing the ERISA federal common law, courts generally look to ordinary principles of contract interpretation. *Mathews v. Sears Pension Plan*, 144 F.3d 461, 465 (7th Cir. 1998) (collecting cases). The contract law doctrine of "scrivener's error," or mutual mistake, allows a court of equity to reform a contract where a written agreement does not reflect the clear intent of the parties due to a drafting error. 27 Richard A. Lord, *Williston on Contracts* § 70:93 (4th ed.). The burden is on the party seeking reformation to establish evidence that is "'clear, precise, convincing and of the most satisfactory character' that a mistake has occurred and that the mistake does not reflect the intent of the parties." *Gerlib v. R.R. Donnelley & Sons Co.,* 2002 WL 1285795, at *3 (N.D. Ill. June 11, 2002).

However, the relevant principles of contract law must be customized to the policies of ERISA, and may not be applicable if the general contract law does not fit the ERISA issue at hand. *Mathews*, 144 F.3d at 465. In addition, when, as here, a case involves an ERISA pension plan, "the interpretive principles are also to be tailored to the distinctive characteristics of pension plans." *Id.* Therefore, the Court's reformation analysis must focus on traditional contract principles in light of ERISA-specific concerns.

### a.    ERISA's "Plan Documents" Rule

Plaintiff argues that Defendants' reformation counterclaim contradicts and is thus barred by ERISA's well-established "plan documents" rule. The plan documents rule, also referred to as ERISA's writing requirement, mandates that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). The written instrument must specify the basis on which payments are made to and from the plan. 29 U.S.C. § 1102(b)(4). ERISA fiduciaries are required to discharge their duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. 1104(a)(1)(D). The rule aims to ensure that "every employee may, *on examining the plan documents*, determine exactly what his rights and obligations are under the plan." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (emphasis in original).

The Supreme Court recently emphasized the importance of the plan documents rule in *Kennedy v. Plan Adm'r for DuPont Sav. and Inv. Plan*, --- U.S. ---,---, 129 S. Ct. 865 (2009). In *Kennedy*, an ERISA plan participant neglected to change his designated

beneficiary as required by the plan, resulting in a windfall to his ex-wife who had unequivocally waived those benefits in a divorce decree. *Id.* at 868-69. ERISA specifically provides that only a Qualified Domestic Relations Order (QDRO) will be binding on employee benefit plans, and the Court found that the divorce decree at issue was not a QDRO and thus not a controlling plan document. *See* 29 U.S.C. § 1056(d)(3). The Court held that "[t]he plan administrator . . . did exactly what [ERISA] required: 'the documents control, and those name the ex-wife.'" 129 S. Ct. at 877.

In so holding, the Supreme Court reasoned that the cost of complicating ERISA's "uncomplicated" bright-line plan documents rule by creating "less certain rules" is too great. *Id.* at 875-76. The rule permits participants to rely upon the plan documents, to avoid unnecessary confusion and the need to endure complicated factual inquiries into "nice expressions of intent," and to "get what's coming quickly" based upon a "clear set of instructions." *Id.* However, the *Kennedy* Court held only that a non-plan document cannot override a plan document. It thus leaves open the question of what to do when a plan document contains a drafting error.

### b. Reformation Principles In Light of the Plan Documents Rule

Courts confronting equitable reformation of ERISA plans have noted the tension between the equitable doctrine of reformation of a scrivener's error and the plan documents rule. The Third Circuit acknowledged:

> Allowing the doctrine of scrivener's error to apply in ERISA cases would seem at odds with [the plan documents rule]. A plan document containing a scrivener's error might mislead an employee into believing he had rights or obligations that he did

> not, in fact, have. If, on the other hand, the employer were
> bound by the plan documents, whether or not they contained
> errors, the employee would know precisely his obligations and
> right upon reading the plans.

*Int'l Union v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 907 (3d Cir. 1992). Despite this

potential tension, the *Murata* court found the scrivener's error doctrine to be appropriate in

that case. *Id.* On the other hand, under certain circumstances application of the mutual

mistake doctrine has been found to be inconsistent with "ERISA's strong preference for the

written terms of the plan." *Cinelli v. Security Pac. Corp.*, 61 F.3d 1437, 1445 (9th Cir. 1995)

(parol evidence of Board resolution offered to show intent of Board of Directors deemed

insufficient for reformation because Board resolution is not a plan document). However,

even courts who have declined to grant reformation have not altogether foreclosed the

possibility. *See Cinelli,* 61 F.3d at 1445; *Blackshear v. Reliance Standard Life Ins. Co.*, 509

F.3d 634, 642 (4th Cir. 2007)*; Cent. Pennsylvania Teamsters Pension Fund v. McCormick

Dray Line, Inc.,* 85 F.3d 1098, 1104 (3d Cir. 1996)*.* The Court will now examine the factors

courts analyze in deciding whether to grant reformation.

### i.    Mutual Mistake

The issue of whether to reform a scrivener's error in an ERISA plan turns on the case-

specific facts. Where the mutual understanding of the parties can be established, reformation

may be warranted if the plan terms do not reflect that understanding. In *Wilson v. Moog

Auto., Inc. Pension Plan*, the Eighth Circuit affirmed reformation where a collectively

bargained closing agreement, an acknowledged "plan document," conflicted with the pension

plan's actual terms due to a clerical error in the plan. 193 F.3d 1004, 1007-08 (8th Cir.

