**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CYNTHIA N. YOUNG, on behalf of herself, and others similarly situated,** ) ) ) | |
| **Plaintiff,** ) | **Case No. 05 C 7314** |
| ) | |
| **v.** ) | **Magistrate Judge Morton Denlow** |
| ) | |
| **VERIZON'S BELL ATLANTIC CASH BALANCE PLAN, formerly known as Bell Atlantic Cash Balance Plan, formerly known as Bell Atlantic Management Pension Plan, and VERIZON COMMUNICATIONS, INC., as successor in interest to Bell Atlantic Corporation,** ) ) ) ) ) ) ) ) ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cynthia N. Young ("Plaintiff"), class representative in this ERISA class

action suit, brings a motion for attorney's fees and costs under 29 U.S.C. § 1132(g)(1).

The Seventh Circuit previously affirmed the judgments this Court entered after a two-

phase trial process. This Court entered judgments in favor of Plaintiff on Counts III and

IV of her Second Amended Complaint and in favor of Defendants on Counts I and II of

Plaintiff's Second Amended Complaint, as well as in favor of Defendants on their

counterclaim for reformation.

This Court ruled in an earlier opinion that Plaintiff may recover fees and costs for

only part of the litigation. All that remains is to determine the reasonable fees and costs

associated with that portion of the case.

## I. BACKGROUND FACTS

The complicated facts of this case have been fully developed in prior opinions by this Court and the Seventh Circuit Court of Appeals. *See Young v. Verizon's Bell Atlantic Cash Balance Plan* (*Young IV*), 748 F. Supp. 2d 903 (N.D. Ill. 2010) (regarding whether to award any attorney's fees); *Young v. Verizon's Bell Atl. Cash Balance Plan* (*Young III*), 615 F.3d 808 (7th Cir. 2010), *petition for cert. filed*, 79 U.S.L.W. 3370 (Dec. 7, 2010) (No. 10-765); *Young v. Verizon's Bell Atl. Cash Balance Plan* (*Young II*), 667 F. Supp. 2d 850 (N.D. Ill. 2009) (regarding the Phase II trial); *Young v. Verizon's Bell Atl. Cash Balance Plan* (*Young I*), 575 F. Supp. 2d 892 (N.D. Ill. 2008) (regarding the Phase I trial). The following summarizes the facts most relevant to the current motion.

Plaintiff initiated this suit in 2005 under ERISA § 502(a)(1)(b), 29 U.S.C. § 1132(a)(1)(b), and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), seeking to recover retirement benefits under an ERISA-governed pension plan. Plaintiff alleged that Defendants Verizon's Bell Atlantic Cash Balance Plan (the "Plan") and Verizon Communications, Inc. ("Verizon") (collectively "Defendants") improperly calculated her pension benefits and those of similarly situated employees. The Court certified a class pursuant to Federal Rule of Civil Procedure 23.

The class members were all participants in a series of defined-benefit pension plans provided by the Bell Atlantic Corporation (now Verizon) to its management employees. At issue in this case were certain provisions in a cash-balance pension plan first instituted in

1996.  Before 1996, Bell Atlantic operated a traditional pension plan, known as the Bell Atlantic Management Pension Plan ("Pension Plan"), under which employees received a defined benefit beginning at age 65.  On December 31, 1995, the Pension Plan was amended and renamed the Bell Atlantic Cash Balance Plan ("Cash Balance Plan"), under which employees received benefits according to the balance they had accrued under the plan.

To transition then-current employees from the Pension Plan to the Cash Balance Plan, the Plan provided a formula in § 16.5.1 to calculate each participant's opening balance in the new plan.  The formula consisted of two steps:  (1) calculating the lump-sum cashout value of a participant's annuity under the Pension Plan; and (2) multiplying the lump-sum cashout value by a transition factor.  To determine the lump-sum, the plan used a mortality table to determine the participant's life expectancy and then applied an interest rate to convert the expected annuity payments into a lump-sum benefit.  Then, the transition factor was determined by an actuarial formula based on the participant's age and service.