1999).  Because the agreement proved that the intent of the parties was not reflected in the plan itself, reformation was justified.  *Id.* at 1008.  Similar circumstances occurred in *Murata*, where a collective bargaining agreement (a "plan document") demonstrated the mutual intent of the parties despite the erroneous omission of a provision in the plan itself.  The *Murata* court held reformation was appropriate if the parties' intended terms were not reflected in the plan.  980 F.2d at 908.

Courts have also acknowledged the viability of an ERISA reformation claim where communications to participants clearly summarized intended plan terms that were not reflected in the formal plan due to a drafting error.  *Rea v. The Hershey Co. 2005 Enhanced Separation Plan*, 2008 WL 2782663, at * 8 (M.D. Pa. July 15, 2008);  *Air Line Pilots Ass'n v. Shuttle, Inc.,* 55 F. Supp. 2d 47, 53 (D.D.C. 1999).  In *Rea*, the court found that reformation was appropriate where the plan participants received consistent communications describing the plan's terms and where it was unlikely that any plan participant would have relied upon the typo in the plan text.  *Id.*  In *Air Line Pilots*, a claim for reformation was allowed to proceed to trial on a theory of scrivener's error or mistake where the participants were informed that their new plan would mirror the benefits they had been receiving under an old plan, but due to editing errors the new plan reflected a markedly increased benefit.  55 F. Supp. at 52-53.

When examining extrinsic evidence in ERISA plan interpretation, such evidence "must be objective."  *Mathews*, 144 F.3d at 467.  "It must not depend on the credibility of testimony (oral or written) of an interested party."  *Id.*  In *Mathews*, the court held that

treasury regulations, a course of dealing between the parties, and contents of a summary plan description (SPD) were sufficient objective evidence to show that a term of an ERISA plan "doesn't mean what it seems to mean." *Id.* at 468. In that case, the court was looking to parol evidence to establish the understanding among all parties as to the meaning of a seemingly unambiguous plan term. In its analysis of the differences between general contract interpretation and ERISA plan interpretation, the court specifically discounted less reliable forms of evidence such as oral testimony from the plan administrator. *Id.* at 466-67.

When no official "plan document" or other consistent plan communications could have put participants on notice that the plan itself contained an error, courts have barred reformation. In *Blackshear*, the Fourth Circuit determined that reformation was not appropriate where a clerical error had been printed in both the plan *and* the summary plan description ("SPD"). 509 F.3d at 643. When the SPD and the plan agree, "there is utterly no indication of error or mistake." *Id.* at 644. In *Cinelli,*, only a Board resolution, which was not a plan document, was offered as evidence that the plan contained a scrivener's error, while the plan otherwise provided a clear statement of benefits. 61 F.3d at 1445. The Ninth Circuit held that parol evidence of the intent of the Board could not overcome otherwise consistent terms in the formal plan document to establish mutual mistake. *Id.* Similarly, in *Gerlib*, the court determined that internal company guidelines were insufficient to trump the "unambiguous" plan documents and were not clear and convincing evidence of mutual mistake. 2002 WL 1285795 at *4.

Plaintiff has further raised the issue of whether the alleged drafting error by Defendants can be classified as a "mutual" mistake in the context of a unilaterally drafted ERISA plan. The mutual v. unilateral mistake distinction is an important one in a reformation analysis, as courts have been "reluctant to allow a party to avoid a contract on the ground of [unilateral] mistake, even as to a basic assumption, if the mistake was not shared by the other party." Restatement (Second) of Contracts § 153 cmt. a (1981). In the ERISA context, absent an employee collective bargaining agreement, pension plans are not negotiated by the parties, but are unilaterally conferred and amended by the administrator. *Mathews*, 144 F.3d at 465. Thus, a drafting error by an ERISA plan drafter is only a mutual mistake if the employees were "on notice" of the plan sponsor's actual intent. *Bock v. Computer Assocs. Int'l*, 257 F.3d 700, 710-11 (7th Cir. 2001) (case remanded for trial to determine whether plaintiff knew, or had reason to know, that employer intended to exclude commissions based on plan summary); *see also Grun,* 163 F.3d at 421-22 (no mutual mistake where unambiguous language in severance compensation agreement was consistent with employees' understanding). However, where both the plan sponsor and plan beneficiaries were operating under the same understanding of the sponsor's intent, it is a "mutual" mistake if the plan does not reflect that understanding. *Murata*, 980 F.2d at 907; *Wilson,* 193 F.3d at 1009 (pension plan amendment reformed to be made consistent with the plant closing agreement); *Air Line Pilots,* 55 F. Supp. 2d at 53-54 (cross motions for summary judgment denied to permit trial on doctrine of scrivener's error).