For employees covered by § 16.5.1(a)(2), the Plan called for the lump-sum cashout value to be multiplied twice by the transition factor.  By contrast, employees covered by § 16.5.1(a)(1) of the Plan received only one application of the transition factor.  Verizon contended the language in § 16.5.1(a)(2) contained a scrivener's error and that each section should have applied only one multiplication by the transition factor.  All communications Defendants sent to participating employees explaining the transition to the Cash Balance Plan, including the Summary of Material Modifications required by ERISA, only referenced one transition factor for all employees.  Defendants calculated benefits for all employees

multiplying only once by the transition factor. The Plan was amended again in September 1997, the year Plaintiff retired, and continued to contain the second reference to the transition factor in § 16.5.1(a)(2). In 1998, the Plan was amended again, this time without reference to the second transition factor.

Plaintiff's claims against Defendants involved both the calculation of the lump-sum value for all covered employees as well as the use of the transition factor for employees covered by § 16.5.1(a)(2) of the plan. Plaintiff alleged Defendants used the incorrect Pension Benefit Guaranty Corporation ("PBGC") interest rate when calculating the opening balance of her account. Defendants used a rate of 120% of the applicable interest rate specified by the PBGC, and Plaintiffs alleged they should have used 100% of the applicable interest rate. Plaintiff also alleged Verizon abused its discretion in multiplying the transition factor only once for employees covered by § 16.5.1(a)(2).

The class members were divided into two subclasses. Subclass 1 included those employees whose opening balances under the Cash Balance Plan were calculated using 120% of the PBGC rate pursuant to § 16.5.1(a)(1) and (a)(2). The class claim associated with Subclass 1 (the "Discount Rate Issue") was defined as follows:

> Whether, in determining the benefits afforded by the Bell Atlantic Cash Balance Plan to the plaintiff and the Class, it was proper to use 120% rather than 100% of the applicable PBGC interest rate when calculating the "opening balances," and, if improper, the remedy therefor.

Agreed Order for Class Certification, 2, Jan. 16, 2007, Dkt. 61.

Subclass 2 included those employees covered by § 16.5.1(a)(2) whose opening

balances were calculated by multiplying their applicable transition factor only once. The class claim associated with Subclass 2 (the "Transition Factor Issue") was defined as follows:

> Whether, in determining the benefits afforded by the Bell Atlantic Cash Balance Plan to plaintiff and the Class, it was proper to apply the cash balance transition factor found in Table 1 of Section 16 of the Cash Balance Plan once rather than twice when calculating the "opening balances," and if improper, the remedy therefor.

*Id.*

The Court decided these issues in two phases. In Phase I, the Court conducted a trial on the papers, applying a deferential standard of review to the Plan administrators' decisions to deny Plaintiff's claims based upon the administrative record. *Young I*, 575 F. Supp. 2d 892. On the Discount Rate Issue (Counts I and II), the Court upheld Defendants' decision to calculate Plaintiff's opening account balance at 120% of the PBGC rate, instead of 100%, as a reasonable interpretation within Defendants' discretion. *Id.* at 910. On the Transition Factor Issue (Counts III and IV), the Court found Defendants abused their discretion by unilaterally disregarding unambiguous Plan terms requiring the transition factor to be multiplied twice in calculating Plaintiff's opening balance, even though Defendants claimed the language was ambiguous due to a "scrivener's error." *Id.* at 918. The Court held that "upon determining the language was a mistake, the Committee should have sought to reform the plan document in court" subject to *de novo* judicial review. *Id.*

In Phase II, Defendants counterclaimed for reformation of the Plan to eliminate the second reference to the transition factor multiplication. The Court then conducted a bench trial to evaluate Plaintiff's claims under a *de novo* standard of review and to decide

Defendants' counterclaim for reformation. *Young II*, 667 F. Supp. 2d 850.