Whether the parties were "on notice" of the plan sponsor's intent (*e.g.*, whether there was a mutual mistake) is thus the key consideration in determining whether to reform an alleged scrivener's error. Clear and convincing evidence cannot be shown where no clear documentation existed demonstrating what the plan participants understood the plan terms to be. *See Blackshear,* 509 F.3d at 642-43*; Cross v. Bragg*, 2009 WL 2196887, at *7 (4th Cir. July 24, 2009); *Humphrey v. United Way of the Texas Gulf Coast*, 2007 WL 2330933, at *11-12 (S.D. Tex. Aug. 14, 2007)*.* In *Blackshear*, no written evidence existed showing that the plan beneficiaries would have known of an even "obvious" mistake. 509 F.3d at 643. In *Cross* and *Humphrey*, the courts specifically found there could not have been a mutual mistake where evidence was only offered as to the plan sponsor's intent and not the understanding of the plan beneficiaries. 2009 WL 2196887 at *8; 2007 WL 2330933 at *11. However, when an SPD or SMM, along with consistent plan communications, sufficiently put the beneficiaries on notice of the plan sponsor's intent, then a mutual understanding has been reached. *See Air Line Pilots,* 55 F. Supp. 2d at 53-54; *Mathews*, 144 F.3d at 466-67.

### ii. Reliance

When there is no evidence that any plan beneficiaries actually relied on an error in the plan, "ERISA's goal of providing clear Plan documents is . . . less pertinent." *Murata,* 980 F.2d at 907; *see also Rea v. The Hershey Co. 2005 Enhanced Separation Plan*, 2008 WL 2782663, at * 8 (M.D. Pa. July 15, 2008) ("reformation of a plan document does not contravene [the plan documents rule] if a court can determine that it is unlikely that plan participants relied upon the scrivener's error"). In fact, allowing equitable reformation when

there has been no reliance on an error reinforces the plan documents rule because it ensures that the plan is accurate. This strengthens ERISA's promise that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995).

The Court finds that the question of what the plan participants actually relied upon is probative in the context of an ERISA reformation analysis. The Seventh Circuit found the fact that "[n]obody complained during the period in which the critical language was in the plan" to be crucial evidence that there was no actual reliance on erroneous plan language. *Mathews*, 144 F.3d at 468. In *Murata*, the Third Circuit emphasized the importance of reliance, stating it was a key consideration in determining whether reformation would comport with the plan documents rule. *Murata*, 980 F.2d at 907. The Ninth Circuit also recognized that actual reliance is a determinative factor in the analysis of reformation of a scrivener's error in the ERISA context. *Cinelli,* 61 F.3d at 1445 (finding insufficient evidence of such reliance).

Summary plan descriptions ("SPD") and summaries of material modifications ("SMM") provide key evidence on the reliance question, as they are "what the plan beneficiaries actually read." *Mathews,* 144 F.3d at 466. ERISA requires that plan administrators provide an SPD and SMM written in a manner "calculated to be understood by the average participant." 29 U.S.C. §§ 1022(a), 1024(b)(1). SPDs and SMMs are plan documents. 29 U.S.C. § 1024(b)(2), (b)(4); *Kennedy v. Plan Adm'r for DuPont Sav. and Inv. Plan*, --- U.S. ---,---, 129 S. Ct. 865, 877 (2009). In the event an SPD or SMM directly

conflicts with the plan text, as it does in the present case, this Circuit has consistently held that the summary controls because it is the document participants read and rely upon. *Helfrich v. Carle Clinic Assoc., P.C.*, 328 F.3d 915, 916 (7th Cir. 2003); *Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan,* 144 F.3d 1014, 1023 (7th Cir. 1998); *Mathews,* 144 F.3d at 466 ("plan summary generally controls in the case of a conflict with the plan itself . . . ."); *Senkier v. Hartford Life & Acc. Ins. Co.*, 948 F.2d 1050, 1051 (7th Cir. 1991); *cf Perry v. Sheet Metal Workers' Local No. 73 Pension Fund,* No. 08-2024, slip. op. at 11 (7th Cir. Oct. 27, 2009) (plan governs absent contradictory SMM or SPD).

Plaintiff correctly points out that Plan communications in the present case contain the boilerplate disclaimer that the Plan would govern in the event of a conflict between the Plan and any summary descriptions. However, to allow such a disclaimer would essentially nullify ERISA's requirement that plan summaries be "accurate" and "sufficiently comprehensive to reasonably apprise" plan participants of their rights and obligations under the plan. *Hansen v. Continental Ins. Co*, 940 F.2d 971, 982 (5th Cir. 1991); *Hopkins v. Prudential Ins. Co. of Am.*, 432 F. Supp. 2d 745, 763 (N.D. Ill. 2006) ("In general, a claimant sees the SPD, not the plan, and he makes decisions based on the terms as they are set forth in the SPD."). Therefore, the Court will look to the contents of the SMM and SPD governing the Plan as evidence of what the plan beneficiaries relied upon.

### iii. "Course of Dealing" Between the Parties

A long and consistent course of dealing is further objective evidence of a mutually understood agreement. Course of dealing evidence is particularly reliable in contract

interpretation because the credibility of such evidence is "not a function of the self-serving testimony of a party to the contract." *Mathews,* 144 F.3d at 466. The history between the parties will demonstrate what they believed their written agreement was, even if a scrivener's error resulted in the actual written terms differing from that understanding. *Murata*, 980 F.2d at 908. The fact that benefits were consistently paid out and accepted over a period of years using the same calculation is strong evidence of a "course of dealing" between an ERISA plan administrator and the plan beneficiaries.