Following completion of the Phase II trial, the Court entered its final judgment. On the Discount Rate Issue (Counts I and II), the Court entered judgment in favor of Defendants, finding the correct interpretation of the Plan required a participant's opening account balance at 120% of the PBGC rate. *Id.* at 906. On the Transition Factor Issue (Counts III and IV), the Court entered judgment in favor of Plaintiff to the extent Defendants abused their discretion by unilaterally disregarding the plain language of the plan. *Id.* at 906–07. The Court then entered judgment in favor of Defendants on their counterclaim for reformation and reformed § 16.5.1(a)(2) of the 1996 and 1997 Cash Balance Plan to eliminate the second transition factor reference. *Id.* at 907. The Court found that Defendants committed "profound negligence" for failing to discover the mistake in 1997, but that negligence is not a bar to reformation. *Id.* at 905–06. Therefore, the Court held the Plaintiff class members were not entitled to additional Plan benefit distributions. *Id.* at 907.

Following this Court's judgment, both parties appealed to the Seventh Circuit. Plaintiff filed an appeal from this Court's rulings on the Discount Rate Issue in Phase I and on the judgment for Defendants in Phase II. Defendants cross-appealed on the judgment for Plaintiff on the Transition Factor Issue in Phase I. The Seventh Circuit affirmed this Court's ruling on all counts. *Young III*, 615 F.3d at 824.

Plaintiff then moved this Court to award attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). Deciding this issue required application of new Supreme Court precedent. *Hardt v. Reliance Standard Life Insurance Co.* held that ERISA fee awards may be

appropriate where a party has achieved "some degree of success on the merits," overruling circuit precedent that imposed a "prevailing party" requirement. --- U.S. ---, 130 S. Ct. 2149, 2152 (2010).  Applying *Hardt*, this Court reasoned that Plaintiff had achieved some success on the Transition Factor Issue in Phase I, but no success on the Discount Rate Issue or in any part of Phase II.  *Young IV*, 748 F. Supp. 2d at 910–12, 916.  After resolving this threshold question, the Court exercised its discretion to award fees within the framework of existing Seventh Circuit precedent.  The Court applied both a five-factor test and a "substantial justification" test, holding that under either approach an award was justified for fees relating to the Phase I Transition Factor Issue.  *Id.* at 913–14.

After this ruling, the Court invited the parties to resolve the amount of fees to be awarded to Plaintiff's counsel by engaging in baseball arbitration, but the parties opted to litigate the issue instead.  Plaintiff now moves the Court to determine the amount of fees and costs owed by Defendants.  The Court held oral argument on March 30, 2011.

## II. LEGAL STANDARDS

ERISA authorizes courts in their discretion to award a "reasonable attorney's fee and costs" to either party. 29 U.S.C. § 1132(g)(1). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Anderson v. AB Painting and Sandblasting, Inc.*, 578 F.3d 542, 544 (7th Cir. 2009) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). A court may adjust this "lodestar" figure based on twelve factors identified in *Hensley*. 461 U.S. at 434 n.9. That said, "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Id.* The *Hensley* factors include "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Id.* at 430 n.3.

# III. DISCUSSION

Before calculating reasonable fees and costs, a word on why the Court is awarding fees even though Plaintiff achieved no monetary recovery. The Court addressed this point previously when deciding whether to award fees, but it bears repeating here:

> While Plaintiff class members lost on the Discount Rate Issue and did not ultimately recover a monetary judgment, Plaintiff successfully established an ERISA violation and forced Defendants to counterclaim to reform the Plan. Indeed, viewing matters as they stood after Phase I, Plaintiff was the prevailing party on the Transition Factor Issue; but for this Court's allowance of Defendants' counterclaim, Plaintiff class members would have been entitled to a substantial judgment as a result of the Phase I litigation. Plaintiff's suit benefitted other Plan beneficiaries by forcing Defendants to officially and transparently correct their mistake, thus clarifying benefits and hopefully encouraging the Plan to act more carefully in the future.

*Young IV*, 748 F. Supp. 2d at 912. Aside from Plaintiff's success in Phase I, Defendants bore some blame in this lawsuit. Their "meritless construction of a careless drafting error gave rise to the dispute, and for that they are culpable." *Id.* at 913. If ERISA violations like the one here are to be prevented in the future, plan members must be able to retain competent counsel to undertake difficult cases. If fee shifting is to further this goal, courts must award fair attorney's fees where an award is justified.