### iv. Windfall

A related consideration to the reliance question is whether the results without reformation would be "absurd" or create a windfall to some plan participants. *Murata,* 980 F.2d at 907; *Gerlib*, 2002 WL 1285795, at *3; *Cinelli,* 61 F.3d at 1444 (court considered whether windfall would be created by failing to correct alleged error); s*ee generally* Black's Law Dictionary (8th ed. 2004) (defining a "windfall" as "an unanticipated benefit . . . not caused by the recipient"). In *Mathews*, the Seventh Circuit emphasized: "[w]e cannot see how ERISA beneficiaries . . . would be benefitted by the adoption of principles of contractual interpretation so rigid and archaic as to permit the class to reap the pure windfall here sought to the potential prejudice of other beneficiaries." *Mathews* at 469. And as discussed above in *Murata*, the Third Circuit relied on "scrivener's error" in the ERISA context in part because of the unanticipated "windfall" that could result if it rejected reformation. 980 F.2d at 907. There, ERISA's goal of providing clear plan documents was not implicated where neither party foresaw the excess benefit. *Id. See also Air Line Pilots Ass'n v. Shuttle, Inc.,*

55 F. Supp. 2d 47, 53 (D.D.C. 1999) ("When . . . employees would receive a 'windfall' if the plan were not reformed, courts have been more inclined to intervene and change the terms of the plan to reflect the parties' true intent.").

Plaintiff contends Defendants cannot prove a windfall or absurdity, additionally urging such issues are irrelevant. Plaintiff points to a series of cases which stand for the proposition that courts enforce harsh rules, especially in ERISA cases, even when they lead to a windfall. *See, e.g., Schena v. Metro. Life Ret. Plan*, No. 06-16623, 2007 WL 1875644, at *3 (11th Cir. June 29, 2007) (noting the plan documents rule can often lead to harsh results and explaining the rule provides predictability as to the extent of future obligations); *Integrated Health Servs. Brentwood, Inc. v. Commonwealth Edison*, No. 98-0558, 1999 WL 1256255, at *1 (N.D. Ill. Dec. 20, 1999) (same). However, the cases Plaintiff cites relate to oral modifications and other informal communications made to plan beneficiaries, not summary provisions sent out to employees notifying them of their rights under the plan as was done in the present case.

Furthermore, courts do not look favorably on attempts to obtain windfall recoveries from ERISA plans. *See Harms v. Cavenham Forest Indus., Inc.*, 984 F.2d 686, 693 (5th Cir. 1993) (windfall recoveries are "abhorred by ERISA"); *Henry v. Champlain Entersprises, Inc*. 445 F.3d 610, 624 (2d Cir. 2006) (Sotomayor, J.) (the aim of ERISA is "to make the plaintiffs whole, but not to give them a windfall"). Clearly, the goals of ERISA to protect the rights of plan beneficiaries were not intended to extend to benefits that participants never expected.

### v.    Additional ERISA Policy Considerations

Defendants additionally set forth the public policy argument that employers, who are under no obligation to offer employee benefit plans, will be discouraged from doing so if not allowed to reform scrivener's errors. Defendants contend that enforcing a term resulting from a mistake or scrivener's error undermines one of ERISA's principal goals–to "protect employees' justified expectations of receiving the benefits their employers promise them." *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 730, 743 (2004). In addition, in order to protect employees' expectations under ERISA plans, the statute requires that plans be adequately funded. 29 U.S.C. § 1001(c). To allow some employees to receive unanticipated and unintended benefits, Defendants argue, would circumvent both of these goals by producing unpredictable financial consequences and potentially leaving the Plan underfunded.

The Court must consider that an absolute bar on reformation of a drafting error could have the effect of discouraging employers from establishing and maintaining employee benefit plans. The Supreme Court has pointed out that employers are under no obligation to provide employee benefit plans, nor what kind of benefits to provide if they do choose to establish a plan. *Lockheed Corp. v Spink*, 517 U.S. 882, 887 (1996). On one hand, Congress implemented ERISA to ensure that employees' benefits were protected. *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). On the other hand, Congress did not desire to create a system that would result in high administrative and litigation costs that could potentially discourage employers from offering plans. *Id.* If errors in plan drafting are to be strictly

enforced so as to create a windfall to participants at the unanticipated expense of the plan, it could presumably act as a deterrent to employers from establishing such plans.

### 3. Given the Above Considerations, Reformation is Justified

Analysis of the Plan under the mutual mistake doctrine is not inconsistent with ERISA's plan documents rule in the present case. Defendants have shown, by objective clear and convincing evidence, that both parties operated under an understanding that the Transition Factor under § 16.5.1(a)(2) would only be multiplied once in determining an employee's opening balance. The phrase calling for a second multiplication was a drafting error. No evidence exists to suggest that any plan participant relied upon the error. In fact, the course of dealing between Defendants and the plan participants shows that benefits were consistently calculated by multiplying the Transition Factor once. To enforce the erroneous plan provision now would result in an enormous windfall to the Class participants in Subclass 2.

### a. Participant Communications

Defendants sent numerous communications to plan participants that clearly and consistently established the Transition Factor would be multiplied only once. The first of these was the brochure sent out to participants in October 1995 entitled "Introducing Your Cash Balance Plan," which constituted the Plan's summary of material modifications (SMM) and was thus a plan document. The SMM was written in a straightforward manner and set forth in simple terms that the opening balance would be calculated pursuant to this formula:

OLD PLAN LUM SUM VALUE x TRANSITION MULTIPLIER = OPENING ACCOUNT

BALANCE.  The SMM also contained specific examples using the single multiplication of the Transition Factor.  In letters to plan participants in October 1995, November 1995 and May 1996, Bell Atlantic repeatedly instructed participants to "please be sure to read" and "please refer to" the SMM for an accurate statement of the Plan's opening balance and Transition Factor provisions.