A closely related question is whether the lack of recovery should affect the fee award in this case. The lack of recovery is relevant, but it has already been taken into account by the Court's decision to award fees for only part of the litigation. Had Plaintiff prevailed in Phase II and achieved monetary relief, her attorneys could have recovered a far greater fee. As things stand, the requested fees represent only a fraction of the work Plaintiff's counsel

have performed in prosecuting this complex case over the past five-plus years. They estimate that they put in over six million dollars worth of time in the case as a whole. Pl. Mem. 2.[1] Because Plaintiff carried the day as to the Phase I Transition Factor Issue, the Court will award all fees and costs reasonably incurred in that part of the litigation.

In connection with the Phase I Transition Factor Issue, Plaintiff requests $2,577,219[2] in fees and $39,433 in costs. Heffner Decl. ¶¶ 35–36. Defendants oppose the fee request, primarily on the ground that Plaintiff's counsel recorded an unreasonable amount of time in the case. They submit that a reasonable fee award would total $500,000 or less.

## A. The Requested Rates Are Reasonable.

Plaintiff's counsel request the following hourly billing rates:

- Arthur T. Susman:      $750.00
- Allen Engerman:        $750.00
- Matthew T. Heffner:    $500.00
- Matthew T. Hurst:      $500.00
- Jeffrey Engerman:      $450.00
- Glenn Hara:            $390.00
- Gina Lamancusa:        $350.00
- Sandra Pavlat:         $200.00
- Jorge Galvan:          $95.00

Ex. 3 to Heffner Decl. In support of these rates, Plaintiff cites cases in which similar rates have been approved; a compensation survey; and declarations from several other ERISA practitioners. Plaintiff also notes that her primary billers request lower rates than what

---

[1] "Pl. Mem." refers to the Memorandum in Support of Motion for Award pf Attorney's Fees and Costs, Dkt. 276.

[2] All figures are rounded to the nearest dollar or hour.

Defendants paid their counsel. Defendants do not hotly contest the requested billing rates, and instead focus on the number of hours billed. Defendants maintain that the billing rates are "not the critical issue here" but that the rates requested "are appropriate only where counsel is highly efficient." Def. Opp'n 18.[3] The requested rates are reasonable given the nature of this case and the experience of counsel, so the Court will accept Plaintiff's stated hourly rates and focus attention on the hours requested. Based on the Court's observations, counsel for both sides have conducted themselves professionally and advocated skillfully for their respective sides throughout the case.

Plaintiff also requests that the Court apply her lawyers' current hourly rates to the entire period back to 2006, as an adjustment for delay in payment. The Supreme Court has held that "[a]n adjustment for delay in payment is . . . an appropriate factor in the determination of what constitutes a reasonable attorney's fee." *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989). Trial courts may effect this adjustment by calculating the lodestar amount with "either current rates or past rates with interest." *Mathur v. Bd. of Trustees of S. Ill. Univ.*, 317 F.3d 738, 744–45 (7th Cir. 2003). This Court will apply current hourly rates to account for the delay in payment.

---

[3] "Def. Opp'n" refers to Defendants' Opposition to Plaintiff's Motion for an Award of Attorney's Fees and Costs, Dkt. 283.

**B.**     **The Requested Hours Will Be Reduced by Thirty Percent.**

The hours request represents the real point of contention here. Plaintiff's counsel request payment for 5,297 hours of work relating to Phase I, plus an estimated lodestar of $50,000 since January 1, 2011, for a total of $2,577,219 in fees if the requested hourly rates are applied. Ex. 3 to Heffner Decl. Defendants argue that these hours are excessive, noting that the requested hours far exceed what Defendants spent on the case. As one might expect with time records stretching back five years, the parties dispute numerous aspects of the hours request.

The Supreme Court has cautioned that "[a] request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437. To further this goal, the Seventh Circuit has endorsed "lump sum" reductions to "trim the fat" from inflated hours requests. *Tomazzoli v. Sheedy*, 804 F.2d 93, 97–98 (7th Cir. 1986). Especially in large cases like the one here, it is not realistic to expect the trial court to conduct a line-by-line analysis of the fee application. *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 355 F. Supp. 2d 931, 935 (N.D. Ill. 2005) (citing *Tomazzoli*, 804 F.2d at 98). Of course, a court must do more than simply "eyeball" the fee request and reduce it by an arbitrary percentage. *Spellan v. Board of Educ.*, 59 F.3d 642, 647 (7th Cir. 1995). Rather, a judge acts within his discretion to reduce the requested hours so long as he states a "concise but clear explanation of his reasons." *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 551 (7th Cir. 1999) (quoting *Tomazzoli*, 804 F.2d at 97).