In November 1995, Bell Atlantic sent estimated "opening account balance" statements to BAMPP participants.  These statements provided each participant with an estimate of his or her opening balance in the Cash Balance Plan, provided a step-by-step description of the opening balance formula, and contained a table of the Plan's Transition Factors.

In May 1996, Bell Atlantic provided each participant in the Cash Balance Plan with a customized retirement planning guide, "A Look at Your Future Today: Your Retirement Planning Guide."  This guide included a personalized "opening balance" statement setting forth each participant's actual opening balance calculation.  These statements explained that each participant's lump sum cash-out value would be multiplied by the applicable Transition Factor only once.  Bell Atlantic also sent participants a quarterly statement that, among other information, set forth the participant's current balance in the cash balance plan.  By June 30, 1996, Bell Atlantic had completed more than 50,000 separate mailings to participants, each of which made clear that the lump-sum cash out was multiplied by the Transition Factor just once.

### b.      Other Evidence of Intended Formula

The development and drafting history of the Plan clearly demonstrates that Bell Atlantic only intended to multiply the Transition Factor once. On September 26, 1995, Mercer submitted a memorandum to Bell Atlantic that included a copy of the plan's Transition Factor table and a 15-year projection of liabilities. The projected liabilities were based on the Transition Factor being multiplied once, not twice. Mercer's cover memorandum submitting its final recommendation for the Cash Balance Plan explained that the Transition Factor was to be multiplied only once by the lump cashout value. On September 27, 1995, Mercer sent Coopers & Lybrand the specifications to calculate the opening balances as of December 31, 1995. Those specifications provided for multiplying the lump-sum cashout value times the Transition Factor only once, not twice.

The Transition Factors in the table attached to Mercer's September 26, 1995 memorandum to Bell Atlantic and its September 27 memorandum to Coopers & Lybrand were the same ones used to calculate the actual opening balances in January 1996 and the same ones contained in the tables attached to the July 1996 Cash Balance Plan. These documents and the related testimony by Moreen, the Mercer Partner in charge of the Bell Atlantic engagement, and Peters, the in-house counsel responsible for drafting the Cash Balance Plan, fully support a finding that Defendants intended to multiply the Transition Factor only once.

Bell Atlantic's Corporate Employee Benefits Committee ("CEBC") adopted a resolution in October 1995 authorizing the transition from the BAMPP to the Cash Balance Plan. The resolution specified that a participant's opening balance in the Plan would equal

"the product of the cashout value of the participant's accrued benefit on the Effective Date (determined under the existing rules of BAMPP as of 12/31/95) times a Transition Factor (greater than or equal to 1.0) according to the table presented to this meeting..."  The table presented at the meeting was the Transition Factor table submitted by Mercer in September 1995.  In November 1995 the Human Resources Committee ("HRC") of Bell Atlantic's Board of Directors approved the amendment of the BAMPP, effective December 31, 1995, to create the Cash Balance Plan.

### c.    Scrivener's Error

The drafting error caused by Peters in the 1996 Plan was a classic "scrivener's error" that caused the Plan itself to reflect something different than what both parties understood it to mean. The drafting history of the Cash Balance Plan demonstrates by clear and convincing evidence that a mistake was made in the drafting of the restated Plan document by including two references to the Transition Factor in § 16.5.1(a)(2) of the Plan.

Peters was the Bell Atlantic employee responsible for coordinating and steering the plan documentation process.  Abramowitz from Morgan Lewis was hired to provide outside legal assistance in the drafting of the Cash Balance Plan.  Strella was the head of the document drafting working group on the team Mercer assembled for the Bell Atlantic cash balance conversion.  Strella prepared the first three drafts, completing the third in October 1995.  The three Mercer drafts express the opening balance formulas for Service Pension eligible and non-Service Pension eligible participants in similar terms, using a single Transition Factor.

Peters prepared Draft 4 of the Cash Balance Plan, dated April 15, 1996. Draft 4 is the first draft of the Plan that contains a second reference to the Transition Factor in the opening balance formula for nonservice pension eligible participants. In Draft 4, Peters edited and reorganized the language in an effort to make the text more clear. He intended to treat those Eligible for Service Pensions and those Not Eligible for Service Pensions the same in describing their opening balance formulas. However, Peters neglected to delete the "trailing clause" that read "multiplied by the applicable transition factor" at the end of the section relating to those Not Eligible For Service Pensions.

As a result of Peters' mistake, the formula called for the lump-sum cashout value to be multiplied by the Transition Factor twice; rather than once as intended. This mistake went unnoticed despite further drafts and reviews by Abramowitz, and was carried over into the renumbered § 16.5.1(a)(2) in the final version of the 1996 Plan. Peters provided credible testimony at the Phase II trial of his error: "I was always working electronically so that I could share my work more efficiently with both people in my company and elsewhere, and I must not have seen clearly the words that had been left at the end of that paragraph ... It was unfortunately my own mistake by my own hand." (T. 101.)