The parties here agreed to a high-level approach, given the voluminous time records

at issue and the Court's experience with this case.  Adjudicating the 5,297-hour request line-by-line would indeed result in "a second major litigation." *Hensley*, 461 U.S. at 437.  Luckily, this Court is in a good position to make an overall judgment about the number of hours reasonably necessary.  The Court has lived with the case since April 27, 2006, from discovery to the merits to this fee litigation.  The Court has presided over two trials, issued five other written opinions,[4] and managed the docket as it grew to 287 entries.  Beyond the specifics of this case, the Court also draws on considerable litigation experience, including fifteen years on the bench and twenty-fours years practicing law.  A significant portion of that prior practice was spent prosecuting class actions.  In short, the Court has a good feel for the work required by this case.

Although the parties have spent much of their energy comparing Plaintiff's request with Defendants' legal bills, the Court does not consider the comparison dispositive.  Hours billed by opposing counsel "may be helpful in determining whether time expended on a case was reasonable, but the opponent's time is not an 'immutable yardstick of reasonableness.'" *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 538, 543 (10th Cir. 2000).  Often times, a plaintiff must invest greater effort to investigate a claim and carry the burden of proof than a defendant who merely responds to the plaintiff's arguments.  That was the case here, where

---

[4] *Young IV*, 748 F. Supp. 2d 903 (regarding whether to award any attorney's fees); *Young II*, 667 F. Supp. 2d 850 (regarding the Phase II trial); *Young I*, 575 F. Supp. 2d 892 (regarding the Phase I trial); *Young v. Verizon's Bell Atl. Cash Balance Plan*, 05 C 7314, 2007 WL 4277438 (N.D. Ill. Dec. 3, 2007) (regarding Plaintiff's motion to compel discovery); *Young v. Verizon's Bell Atl. Cash Balance Plan*, 498 F. Supp. 2d 1101 (N.D. Ill. 2007) (regarding Defendants' motion to quash discovery and for a protective order).

Plaintiff's counsel had to investigate their claims and develop their theories by searching through tens of thousands of pages of Defendants' documents, many of which were records containing complex actuarial information. Defendants may have had to work with the same documents, but they had the benefit of institutional knowledge about the records, including help from people who authored some of the documents. Because of differences like these, Plaintiff's counsel were justified in spending more time on the case than defense counsel.

Nevertheless, the requested hours appear excessive in several areas, particularly with respect to time spent researching and briefing. First, Plaintiff seeks fees for 1,199 hours of work during the five-month period the parties spent briefing and presenting oral arguments on Phase I. Def. Opp'n 7 (citing Plaintiff's time records). This figure presumably represents only that portion of work attributable to the Transition Factor Issue. By contrast, defense counsel billed only 456 hours for the same period, on both claims. *Id.* The time billed by defense counsel holds some relevance regarding these tasks, because both sides briefed the same issues. Plaintiff's counsel contend that they presented more complicated arguments than Defendants and that they synthesized much more case law, but even if true, this does not justify all of their time. The Court believes that 1,199 hours spent researching and drafting the Transition Factor Issue was more than reasonably necessary to assemble the Phase I briefings.