### d. No Reliance

There is no evidence that Plaintiff or any Class member actually relied upon language calling for the Transition Factor to be multiplied twice instead of once. Prior to this litigation, no Class member ever brought a claim that the Transition Factor had been misapplied. In fact, the plaintiffs in the *Corcoran* litigation took specific note of the

scrivener's error, but did not assert a claim that they were entitled to greater benefits as a result. Furthermore, Plaintiff never reviewed or relied upon the mistaken language in the Plan. Plaintiff did, on the other hand, produce from her files the communications she received in 1995 and 1996, including the SMM, quarterly statements, Estimated Opening Account Balance Statement, and the "A Look at Your Future Today" booklet. Plaintiff kept these as "important" documents related to her employment. The documents were all consistent in explaining that the Transition Factor would be multiplied once.

### e. Course of Dealing

The course of dealing between the Plan administrator and the Plan participants indicates that benefits were always paid out under the Plan by multiplying the Transition Factors only once. Opening Balances were established for 13,784 plan participants retroactive to January 1, 1996. All of the calculations were performed multiplying the Transition Factor only once. Quarterly statements consistently used this same methodology.

### f. Windfall

To allow Plaintiff and the other Class members to receive benefits pursuant to the scrivener's error would create a $1 billion windfall to the Class, including $400,000 to Plaintiff. More than 5,780 participants would receive unanticipated increases in their opening balances of $100,000 or more. Furthermore, squaring the Transition Factor would result in Plaintiff and many members of Subclass 2 receiving benefits substantially larger than those received by co-workers who worked more years for Bell Atlantic, a result clearly not intended by Defendants, nor anticipated by the Class.

**F.     Plaintiff's Equitable Defenses to Reformation**.

Plaintiff contends that even if reformation of the Plan is appropriate due to mutual mistake or scrivener's error, the Court should still exercise its discretion and deny equitable relief. "Since the remedy of reformation is equitable in nature, a court has the discretion to withhold it, even if it would otherwise be appropriate, on grounds that have traditionally justified courts of equity in withholding relief." Restatement (Second) of Contracts § 155 cmt. d (1981). Plaintiff raises several equitable affirmative defenses she claims should bar reformation: 1) undue delay and laches, 2) inexcusable neglect, 3) acquiescence and ratification, 4) unclean hands, and 5) judicial estoppel. The Court is not persuaded that any or all of these defenses is sufficient to bar reformation of the Plan. The Court will consider each in turn.

**1.     Undue Delay / Laches**

The equitable doctrine of laches derives from the maxim that those who sleep on their rights, lose them. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). Laches may estop a party from asserting a right or claim where, independent of the statute of limitations, a party's delay becomes inequitable. 31 Richard A. Lord, *Williston on Contracts* § 79:11 (4th ed.). Two basic elements comprise a laches defense: 1) an unreasonable lack of diligence by the party against whom the defense is asserted ; and 2) prejudice resulting from the delay. *Hot Wax*, 191 F.3d at 820.

Plaintiff urges that Defendants' conduct was "inexcusable" because they failed to bring a reformation claim after they were put on notice of the alleged error in the Plan in a

footnote to a brief in the 1997 *Corcoran* litigation. However, Defendants' conduct does not rise to an inexcusable level. The plaintiffs in the *Corcoran* litigation explicitly did not make a claim for benefits under the erroneous plan term, stating they believed it to be a scrivener's error. Furthermore, nothing changed in the conduct of the parties following the 1997 notification to Defendants–benefits continued to be paid and accepted under the Plan terms. Where a scrivener's error has not resulted in a dispute between the parties, it is not unreasonable for one to assume the terms of the agreement will continue to be carried out pursuant to the parties' mutual understanding. *See, e.g., Safeway, Inc. v. Sugarloaf P'ship, LLC.,* 423 F. Supp. 2d 531, 537 (D. Md. 2006) (no inexcusable delay where reformation action instituted only after tenant was notified that landlord desired to terminate lease).

Furthermore, Defendants' inaction did not prejudice Plaintiff. While witnesses' memories may have faded since the most relevant years in question (1996-1998) and documents have been lost or destroyed, Plaintiff has not shown any prejudice in presenting her case. Furthermore, Plaintiff has not been prejudiced because she was never aware of the scrivener's error, and she never relied on the possibility that the Transition Factor might be multiplied twice. In fact, even Plaintiff's counsel did not notice the double multiplication of the Transition Factor under § 16.5.1(a)(2) when this lawsuit was filed in 2005. Thus, the doctrine of laches will not bar reformation here.

### 2. Acquiescence & Ratification

Plaintiff argues that Defendants ratified and acquiesced to the alleged drafting error when the Plan was restated in 1997 with the error following receipt of the *Corcoran* brief.

Generally speaking, "[t]he power of a party to avoid a contract for mistake or misrepresentation is lost if after he knows or has reason to know of the mistake . . . he manifests to the other party his intention to affirm it." Restatement (Second) of Contracts § 380(2) (1981). A party acquiesces to a contract when it fails to repudiate benefits received, indicating acceptance of the contract terms. *Carr v. Runyan*, 89 F.3d 327, 332 (7th Cir. 1996).

The evidence here does not demonstrate that Defendants ratified the error or acquiesced to it. For nearly a decade Defendants calculated, reported, and paid benefits to Plan participants based on a single multiplication by the Transition Factor. Thus, they never manifested an intent to affirm the error. The 1997 Plan restatement was prepared pursuant to authorization given on June 26, 1997. The *Corcoran* brief was not received until August 8, 1997. And while Defendants had knowledge of the error by the time the Plan was restated in 1998 without the erroneous term, this does not indicate they acquiesced to it. In fact, it shows exactly the opposite of acquiescence. Furthermore, all of the communications sent to plan participants remained consistent throughout this time. The Court therefore sees no equitable basis under these principles that would bar reformation.