Plaintiff's request for the appeal is also quite excessive. Plaintiff requests payment for 467 hours of work, for a total of $205,023 in fees if the requested hourly rates are applied. Ex. 3 to Heffner Decl. This figure represents time spent defending against the cross-appeal

on the Transition Factor Issue and excludes 1,583 hours of work attributed to the Discount Rate Issue and the Phase II reformation claim. In other words, Plaintiff requests that Defendants pay for about $205,000 of approximately $916,000 worth of work on the appeal. Def. Opp'n 14 (citing Plaintiff's time records). This far exceeds what a client would pay for an appeal of this case, especially given the extensive briefing that had already occurred before this Court. In fact, Defendants' counsel billed only 440 hours of work on the entire appeal, for a total of about $215,000 in fees. Huvelle Decl. ¶ 5, Ex. A to Def. Opp'n. Although not a perfect proxy, the Court believes that defense counsel's numbers come much closer to reasonable hours for the appeal. Plaintiff cites several cases in which courts have awarded fees in the neighborhood of $200,000 for work on an appeal, but those awards represented total fees for an appeal, whereas Plaintiff requests over $200,000 for only a fraction of an appeal.[5]

Plaintiff's requested hours for the fee litigation also seem inflated. Plaintiff requests payment for 548 hours of work, totaling $236,537 in fees if the requested hourly rates are applied. Ex. 3 to Heffner Decl.; Pl. Mem. 21–22. Plaintiff reaches this number by cutting in half the time spent on the initial fee motion that dealt with the *Hardt* issue, to account for its limited success; including all time spent since October 2010; and adding $50,000 in estimated

---

[5] *See Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1287–88 (9th Cir. 2004) (awarding $235,000 total in attorney's fees for appeal by three parties); *Tenax Corp. v. Tensar Corp.*, No. 89-424, 1992 WL 516089, at *4–5, 8 (D. Md. Oct. 22, 1992) (awarding nearly $220,000 in attorney and paralegal time); *Gonzalez v. Bratton*, 247 F. Supp. 2d 432, 436–37 (S.D.N.Y. 2003) (awarding $155,000 for defending appeal of Title VII claim); *Flying J. Inc. v. Comdata Network, Inc.*, No. 96-066, 2007 WL 3550342, at *26 (D. Utah Nov. 15, 2007) (awarding $304,000 for appeal of contract dispute).

fees since January 1, 2011. This request exceeds the approximately $185,000 that Defendants have paid for the entire fee litigation (Plaintiff reports about $370,000 of total work on the fee litigation). Presumably both sides performed an independent analysis of the time records and the law, yet the total alleged dollar value of Plaintiff's work is about double what Defendants paid. Even given Plaintiff's lower billing rates, these figures show that Plaintiff spent far more time than Defendants, and more time than necessary, on a similar task.

The foregoing are examples of excessive hours, but more generally, Plaintiff's robust staffing has undoubtedly caused some inefficiency throughout the case. For example, eight of the top ten billers in Phase I worked for Plaintiff, including seven attorneys and one paralegal. Likewise, Plaintiff used five attorneys to research the fee issue, which undoubtedly meant some duplication of effort. The Court recognizes that high-value cases require more thorough lawyering, see *Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 273 (7th Cir. 1993), but it seems doubtful that Plaintiff's counsel could have billed a paying client for the full value of this work.

In the Court's judgment, a thirty-percent reduction to the requested hours would adequately "trim the fat" attributable to the inefficiencies discussed above. Defendants have urged the Court to cut Plaintiff's request by eighty percent, but the Court sees no justification for such a discount. Some portions of the request are likely inflated by more than thirty percent, and others less, but a thirty-percent reduction accounts for the total inflation that the Court perceives in Plaintiff's hours. Because the Court has awarded the requested hourly rates, the lodestar figure comes to seventy percent of Plaintiff's gross request (.70 x

-16-

$2,577,219): $1,804,053.

**C.     Plaintiff's Case Does Not Merit an Enhancement to the Lodestar Figure.**

Plaintiff requests an enhancement to the lodestar figure, as an alternative basis for awarding the full amount of fees requested even though the Court has reduced the requested hours. Plaintiff proposes two bases for an enhancement: the five-factor test applied by the Court to justify a fee award and the undesirability of this case.