### 3. Inexcusable Negligence and Bad Faith

When a party seeks reformation of an instrument due to mistake, courts will not ordinarily deny relief even if that party was negligent. 27 Richard A. Lord, *Williston on Contracts* § 70:49 (4th ed.). "It is obvious that negligence itself is not a defense to reformation, since there would then be no ground for reformation because of a mutual

mistake, inasmuch as mistakes nearly always presuppose negligence." *Blumenfeld v. Neuman*, 112 N.E.2d 742, 745 (Ill. App. Ct. 1953); *see also, e.g., Pioneer Res. LLC v. D.R. Johnson Lumber Co.*, 68 P.3d 233, 251-52 (Or. Ct. App. 2003) (oversight in failing to read documents that might correct a party's mistaken understanding of a term is not gross negligence). In order to bar equitable relief, a party's negligence must be "gross," that is, it must "amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing." Restatement (Second) of Contracts § 157 (1981). This language indicates a much higher standard than simple negligence – it rises to the level of wilful behavior where a party has knowingly acted in bad faith.

Defendants' behavior here did not rise to that standard. Plaintiff contends that Defendants were grossly negligent when they failed to detect the erroneous second Transition Factor in § 16.5.1(a)(2) before finalizing the 1996 Plan, setting forth numerous occasions where the Defendants could have discovered and corrected the mistake but failed to do so. Plaintiff also argues that Defendants were grossly negligent when they failed to correct the error in 1997.

There is no question Defendants were negligent in failing to discover and correct the scrivener's error prior to 1998. Defendants repeatedly failed to detect the erroneous second Transition Factor in § 16.5.1(a)(2) despite numerous revisions, the work of multiple ERISA experts, and the notice from the *Corcoran* litigants. Defendants had the resources and ability to notice and correct the erroneous second Transition Factor on multiple occasions. It befuddles the Court how a major corporation could inattentively look over such a crucial plan

term, and the Court cannot simply turn a blind eye to the profound degree of negligence Defendants exhibited here.

However, in a balance of the equities, the negligence is not so "inexcusable" or "gross" as to preclude reformation. No evidence indicates Defendants acted in bad faith or failed to follow reasonable standards of fair dealing. While Defendants' negligence was a "bell" ringer, it was not bad faith. The fact remains that Defendants and the Plan participants had a mutual understanding as to the Transition Factor provision of the Plan. Benefits were paid to the Class members based on that clear understanding. No one relied on the scrivener's error and no one anticipated they would receive benefits under a double multiplication of his or her Transition Factor. To preclude reformation here would produce a harsh and inequitable result and a huge windfall recovery for the Class. As a result, Defendants' negligence will not bar their reformation claim.

### 4. Unclean Hands

The "unclean hands" doctrine allows a court to deny equitable relief to a party who has engaged in unlawful or inequitable conduct in connection with the matter from which he or she seeks relief. *Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1021 (7th Cir. 2002). In other words, it affords the court the power to refuse equitable relief if granting such relief would produce an illegal or unjust result. *Packers Trading Co. v. CFTC*, 972 F.2d 144, 48-49 (7th Cir. 1992). Wrongful conduct includes any acts which are inequitable, unfair, dishonest, fraudulent, unconscionable, or in bad faith. 27A Am. Jur. 2d Equity § 100 (2d ed. 2009).

Plaintiff contends that Defendants had unclean hands as of August 1997, when it was put on notice of its error, and continuing to 1998, when it reissued the Plan without reference to the second Transition Factor. Plaintiff asserts that Defendants had a fiduciary duty to disclose the correction of the error as a "material modification" to the plan. *See* 29 U.S.C. § 1024(b)(1); 29 C.F.R. § 2520.104b-3. Furthermore, Plaintiff asserts Defendants knowingly submitted a copy of the Plan to the IRS in November 1997 with knowledge that they were not administering the Plan in accordance with its written terms.

Plaintiff has not shown that Defendants acted deceitfully, fraudulently, unconscionably or in bad faith. Defendants made a mistake drafting the Plan, a mistake which was undoubtedly negligent. However, Defendants continued to administer the Plan consistently throughout. Defendants' actions were in concert with both the Board authorization and the communications to the Plan participants regarding the implementation of the Cash Balance Plan. The Court does not find any evidence of wilful misconduct and therefore, Plaintiff's unclean hands defense will not bar reformation.

### 5.     Judicial Estoppel

Finally, Plaintiff argues that the Court should estop Defendants from asserting a claim for reformation because they have "successfully" argued that reformation of unilateral mistake is unavailable. Judicial estoppel operates to prevent a party from asserting a position inconsistent with an argument it prevailed on in a previous case. *Urbania v. Cent. States, Se. & Sw. Areas Pension Fund,* 421 F.3d 580, 589 (7th Cir. 2005). For judicial estoppel to apply: (1) the latter position must be clearly inconsistent with the earlier position; (2) the facts at

issue must be the same in both cases; and (3) the party to be estopped must have prevailed upon the first court to adopt the position.  *Id.*  The threshold for prevailing on a judicial estoppel argument regarding inconsistency is high.  *Kim v. Sara Lee Bakery Group*, *Inc.,* 412 F. Supp. 2d 929, 939 (N.D. Ill 2006).