First, Plaintiff argues that the five-factor test used to award fees supports an enhancement to the lodestar. Pl.'s Br. 22–23. In determining that some fee award was appropriate, this Court held that a five-factor test[6] weighed in favor of a discretionary fee award. *Young IV*, 748 F. Supp. 2d at 913–14. These factors have typically been employed to guide courts' discretion in deciding whether or not to award fees in the first place. *See, e.g.*, *Hardt*, 130 S. Ct. at 2154, 2158. Plaintiff argues that since the factors are relevant concerning whether to award fees, they must also bear on how much to award. But Plaintiff cites no authority suggesting that the five-factor test may be used to enhance a lodestar calculation, and this Court is aware of none. One of the factors, the amount of benefit conferred, does overlap with the *Hensley* factors, but that consideration has been subsumed in the Court's decision to award fees only for the Phase I Transition Factor Issue. And even

---

[6] The factors are "(1) the degree of the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy personally an award of attorney's fees; (3) whether or not an award of attorney's fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions." *Sullivan v. Randolph, Inc.*, 504 F.3d 665, 671 (7th Cir. 2007) (citation omitted).

assuming that other parts of the five-factor test could be used to enhance a lodestar figure, those considerations were subsumed in the Court's decision to award any fees at all. *See Young IV*, 748 F. Supp. 2d at 913–14. None of the five factors merits an enhancement to Plaintiff's lodestar.

Second, Plaintiff claims that the undesirability of this case justifies an enhancement to the lodestar. "Undesirability" is one of the twelve *Hensley* factors, with which courts may adjust a lodestar figure if a given factor was not subsumed within the initial lodestar calculation. *See* 461 U.S. at 430 n.3. To illustrate the undesirability of this case, Plaintiff highlights a similar class action against the Bell Atlantic Corporation, in which class counsel declined to pursue a transition factor claim even though the six class representatives alone stood to gain about $2,000,000 had they won the claim. *See Young II*, 667 F. Supp. 2d at 876–78 (discussing *Corcoran v. Bell Atlantic Corp.*, No. 97 C 510 (E.D. Pa.)). Plaintiff emphasizes that lawyers must be incentivized to take on difficult cases like this one, to ensure that ERISA participants can retain counsel on meritorious claims.

Defendants retort that lawyers already have all the incentive they need to take on large-dollar class actions like the one here, and the Court agrees. Had the Court awarded the billion-dollar relief that Plaintiff sought, Plaintiff's counsel likely would have earned an enormous fee. Perhaps the case presented a low chance for success, but the possibility of a contingent fee based on a billion-dollar recovery provided a considerable incentive to take the case. The Court declines Plaintiff's invitation to enhance the lodestar calculation.

**D.    Plaintiff Shall Receive All Requested Costs.**

Finally, Plaintiff requests reimbursement for $39,433 in costs relating to Phase I, as detailed in attachments provided by Plaintiff's counsel. Heffner Decl. ¶ 36; Ex. 5 to Heffner Decl. Defendants have stated no objections to these costs, either in their brief or at oral argument. Because Defendants do not raise any objections to the requested costs, and because the costs appear reasonable in relation to this litigation, the Court awards the full request to Plaintiff's counsel.

## V. CONCLUSION

For the reasons set forth in this opinion, Plaintiff's motion for attorney's fees and costs is granted in part and denied in part. The Court awards $1,804,053 in attorney's fees and $39,433 in costs, for a total of $1,843,486 to be paid to Plaintiff's counsel.

SO ORDERED THIS 27th DAY OF APRIL, 2011.

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

| | |
|---|---|
| Matthew Thomas Heffner | James G. Richmond |
| Matthew Todd Hurst | Greenberg Traurig, LLP |
| Arthur T. Susman | 77 West Wacker Drive |
| Susman Heffner & Hurst LLP | Suite 2500 |
| Two First National Plaza | Chicago, IL 60601 |
| Suite 600 | |
| Chicago, IL 60603 | Jeffrey Huvelle |
| | Frederick G. Sandstrom |
| Allen Channon Engerman | Covington & Burling |
| Law Offices of Allen C. Engerman, P.A. | 1201 Pennsylvania Ave., NW |
| 4800 North Federal Highway | Washington, DC 20004 |
| Suite 300-D | |
| Boca Raton, FL 33431 | |
| | Counsel for Defendants |
| Jeffrey C. Engerman | |
| Law Offices of Jeffrey C. Engerman, PC | |
| 11901 Santa Monica Boulevard | |
| Suite 700 | |
| Los Angeles, CA 90025 | |

Counsel for Plaintiff

Abigail A. Clapp