Plaintiff relies on the arguments Defendants prevailed on in *Todisco v. Verizon Communications, Inc.* and *Gramm v. Bell Atlantic Management Pension Plan* to support its application of judicial estoppel in this case.  *See Todisco*, 497 F.3d 95 (1st Cir. 2007), *aff'g.* No. 01-12116 (D. Mass 2001); *Gramm,* 983 F. Supp. 585 (D.N.J. 1997).

Contrary to Plaintiff's contention, the position adopted by Defendants in this case is not "clearly inconsistent" with the positions they adopted in *Todisco* or *Gramm*.  In *Todisco*, a plan beneficiary allegedly relied on incorrect information she received orally via Verizon's telephone hotline.  Verizon argued that she was not entitled to reformation of the plan because the oral information clearly conflicted with the terms of the plan.  The *Todisco* court dismissed the plaintiff's claim, stating that "reformation is available to repair mistakes or confusion attending the formation of a contract" but holding that the plaintiff did not allege "that there were any mistakes or misunderstandings at the time of formation of the contract." *Todisco*, No. 01-12116 (D. Mass. 2001).  Verizon's argument in *Todisco* that oral communications cannot override plan terms is not inconsistent with their present argument of mutual mistake and scrivener's error.

Similarly, Plaintiff's reliance on *Gramm* as a basis for judicial estoppel is misplaced. In *Gramm,* the plaintiff, under an equitable estoppel theory, asked the court to bind Bell

Atlantic to the allegedly misleading representations of pension benefits it sent him via informal written communications. 983 F. Supp. at 587. Defendants successfully argued that informal communications cannot trump plan terms where the plaintiff did not detrimentally rely on them . *Id.* In *Gramm,* there was no allegation of mutual mistake or scrivener's error. In fact, the court held that Bell Atlantic had communicated the proper plan terms to the plaintiff. Thus, the Court cannot accept Plaintiff's position that Defendants raised the same argument in *Gramm* as they have in the present case. Defendants are therefore not estopped from asserting their mutual mistake and scrivener's error argument.

## IV. CONCLUSION

This ERISA class action raises novel legal issues with billion dollar consequences. The Court has analyzed Plaintiff's claims under both a deferential and *de novo* standard of review. With respect to the Discount Rate Issue, the Court holds that under both standards of review, Defendants properly used an interest rate of 120% of the PBGC rate, rather than 100% of the PBGC rate, in calculating Plaintiff's opening balance. The Court concludes that this issue was properly within Defendants' discretion and Defendants' interpretation was reasonable. *Young*, 575 F. Supp. 2d at 905-12.

With respect to the Transition Factor Issue, the Court concludes that Defendants abused their discretion by disregarding "unambiguous" Plan terms requiring the Transition Factor to be multiplied twice in calculating Plaintiff's opening balance. *Id.* at 918. After the trial *de novo*, the Court determines there was a scrivener's error in Plan § 16.5.1(a)(2) and

Defendants are entitled to reformation to eliminate the second reference to the transition factor in Plan § 16.5.1(a)(2).

Accordingly, **Judgment is hereby entered in favor of Defendants and against Plaintiff on Counts I and II ("Discount Rate Issue") of Plaintiff's Second Amended Complaint.**

**Judgment is hereby entered in favor of Plaintiff and against Defendants on Counts III and IV ("Transition Factor Issue") of Plaintiff's Second Amended Complaint to the extent that Defendants abused their discretion when, upon finding a mistake in the Plan, they decided to disregard the "mistaken" language and deny Plaintiff's claim.**

**Judgment is hereby entered in favor of Defendants and against Plaintiff on Defendants' Counterclaim for Reformation on theories of Scrivener's Error (Count I) and Mistake (Count II), and §§ 16.5.1(a)(2) of the 1996 and 1997 Cash Balance Plan are hereby reformed to eliminate the second reference to a Transition Factor ("multiplied by the applicable transition factor described in Table 1 of this Section").**

**Plaintiff Class members are not entitled to any additional Plan benefit distributions by reason of this litigation.**

**SO ORDERED THIS 2nd DAY OF NOVEMBER, 2009**

*Morton Denlow*

_____

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies Sent to:**

**Matthew Thomas Heffner**
**Matthew Todd Hurst**
**Arthur T. Susman**
Susman Heffner & Hurst LLP
Two First National Plaza
Suite 600
Chicago, IL 60603

Counsel for Plaintiff

**Allen Channon Engerman**
Law Offices of Allen C. Engerman, P.A.
4800 North Federal Highway
Suite 300-D
Boca Raton, FL 33431

Counsel for Plaintiff

**Jeffrey C. Engerman**
Law Offices of Jeffrey C. Engerman, PC
12400 Wilshire Boulevard
Seventh Floor
Los Angeles, CA 90025

Counsel for Plaintiff

**James G. Richmond**
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 2500
Chicago, IL 60601

Counsel for Defendants

**Jeffrey Huvelle**
**Frederick G. Sandstrom**
Covington & Burling
1201 Pennsylvania Ave., NW
Washington, DC 20004

Counsel for Defendants

**Abigail A. Clapp**